1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3    _____

4    ALAN BAKER, ET AL.,

5            PLAINTIFFS,

6        V.                          CASE NO. 2:19-CV-08024

7    ALLSTATE INSURANCE CO., ET AL.,

8            DEFENDANTS.

9    _____

10

11            DEPOSITION OF ROBERT ROMERO

12                   VOLUME I

13

14   DATE:         WEDNESDAY NOVEMBER 13, 2019

15   TIME:         10:07 A.M.

16   LOCATION:     VERITEXT LEGAL SOLUTIONS

17                 707 WILSHIRE BOULEVARD, SUITE 3500

18                 LOS ANGELES, CA 90017

19

20

21

22   JOB NO.:      3618624

23   REPORTED BY:  LUCAS MAYEDA, NOTARY PUBLIC

24   PAGES:        1 - 186

25

                                            Page 1

Robert Romero- 11/13/19

```
 1               A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3         CHRISTOPHER G. HOOK, ESQUIRE
 4         LAW OFFICE OF CHRISTOPHER G. HOOK
 5         4264 OVERLAND AVENUE
 6         CULVER CITY, CA 90230
 7         CHRIS@CGHLAW.COM
 8         (310) 839-5179
 9
10    ON BEHALF OF DEFENDANT:
11         MARC J. FELDMAN, ESQUIRE
12         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
13         501 WEST BROADWAY, 19TH FLOOR
14         SAN DIEGO, CA 92101
15         MFELDMAN@SHEPPARDMULLIN.COM
16         (619) 338-6526
17
18    ALSO PRESENT:
19         ALAN BAKER, PLAINTIFF
20
21
22
23
24
25
                                          Page  2
```

Robert Romero- 11/13/19

```
 1                        I N D E X

 2    EXAMINATION:                                    PAGE

 3         BY MR. HOOK                                5

 4

 5

 6

 7                    E X H I B I T S

 8    NO.             DESCRIPTION                     PAGE

 9    EXHIBIT 1       AMENDED NOTICE OF DEPOSITION    20

10    EXHIBIT 2       SERIES OF DOCUMENTS             47

11    EXHIBIT 3       MACKEY CONSTRUCTION INVOICE     66

12    EXHIBIT 4       GLOBAL CONSULTING SYSTEMS

13                    ESTIMATE                        83

14    EXHIBIT 5       BALDWIN ESTIMATE                86

15

16                    (*EXHIBITS ATTACHED.)

17

18

19

20

21

22

23

24

25
```

                                                  Page  3

Robert Romero- 11/13/19

```
 1              P R O C E E D I N G S

 2              COURT REPORTER:  Good morning. My name is

 3    Lucas Mayeda.  I am the reporter assigned by Veritext to

 4    take the record of this proceeding. I am a notary

 5    authorized to take acknowledgements and administer oaths

 6    in the state of California. We are now on the record.

 7              This is the deposition of Robert Romero,

 8    taken in the matter of Baker vs. Allstate.  This

 9    proceeding is being digitally recorded at 10:07 a.m. on

10    November 13, 2019, at 707 Wilshire Boulevard, Suite

11    35000, Los Angeles, CA 90017.

12              The parties agree that the record of this

13    proceeding is being captured via high-quality digital

14    audio and that a certified transcript of this proceeding

15    is intended for the possible use at trial and the

16    purpose of discovery and for all other uses permitted

17    under California procedural rules.

18              Please note that the microphones are

19    sensitive to touch, whispering, and cell phone noises.

20    We will remain on the record unless all parties agree to

21    go off the record.

22              At this time will everyone in attendance

23    please identify yourself for the record, beginning with

24    my right.

25              MS. HOOK:  Christopher Hook, attorney for
```

Page 4

Robert Romero- 11/13/19

1    the plaintiffs Alan Baker and Linda B. Oliver.

2                      State your name.

3                      MR. BAKER:  Alan Baker, Plaintiff.

4                      MR. FELDMAN:  Marc Feldman for the

5    defendants.

6                      THE WITNESS:  Robert Romero, Allstate

7    Insurance Company.

8                      COURT REPORTER:  Sir, please raise your

9    right hand.

10   WHEREUPON,

11                      ROBERT ROMERO,

12   called as a witness, and having been first duly sworn to

13   tell the truth, the whole truth and nothing but the

14   truth, was examined and testified as follows:

15                      EXAMINATION

16   BY MR. HOOK:

17       Q    Good morning, Mr. Romero.  We introduced

18   ourselves off the recor, but for the sake of the record

19   I'll introduce myself again.  My name's Christopher

20   Hook.  I represent the plaintiffs Alan Baker and Linda

21   Oliver in a lawsuit that was filed against Allstate

22   Insurance Company and one of their adjusters Edward

23   Carracsco.  You're aware of that lawsuit, sir?

24       A    Yes.

25       Q    Okay.  And you understand that you're here to

Robert Romero- 11/13/19

```
 1    give testimony with respect to that case today; do you

 2    understand that?

 3         A    Yes.

 4         Q    Perfect.  I'm going to go through a few

 5    admonitions with you just so we're clear about the

 6    ground rules for the deposition proceeding.  The court

 7    reporter is making a digital recording of this

 8    proceeding that's going to be transcribed into a

 9    booklet.  It's important that only one of us speak at a

10    time so that the video recording is clear and that the

11    transcript can be clear.  So for that reason I'm going

12    to ask that you allow me to get my full question out,

13    even if you can anticipate what I'm going to ask.  Is

14    that something that you can try to do?

15         A    I will try.

16         Q    Great.  And, likewise, I'm going to allow you

17    to get your full answer out and any statements from your

18    counsel before I respond or pose another question.

19    Okay?

20         A    Okay.

21         Q    The court reporter has administered a note to

22    you, and it's the same oath that you would recite in a

23    court of law to tell the truth, and it carries the same

24    force and effect and obligates you to tell the truth

25    here.  You understand that?
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1        A    Yes.
 2        Q    Is there any reason why you can't give your
 3   best testimony today.
 4        A    Not that I can think of.
 5        Q    Okay.  Have you taken any medication, drugs,
 6   anything like that in the last 24 hours that would
 7   affect your ability to testify accurately or recall
 8   facts?
 9        A    I do take medication, but it would not affect
10   my testimony today.
11        Q    And that's fine.  And I may ask for some
12   things that you may not have a perfect recollection of
13   but you have some basis for providing an estimate.  I'm
14   entitled to your best estimate, even if you don't have a
15   perfect recollection, but I don't want you to guess.  Do
16   you understand?
17        A    Ye.
18        Q    Okay.  We are going to try to get through this
19   as quickly as we can today, but it may take some time
20   because we have quite a bit of documents.  Your
21   attorney's office produced over 4,000 pages of documents
22   on the file; so it's a large file; there's a lot to talk
23   about.  But I want to try to get through it as quickly
24   as we can.  With that said, if you need to take a break
25   to make yourself comfortable, to get some refreshment,
```

Page  7

Robert Romero- 11/13/19

```
 1    let me know and we can certainly do that.  All right?

 2         A    Thank you.

 3         Q    Sure.  However, if there is a question

 4    pending, of course I'd like that question to be

 5    answered.  It's not appropriate to pause and stole the

 6    proceeding while there's a question pending.  You can

 7    appreciate that; correct?

 8         A    I can.

 9         Q    Great.  So why don't we just get into it then

10    with some basic facts.  Can you, please, again state and

11    spell your full name for the record, sir.

12         A    Robert Romero.  R-O-B-E-R-T Romero, R-O-M-E-R-

13    O.

14         Q    What's your current address, sir?

15         A    1305 South Primrose, P-R-I-M-R-O-S-E, Avenue,

16    Alhambra, California 91803.

17         Q    Any plans to relocate in the next year?

18         A    I hope not.

19         Q    And where did you attend high school, sir?

20         A    Cathedral High School.  It's a Christian

21    Brothers High School.

22         Q    In which city?

23         A    Los Angeles.

24         Q    Did you graduate from high school?

25         A    I did.
```

Robert Romero- 11/13/19

```
 1        Q    In what year?

 2        A    1985.

 3        Q    And after high school, did you attend college?

 4        A    I did.

 5        Q    Where?

 6        A    California State University at Los Angeles.

 7        Q    Which campus?

 8        A    Los Angeles.

 9        Q    Okay.  Where specifically is that campus

10   located?  Is that the one --

11        A    It's right by the 10 and the 710.

12        Q    Okay.  How long did you attend CSULA?

13        A    I was there on the five-year plan.

14        Q    What do you mean by that?

15        A    Well, I took -- you know, I was there for five

16   years.

17        Q    It took you five years to finish aye four-year

18   degree?

19        A    I didn't finish my four-year degree.  I had

20   two classes left, and then Hurricane Andrew hit.  So I

21   was working for Allstate at the time, and so they

22   deployed me to Hurricane Andrew.  I was there for one

23   year handling large losses for the catastrophe.  When I

24   connect to finish my last two classes, since I'd missed

25   two quarters in a row, they told me I have to reregister
```

Page 9

Robert Romero- 11/13/19

```
 1    and I just never did.
 2         Q    So do you have a college degree?
 3         A    No.  I mean, my -- I never got my BS.
 4         Q    And what's your title with Allstate?
 5         A    Front line performance leader.
 6         Q    After's CSULA, did you attend any further
 7    secondary education?
 8         A    No.
 9         Q    What was your major while you were attending
10    CSULA
11         A    Business, entrepreneurship, and economics.
12         Q    Okay.  Do you hold any professional license?
13         A    No.
14         Q    You've been with Allstate for a long time.
15         A    I have many
16         Q    Since 1985 you said?
17         A    No.
18         Q    Excuse me.  What year did you start with
19    Allstate?
20         A    I started as a summer intern sometime in I
21    think it was June of '88.  And then I became permanent
22    in August of 89. Approximately June of '88, give or take
23    a few months.
24         Q    And then in 1989 you were hired?
25         A    I was hired as a permanent adjuster.
```

Page 10

Robert Romero- 11/13/19

```
 1        Q    A claims adjuster, right?
 2        A    Actually, I -- it was a summer internship when
 3    I first got hired, and that's why they didn't -- they
 4    don't count that time.  And then in August of '89 they
 5    gave me a full-time position as an adjuster.
 6        Q    And what does the job of an adjuster entail?
 7        A    Depends on what capacity.
 8        Q    Well, in what capacity was your first job as
 9    an adjuster?
10        A    I was a property claims adjuster.  So I would
11    be handling claims, small losses.  You know, something
12    happens to a house -- you know, some damages, vandalism,
13    water losses -- I would go out, estimate the damages,
14    investigate the coverage, and pay our customer and
15    customer service.  I mean, there's lots of things
16    entailed in adjusting claims.
17        Q    And what type of training course did Allstate
18    provide to train you to serve as a claims adjuster?
19        A    The -- initially, they sent me to Chicago.
20    And there was a three-week course in Chicago for
21    property technical school and estimating.  There was a
22    policy -- and then I went back for policy training.
23    It's been a long time.  And then managers would ride
24    along with me when I'd go out in the field and make sure
25    that I'm determining coverage properly, that I'm
```

                                        Page 11

Robert Romero- 11/13/19

```
 1    estimating properly and issuing checks.
 2         Q    So it was a -- you said it was a three-week
 3    training course in Chicago?
 4         A    I believe -- it's been a long time, so I'm
 5    just going to give you my best estimate.  I believe the
 6    policy training was two weeks and then property
 7    technical school was three weeks.  And I think it was in
 8    Northbrook, Illinois, close to Chicago.
 9         Q    So you said two weeks in policy training and
10    three weeks in property?
11         A    Technical.
12         Q    Property technical?
13         A    Correct.
14         Q    And what is that?
15         A    Well, it was a big commercial building, and
16    then they had a house inside this big commercial
17    building in different stages and they would show you --
18    you know, they showed you what the materials were; they
19    showed you how to estimate; they showed you how to
20    measure properly.  Taught you how to estimate property
21    damages to residential homes.
22         Q    Is that a training program that all Allstate
23    adjusters undertake?
24         A    It's changed a bit, you know, throughout the
25    years.  But when I went, that's what I had to do.
```

Page 12

Robert Romero- 11/13/19

```
1        Q     How about now?
2        A     Now I think it's a two-week course.  But they
3   do a lot of online training before they go out there.
4   So before, you would go out there and they'd teach you
5   everything.  Now, you know, you'll take course on, you
6   know, how to drywall, how to paint, you know, stuff like
7   that.
8        Q     Okay.  And how long did you -- so your first
9   title was claims adjuster?
10       A     Yeah, I don't remember the exact title, but it
11  was a claims adjuster.
12       Q     Okay. And how long did you serve in that role?
13       A     I think I got promoted in '92 or '93 to my
14  current position.  It wasn't called front line
15  performance leader.  It was a unit claim manager then.
16  But it's basically the same role.
17       Q     Unit claims manager?
18       A     That's correct.
19       Q     And what is the unit claim manager's job?
20       A     Well, we have to supervise field adjusters.
21  Well, my job as a unit claim manager was to -- it
22  depends on what capacity you have with the company.  I
23  mean, if you're doing auto, that's a different capacity.
24  If you're doing bodily injury, that's a different
25  capacity.  So it's a different capacity, depending on
```

Page 13

```
 1    which defendant you're in.
 2         Q    Okay.  And which department were you in
 3    originally?
 4         A    I've always been in property.
 5         Q    So is the unit the property unit?  When you
 6    say "unit claims manager," there's different managers
 7    for different units; right?
 8         A    Correct.
 9         Q    Okay.  So what's the name of the unit you work
10    for?
11         A    There was no name.  I mean, it was my unit.  I
12    mean, I call it the N Unit because when I first started
13    I had a desk location of NNN.  But, I mean, there's no
14    real significance with the name of the unit.  Just --
15         Q    But you have -- you are assigned to a number
16    of field adjusters whom you supervisor; correct?
17         A    Correct.
18         Q    And you're the only person -- there's a single
19    claims manager that supervises that corral of field
20    adjusters?
21         A    Yes and no.  I mean, I'm the one that's
22    responsible.  But if I'm on vacation or if I'm somewhere
23    where I'm not available, then there's other managers
24    that can step in and assist while I'm gone.
25         Q    Okay.  So what is your current load in terms
```

Page 14

```
 1    of how many adjusters you're supervising?

 2        A    Eight.

 3        Q    And then how about when you originally became

 4    a claims manager?  An estimate, if you don't --

 5        A    Yeah, I don't want to say something that 100

 6    percent wrong but --

 7        Q    No, that's okay.  I don't want to say

 8    something

 9        A    -- probably 12, 14.  I don't remember.

10        Q    Okay.  And so that load has changed over the

11    years, the amount of adjusters that you supervised?

12        A    It has.

13        Q    And has that changed based on your performance

14    or the needs of the company, or what factors influence

15    that?

16        A    I'm not sure of the factors, but it's not

17    based on my performance.  Before, we had several little

18    regional offices, like, one in Torrance, one in

19    Arcadia -- not in -- well, maybe Arcadia, one in West

20    Covina.  So you would handle a small geographic area.

21    Now we have one main office in California.  So it just

22    changes and, you know, they give us more responsibility

23    doing other things that we -- our spending control -- we

24    just want to make sure that our spending control is

25    manageable.  So I really don't know all the details as
```

                                                    Page 15

Robert Romero- 11/13/19

```
 1    to why I have eight now and why I had 14 at one point.
 2    But, you know, I think you try to balance life and work
 3    life.
 4         Q    And Mr. Edward Carracsco is one of the
 5    adjusters you've supervised?
 6         A    That's correct.
 7         Q    When was Mr. Carrasco hired by Allstate?
 8         A    I don't know the exact date but approximately
 9    maybe six, seven years ago.
10         Q    Have you been his supervisor the entire time?
11         A    I have.
12         Q    so with respect to the Bakers' claim, when did
13    you first learn about that water loss?
14         A    I don't remember the exact dat.  Probably -- I
15    mean, I have to review the file.  So, I mean, probably
16    from sometime in the beginning.  I just can't give you
17    the exact date.  I have hundreds of files, and it would
18    be almost impossible to remember what date I was aware
19    of any single claim, you know, a year or six months
20    later.  It's tough.
21         Q    All right.  Let's go back for a second.
22    Brings me to a good point.  Did you review any documents
23    before your deposition here today?
24         A    Yes.
25         Q    What did you review?
```

Page 16

```
 1        A     With my attorney yesterday I reviewed the
 2    claim file, some e-mails, policy manual, the claim
 3    diary.  What I mean -- and the claim file, which
 4    includes estimates and stuff like that.
 5        Q     And who else was present during this meeting?
 6        A     My attorney.
 7        Q     And you're pointing to Mr. Marc Feldman?
 8        A     Yes, sir.
 9        Q     Nobody else was present?
10        A     Yesterday just Marc Feldman were present.
11        Q     Okay.  And had you met with Mr. Feldman
12    previously?
13        A     Yeah, like, two weeks ago.  Approximately two
14    weeks ago.
15        Q     In L.A. or in San Diego?
16        A     Two weeks ago?
17        Q     Yes.
18        A     No San Diego.
19        Q     And who was present at that meeting?
20        A     Mr. Feldman, Ed Carracsco -- Maybe Mr. Feldman
21    was not present.  I'm sorry.  Jack Burns was present.
22    Ed Carracsco and myself.
23        Q     And have you spoken with any of your
24    supervisors at Allstate regarding this case?
25        A     I have.
```

Page 17

Robert Romero- 11/13/19

```
 1          Q    Whom?

 2          A    My boss.

 3          Q    And what's his or her name?

 4          A    Brian Marsh.

 5          Q    What's Mr. Marsh's title?

 6          A    Regional Claims Leader.

 7          Q    And when did you discuss the deposition with

 8    Mr. Marsh?

 9          A    Just a few days ago.  I told him I won't be

10    available because I will be in a deposition.

11          Q    And what did he say?

12          A    Okay.

13          Q    That's all you talked to him about?

14          A    Mm-hmm.  Yes.

15          Q    You haven't talked to anybody else at Allstate

16    about the deposition?

17          A    His -- my boss's secretary to let 'em know to

18    put me on the calendar so that, if a customer needs to

19    get a hold of me, they know I'm not available.

20          Q    Did you review the claim substantively with

21    Mr. Marsh?

22          A    No.

23          Q    Have you ever done that?

24          A    With this claim?

25          Q    Yes.
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1        A     No.

 2        Q     Has Mr. Marsh ever asked you, you know, what

 3   happened with this claim or why this claim went into

 4   litigation?

 5        A     No.

 6        Q     Other than Mr. Marsh's secretary, have you

 7   spoken with any other Allstate employees in preparation

 8   for today's deposition?

 9        A     No.  Well, I misspoke.

10        Q     That's okay.  Go ahead.

11        A     I sent a text message to my unit that I won't

12   be available because I'll be in a deposition.  But they

13   don't know what the case is.  I just -- you know,

14   sometimes they look for me for authorizations, and I

15   wanted them to know that I was not available.

16        Q     I understand.  Okay.  And that brings me to

17   another point that we typically mention in the

18   admonitions, but the transcript will be prepared and

19   you'll have a chance to review it and make changes to

20   your testimony.  But, as your attorneys probably

21   cautioned you, it's important to give your best

22   testimony here today because any changes on the

23   transcript can be commented on by counsel at trial.  Do

24   you understand?

25        A     Yeah.  The reason why I corrected myself,
```

Page 19

Robert Romero- 11/13/19

1     because I wanted to give you my best answer right now.

2          Q     Yeah.   That's fine.   It's totally fine to

3     correct yourself now.   And then, you know, for something

4     like that when it's very minor, if you are inclined to

5     do so, you can correct it on the transcript and it's

6     perfectly acceptable.

7                So I'm going to go ahead and ask you to take a

8     look at this document that we're going to attach as

9     Exhibit 1.

10                         (Exhibit 1 was marked for

11                          identification.)

12               And when you've had a chance to review it, let

13    me know, please.

14          A     You want me to read the entire document?

15          Q     Well, have you seen this document before, sir?

16          A     I believe I have.

17          Q     All right.   This was a notice that was sent to

18    your counsel's office demanding your attendance here

19    today, and I request that you produce various documents.

20    And I would like to go through the document request with

21    you and make sure that all of those have been produced.

22    On page --

23                         MR. FELDMAN:   Just for the record, since

24    it accompanies, is I want to state that our office, my

25    office, provided a written response to this which went

                                                          Page 20

Robert Romero- 11/13/19

```
 1    through category by category.  So that written response
 2    through Allstate's and Mr. Romero's attorneys is a
 3    formal response to this document request with the
 4    deposition notice.  But you're free to ask him about it.
 5    BY MR. HOOK:
 6         Q    Request No. 1 asks for your entire claim file
 7    for Allstate, claim number 0517768081, arising from the
 8    water loss incident that occurred on or around September
 9    20, 2018, at the Las Palmas residents.  You see that,
10    sir?
11         A    Yes.
12         Q    And did you bring that document with you here
13    today, that claims file?
14         A    No.
15         Q    And why not?
16         A    Because it's my understanding that my attorney
17    supplied that to you.
18         Q    Okay.  Did you review the claim file that was
19    supplied to your attorneys?
20                   MR. FELDMAN:  Vague.
21                   THE WITNESS:  In which regard?
22    BY MR. HOOK:
23         Q    Did you review that the documents that were
24    provided to Sheppard Mullin that were purportedly the
25    claim file, comprehensively?
```

Page 21

Robert Romero- 11/13/19

```
 1      A     Well, I didn't review it comprehensively.
 2   When I was preparing for this with my attorney, I was
 3   reviewing it then.
 4      Q     Okay.  So if I were to ask you today to go and
 5   obtain the full claims file for this claim, what would
 6   you do to do that?
 7      A     I probably would ask the secretary to copy the
 8   claim file --
 9      Q     Okay.
10      A     -- or ask someone to copy the claim file.  I
11   don't have the capacity to do that.
12      Q     And then what would your secretary have done?
13   Is there a physical file?
14      A     No.  No -- I'm sorry.  I'll let you finish.
15      Q     It's okay.  Yeah, I'm wondering.  So then what
16   would your secretary do to get the claims file?
17      A     I don't know what the protocol she does, but
18   when I look at the file, it's electronically; it's done
19   on a computer.  Once it's in there, you can't change it,
20   you can modify it; it's in there.  So I guess they'll go
21   through the claim diary and start copying everything.
22      Q     Okay.  Number 2 asks for all written
23   communications that you've sent or received, including
24   but not limited to e-mails, letters, reports, text
25   messages that refer to or relate to the subject claim.
```

Page 22

Robert Romero - 11/13/19

```
1              Did you bring all your written communications
2        regarding the subject claim here today, sir?
3          A    No, because it's my understanding that we,
4        like, through my attorney, we supplied everything to
5        you, everything that we have.
6          Q    Okay.  But what about you particularly?  What
7        did you do to look for all your communications regarding
8        this claim?
9          A    Well, all the -- I don't ever separate
10       communications.  Like, I don't keep -- everything's in
11       the claim diary.  So it's -- so unless they e-mail me
12       directly, and I don't recall ever receiving any personal
13       e-mails from the Bakers or anything on this claim file.
14         Q    Not just from the Bakers, but for any
15       adjuster.
16         A    From any adjuster on this claim file.  I don't
17       recall receiving any.
18         Q    Did you look?
19         A    Well, I haven't -- I mean, how do I say this?
20       I mean, I get hundreds --
21         Q    Well, you just tell me no.  I'm asking you did
22       you search your in-box for this claim number?
23         A    Well, I know I don't have any in my in-box
24       because I clear everything and then I delete them as I
25       work them.  So my in-box is pretty clear.  So if I
```

Page 23

```
 1     would've go through my in-box on my computer, I
 2     wouldn't -- I know I don't have anything pertaining to
 3     the Bakers on this claim other than an e-mail from my
 4     attorney saying --
 5                      MR. FELDMAN:  But don't talk about what
 6     an e-mail from your attorney might say.  That's
 7     privileged.
 8                      THE WITNESS:   -- to see them, but okay.
 9     BY MR. HOOK:
10        Q    So what's Allstate's policy for preserving
11     your e-mails?
12        A    Well, we try to put every e-mail that we
13     can -- claim adjusting is extremely difficult.  You
14     know, most of the adjusters -- field adjusters, they
15     work out of their home.  So, you know, they don't have
16     an office where they're sitting down waiting for
17     customers to e-mail them or call them.  You know, they
18     work through their cell phone and stuff.  So they'll go
19     out in the field and they'll look at a loss.  You know,
20     on the way home they would get an e-mail or they -- they
21     stop while waiting for a customer --
22        Q    Sir -- I'm sorry -- I asked you what
23     Allstate's policies are with respect to maintaining or
24     retaining your e-mails?
25        A    I was trying to answer that.  I'm sorry if I
```

Robert Romero - 11/13/19

```
 1   didn't.  So --
 2        Q    You didn't.
 3        A    Okay.  Well, we try to -- we try to put them
 4   in the claim file whenever possible.
 5        Q    Whenever possible?
 6        A    Yeah.  Like, if it's a pertinent e-mail, we
 7   would like that e-mail to be in the claim file.
 8        Q    So what's your personal -- what's your work e-
 9   mail account?
10        A    I have cdnfn@allstate.com [ph].
11        Q    And when you receive e-mails from that
12   account, what e-mail client do you use to look at them?
13        A    I'm not sure what you mean by "e-mail client."
14        Q    Microsoft Outlook --
15        A    It's -- oh, it's Outlook.
16        Q    Okay.  So the e-mails are saved on a Microsoft
17   Exchange server; is that correct?
18        A    I'm not a techy.  I can't answer that.  I
19   don't know how they're saved.
20        Q    So this is the 700-page claims file that I got
21   from your counsel.  And I didn't see any notes from you
22   in here.  Maybe you can find one.  Like from your e-mail
23   account.
24        A    Oh, I -- you asked for my e-mail account.  But
25   there's also a claim e-mail account.  I think that's
```

Page 25

```
 1    where you may be confused.

 2         Q    Okay.  So the CDFN [sic], is that Robert

 3    Romero's personal?

 4         A    It's not personal.  I have my personal one

 5    that no one has here, and I'm not going to give it out.

 6    But I have a work personal e-mail.

 7         Q    And what is that?

 8         A    I just gave it to you -- cdnfn@allstate.com.

 9         Q    So that's work personal e-mail?

10         A    Correct.  Now I'm going to try to clarify this

11    for you so that you can understand where I'm coming

12    from.  I know there's not a question, but I think I -- I

13    think I can help you through this.  There's also an e-

14    mail that goes directly with the claim file.  And on the

15    subject line, that's how I e-mailed you; that's how I

16    normally e-mail people is through the claim file, for

17    customers.  And so when I get an e-mail from that

18    account, it goes directly into the claim file.

19         Q    Okay.  But if you're having -- if you're

20    having issues with an adjuster or critiquing a way he's

21    handling the file, do you ever put that in a personal --

22    like, just a direct email to that adjuster?

23         A    I may have.  I don't recall if I have.  I

24    think if I have an issue with an adjuster, I'm not the

25    type of person that sends a bunch of letters or e-mails.
```

Page 26

Robert Romero- 11/13/19

```
 1    I like to talk to people one on one.  So I think it
 2    would be more of a conversation that I would have.  I
 3    mean, that's just my style.
 4         Q    So you never send e-mails to adjusters, you
 5    know, critiquing their work on a file?
 6         A    I didn't say that.  I just -- you know, I
 7    might have.  I don't recall, as I sit here today.  But I
 8    can tell you 99.9 percent of the time I like picking up
 9    the phone and talking to someone voice to voice.
10         Q    How about in this claim where there was a lot
11    of back and forth, a lot of delays; did you have any
12    personal exchanges with Ed Carracsco via e-mail?
13                   MR. FELDMAN:  Well, object.  Lacks
14    foundation and argumentative.
15                   THE WITNESS:  I don't recall having any
16    e-mails back and forth with Ed Carracsco.
17    BY MR. HOOK:
18         Q    Did you look?
19         A    Like I said --
20         Q    No, no, no.  I just want you to answer my
21    question.  Did you look?
22                   MR. FELDMAN:  Vague
23                   THE WITNESS:  Well, I must've looked when
24    I -- if I would have got an e-mail; I look at all my e-
25    mails.
```

Page 27

Robert Romero- 11/13/19

```
1    BY MR. HOOK:
2         Q    Sir, that's not what I asked you.  I asked
3    you, in preparation for this deposition today, did you
4    look through your personal e-mail account for e-mails
5    related to the Baker account?
6         A    No, because I know I don't have any.
7         Q    How do you know if you didn't look?
8              MR. FELDMAN:  Argumentative, but you can
9    answer.
10             THE WITNESS:  Because I -- when I work my
11   e-mails, I clear them.  I don't have tons of e-mails
12   just hanging out there.  I clear them.  I like to have a
13   clean desk.
14   BY MR. HOOK:
15        Q    Okay.  And --
16        A    So if I know that I have no e-mails there,
17   then why look?
18        Q    So you don't just archive them; you delete
19   them.
20        A    Well, after about a month I delete them.
21        Q    Okay.  So --
22        A    Yeah.  I -- because it slows my computer down.
23        Q    And that's consistent with Allstate's policy?
24        A    I don't think Allstate has an issue -- on what
25   their -- they don't -- I haven't read anything about
```

Page 28

Robert Romero- 11/13/19

```
 1      deleting read e-mails on Allstate policy.
 2           Q    Okay.  So you don't know if they have a policy
 3      on the retention of electronic records?
 4           A    Well, no, they do have a policy on retention
 5      of electronic records if it pertains to the claim file.
 6      You asked me if I had conversations with Ed regarding
 7      this file.  I can bet you dollars to donuts that I did
 8      not have an electronic conversation with Ed regarding
 9      this file.
10           Q    Okay.  But you didn't look.
11                     MR. FELDMAN:  Asked and answered.
12                     THE WITNESS:  I --
13      BY MR. HOOK:
14           Q    That's okay.  I got your answer.  It's okay.
15                Number 3 asks for all written conversations
16      that you sent to or received with the Plaintiffs --
17           A    Do you need this back?
18           Q    Please.
19           A    Here you go. Sorry.
20           Q    Number 3 asks for all written communications
21      you sent to or received with the plaintiffs; do you see
22      that, sir?
23           A    Yes.
24           Q    Did you bring those here today?
25           A    I don't have any to bring.  I didn't
```

Page 29

Robert Romero- 11/13/19

1    communicate with the plaintiffs.

2         Q    Okay.  Did you look through your electronic

3    communication toss see if you had any communications

4    with them?

5         A    If I know I did not send the Bakers any

6    electronic communication, then there's no need for me to

7    look for it.

8         Q    Because you have a perfect recollection of all

9    the e-mails you send and receive?

10                  MR. FELDMAN:  Argumentative.

11                  THE WITNESS:  No, I don't have a

12   perfect -- I'm human, you know, and I try my very best.

13   And I'm giving you my very best and truthful answer.

14   BY MR. HOOK:

15        Q    No --

16        A    And this is what I believe is true right now,

17   as I sit here today.

18        Q    right, but why I'm getting at this is because

19   you were actually obliged to look for these things.  And

20   maybe that wasn't shared with you by your counsel, but

21   you, personally, were obliged to look for these

22   documents and bring them here today.  And it seems like

23   you didn't do that at all.

24                  MR. FELDMAN:  Well, lacks foundation.  I

25   think it misstates the law.  He wasn't subpoenaed here;

                                              Page 30

1     he was produced via notice of deposition.  As I said on

2     the record and as Mr. Romero clarified, he's represented

3     by counsel.  Counsel responded point-by-point, category-

4     by-category to the document request.

5                    THE WITNESS:  I -- I have a pretty decent

6     memory.  And I don't recall ever sending an e-mail to

7     the Bakers.  And so if --

8                    MR. FELDMAN:  You don't need to argue

9     with that.

10    BY MR. HOOK:

11       Q    Number 4 asks for all internal Allstate

12    Insurance Company communications relating to the subject

13    claim.  Did you bring any documents responsive to that

14    request here today, sir?

15       A    It's going to be the same answer for all of

16    them.  You know, my attorney supplied that to you.

17       Q    He supplied all internal Allstate Insurance

18    Company communications?

19       A    That were -- that we have.

20                   MR. FELDMAN:  Well, that were not

21    privileged.  Again, just to clarify, we responded in

22    writing to all of this.  So Mr. Romero is not providing

23    the legal response to each of these.  You can ask him

24    what he did, but he doesn't have memorized our written

25    response to each one of these.

                                              Page 31

Robert Romero- 11/13/19

```
1                      THE WITNESS:  So to clarify a little bit.
2     When the lawsuit came in, we got an e-mail to make sure
3     that whatever --
4                      MR. FELDMAN:  You don't need to clarify.
5     There's no question pending.
6                      THE WITNESS:  Okay.
7     BY MR. HOOK:
8         Q    So with respect to number 4, what steps did
9     you take to make sure that all internal Allstate
10    Insurance Company communications relating to the subject
11    claim had been produced to my office?
12        A    We attempt to put everything in the claim
13    diary or e-mails.  And when the lawsuit came in, we got
14    a notification that a lawsuit came in and to ensure
15    that, you know, we go through our stuff to ensure that,
16    you know, we put everything in the claim file or, you
17    know, submit all the e-mails so that we can supply the
18    information for the subpoena.
19        Q    Okay.  So number 8 asks for all Allstate
20    insurance company training materials you have received
21    in the last three years.  Did you bring any such
22    training materials with you here today, sir?
23        A    I did not bring anything at all.  Any of these
24    questions I did not, because it's my understanding that
25    my attorney has supplied that to you.
```

Page 32

Robert Romero- 11/13/19

1       Q     So you provided your attorney's office with

2    training materials for the last three years that you

3    received?

4       A     I did not provide the training materials.  We

5    had sexual harassment training --

6                    MR. FELDMAN:  You just need to answer the

7    question.

8                    THE WITNESS:  Okay.

9    BY MR. HOOK:

10      Q     Have you received training materials on

11   property claims adjustments in the last three years?

12      A     The DOY test that --

13      Q     What was that?  Excuse me?

14      A     The Department of Insurance exam.  We have to

15   take a DOY exam annually.  It's a series of 20 questions

16   that you have to answer.

17      Q     How about training materials from Allstate?

18      A     In what regards?  To claim handling or, or --

19      Q     Yeah, the claim handling of a property damage

20   claim.

21      A     I don't -- we have a training manual that I

22   haven't referred to in a long time, because, you know,

23   I've been doing it for a long time.  But I don't recall

24   receiving new training on property handling recently.

25      Q     How about in the last three years?

Page 33

```
 1        A     Well, within the last three years.  I mean,

 2    other than, like, cyber security to make sure that

 3    our -- you know, we lock our computers and stuff like

 4    that.

 5        Q     Did you do anything to look for documents that

 6    were responsive to that request?

 7        A     I spoke to my attorney and -- when I reviewed

 8    this, and they said that --

 9                    MR. FELDMAN:  Don't -- no, no, no.  You

10    don't talk about privileged -- conversations --

11                    MR. HOOK:  No, no.  Don't -- yeah.

12                    MR. FELDMAN:   -- with your attorneys are

13    privileged.

14                    THE WITNESS:  Okay.

15    BY MR. HOOK:

16        Q     Anything between your attorney I'm not

17    entitled to know.

18        A     Okay.

19        Q     So -- but to the extent you can answer my

20    question, I am entitled to know what steps, if any, you

21    took to locate training materials you received from

22    Allstate in the last three years.

23        A     Well, I can't tell you because then -- you

24    just stopped me.  I mean, I talked to my attorney to

25    make sure that --
```

Page 34

Robert Romero- 11/13/19

```
 1                    MR. FELDMAN:  Okay.  Don't -- let's take
 2      a break for a second.  I want to --
 3                    MR. HOOK:  Sure.
 4                    MR. FELDMAN:   -- make sure the privilege
 5      is preserved.
 6                    MR. HOOK:  Agree to go off record.
 7                    COURT REPORTER:  We are going off record.
 8      The time is approximately 10:44 a.m.
 9                    (Off the record.)
10                    COURT REPORTER:  We are going back on the
11      record.  The time is approximately 10:50 a.m.
12      BY MR. HOOK:
13           Q    Okay.  Mr. Romero, we're back on the record.
14      You understand you're still under oath?
15           A    Yes.
16           Q    Okay.  When we left off, we were talking about
17      document request number 8, I believe, for training
18      materials you've received in the last three years.  And
19      it doesn't appear that you brought anything today that
20      is responsive to that request nor did you undertake any
21      effort to look for those materials; correct?
22           A    Correct, because I was under the impression
23      that my attorney had supplied all the information to
24      you.
25           Q    Okay.  And on what --
```

Page 35

```
 1                      MR. FELDMAN:  And just for the record,
 2      while Mr. Romero is not a lawyer and is not speaking in
 3      legal terms, we provided written responses consisting of
 4      both objections and offers to produce documents.
 5                      MR. HOOK:  Right.  You've said that many
 6      times for the record.  Appreciate it.
 7      BY MR. HOOK:
 8          Q    Allstate Insurance Company -- number 9 --
 9      training materials and writings that you used in
10      conjunction with the handling of the subject claim.
11      Number 9 -- did you bring any documents responsive to
12      that question request, sir?
13          A    No.
14          Q    And why not?
15          A    I don't have any training materials regarding
16      this claim.
17          Q    Okay.  Number 10 asked for all writings that
18      you relied upon or referenced in your handling of the
19      subject claim.  Did you bring any documents responsive
20      to that request today, sir?
21          A    No.
22          Q    Did you look for any responsive documents?
23          A    No.
24          Q    Number 12 asks for all contracts between you
25      and Allstate Insurance Company in effect at any time of
```

Page 36

```
 1     the subject claim to the present.  Did you bring any
 2     documents responsive to that request today, sir?
 3          A    No, I don't.
 4          Q    And why not?
 5          A    'Cause I don't have any contracts between
 6     Allstate and I.
 7          Q    Do you have an employment agreement with them?
 8          A    I'm employed but I didn't -- I'm not sure of
 9     any employment agreements.
10          Q    Okay.  All photographs of the property damage
11     relating to the subject claim -- is it your
12     understanding that all you such photographs have been
13     produced?
14          A    Yes, sir.
15          Q    All right.  Number 14 asks forward your
16     paychecks from the date of the subject claim to the
17     present.  Did you bring any documents responsive to that
18     request?
19               MR. FELDMAN:  Objection.  Calls for
20     private protected information.
21               THE WITNESS:  No.
22     BY MR. HOOK:
23          Q    And why not?
24          A    'Cause I didn't want to share my paychecks
25     with you.
```

Page 37

1           Q     And number 15 asks for all negative

2     performance reviews, write-ups, complaints, demotions,

3     or similar writings that refer to you that were created

4     in the last five years.  Did you bring any documents

5     responsive to that request?

6                      MR. FELDMAN:   Objection.  Protected by

7     the right of privacy.

8                      THE WITNESS:   No.

9     BY MR. HOOK:

10          Q     And why not?

11          A     'Cause I don't have any negative reviews on

12    me.

13          Q     No complaints?

14          A     Not that I can recall.

15          Q     So why don't you take me through a typical

16    property damage claim for a water loss and the steps

17    that the insureds go through to submit the claim and get

18    their home repaired.  So after a loss, what's the first

19    step?

20                      MR. FELDMAN:   Overbroad; incomplete

21    hypothetical.

22    BY MR. HOOK:

23          Q     Let's take an example like the Bakers where

24    5,000 square feet of water comes down from the second

25    floor to the home and inundates the home with water and

                                                    Page 38

Robert Romero - 11/13/19

```
 1    destroys a large portion of it.  What's the first step
 2    that the insureds take?
 3              MR. FELDMAN:  Lacks foundation; vague.
 4              THE WITNESS:  Every claim is different,
 5    and I don't like to -- there's so many mitigating
 6    circumstances on each and every claim.  It's -- you have
 7    to adjust the claim based on its own merit.
 8    BY MR. HOOK:
 9        Q    Okay.  So when an insured suffers a serious
10    property damage event at their home and it involves a
11    substantial rebuild, what's the process?  What does the
12    process entail?
13        A    Again, every claim is different.  You know,
14    what may apply to one house may not apply to another
15    house.  It's too -- I can't tell you a process because
16    what may apply to the Bakers may not apply to some other
17    house.
18        Q    Okay.  Well, when an insured has been
19    displaced from their home, what's Allstate's procedure?
20        A    It depends on why they've been displaced.
21        Q    Well, if it's for water damage, what's the
22    procedure?
23        A    First of all, you have to determine coverage.
24        Q    Okay.  And if coverage is present?
25        A    And if the house is uninhabitable due to the
```

Page 39

Robert Romero- 11/13/19

1    water damage, then we find additional living -- well,

2    additional living expenses would apply.

3         Q    Okay.  And then what about the property loss;

4    how is that adjusted?

5         A    Well, it depends, you know.

6         Q    The physical building?

7         A    First of all, you have to make sure that the

8    property is dry so that all the damages can be

9    determined.

10         Q    And who is responsible for that?

11              MR. FELDMAN:  Vague.  Potentially calls

12    for a legal conclusion.

13              THE WITNESS:  Financially responsible?

14    Or signing the contract?

15    BY MR. HOOK:

16         Q    Who's responsible for organizing the dry out,

17    making sure that the vendor is doing it?

18              MR. FELDMAN:  Same objection.

19              THE WITNESS:  It really depends

20    merchandise the insured should, you know, mitigate their

21    damages.  If the insured needs assistance, then we can

22    refer a mitigation company.

23    BY MR. HOOK:

24         Q    Okay.  And then that's a cost that Allstate

25    will pay; correct?

                                                  Page 40

1        A     It depends.  If it's reasonable, then yes.

2     And if it's claim-related.  It depends on the claim and

3     the facts and circumstances based on each and every

4     individual claim.

5        Q     Okay.  So in this case, it called for a

6     massive dry-out; correct?

7        A     It was a --

8                  MR. FELDMAN:  Vague; argumentative.

9                  THE WITNESS:  I it was a substantial dry-

10    out, yes.

11    BY MR. HOOK:

12       Q     Okay.  And were you physically present for

13    part of the dry-out?

14       A     No.

15       Q     Was Mr. Carracsco?

16       A     I believe he went there early on the claim.

17       Q     Yeah.

18       A     And so the claim diary reflects that he was

19    there.

20       Q     Okay.  And did Allstate promptly pay

21    Servepro's bill from that?

22       A     Well, we had concerns with Servepro's bills.

23    Most mitigation vendors follow the IICRC guideline.

24    And, you know, we need moisture mapping; we need dried

25    logs.  And when I had received the bill from Mr. Baker's

                                             Page 41

1    mitigation company, we weren't able to decipher if that

2    bill was in line and we needed additional information.

3         Q    And to date has it been paid?

4         A    I believe it has.

5         Q    When?

6         A    I'd have to look at the claim diary.  It's

7    going to take me about a half hour, but I'll find it.

8         Q    It's chronological.  Towards the bottom is the

9    latter events from the claims diary.

10        A    I don't want to rip your pages.

11             Do you have a area where we issued checks?

12   That'll be probably faster for me to find.

13        Q    I think at the very back there's a

14   summation --

15        A    If I can look at the date of the checks, then

16   that will be easier than me going through 4,000 pages.

17        Q    7/12, two thousand -- how much did they pay?

18        A    $53,222.83.

19        Q    Two hundred and what?

20        A    $53,222.83.

21        Q    And before Allstate -- so that's 10 months

22   after the loss you guys paid that, huh?

23        A    Approximately

24        Q    And coverage was determined immediately;

25   correct?

Page 42

Robert Rapero- 11/13/19

```
 1        A     Correct.

 2        Q     Do you have an explanation as to why it took

 3   Allstate 10 months to pay for water remediation at this

 4   house?

 5        A     Yes.  We were asking for additional

 6   information that we didn't receive.  And then I think

 7   I -- I know I spoke to Ed Carracsco; I said, look -- you

 8   know, he felt the mitigation bill was high, and I said

 9   let's get an independent expert to take a look at the

10   bill.  And I believe I asked him to call Jim Holland,

11   who is an expert in the field.  I think he was one that

12   wrote the standards for the IICRC and is actually

13   writing the revised standards now.  And he looked at it,

14   and he needed additional information; we didn't get that

15   additional information.

16        Q     What additional information did you need?

17        A     I believe he was looking for some dry logs,

18   some numbers to ensure that the equipment was running.

19   It's very complex.  You know, mitigation is not that

20   easy, and so -- it depends on how many air movers you

21   have, how many dehumidifiers you have, and it is

22   extremely complex.  It's even hard for me to even

23   explain it.

24        Q     Oh, so you thought they were defrauding

25   Allstate, Servepro?
```

Page 43

Robert Romero - 11/13/19

```
 1        A    I did not say that.
 2        Q    Okay.  So why didn't you pay their original
 3   invoice?
 4        A    Because I thought it was excessive.
 5        Q    So you think -- you thought they were charging
 6   you for things they didn't do?
 7        A    I think they were charging me for things that
 8   should not be charged for.
 9        Q    Like what?
10        A    For example, the amount of equipment that they
11   have in there or, for example, like, the Exactimates
12   those that [ph] -- like, the filters, like, they have
13   the filters and stuff like that -- that's included in
14   the daily rental, and they had filters in there.
15   There's stuff like that.  Yeah, I don't really recall
16   every line item right now, but I can look at the -- at
17   their invoice and I can go over with you, if you'd like,
18   in more detail.  But there was some concern.  And we
19   ended up, I think, reducing it, like, 3-, $4,000 and we
20   paid it.
21        Q    Okay.  So and then over that course of 10
22   months, what was Servepro doing to try to collect the
23   money?
24        A    Well, they called in.  They wanted to get
25   their bills, and Ed goes, Look, this is the information
```

Page 44

Robert Romero- 11/13/19

```
 1    I need, and I'm sending this to an independent person so
 2    that they can tell us if it's in line because it looks
 3    inflated."
 4         Q    So -- and then they're also coming after the
 5    insureds' money, right?
 6         A    I don't think they -- I think they wrote an e-
 7    mail to the customers telling them, hey, you know, we
 8    want to get paid; we haven't got paid.  But I didn't
 9    think they went after the insureds.  They wanted to get
10    paid.
11         Q    Do you think that's stressful for the insureds
12    to have a vendor that they hired not get paid by their
13    insurance company?
14              MR. FELDMAN:  Calls for speculation;
15    lacks foundation.
16              THE WITNESS:  I don't know the customers.
17    This is the first time I met Mr. Baker today.
18    BY MR. HOOK:
19         Q    Okay.  So if you hired a vendor at your house
20    and they did $60,000 at work and your insurance company
21    was supposed to pay for it and they didn't, would that
22    stress you out?
23         A    I don't know.  It --
24              MR. FELDMAN:  Incomplete hypothetical.
25              THE WITNESS:  I don't know.  It depends.
```

Page 45

 1    If I think the estimate is inflated, you know, then I

 2    want to make sure that I do the right thing.  I always

 3    want to do the right thing.

 4    BY MR. HOOK:

 5        Q    Do the right thing for who?

 6        A    For everyone involved.

 7        Q    And so how is that doing the right thing for

 8    the Bakers to stall for 10 months for 3- or $4,000?

 9                    MR. FELDMAN:  Argumentative; lacks

10    foundation.

11                    THE WITNESS:  I don't think we're

12    stalling.  We're asking for information that we didn't

13    receive from Service Master [sic].  To me, that's not

14    stalling.  If we got the information and we had

15    everything we asked for up front, this wouldn't have

16    dragged on for 10 months.

17    BY MR. HOOK:

18        Q    Yeah, well, is there any requirement in this

19    insurance policy that Allstate wrote that the Servepro

20    people provide the information that you are requesting?

21        A    Well, it's a standard within their industry.

22    And I see our standards Where they do -- where they

23    should have moisture readings and dried logs.  It's not

24    in the policy, but it is a standard in the industry.

25        Q    I'm going to read you a -- did you read the e-

                                              Page 46

Robert Romero- 11/13/19

```
 1    mail that the Servepro president wrote about Carracsco?
 2         A    I have not.  Do you need this back?
 3         Q    Yeah, please.
 4                   MR. HOOK:  Let's Attach this as
 5    Exhibit 2.  A series of documents
 6                        (Exhibit 2 was marked for
 7                        identification.)
 8                   THE WITNESS:  And I did read it.
 9                   MR. FELDMAN:  And, Counsel, just for
10    clarification, I see your Bates stamps on the bottom but
11    they're not consecutive.  This is just -- that's
12    intentional, right?
13                   MR. HOOK:  That's intentional.
14                   MR. FELDMAN:  Okay.
15    BY MR. HOOK:
16         Q    And did you see this e-mail at the time,
17    January 5th?
18         A    No.
19         Q    Okay.  When was the first time you saw that?
20         A    Yesterday.
21         Q    Okay.  What do you think of it?
22         A    It's an e-mail from Servepro and that -- he's
23    looking to get payment.  He's not happy that he hasn't
24    got paid.
25         Q    Mm-hmm.  And he also said "... you should try
```

Page 47

```
 1    to mandate that the adjuster Ed Carracsco be replaced

 2    with a more senior level adjuster that is reasonable.

 3    Ed Carracsco has been completely difficult to deal with,

 4    constantly stalls, and acts as if though the payments

 5    are coming from his" own "personal account therefore he

 6    must fight tooth and nail."  Do you see that?

 7        A    I do.

 8        Q    Would you say that's an accurate

 9    characterization of how Mr. Carracsco handled this file?

10        A    Absolutely not.

11        Q    It seems pretty accurate from everything I've

12    looked at.

13             MR. FELDMAN:  Argumentative.  That's not

14    a question.

15    BY MR. HOOK:

16        Q    Let's go to the next passage.  He has a longer

17    list here.  Go ahead, take a look at that.

18             Did you finish the e-mail?

19        A    I did.

20        Q    Okay.  Did you see this e-mail before?

21        A    I believe I have.

22        Q    When?

23        A    Yesterday.

24        Q    Okay.  This didn't go in the claims file?

25        A    I don't remember seeing it in the claim file.
```

Page 48

1      Q      Okay.  Would this have been something that
2    should have been brought to your attention, a vendor
3    accusing the primary adjuster of acting in bad faith and
4    being unreasonable, stating that we on cannot deal with
5    Mr. Carracsco due to his actions?  I mean, wouldn't that
6    be something that Mr. Carracsco should have brought to
7    your attention?
8      A      He did talk to me about this claim.  He didn't
9    show me the e-mail, but he told me, you know, the gist
10   of this e-mail.  We did have a conversation with -- I
11   did have a conversation with him.
12     Q      In January?
13     A      I don't remember the date.
14     Q      Okay.  And what did -- tell me about that
15   conversation.
16     A      He said that they weren't in agreement with
17   the estimate, you know, they wanted a different
18   adjuster.  I reviewed the estimate; I have concerns with
19   the mitigation bill as well.  I think we got Ruben
20   Franco involved just to see if he could help negotiate
21   this, and he eventually did get it resolved.
22     Q      What about all these on complaints from people
23   that Ed Carracsco is being unreasonable, acting in bad
24   faith?  I mean, why would you subject your injureds to
25   an adjuster that's behaving that way?

Page 49

```
 1                    MR. FELDMAN:  Lacks foundation.

 2                    THE WITNESS:  I don't believe Ed was

 3      acting in bad faith.  I don't believe that because we

 4      don't agree with an contractor's estimate that it's bad

 5      faith.  Like I said, we want to do the right thing.

 6      BY MR. HOOK:

 7          Q    As long as it doesn't cost too much money;

 8      right?

 9          A    That is incorrect.

10                    MR. FELDMAN:  Argumentative.

11                    THE WITNESS:  I want to do the right

12      thing for everyone involved.

13      BY MR. HOOK:

14          Q    No, you don't.  So what was wrong with the

15      Servepro bill again?  Why did you think it was

16      unreasonable?

17          A    I have to look at it.  Can you give it to me

18      and I can go over some items with you?

19          Q    It's -- I don't have it.  It's -- is it in the

20      claims file?  You were asked to bring it today.

21                    MR. FELDMAN:  It should be in the claim

22      file, if you want to show it to him, if you could find

23      it.

24      BY MR. HOOK:

25          Q    Sure.  This is your claims file.  Why don't we
```

Page 50

```
 1    discuss why you thought --

 2         A     Okay.

 3         Q     -- Servepro's bill was unreasonable?

 4         A     Not a problem. Sure.

 5                    MR. FELDMAN:  It's been asked and

 6    answered, but you can go through it again.

 7                    THE WITNESS:  Do you have any idea where

 8    in the claim file it is?  It's going to take a while

 9    then.

10    BY MR. HOOK:

11         Q     I would assume the claims supervisor would

12    know the claim better than the attorney that got it

13    yesterday.

14         A     I'm sorry.  This is your binder -- this is the

15    binder that you just gave me and it's, you know,

16    4,000 --

17         Q     It's 700 pages.

18         A     -- or 700 pages; it's going to take me a

19    little bit of time.  But once I find it, I'll go through

20    it.  Not a problem.

21                    MR. FELDMAN:  Counsel, I'm just doing in

22    the interest of efficiency.  The binder that you're

23    showing Mr. Romero is not the entire claims file; it's

24    just the electronic claim notes.  So we produced more

25    than that.  So to the extent you represented that the
```

                                              Page 51

```
 1    binder is the entire claim file for --
 2                  MR. HOOK:  I didn't represent that.
 3                  MR. FELDMAN:  You did, for the record.
 4    You said "here's the claim file.  " so --
 5                  MR. HOOK:  Well, I think that's what the
 6    witness said.
 7                  MR. FELDMAN:  No.  The witness actually
 8    said he doesn't know if it's the whole claim file; he
 9    just knows it's a binder that you put in front of him.
10                  MR. HOOK:  Right, 'cause he didn't look
11    for anything, right?
12                  MR. FELDMAN:  I'm just trying to be
13    helpful here.  I don't think -- it's not --
14                  MR. HOOK:  It's okay.
15                  MR. FELDMAN:   -- subject to dispute,
16    it's the online claim diary; it's not the claims file.
17    There are no estimates that I've seen standing alone.
18    It's just online diary notes.  But if you want the
19    witness to finish looking for it, that's fine.
20                  MR. HOOK:  Well, I asked him to bring
21    them here today.  So he's going to have to come back to
22    answer questions about that.  So --
23                  MR. FELDMAN:  Well, we've -- I know for a
24    fact that we've produced more than what's in this
25    binder, including, I believe, the claims file
```

                                                   Page 52

Robert Romero- 11/13/19

```
 1    material -- well, I know claim file material which
 2    includes the Servepro estimate, the Baldwin estimate,
 3    the Mackey estimate, etc.  So you -- we've given that to
 4    you.
 5              MR. HOOK:  Yes, you have.
 6              MR. FELDMAN:  So if you brought it here
 7    today --
 8              MR. HOOK:  I don't have it here today.
 9              MR. FELDMAN:  Okay.
10    BY MR. HOOK:
11       Q    I mean, this -- if it's not in the notes --
12    I'm not, perhaps in this -- wouldn't this diary have
13    some notes describing why Servepro's bill was considered
14    unreasonable, in the 700-page electronic claim diary?
15       A    I don't know.  I don't know if Ed Carracsco
16    had a conversation with Servepro letting them know his
17    concerns.  I remember -- I'm not trying to waste your
18    time, I promise you; I'm trying to be as efficient as
19    possible.  But I remember going through the estimate and
20    having concerns with the estimate.  I do.
21       Q    Okay.  And so you think that having concerns
22    about a few thousand dollars is a reasonable basis for
23    denying payment of claims that are due to the insureds
24    and making them wait for 10 months after a water loss?
25              MR. FELDMAN:  Lacks foundations.
```

Page 53

1              THE WITNESS:  We have to pay the right

2     dollar amount.  I have to equally weigh our insured as

3     well as Allstate.  That's my position.  That's how I

4     view my job.  I have an obligation to make sure that I'm

5     being fair to both parties equally.  And if I see issues

6     with the estimate, there's no reason why a contractor

7     should take advantage of our customer or Allstate.

8     BY MR. HOOK:

9         Q    Does this Servepro company in Northridge have

10    any history of taking advantage of Allstate?

11        A    I don't know what their history is.  When I'm

12    looking at the claim, I -- I don't go back, past

13    history.  You have good estimators; you have bad

14    estimators.

15        Q    Okay.

16        A    I look at that estimate on an individual basis

17    based on my knowledge and expertise and my experience.

18        Q    Okay.  And then you made the decision, based

19    on never being to the house, never seeing the

20    mitigations efforts, that it was too high; right?

21        A    No.  I talked to Ed Carracsco who also felt it

22    was too high, and we both talked about it.

23        Q    And what specifically did he tell you with

24    respect to the bill being too high?

25        A    I have to look at it.  Like, I don't remember.

Page 54

1      I look at hundreds of estimates a week.

2          Q    Mm-hmm.

3          A    It'd be impossible for me to --

4          Q    Wouldn't that be important to document in the

5      claim note that there's some -- there's a concern that

6      they're charging for 10 humidifiers when was there only

7      five.  This is in the claim note.  Charge 'em -- only

8      pay 'em 50 percent.  I was expecting something like

9      that, but it's -- there's nothing like that in there.

10     It's just, oh, it's too much.

11                    MR. FELDMAN:  Lacks foundations.  And

12     there's actually not a question.  So …

13     BY MR. HOOK:

14         Q    So is your pay based on -- Is your income at

15     all based on your performance with respect to settling

16     claims?

17                    MR. FELDMAN:  Vague.  And potentially

18     invades --

19     BY MR. HOOK:

20         Q    Yeah, do you get paid more money if you save

21     Allstate money?

22         A    No, I don't.

23         Q    Do you get a performance bonus if you handle a

24     certain amount of claims?

25                    MR. FELDMAN:  Vague.

                                              Page 55

Robert Romero- 11/13/19

```
 1                    THE WITNESS:  No.
 2      BY MR. HOOK:
 3           Q    What is the bonus system like at Allstate?  Is
 4      there a bonus structure at all?
 5           A    If there -- well, not for my level.
 6           Q    Okay.  So looking back at the way that
 7      Allstate handled just the Servepro estimate, do you
 8      think that was a reasonable way to handle that vendor
 9      invoice, and you would've handled it the same way again?
10           A    Hindsight is 20 --
11                    MR. FELDMAN:  Call -- calls for
12      speculation.  Go ahead.
13                    THE WITNESS:  Hindsight is 20/20.  You
14      learn; if you don't, then you're not human, right?
15      Nobody wants to wait a long time to get paid.  And, you
16      know, we don't want to pay their bills.  We want to be
17      able to close it and move on to the next claim.  Maybe
18      another job walk [ph] with all involved parties would
19      have been better.  I don't know.  I can't speculate.
20      But the point is that we did our very best to try to get
21      this claim -- this bill paid based on the information we
22      had.  We requested additional information that wasn't
23      supplied to us that Jim Holland felt was necessary.
24      BY MR. HOOK:
25           Q    Who's Jim Holland?
```

Page 56

1          A     He is an expert in the field.

2          Q     And was he at the house?

3          A     No.

4          Q     But you used his opinion to negotiate against

5     Servepro and get a discount --

6          A     Well, we asked for his opinion.  This is an

7     expert.  He can read the dried logs; he can determine --

8     sometimes when you have too many dehumidifiers, it

9     actually brings more moisture in the house.  There's

10    lots of stuff that I don't know, that I'm not, you know,

11    that qualified to do.  So we wanted to get an expert to

12    get their been.

13         Q     Mm-hmm.  So what's Allstate's policy with

14    respect to a large property claim where the primary

15    handling adjuster is being accused of bad faith?

16                    MR. FELDMAN:  Overbroad; calls for

17    speculation.

18                    THE WITNESS:  Honestly, this is the first

19    time that I've heard that Ed or one of my adjusters --

20    said it's bad faith.  There's cases where insureds say,

21    hey, I'm not getting enough money and it's going to be

22    bad faith.  They throw that word around a lot, you know.

23    Even sometimes before we even adjust the claim.  I look

24    at the claim file and I see that Ed's handling

25    appropriately, and I don't see any bad faith.

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1    BY MR. HOOK:

 2         Q     You don't?

 3         A     I don't see bad faith.

 4         Q     What is bad faith?

 5                    MR. FELDMAN:  Calls for a legal

 6    conclusion.

 7    BY MR. HOOK:

 8         Q     Do you know it's codified in the insurance

 9    code of California?

10                    MR. FELDMAN:  Lacks foundations;

11    misstates the law.

12    BY MR. HOOK:

13         Q     Are you familiar with the insurance code

14    regulations?

15         A     I am.

16         Q     Okay.  Are you familiar with the prohibited

17    acts that are set forth by the insurance code with

18    respect to unfair practices?

19         A     Yes.

20         Q     And what are though?

21         A     I don't have them memorized?

22         Q     What's one of them?

23         A     We have to accept or reject a claim within 30

24    days.  That's one of them.

25         Q     Anything else?
```

Robert Romero- 11/13/19

1        A     There's many.

2        Q     Anything else that you can recall?

3        A     We have to respond within 15 days when a

4    response is reasonably expected.

5        Q     Did you guys do that in this claim?

6        A     For the most part.

7        Q     Within 15 days, huh?

8        A     For the most part.  There are some exceptions.

9        Q     So one of the things that's considered an

10   unfair practice is misrepresenting to claimants

11   pertinent facts for insurance policy provisions relating

12   to any coverage or issue.  Do you agree with that?

13       A      Intentionally misrepresenting facts, yes, that

14   would be bad.

15       Q     Okay.  And if Mr. Carracsco had been

16   intentionally misrepresenting facts such as the amount

17   of repair estimates in this case, would you consider

18   that to be bad faith?

19              MR. FELDMAN:  Calls for a legal

20   conclusion.

21              THE WITNESS:  It depends.  I'd need more

22   facts, but possibly.  I don't know.  I have to review it

23   and get all the facts in order to make a decision.

24   BY MR. HOOK:

25       Q     Okay.  And what policy and so procedures does

Page 59

Robert Romero - 11/13/19

```
1    Allstate have in place to prevent adjusters from
2    misrepresenting pertinent facts regarding insurance
3    policy provisions?
4         A    There's a code of ethics; we got to be honest
5    in all our dealings.
6         Q    And what policies do they have in place to
7    make sure that the adjusters are complying with that
8    code of ethics?
9         A    Well, I review the claim files.  I review the
10   files.  I ride along with my adjusters.  There's lots of
11   which direction and balances.
12        Q    What else?  What other which direction and
13   balances are there?
14        A    Besides riding with the adjusters and
15   reviewing the claim files, doing a seven-day review,
16   doing 30-day reviews.
17        Q    Okay.  Another prohibited act under the
18   insurance code is failing to acknowledge and act
19   reasonably promptly upon communications with respect to
20   claims arising under an insurance policy.  Would you
21   agree with that?
22        A    Yes.
23        Q    Okay.  And how fast does Allstate typically
24   respond to a construction bid?
25                   MR. FELDMAN:  Vague; overbroad.
```

Page 60

Robert Romero- 11/13/19

1                    THE WITNESS:  It depends on the facts and

2       circumstances of every claim.  Some maybe sooner; some

3       maybe later.

4       BY MR. HOOK:

5           Q    What's the policy?

6                    MR. FELDMAN:  Lacks foundations.

7                    THE WITNESS:  There's no policy because

8       every claim is different and handled on its own merit.

9       BY MR. HOOK:

10          Q    So Allstate doesn't have any policy with

11      respect to responding to a customer with respect to a

12      construction estimate for covered loss?

13                   MR. FELDMAN:  Vague; overbroad.

14                   THE WITNESS:  Well, we follow the -- we

15      try to follow Department of insurance regs.

16      BY MR. HOOK:

17          Q    And what are they?

18          A    That we have 30 days to accept or reject an

19      estimate.

20          Q    Uh-huh.  And was that done in this case?

21          A    I believe so.

22          Q    When did Allstate receive the bid from Mackey

23      Construction?

24          A    I have to look at the claim file.

25          Q    Here you go.

                                                    Page 61

```
1                    MR. FELDMAN:  Well, just for the record,
2      again, that's not the whole claim file; that's just the
3      diary or the notes.
4                    THE WITNESS:  I'm trying to think so I
5      don't go through the whole file.  If you have the Mackey
6      estimate, I can look at the date and it'll make it a lot
7      faster.  Do you have the date on the Mackey estimate so
8      I can ...  October 24th.
9                    MR. HOOK: Can I have the last question read
10     back, please.
11                         (The reporter replayed the record as
12                         requested.)
13                    COURT REPORTER:  Further than that?
14                    MR. HOOK:  The last question I asked.
15     (The reporter replayed the record as requested.)
16                    MR. HOOK:  Never mind.  Don't worry about
17     it.
18     BY MR. HOOK:
19         Q     The yes is when did Allstate receive this
20     Mackey testament?
21         A     I thought the question -- the original
22     question was when did we reject the estimate.
23         Q     No.  My question was when did you receive the
24     estimate.  And then my follow-up question will be when
25     did you reject the estimate?
```

Page 62

1        A     Well, I'm looking for it.

2        Q     Okay.  Great.

3        A     There must be other e-mails and maybe behind

4    it that would show.  I, I don't know --

5        Q     So I'll explain that this was produced as one

6    volume, and then I received about 3500 pages of e-mails

7    that were stacked in threads.  So there would be like --

8    it was a very -- I think it's the bulk of e-mails but

9    it's not easy to go through.

10       A     Yes.  That's why I'm having difficulty,

11   because -- I get your frustration because there's the

12   claim diary and then there's little attachments.  So

13   then those attachments have to be printed out

14   separately.  So I think that's why we're missing some of

15   those -- or not missing, but they're in another binder,

16   so that I can give you the answer.

17       Q     But the claim notes, don't those reflect when

18   the estimate was received?

19       A     Usually it's like -- there's, like, a little

20   paper clip.  And then you click on the paper clip and

21   then it's an e-mail.  So then you don't have to -- it'll

22   be redundant if you just documented the claim notes

23   again, if the e-mail already has that information.  Does

24   that make sense?

25       Q     Yes, but I'm pretty sure the claim notes have

Page 63

```
 1     them.
 2         A    Well, it -- you would have to click on the
 3     paper clip, and then that's where I'm going to need the
 4     e-mails.
 5         Q    Okay.  So you're telling me that you're
 6     sitting here and looking at 800 pages of claim notes for
 7     Allstate, right?
 8         A    Okay.
 9         Q    These are your notes from the file.  Is that
10     correct?
11         A    Yes.
12         Q    Okay.  And based on those notes, you can't
13     tell me when Allstate received Mackey's invoice?
14         A    Well, because this is not complete.  I'm going
15     to need to see the actual e-mails to -- because -- if we
16     receive an e-mail that has all this information on
17     there, we're not going to redocument all that
18     information.  It's redundant.
19         Q    I'm not asking you for all the information.
20     I'm asking you when you received -- when Allstate
21     received this.  That's not documented in the claim
22     notes?
23                 MR. FELDMAN:  It's asked and answered.
24                 THE WITNESS:  It is, but I need the
25     entire file.
```

```
 1    BY MR. HOOK:
 2        Q    I'm just asking you when Allstate received it.
 3                MR. FELDMAN:  This is the fifth time he
 4    told you he needs to look at the whole file to answer
 5    your question.
 6    BY MR. HOOK:
 7        Q    Okay.  You know what, give it back to me.
 8    I'll find it and show you.  Okay.
 9        A    That will -- that will save some time.
10        Q    That'll be great.
11                October 30.  Is it your understanding that
12    Allstate received the Mackey estimate on or about
13    October 24, 2018?
14        A    I don't remember when we received the
15    estimate.
16        Q    Do you have any reason to believe it was not
17    received in October of 2018?
18        A    It sounds about right, but I can't give you a
19    100-percent answer because I --
20        Q    Okay.  And so what are Allstate's standards
21    for the prompt investigation and processing of a claim?
22                MR. FELDMAN:  Vague; overbroad.
23                THE WITNESS:  It depends on the claim and
24    the facts and circumstances.
25    BY MR. HOOK:
```

Robert Romero- 11/13/19

```
1          Q     So with respect to a construction estimate,

2     how  is a construction estimate promptly investigated

3     and processed?

4          A     Again --

5                     MR. FELDMAN:  Lacks foundations; vague

6     and ambiguous.

7                     THE WITNESS:  Every claim is different.

8     I need to get all the facts, and I can give you the

9     answer based on those specific facts.

10    BY MR. HOOK:

11         Q     So we'll attach as Exhibit 3 the Mackey

12    invoice.  Take a look at it.

13                    MR. FELDMAN:  You mean estimate, just for

14    clarification?

15                    MR. HOOK:  Estimate.  Excuse me.

16                    MR. FELDMAN:  Is this -- do you have more

17    than one?  I don't want to write on ...

18                    (Exhibit 3 was marked for

19                    identification.)

20    BY MR. HOOK:

21         Q     So tell me how this was evaluated and what is

22    process is when Allstate received this.

23         A     Well, when we had received this estimate, I'm

24    not sure if we had received the competitive bid yet or

25    not.  I don't think so.  But when you're looking at this
```

Page 66

```
 1     estimate, it's very difficult to decipher exactly what
 2     the unit costs are.  It's not broken down enough.  We
 3     can't decipher if this is in line or not in line.  We
 4     needed more information regarding this estimate.
 5          Q    Okay.  And did you tell that to Mackey?
 6          A    I did not tell that to Mackey?
 7          Q    And would that have been an important part of
 8     the claims handling process?
 9          A    No, because I never spoke to Mackey.
10          Q    So that wouldn't be an important part of the
11     process to tell the vendor what additional information
12     is needed in an estimate?
13          A    Yes, but the -- Ed Carracsco did that.  You
14     asked me if I spoke to -- if I did it.
15          Q    When did Edward Carracsco tell Mackey
16     Construction that he needed additional information on
17     their estimate?
18          A    I don't remember what date.
19          Q    Did he advise them of that in writing?
20          A    I don't know if he did in writing.  Most
21     likely, he did it verbally.
22          Q    Would it be the policy of Allstate to advise a
23     vendor that -- of the insufficiencies in their estimate
24     for a claim of this magnitude?
25          A    I believe that you need to have communication
```

Page 67

Robert Rotero- 11/13/19

```
 1    with the vendors so that you can, you know, reading out
 2    of the same handbook.
 3         Q    Mm-hmm. All right.  So the insured's expressed
 4    a desire to use this contractor; correct?
 5         A    Yes.
 6         Q    Okay.  And that -- Allstate had no objection
 7    to that; correct?
 8         A    Correct.
 9         Q    Okay.  And then Mackey submitted this invoice
10    in October of 2018; correct?
11         A    I don't think this is an invoice.
12         Q    Estimate.  Excuse me.  I misspoke.  You're
13    correct.  They submitted this estimate to Allstate;
14    right?
15         A    Sometime in 2018 -- latter part of 2018.
16         Q    And what did Allstate do to evaluate whether
17    this estimate was reasonable?
18         A    Well, Ed had inspected the property.  I know
19    he had a conversation with Mackey requesting, you know,
20    more detail on the estimate.  We also were -- spent the
21    time securing a competitive bid.
22         Q    And tell me about that process of securing a
23    competitive bid.  Why do you do that?
24         A    Because we want to make sure that the estimate
25    is accurate and reflects the claim-related damages.
```

Page 68

Robert Romero- 11/13/19

```
 1        Q    And did this estimate not reflect the claim-
 2   related damages?
 3        A    This estimate -- the initial estimate was
 4   extremely vague, and it's too difficult to determine
 5   exactly how much you're paying per item.  When you look
 6   at it, it's two, three, four -- it's basically four
 7   pages.  And the only dollar amount you have is in the
 8   last page.  You know, baseboards 523 linear feet.  I
 9   mean, I can -- when I go through it and I do the math,
10   it appears to be substantial inflated.
11        Q    Mm-hmm.
12        A    So we need to get more description so we
13   see -- to determine  if it's in line or inflated.
14        Q    Okay.  And based on what?  Inflated based on
15   what?
16        A    Based on the unit cost.
17        Q    And the unit cost is standard?
18        A    It's not --
19             MR. FELDMAN:  Vague.  It's vague.
20             THE WITNESS:  It's not a standard cost,
21   but you have a good guideline, you know, and you have
22   the industry standards as to compare.  So, for example,
23   if you have 500 linear feet of base shoe and you're --
24   our measurements, based on the sketch, was off.  That's
25   not the correct measurement.  So, I mean, there's issues
```

Page 69

1    here that we couldn't decipher if they were right or

2    wrong because it's so -- it's not itemized.

3    BY MR. HOOK:

4        Q    And Allstate promptly advised Baldwin of all

5    those deficiencies in the estimate?

6                    MR. FELDMAN:  Vague.

7                    THE WITNESS:  Baldwin?  No.  It's Mackey.

8    BY MR. HOOK:

9        Q    Correct.  Did Allstate promptly advise Mackey

10   of all of the deficiencies in their estimate?

11       A    I don't know if he advised Mackey of all the

12   deficiencies.  We explained to them that it was very

13   difficult to decipher this estimate, we needed more

14   detail.  And I believe he asked for additional

15   inspections at the property.

16       Q    Mm-hmm.  And were those permitted?

17       A    Some of them were?

18       Q    Were they denied?  Were they ever denied

19   access during this original claim-handling portion?

20       A    I e-mailed you, and you denied me access to

21   the property.

22       Q    Yeah, in August, right?  After the --

23       A    Recently.

24       Q    Right, when there would have been absolutely

25   no point to come.  That's right.

                                               Page 70

```
 1        A    Well --
 2        Q    But so -- but prior to the construction
 3   starting, were the insureds ever not cooperative with
 4   the vendors?
 5                  MR. FELDMAN:  Lacks foundations;
 6   argumentative because of the preface of the question.
 7                  But you can answer it.
 8                  THE WITNESS:  I don't think the insureds
 9   were -- yeah, I think they were cooperating.
10   BY MR. HOOK:
11        Q    Okay.  So Allstate's -- it's all based on unit
12   cost, right, an average cost that you get from --
13        A    Not necessarily.  Every claim is different.
14        Q    Right.
15        A    You know, there's -- in this room, it's pretty
16   easy.  You know, we know drywall is about two bucks a
17   square foot here.  We know the T-molding.  You know,
18   every house is different.
19        Q    And what was different about the Las Palmas
20   house?
21        A    Well, it was part of the HPOZ; you know, it's
22   a historical house.  It had wood lath and plaster.  It
23   had, you know, four-piece crown molding.  It had the
24   original T&G wood floors on most of the house.  I grew
25   up in a house like that, so I can appreciate the type of
```

                                                    Page 71

Robert Romero- 11/13/19

```
 1    construction.

 2        Q    Mm-hmm.

 3        A    Not that big, but, you know, similar

 4    construction, you know, same era.

 5        Q    So if you were going to be repairing that

 6    house, wouldn't you want to have a contractor that was

 7    qualified to do so?

 8        A    Within the house.

 9        Q    Any house, right?

10        A    Yeah.

11        Q    Any house repairing you want a contractor that

12    was qualified to work on your homes, right?

13        A    Absolutely.

14        Q    So for a historic home you'd want a contractor

15    that has experience with historic properties, right?

16        A    Well, it really -- it helps.  You know, it

17    definitely helps, but I don't think it's necessary.

18        Q    Well, I mean, a contractor that's preparing an

19    estimate for a historic home built in 1900 or 1920,

20    whatever it is, who's never worked on a historic home

21    isn't going to have a very accurate estimate, is he?

22              MR. FELDMAN:  Lacks foundations;

23    incomplete hypothetical.

24              THE WITNESS: I don't know if that's the

25    case because contractors -- you know, GCs, they use
```

Page 72

1    subcontractors.  So it really depends on the equality of

2    the subcontractors.  There's so many, you know --

3    BY MR. HOOK:

4        Q    So if you had a historic home and there was

5    300,000 or so of damage or massive damage, would you

6    want a contractor to come and work on that home that had

7    never worked on a historic home before?

8                    MR. FELDMAN:  Lacks foundations;

9    incomplete hypothetical.

10                   THE WITNESS:  It depends on their

11   qualifications.

12   BY MR. HOOK:

13       Q    Okay.  What are Michelle Fan's [ph]

14   qualifications to work on a historic home?

15       A    I don't know who Michelle Fan is.  I know she

16   works for the contractor.

17                   MR. BAKER:  Bolton.

18                   THE WITNESS:  Thank you.

19                   MR. HOOK:  Hey.

20                   MR. BAKER:  Oh, I'm sorry.

21   BY MR. HOOK:

22       Q    What are her qualifications to provide an

23   estimate on a historic home?

24       A    I don't know what her qualifications are.  I

25   don't vet the contractors.

                                              Page 73

Robert Romero- 11/13/19

```
1          Q     Who does?

2          A     Innovation vetted this contractor.

3          Q     And were they told that this was for a

4     historic three-and-a-half-million-dollar home in Hancock

5     Park?

6                     MR. FELDMAN:  Lacks foundations.

7                     THE WITNESS:  I don't know what they were

8     told.  But I know that they get vetted.  They ask for

9     ZIP codes that they want to work in the area, and, you

10    know, if, if --

11    BY MR. HOOK:

12         Q     Okay.  So you guys don't pick the contractor;

13    you outsource it; right?

14         A     Correct

15         Q     To Innovation.  Who's that?

16         A     It's a third party.  You know, and what they

17    do is they vet the contractors.  We call Innovations;

18    they select the contractor that works in that ZIP code.

19         Q     How do they vet the contractor?

20         A     I'm not sure of the entire process, but I can

21    assume how other third parties do it.  And that's -- you

22    know, they do criminal background checks --

23         Q     I don't want to assume.  I don't want you to

24    assume.  Do you know for a fact how Innovation vets

25    contractors?
```

                                                  Page 74

Robert Romero- 11/13/19

```
 1        A    I don't know for a fact how they vet the
 2    contractors.
 3        Q    Do you know how Innovation vetted, if at all,
 4    Baldwin Construction?
 5        A    Well, I know they have to vet them because
 6    that's part of the process.  I just don't know what the
 7    process is.
 8        Q    Okay.  So when preparing a competitive bid,
 9    what parameters are put into this request to Innovation
10    to make sure that you get a contractor that's qualified
11    to provide that bid?
12        A    We put the -- Innovations only deal with large
13    losses.  They don't deal with small losses.  So their
14    process of vetting -- I don't want to assume what the
15    process of vetting is, but I just know that the ZIP code
16    that the Bakers are in, they are assigned -- or they
17    work in that general area.
18        Q    Who does?
19        A    Baldwin.  I mean, because that's the ZIP code
20    that they were assigned to -- one of the ZIP codes.
21        Q    You know, I didn't see any historic homes on
22    their website while it was up.  I saw a lot of motels in
23    San Bernardino.  Do you know if they work on historic
24    homes?
25        A    That's funny that you ask.
```

Page 75

Robert Romero- 11/13/19

```
 1                    MR. FELDMAN:  Just answer the question.
 2     Don't --
 3                    THE WITNESS:  I believe they do.
 4     BY MR. HOOK:
 5         Q    And what's that belief based on?
 6         A    'Cause I was driving by my house and it was --
 7     you know, I live in an old neighborhood, 1920s -- it's a
 8     historic neighborhood -- and there was a house fire, and
 9     I saw one of their signs in front of the house that
10     they're rebuilding.  It has lath and plaster, wood
11     floors; it's very similar character.
12         Q    Do you know there's more than one Baldwin
13     Construction?
14         A    Yeah, but I recognized the sign.
15         Q    So -- and when did you see this sign?
16         A    I think it's still out there.  Recently.
17         Q    Okay.  And other than that -- seeing a sign
18     for Baldwin Construction in front of a house that you
19     consider historic, do you have any basis for believing
20     that Baldwin Construction was qualified to provide a
21     repair estimated for the Bakers' home?
22                    MR. FELDMAN:  Asked and answered.
23                    THE WITNESS:  I believe they are
24     qualified.
25     BY MR. HOOK:
```

Page 76

Robert Romero- 11/13/19

```
 1          Q     And what's the basis of that belief.

 2          A     They're a licensed general contractor.  That's

 3     about it [ph].

 4          Q     So they're qualified; right?

 5          A     I grew up in a -- yes, I believe they are

 6     qualified.

 7          Q     Because they're a general license contractor.

 8     Any other reasons?

 9          A     Yeah.  You know, generally contractors use

10     subcontractors.  And some contractors -- flooring, you

11     know, whether you have a T&G floor or whether you have a

12     pegged floor --

13          Q     It doesn't matter.

14          A     It's not that it doesn't --

15                MR. FELDMAN:  It's argumentative.

16                THE WITNESS:  It's not that it doesn't

17     matter.  It's that you use the generally contractor --

18     you use the subcontractors that can do the job.

19     BY MR. HOOK:

20          Q     Mm-hmm.  And the contractor's skill is not as

21     important; is that what you're telling me?

22          A     No.

23          Q     Okay.

24          A     I'm not telling you that.

25          Q     All right.
```

Page 77

Robert Romero- 11/13/19

```
 1        A    I'm saying that what makes a good contractor
 2    is their subs is what I'm saying.
 3        Q    Okay.  Has Baldwin Construction ever worked on
 4    a home that was valid over $500,000?
 5        A    I have no idea.
 6        Q    Okay.  Would Edward Carracsco know that?
 7        A    I have no idea.
 8              MR. FELDMAN:  Lacks foundations.
 9    BY MR. HOOK:
10        Q    What's the full name of this Innovation
11    company?
12        A    Innovations.
13        Q    Innovations?
14        A    Correct.
15        Q    Do you know the names of anybody that works
16    there?
17        A    They will come to me, and I'll tell you.
18        Q    Do you know where Innovations is based?
19        A    I don't.  I think somewhere in the Midwest,
20    but I can find out.
21        Q    So how long did it take to accept or reject
22    this estimate?
23        A    I have to look at the claim diary.
24        Q    You don't know?
25        A    I don't know.
```

Page 78

Robert Rojero- 11/13/19

```
 1        Q    Was it within 30 days?

 2        A    I would hope so.

 3        Q    It wasn't.  It was well after.  And do you

 4   know when Edward Carracsco communicated his rejection of

 5   this estimate to the Bakers?

 6        A    I would have to look at the claim file.  I

 7   don't know.

 8        Q    Would it surprise you that it was the day

 9   after you received the late estimate from Baldwin

10   Construction?

11              MR. FELDMAN:  Lacks foundations;

12   argumentative.

13              THE WITNESS:  I don't think it would

14   surprise me.

15   BY MR. HOOK:

16        Q    And he just instantly adopted the Baldwin

17   estimate as the reasonable one and completely discounted

18   this estimate; right?

19        A    No.  I don't believe that's the case.

20        Q    No?  What did he do?

21        A    I think he was asking Mackey Construction for

22   more information --

23        Q    Mm-hmm.

24        A    -- you know, more details.

25        Q    A detailed invoice like perhaps the one
```

Page 79

```
 1     prepared by Global Consulting Systems?

 2          A     That's more -- that's definitely detailed

 3     estimated.

 4          Q     Yeah.  Let's talk about this one.

 5          A     Okay.

 6                      MR. HOOK:  We're going to attach this

 7     one -- should we take a break before this?

 8                      MR. FELDMAN:  Yeah, we can take a five-

 9     minute break if you're going to move on to another

10     document.

11                      MR. HOOK:  Yeah, let's take a break.

12                      COURT REPORTER:  We are going off the

13     record.  The time is approximately 11:54 a.m.

14                      (Off the record.)

15                      COURT REPORTER:  We are going back on the

16     record.  The time is approximately 12:03 p.m.

17     BY MR. HOOK:

18          Q     Okay, Mr. Romero, we're back on the record.

19     You understand you're still under oath?

20          A     I do.

21          Q     So prior to taking a break, we were discussing

22     the Mackey estimate, right?  And the Baldwin

23     Construction estimate.  And I'm trying to understand why

24     it took Allstate, like, well over 30 days to accept or

25     reject this Mackey estimate but the Baldwin Construction
```

Page 80

Robert Romero- 11/13/19

```
 1    estimate was basically accepted instantly; is that

 2    right?

 3         A    No.

 4         Q    It wasn't?

 5         A    No.

 6         Q    What was -- what --

 7         A    It wasn't accepted instantly.  We had reviewed

 8    it, looked at it, make sure it was in line, and we

 9    accepted it.

10         Q    He accepted it.

11         A    He felt that it was in line.  Yes.

12         Q    Because it was cheaper.

13         A    No.  Because it -- because in his opinion it

14    reflected the claim-related damages.

15         Q    And is he a contractor?

16         A    He was.

17         Q    Okay.  Is he still a licensed contractor?

18         A    I know he -- I don't think it's active, but I

19    know he was -- he was a B [ph].

20         Q    Okay.  And do you think that the Baldwin

21    Construction estimate was accurate?

22                   MR. FELDMAN:  Vague.

23                   THE WITNESS:  I wanted to reinspect this

24    loss.  I hadn't seen the loss.  That's I didn't asked

25    you to reinspect the loss.  I would have been able to
```

                                              Page 81

1    answer that question a little bit better.  I think it's

2    fairly accurate.  I mean sure if I go through it and go

3    through the house, I can find some issues.  But I

4    believe it's more accurate than the other estimates.

5    BY MR. HOOK:

6        Q    Okay.  So you would agree that maybe not

7    all -- none of the estimates were 100 percent accurate;

8    correct?

9        A    I would agree with that, yes.

10       Q    Okay.  So it's a matter of finding a

11   compromise amongst the estimates, right?

12       A    I don't know if it's a compromise.  It's a

13   matter of, you know, penciling it and making sure that

14   everything's accounted for.

15       Q    Okay.  So what happened after the -- Mr.

16   Carracsco told the insureds about the Baldwin

17   Construction bid?

18       A    I don't believe the -- our customers were

19   happy with the construction bid.

20       Q    Do you know why not?

21       A    I believe they didn't believe that it was

22   enough money to get their house completed.

23       Q    Yeah.  And did they express concerns about the

24   qualifications of the contractor to you?

25       A    They did not express concerns to me.

Page 82

Robert Romero- 11/13/19

```
 1        Q    Did they express them to Mr. Carracsco?
 2        A    Yes.
 3        Q    And how did Mr. Carracsco respond to those
 4   concerns?
 5        A    I think he acknowledged the Bakers but felt
 6   that Baldwin Construction was capable of doing the
 7   repairs.
 8        Q    And what did he do to make that evaluation?
 9        A    I -- I don't know.
10        Q    I'll have to ask him Friday.
11        A    Yes.
12        Q    Okay.  And did he ask you for help in
13   evaluating whether Baldwin Construction was qualified?
14        A    I don't remember.  I don't believe so.
15        Q    Okay.  So the insureds went out and got an
16   additional quote; is that right?
17        A    I believe they hired a public adjuster who
18   then got Global Consulting Systems.
19        Q    Okay.  To provide a repair estimate, right?
20        A    Correct.
21        Q    I'm going to attach that as Exhibit 4.
22                  (Exhibit 4 was marked for
23                   identification.)
24             And this looks like a pretty detailed
25   estimate, does it not?
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1          A     Yes, it does.
 2          Q     Okay.  And this estimate, on page 52, has a
 3     grand total for repairs of $364,297.84; correct?
 4          A     Yes, it does.
 5          Q     Okay.  And what did Allstate do to evaluate
 6     whether this was a reasonable estimate?
 7          A     Well, he went through the estimate and, based
 8     on his inspection, determined if this was in line or
 9     not.
10          Q     Okay.  I mean, what -- did you review this
11     estimate?
12          A     I did.
13          Q     And what did you think?
14          A     I felt that it was inflated.
15          Q     At which parts?
16          A     Many.
17          Q     Where?
18          A     Okay.  For example, let's start with line item
19     number three.  Residential supervision 320 hours for
20     $21,472.  That is extremely inflated.
21          Q     What's inflated about that?
22          A     Well, the 320 hours.  The price that we paid
23     on the -- for exacting the [ph] unit cost, that's for
24     skilled people that do that work.  So you're paying
25     someone $21,472 just to watch somebody work.  That seems
```

Page 84

Robert Romero- 11/13/19

```
 1    extremely inflated.
 2         Q    To pay a supervisor on a high-end construction
 3    job $21,000 is inflated?
 4         A    Yes, because the unit -- because the labor
 5    cost is -- when you look at the labor cost --
 6         Q    Yeah.
 7         A    -- that we pay, they're for skilled journey
 8    men.  I mean, it's even, I believe, in some cases more
 9    money than they pay union wages.  So first --
10         Q    Well, --
11         A    -- so when you just have -- that includes for
12    skilled people to do that type of work, you know, the
13    skilled electricians, skilled framers, skilled
14    carpenters.  So when you're looking at 320 hours, yes,
15    that's extremely inflated.
16         Q    Do you know how long the project took, the
17    repair project?
18         A    No, but it should take about five months.
19         Q    Okay.  And so how is 320 hours not reasonable
20    for a five-month project?
21         A    Because the prices that we pay on the unit
22    cost are for skilled people to do that.  This is -- this
23    is strictly for supervision.  No workers.  Just to --
24    not a working supervisor.  This is just strictly
25    supervision.
```

Page 85

Robert Romero- 11/13/19

```
1        Q    Supervision, right, in Hancock Park, one of
2    the most extensive neighborhoods in Los Angeles.  So
3    paying $67 is unreasonable, right?
4        A    No.  This 320 hours is unreasonable.
5        Q    Okay.  What else in here -- in this estimate?
6        A    Okay.  When we're looking at the -- you have
7    the 13 truckloads of debris.  Most of the plaster work
8    and stuff was already removed.  That's seems a little on
9    the high side.
10       Q    Where is that?
11       A    Item number four.
12       Q    Item number four --
13       A    Yeah.
14       Q    -- demo and haul debris.  Okay.
15       A    And then here, when you're looking at --
16       Q    Well, let's compare that to where Baldwin's --
17   where was Baldwin's estimate on that, huh?
18       A    I don't know.
19       Q    Here, I'll attach this as Exhibit 5.
20                 (Exhibit 5 was marked for
21                 identification.)
22            And why don't you show me where in Baldwin's
23   estimate they have their line item for demolition.
24       A    Here.  They have a line item number one; it's
25   one pickup load.  And, again, remember the mitigation
```

Page 86

1    company already did most of the demo already.

2          Q     So they have --

3          A     All the floors were removed; the plaster was

4    removed.

5          Q     Okay.

6          A     See, that's line item number one.

7          Q     And that's based on what Ed told you, right,

8    'cause you'd never been to the site?

9          A     Correct.

10         Q     Okay.  And so they just had one.  So they

11   thought that this -- the only debris would cost $126 on

12   the project, right?

13         A     Yeah, 'cause most laborers -- or most

14   subcontractors take the debris with them.  So --

15         Q     Mmm.  I've never seen that, but okay. All

16   right.

17         A     So I'll go on.

18         Q     Okay.

19         A     The temporary toilet and temporary power

20   usage -- that's usually -- that's industry standard to

21   do it on an incurred basis because we don't know what

22   that's going to be.  So that may be right or it may not

23   be right.  But then you have cleaning technicians here

24   of 32 hours, which doesn't seem bad.  But then you have

25   final cleaning of another $1,000.  I can understand the

                                                  Page 87

Robert Romero- 11/13/19

```
 1    final cleaning, but the -- but the cleaning technician,

 2    when you look at the line item on the supporting events

 3    on Exactimate, it includes picking up after yourself,

 4    you know, for the individual line items.  So that

 5    seems -- you know, it's not a little [ph] thing.

 6              A couple things here is on item number 14.

 7    This is a big one because you have three-coat plaster

 8    over wood lath for item number 14.  And then number 15

 9    you have add for coffered ceilings and domes.  The house

10    didn't have covered ceilings.

11         Q    And how do you know that?

12         A    Because I saw the pictures.

13         Q    But you never inspected the house, did you?

14         A    No, but I've seen the pictures of the ceiling.

15    So that's a $3,933 ...

16              And then, item 16, you have thin coat plaster

17    over it.  Well, you're already paying for a three-coat

18    plaster.  So the way it works, you have your scratch,

19    your brown, and your finish.  But then he's adding an

20    additional coat of plaster that wasn't there or not

21    necessary.

22              You have your outlets detach and reset.  The

23    outlets were already detached when you're taking out the

24    plaster.

25         Q    $69 you can save there.
```

Page 88

```
 1         A     Well, I'm just -- I can go through the whole
 2    estimate.  It's not just --
 3         Q     No, let's go through the whole --
 4         A     -- 69 -- okay.
 5         Q     -- estimate.  We're going to go through -- I
 6    want the whole estimate.
 7         A     All right.  So let's go -- we'll look
 8    through -- so I can compare to the Baldwin estimate.
 9    We're in the foyer.  Here, the crown molding --
10         Q     Which page are you on?
11         A     I'm on page four.
12         Q     Okay.
13         A     Sorry.  My eyes are getting batty.  Give me a
14    second.
15         Q     Sure.
16         A     I think it's the light.  It's kind of hard to
17    read.
18         Q     Would you like me to turn the lights off.
19    Would that --
20         A     No.  No, it's fine.
21               MR. FELDMAN:  How about -- how about --
22    is that glare coming through that window over there?
23               THE WITNESS:  That's what it is.  The
24    glare.  But it's okay.  I don't think we can do much
25    about it.
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1                    MR. HOOK:  I can close the shades.
 2                    MR. FELDMAN:  Do you wear reading
 3      glasses?
 4                    THE WITNESS:  I'm going to need to.
 5                    Okay.  Item number 32, you have Oak
 6      flooring clear grade.  But it's number one standard; not
 7      a big, big issue.
 8               You're adding three coats of stain.
 9      BY MR. HOOK:
10          Q    Wait, wait.  Sorry.  On 32 -- okay.  So --
11          A    It's the number one common.  That's the type
12      of floor that was installed in circa 1920 homes.  The
13      Mackey estimate had select, and this one's clear.
14               And then you add -- on 34, you're adding an
15      additional coat of finish on the floor.
16               And then you're adding for dustless sanding,
17      which is not necessary because the house is empty and
18      vacant and you already have the cleanup.  So that's item
19      35.  There's no need for dustless sanding if you're
20      already cleaning.
21               We'll move on to the dining room.  And, again,
22      you have three coats of plaster; then you're adding for
23      coffered ceilings another $5,746.  There wasn't -- in
24      the dining room there weren't coffered ceilings.  That's
25      a $5,746 mistake.
```

Page 90

Robert Romero- 11/13/19

```
 1              And then item 39, you're adding another thin
 2   coat of plaster over three coats.  That's $3,083.
 3              Is this the final estimate from Baldwin?  I
 4   know there was a revised one at the end.  I'd rather be
 5   more accurate and get the revised -- the final estimate
 6   so I can --
 7        Q    Well, I'm asking you to just looking at the
 8   Global Consulting Systems.
 9        A    Yeah, but I need to see the final estimate to
10   make sure the square footage and stuff is correct.
11        Q    Well, I don't have.  I have -- this is what I
12   have.  I have this estimate.  So ...
13        A    Okay.
14        Q    You know, this is the one that you guys based
15   your rejections of the other ones on, so presumably it
16   was fairly accurate.
17        A    It's fairly.  I mean, not 100 percent because
18   there was --
19        Q    Right.
20        A    -- a $30,000 supplement, approximately.  See,
21   I have to make sure that the measurements are -- and the
22   amount -- the linear footage is in line, too.  That's
23   why I wanted to see the other estimate.
24        Q    Okay.  Well, I don't have it.  So --
25        A    Okay.
```

Page 91

Robert Romero- 11/13/19

```
 1        Q    -- I'm just asking you from -- on this
 2    estimate what's unreasonable about this estimate?
 3        A    Well, you're adding additional coats of finish
 4    on the floor; you're adding dustless sanding --
 5        Q    Well, let's go -- I want you to show me each
 6    line.  So we're now --
 7        A    Okay.
 8        Q    -- on page six.  And tell me which lines are
 9    unreasonable.
10        A    I will tell you that, but I will also -- I
11    need to make sure that you know that I will have more
12    information if I had the other estimate.  Okay?  So this
13    is --
14        Q    Okay.
15        A    -- based on just what I have here in front of
16    me for right now.
17        Q    Okay.  Well, when you guys received this
18    estimate in January, you didn't have a subsequent
19    estimate from Baldwin either.
20        A    Correct.  But --
21        Q    Right?  So I'm asking you to evaluate what's
22    unreasonable --
23        A    But I'm already --
24        Q    -- on what basis did you deny these customers
25    you know the --
```

Page 92

1          A     Well, they didn't have coffered ceilings and,

2     you know, that's thousands of dollars per room that

3     they're charging.  That's significant.

4          Q     According to your adjuster, Edward Carracsco,

5     right?

6          A     And the photos that I reviewed.

7          Q     And the photos that you reviewed, but not your

8     personal knowledge.

9          A     Well, my personal knowledge based on that

10    information.

11         Q     Right.

12         A     Yeah.

13         Q     Okay.

14         A     And then the additional coats of plaster

15    throughout all the walls.

16         Q     Yeah.  Okay.

17         A     And then I'm not sure if the contents people

18    took the chandeliers because that's -- sometimes it

19    happens.  And so I'm not sure if that's an oversight

20    on -- I mean an overlap on this estimate as well, 'cause

21    you have chandeliers in several rooms.

22              We'll go to the living room.  So instead of

23    saying the same objections, it's the same line items for

24    the coffered ceilings --

25         Q     Let's point them all out.  Okay?  That's why

Page 93

Robert Romero- 11/13/19

```
 1    we're here.  So what item where you on?
 2         A    All right.  Item 64 has three coats of plaster
 3    over wood lath.  And then -- then you have plaster add
 4    on for coffered domes.  And that's $7,148.25.  And then
 5    you have another $4,169.41 for the additional coat of
 6    plaster, line item 66.
 7         Q    So 65 and 66 were totally unnecessary?
 8         A    That's correct.
 9         Q    Okay.
10         A    You know, just in that room is over $10,000,
11    plus overhead and profit.  So that's, you know, over
12    $12,000 just in that room.
13              And then here, the plaster had to be skimmed
14    to ensure a smooth finish.  That's not true because
15    you're putting new plaster.  So why skim over new
16    plaster?
17         Q    Okay.  Well, that's part of line 66, and we
18    just discussed that.  So go ahead, keep going.
19         A    All right.  We had 12 recessed light fixtures
20    in the living room counted, and you have 13.
21         Q    And which item number is that?
22         A    Looks like 71.
23         Q    So $117 there.
24         A    I don't see where we have the sheeting, and
25    looking at the pictures, it had the vertical -- diagonal
```

Page 94

1    pricing, and they're adding sheathing here which is

2    $689.  I don't see it on our estimate and I didn't see

3    it in the photographs.

4         And then the Oak floor, item number 89 --

5    Q    You didn't see sheathing -- wait.  Sorry.

6    Number 87, you're saying you didn't see --

7    A    Sheathing.

8    Q    You didn't see sheathing where?

9    A    In the pictures on the original house.  But

10   then they have it on this estimate.  On the Global has

11   it.  Because it was original to the house, they're not

12   going to have half-inch CDX.  They just didn't have that

13   type of material back then.

14   Q    Okay.

15   A    And then item number 89, the Oak flooring with

16   plugs, you're at 10.67.  I think the ITEL came in at $5

17   and change.  So that's a little high.

18   Q    So these homeowners that bought a deluxe

19   policy for their building replacement get $5 a square

20   foot for their hundred-plus-year-old Oak wood flooring

21   'cause that's what your program pumped out?

22   A    No.  That's not what the program pumped out.

23   We actually took a sample of the floor and we sent it to

24   an inspected laboratory and they gave us a suggested

25   retail price of today's cost.

Page 95

Robert Rivero- 11/13/19

```
 1        Q     Okay.  And what -- what is that based on?  Do
 2    you know how they come to that conclusion?
 3        A     Well, my understanding -- okay, I may not be
 4    100 percent, but this is my understanding -- is they
 5    look at it; they look at the thickness of the floor, the
 6    spaces of the floor, the amount of the luminite [ph] it
 7    has, because that is the scratch resistant on the floor.
 8    There's a bunch of criterias that they use.
 9        Q     And this is another Allstate vendor?
10        A     No.  Well, it's an independent vendor that
11    almost all insurance companies use.  It's a laboratory.
12        Q     What's it called?
13        A     ITEL, I-T-E-L.
14        Q     So they don't sell wood floors, right?
15        A     No, no.  They just analyze them and give you
16    the suggested retail price.
17        Q     Okay.  And you thought that that was a better
18    price than Global?
19        A     No, I didn't think it was a better price.  I
20    thought that was the correct price.
21        Q     Based on what?
22        A     On their analysis.
23        Q     And you think they're correct and these guys
24    are wrong?
25        A     Correct because --
```

                                                    Page 96

Robert Romero- 11/13/19

```
 1        Q     Why?

 2        A     -- because they're the one analyzing it

 3   through a microscope where --

 4        Q     So it's right.

 5               MR. FELDMAN:  It's argumentative.  Don't

 6   get into an argument.

 7   BY MR. HOOK:

 8        Q     So they analyze it through a microscope, so

 9   they must come up with the right price, right?

10        A     No.

11               MR. FELDMAN:  Argumentative.

12               THE WITNESS:  I believe that they would

13   be more accurate than someone just guessing what the

14   price is on a wood floor.

15   BY MR. HOOK:

16        Q     And that's what Global did?

17        A     I don't --

18               MR. FELDMAN:  Lacks foundations.

19               THE WITNESS:  I don't know what they did,

20   but their pricing didn't match the ITEL report.

21   BY MR. HOOK:

22        Q     It's true that you just adopt whatever

23   Allstate vendors provide you, you guys just adopt that

24   as reasonable, right?  That's -- that becomes what's

25   reasonable.  And then everything else is unreasonable.
```

Page 97

```
 1    Anything that's higher than that, right?
 2        A    That is not true.
 3        Q    No?  What's the truth?
 4        A    The truth is we pay for what we believe is
 5    owed.
 6        Q    Right.  What you believe is owed.
 7        A    What Allstate believes is owed, what the
 8    industry standards are.
 9        Q    And it doesn't matter what the insureds think
10    they are owed, right?
11                    MR. FELDMAN:  Argumentative.
12                    THE WITNESS:  The insureds are entitled
13    to their opinion, and we respect their opinion.  But we
14    have to go based on our training, our knowledge, and
15    what the industry says the cost should be.
16    BY MR. HOOK:
17        Q    Mm-hmm.  And what industry costs are is less
18    reliable in a really unique property; wouldn't you agree
19    with that?
20                    MR. FELDMAN:  Vague; overbroad.
21                    THE WITNESS:  It depends.  A wood floor,
22    I mean, ITEL -- it's a laboratory in Florida -- they
23    deal with --
24    BY MR. HOOK:
25        Q    Sir, I want you to answer -- listen carefully
```

                                            Page 98

Robert Romero- 11/13/19

```
 1    and answer my question.
 2         A    Okay.
 3         Q    Industry standards are not as accurate a
 4    predictor for replacement costs for a very unique
 5    property; would you agree with that statement?
 6                   MR. FELDMAN:  It's vague.
 7                   THE WITNESS:  It depends.
 8    BY MR. HOOK:
 9         Q    It depends on what?
10         A    On the material.  What material are you
11    referring to?  Are you referring to plaster?
12         Q    Yeah.  I'm referring to historic hundred-year-
13    old materials.  Those -- replacing and repairing those
14    may not be entirely consistent with contemporary
15    industry standard prices that Allstate typically uses;
16    would you agree with that?
17                   MR. FELDMAN:  It's overbroad; it's vague
18    and ambiguous.
19                   THE WITNESS:  It may be true.  It depends
20    on --
21    BY MR. HOOK:
22         Q    Mm-hmm.  Okay.
23         A    -- the certain circumstances.
24         Q    So in this case, what did Allstate do to make
25    sure that they were providing reasonable estimates to
```

Page 99

```
 1    use when they were comparing estimates obtained from

 2    their insureds?

 3         A    Well, I believe Ed conceded to using the

 4    plaster sub bid from Mackey because it was with the true

 5    redwood lath and plaster.  I believe that we used ITEL,

 6    who is an independent laboratory that would give us the

 7    suggested retail of the floor.  I think that's something

 8    we did to ensure that we're getting -- that we're doing

 9    the right thing and that we're getting the correct

10    prices.

11         Q    Mm-hmm.  So even though this is a hundred-

12    year-old plus home, you didn't think any special care

13    needed to be taking in selecting a contractor to get a

14    competing bid?

15                   MR. FELDMAN:  Lacks foundations; vague

16    and ambiguous; argumentative.

17                   THE WITNESS:  I believe that we used the

18    system for a large loss, and the contractor that was

19    selected can do the repairs.

20    BY MR. HOOK:

21         Q    So you didn't answer my question.

22         A    Well, I believe that, that --

23                   MR. FELDMAN:  If you think you answered

24    his question, you don't need to --

25    BY MR. HOOK:
```

Personal Court Reporters, A Veritext Company
818-988-1900

```
1        Q     So you're -- so basically the system --

2                    MR. FELDMAN:  It's not a question.

3    BY MR. HOOK:

4        Q     -- doesn't have a mechanism for -- would you

5    agree with that, that Allstate doesn't have a system in

6    place for providing estimates in situations where

7    there's a unique loss?

8                    MR. FELDMAN:  Vague and ambiguous.

9                    THE WITNESS:  I don't understand what

10   you're asking me.  Can you rephrase it, please.

11   BY MR. HOOK:

12       Q     Yeah.  Sure.  I'm asking you -- you guys hired

13   a really unqualified contractor to provide a competing

14   bid who does no work in Los Angeles and no high-end

15   work.  And you used that as a basis to kind of bludgeon

16   your own insureds into accepting a lower settlement.

17   And what I'm asking you is don't you think Allstate

18   should have a procedure in place whereby you obtain a

19   quote from a competent contractor on a unique property

20   like the Bakers' residence that's worth three and a half

21   million dollars, it was built in 1920.  Rather than

22   somebody that builds 7-Elevens in San Dimas?

23                   MR. FELDMAN:  All right.  There's so many

24   problems with that question.  It basically was, I don't

25   know, testimony from counsel or closing argument for a
```

Page 101

```
 1    paragraph before there was anything with a question

 2    mark.  It lacks foundations; it assumes facts not in

 3    evidence; it's argumentative; it's overbroad; it's vague

 4    and ambiguous

 5                    So if you can remember a question in that

 6    soliloquy, you can answer.

 7    BY MR. HOOK:

 8        Q    Should -- does Allstate have a policy or a

 9    procedure in place for obtaining estimates on unique

10    properties?

11                    MR. FELDMAN:  Vague and ambiguous; asked

12    and answered.

13                    THE WITNESS:  Allstate's policy is to

14    make sure that the contractors are vetted and they can

15    do the repairs in workmanship [ph] manner.

16    BY MR. HOOK:

17        Q    And for a unique property, how is that done?

18                    MR. FELDMAN:  Vague and ambiguous.

19                    THE WITNESS:  The property is, is --

20    BY MR. HOOK:

21        Q    Sir, for a unique property such as --

22        A    I'm trying to answer you.

23        Q    -- the Bakers', how is that done?

24                    MR. FELDMAN:  Asked and answered.

25                    THE WITNESS:  We have a licensed
```

Page 102

Robert Romero- 11/13/19

```
 1    qualified contractor that can give us a competitive bid
 2    to do the repairs.
 3    BY MR. HOOK:
 4        Q    Okay.  And how does Allstate verify that that
 5    contractors is qualified to prepare an estimate?
 6        A    'Cause we use Innovation who vets the
 7    contractors.
 8        Q    Okay.  So you rely on a third party to do it?
 9        A    Correct.
10            MR. HOOK:  Okay.  Let's take a break for
11    lunch, counsel.
12            COURT REPORTER:  We are going off the
13    record.  The time is approximately 12:30 p.m.
14            (Off the record.)
15            COURT REPORTER:  We are going back on the
16    record.  The time is approximately 1:38 p.m.
17    BY MR. HOOK:
18        Q    Good afternoon, Mr. Romero.  Thank you for
19    being with us again here this afternoon.  Do you
20    understand you're still turned oath?
21        A    Yes.
22        Q    Okay.  Excellent.  And as I mentioned, you
23    know, if you ever need to take a break, it's no problem.
24    Okay?
25        A    Thank you.
```

Page 103

```
 1       Q    Sure.  All right.  I don't have a lot more

 2    material.  I'm going to try to get through as much as I

 3    can, subject to some other reservations I'm going to

 4    state.  But let's finish with the Global Consulting.  We

 5    were going through that and you were -- we were -- I

 6    asked you to highlight -- to go through it, you know,

 7    page by page and point out any charges that you thought

 8    were unreasonable, and you had identified several,

 9    including some charges for plaster, coffers, and domes

10    that apparently were not at the property.  But I want to

11    continue this exercise.  We left off, I believe, on page

12    nine.  You mentioned line item 87.  There is a sheathing

13    plywood line item that you mentioned.  But I would like

14    to continue through from there.  And if you could, sir,

15    please go through --

16       A    Okay.

17       Q    -- and then identify any other charges as part

18    of this estimate that you thought were unreasonable or

19    unrelated to the covered loss.

20       A    Okay.  I'm just going to open up the

21    estimates.  Okay?

22       Q    Mm-hmm.  Sure.

23       A    I don't know where I left off on page nine,

24    but we'll just go on item number 91 --

25       Q    Okay.
```

Robert Romero- 11/13/19

```
 1        A     -- where you have the additional cost for the
 2    additional coats of plaster when you're already allowing
 3    for the coats of plaster.  So that's ...
 4            And then item number 92 is the add for
 5    dustless sanding, you know.
 6        Q     Okay.
 7        A     Especially when you already have masking and
 8    cleaning.  So it's -- it would be a duplicate.
 9        Q     All right.  And then the kitchen.
10        A     Item number 95 for $3,525.79 -- that's a
11    duplicate because you already have three coats of
12    plaster in item number 94.
13        Q     Okay.
14        A     Item number 97 -- there's a discrepancy
15    between Baldwin's estimate and Global Consultant's
16    estimate because we have nine recessed light fixtures
17    and Baldwin has one.  But then he has eight on the trim
18    only.  So I think that's okay.
19            You have width [ph] shutters in the Global
20    estimate that I don't see in the Baldwin estimate.  So,
21    again, without reinspecting it, I don't know if that's
22    necessary or not.  A new inspection would assist with
23    me -- would assist me with that.
24            When you're dealing with -- at the beginning
25    of the line item, at the beginning of the estimate, will
```

Robert Romero- 11/13/19

```
 1    you the duct work.  That also includes the detaching and
 2    resetting of the vents.  And then you're having -- you
 3    have an addition here on item number 106.
 4         Q    Say that again.
 5         A    Okay.  When you're replacing duct work --
 6         Q    Yeah.
 7         A     -- it includes the detaching and resetting of
 8    the registers.  Because you're replacing the duct work.
 9    So he has that in the beginning of the estimate.  And
10    then, again, he has it -- then he has detach and reset
11    it in this estimate.  It's a small dollar amount, but --
12         Q    Well, this is --
13         A    -- it's a discrepancy.
14         Q    -- for the living room.  This is for the
15    family room with respect to that specific register.
16         A    Correct.  But he had it on the general items
17    for the entire downstairs.
18         Q    Where?
19         A    In the main -- in the beginning of the
20    estimate.
21         Q    What page?
22         A    Line item number six, $4,974.81.  Page two.
23         Q    That's to replace the duct work.
24         A    Yeah, correct.  But when you replace the duct
25    work, you have to detach and reset the register.  It's
```

Page 106

Robert Romero- 11/13/19

```
1    included in the supporting events on Exactimate.
2        Q    Maybe it is; maybe it isn't.  I mean --
3    secured it [ph] with respect to the register in the
4    family room.  So I agree with you.  But it's really just
5    kind of nickel and diming.  But anyway, what else do you
6    see?
7        A    Well, are you -- do you want me to just pick
8    up the large items?  Or do you -- my understanding when
9    you asked me was to get everything that I could see
10   right here as my review.
11       Q    Yeah.  No, I'm asking you -- so you think
12   that -- so you think that's an unreasonable charge?
13       A    What I'm saying, it's already included in the
14   duct work.
15       Q    How do you know that he's including it in
16   there?
17       A    Because the line item on Exactimate has the
18   supporting events, and the supporting events tells you
19   what it includes, and it includes the detaching and
20   resetting of the registers.
21       Q    Well, you don't know what he intended in this
22   estimate.  That's your own interpretation of what it is.
23            MR. FELDMAN:  Well, that's a statement.
24   It's not a question.
25   BY MR. HOOK:
```

Personal Court Reporters, A Veritext Company
818-988-1900

1      Q     Right?

2      A     Wrong.

3      Q     Okay.  I'm wrong.  Okay.  Continue to go

4    through and identify unreasonable charges, please.

5      A     The carpet -- you have premium grade at $6.16.

6    That's just a generic line item.  You know, you have

7    average carpet, good carpet, premium.  We actually use

8    the ITEL, which -- the carpet that gives you the type of

9    yarn it is, the stitch rate, the weight of the yarn,

10   which is substantial more accurate than the just generic

11   premium grade on the Global Consulting System estimate.

12     Q     Mm-hmm.  Okay.  And what did your Allstate

13   vendor say should have been the cost for the carpet?

14     A     It wasn't the Allstate vendor.  It was the

15   ITEL report, the lab -- the independent lab.

16     Q     They're a vendor that Allstate uses, right?

17             MR. FELDMAN:  Vague and ambiguous.

18             THE WITNESS:  I guess you can consider

19   them a vendor.  I mean --

20   BY MR. HOOK:

21     Q     Okay.  So what was --

22     A     -- I don't but --

23     Q     What was Allstate's vendor's estimate there?

24             MR. FELDMAN:  Lacks foundations.

25   BY MR. HOOK:

Page 108

Robert Romero- 11/13/19

```
 1        Q     For the carpet.

 2        A     I'm looking for it.  Give me a second.  Four

 3   dollars and 21 cents.  It's about an $800 difference for

 4   the room.

 5        Q     Okay.

 6        A     Okay.  Carpet pad --

 7        Q     So again, we have a difference in estimate.

 8   Doesn't mean one's necessarily right or wrong, right?

 9        A     Well, to use your point where you say this

10   is -- you know, you have to estimate for what they have,

11   that's what we did.  They just picked a line item on

12   Exactimate.  We actually got the material and send it to

13   an independent lab to get the suggested price.

14        Q     Okay.  Is the suggested retail price mean that

15   the clients can actually replace the carpet for that

16   amount?

17        A     Correct.

18                  MR. FELDMAN:  Overbroad.

19   BY MR. HOOK:

20        Q     That's correct?

21        A     That's correct.

22        Q     And how do you know that?

23        A     Because it happens all the time.

24        Q     Tell me in a case where it's happened

25   recently.
```

Robert Romero- 11/13/19

```
 1        A     We have a --
 2                   MR. FELDMAN:  By the way, I'll just
 3     causing you that insureds have a right protected -- a
 4     right to privacy protected by the Insurance Code.  So if
 5     you want to give examples that you can actually recall,
 6     you can give examples.  But don't give any names,
 7     because that's not permitted.
 8                   THE WITNESS:  Okay.  It's daily.  We use
 9     ITEL -- in fact, it's very common for the public
10     adjuster who requested this estimate from Global
11     Consulting to use ITEL.  It's almost their standard
12     practice.  In fact, I recall a loss recently with the
13     same public adjuster where they asked for the ITEL
14     report because that's what he wanted to use to put in
15     the pricing.
16     BY MR. HOOK:
17        Q     Okay.  So your vendor came up with a lower
18     number for the carpet.  We have that, $4 as opposed to
19     six.
20        A     Okay.  And then the carpet pad -- let me see
21     where we're at on the carpet pad.  I don't see the
22     carpet pad.
23                   Okay.  We'll move to the hallway.  Now, I have
24     to look at Baldwin's estimate because the rooms don't
25     coincide the other.  So let me look for the hallway.
```

Page 110

1          I'm not going to make sure it's the same

2     hallway, okay?  Square foot after walls we have 98

3     three, and this is four 12. So it's not the same

4     hallway.

5          In the hallway I'm not sure which floor it

6     has, if it had the pegged floor or the original T&G.  So

7     that may be an issue, but I'm not sure until I see

8     pictures or maybe a -- the sketch.

9          It has additional -- item number 125 has an

10    additional coat of flooring.  And then item 126 has

11    dustless sanding.

12         Looking at the powder room, page 13.  It has

13    the -- item number 29 [sic], it has the thin coat

14    plaster, no lath.

15         The floor, I think this was the -- there's two

16    types of floor in the powder room.  Item number 154 they

17    have the wrong grade of floor.  They have the additional

18    coat of finish, item number 155.  They have the dustless

19    sanding, item 156.

20    Q    155 is -- you think that's too high for the

21    floor?

22    A    No, that's not needed because it -- you're

23    already doing the sand stain and finish the wood floor.

24    And now you're adding additional coats on top of that.

25    Q    No, no.  I said 153.  The flooring charge for

Page 111

1    $417 dollars, that's expensive?

2        A    Well, no, I'm talking about the square foot

3    price.  Well, yeah, you're correct.  Because the ITEL

4    came in at, I believe, five bucks, and that's 10.59.

5        Q    And, again, that's what you guys consider

6    reasonable, what ITEL pops out, right?

7        A    Yes.

8        Q    All right.  Keep going through the pages.

9        A    Okay.  So we talked about everything on page

10   14.  We'll go to the informal dining room, which is ...

11           I am not sure about this chandelier, if it was

12   done by the contents people.  If it does, then it may be

13   a duplicate item. I would have to double check on that.

14           Item 166, the mechanically detach and reset

15   the AC register.  That's going to be done when you

16   replace the ducting.

17       Q    But don't you finish the ducting before you do

18   the finished drywall last?

19       A    No.  What you do is you -- because the ducting

20   goes between the walls.

21       Q    Yeah.

22       A    And once the drywall's done, then you come

23   back and you do the -- but the cost is already included

24   in the replacement of the ducting.

25           I see a price difference in the cabinetry

                                          Page 112

Robert Romero- 11/13/19

```
 1    quality.  We $397 a square foot.  And you're at $740 --
 2    I'm sorry.  I misspoke.  A linear foot.  So that's ...
 3         Q    And where did you get that number?
 4         A    167.
 5         Q    And the 740 price is, you think, too high?
 6         A    $740 for cabinets.  I mean, he's using premium
 7    cabinets.
 8         Q    They were premium cabinets.
 9         A    I have no basis to say that they were premium.
10         Q    'Cause you didn't go out there, right?
11         A    Yeah.
12         Q    Right.
13         A    They were built-ins and they were custom, but
14    I'm not sure if they were premium cabinets.  From back
15    then they were either alder or, you know, they weren't
16    like bird's eye maple or anything like that.  They just
17    didn't do that type of wood back then in the '20s, you
18    know, or in that type of construction in the house.
19         Q    So they weren't premium cabinets and you
20    thought that --
21         A    We're saying --
22         Q    -- in your view they weren't premium cabinets,
23    and what was your price for the carpentry?
24         A    Well, a linear foot -- almost $400 a linear
25    foot.
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

1        Q     As opposed to 740.  And what was that based

2    on?  What's that -- where do you get that unit price?

3        A     In -- because the thing is is that we're

4    detaching and resetting that.  Because the reason why

5    we're replacing them is because the wood floor went

6    underneath the cabinets.  So there's a difference in

7    scope.  And you're replacing --

8        Q     How do you know the cabinets weren't damaged?

9        A     Built-in cabinets would need to be detached

10   and reset to have the wood flooring installed.  It notes

11   that -- I'm not -- I don't see an indication that

12   they're damaged.

13       Q     Okay.  So this is a charge for reinstallation.

14       A     And you're charging for the replacement.

15       Q     Why do you see that?

16       A     Okay.  See on your -- on the Global estimate,

17   do you see --

18       Q     Yeah.

19       A     -- 167?

20       Q     Uh-huh.  Removed to facility repairs.

21       A     Yeah.  So why would it be $740 just to detach

22   and reset that?  The linear foot.

23       Q     Because it's a massive wooden cabinetry

24   system.

25       A     I get that, but it's every linear foot.  So

                                              Page 114

1    it's $740 not for the whole unit.  It's for every 12

2    inches.

3         Q    Yeah, I understand.

4         A    Okay.

5         Q    It's a massive cabinetry system that needs to

6    be pulled out and put back in, and they wanted to charge

7    $4,441.  And you guys found that unreasonable, right?

8    And I'm asking you why.

9               MR. FELDMAN:  Asked and answered.

10              THE WITNESS:  Because I believe it's

11   high.

12        Q    Why?  I mean --

13        A    Based on my review of the, of the review of

14   the estimates.  You're asking me why I feel it's

15   expensive?

16        Q    Yeah.

17        A    Because I believe it's inflated.

18        Q    But based on what?

19        A    On the linear footage and the amount of work

20   that's necessary.

21        Q    Because the linear footage was too much.

22        A    No.  They're both about six linear feet.

23        Q    Okay.

24        A    But to detach and reset it, it doesn't cost

25   $4,440.

                                        Page 115

 1        Q     How do you know that?

 2        A     'Cause I've been doing this for a long time

 3   and I've never seen an estimate to detach and reset six

 4   linear feet of cabinet being that high?

 5        Q     Have you ever done a massive property damage

 6   case for a mansion in Hancock Park?

 7                    MR. FELDMAN:  Argumentative; lacks

 8   foundations.

 9                    THE WITNESS:  No.  But I have built my

10   own house and I had premium custom cabinets.

11   BY MR. HOOK:

12        Q     Have you ever worked on a house in Hancock

13   Park?

14        A     No.  I have not.

15        Q     Has Carracsco?

16        A     I don't know.

17        Q     Has -- have you ever handled a property damage

18   claim for a house that was qualified for the Mills Act?

19        A     I'm not sure what the Mills Act is.

20        Q     A house that Ms. Historical providence.

21        A     Yes.

22        Q     And what was that house?

23        A     What do you mean "what was that house?"

24        Q     What -- what was the address?  What was the

25   house?

                                        Page 116

1          MR. FELDMAN:  Well, don't give specific

2     addresses, even if you could possibly remember them.

3          THE WITNESS:  I've had some in the L.A.

4     market.  I've many some in the Pasadena market.  I've

5     had some all over.  I can't remember all the homes, but

6     I have dealt with HPOZs and I have damage multi-million-

7     dollar homes.  I mean, not me personally built them, but

8     I've helped adjust those claims.

9     BY MR. HOOK:

10         Q    Mm-hmm.  And you worked with custom cabinetry

11    people to find out the industry standard for removal of

12    custom cabinetry?

13         A    I haven't researched the industry standards

14    for a custom house, but I've worked on a multi-million-

15    dollar house that's a green and Greene & Greene house

16    that had major historical value, not only on the

17    exterior but also on the interior.

18         Q    Okay.  And who did you guys use to estimate

19    construction costs on that Greene & Greene house?

20         A    We used Protech Construction?

21         Q    Protect Construction?

22         A    Correct.  And they actually did the repairs.

23         Q    Okay.  And was that a contractor that was

24    selected through the Innovation?

25         A    I don't think it was done through Innovation.

Page 117

Robert Romero- 11/13/19

```
 1        It might have been on Alaperty [ph].  There's several

 2        third parties that do that type of work.  I don't quite

 3        remember which third party it was.  But I'm pretty sure

 4        that Protech is part of the Innovation group.

 5             Q    And was Protech selected bite insureds or by

 6        Allstate?

 7                      MR. FELDMAN:  Vague.

 8                      THE WITNESS:  Well, what do you mean by

 9        "selected"?

10        BY MR. HOOK:

11             Q    Who selected Protech to perform the

12        construction on the Greene & Greene house?

13             A    The customer.

14             Q    And did Allstate pay the full estimate in the

15        case?

16             A    I don't remember if there was a policy limit

17        issue.  But the job was complete, and the customer was

18        happy.

19             Q    Okay.  But did Allstate pay the full estimate

20        from Protech?

21             A    Like I said, I don't remember if there was a

22        limit issue.  I remember the guy collected, like,

23        astronaut helmets and was, like, a policy limit issue.

24        So they did the contents -- I can't give you specifics

25        on that, but we paid everything that -- you know, they
```

Page 118

```
 1    did the repairs and the insured was happy.  Protech got
 2    paid.  I don't know how else I can answer that.
 3         Q    Okay.  Let's keep going through and keep
 4    identifying things that you think are too expensive.
 5              What's Allstate's policy for determining if a
 6    unit price is unreasonable?
 7                   MR. FELDMAN:  Overbroad.
 8                   THE WITNESS:  It depends on what you're
 9    referring to.
10    BY MR. HOOK:
11         Q    Well, for example, removal of cabinetry.
12    What's Allstate's policy for determining the
13    reasonableness of that unit charge?
14         A    Well, what we normally do, our normal practice
15    is that we try to reaching agreements with the customer.
16    If there's major discrepancies, then we get competitive
17    bids to see what it's actually going to cost to get the
18    repairs done.
19         Q    Again, that's not answering my question.  I'm
20    asking, when you get an estimate like this, what's
21    Allstate's policy for evaluating the reasonableness of
22    unit charges?
23         A    I believe I answered --
24                   MR. FELDMAN:  Lacks foundations; asked
25    and answered.
```

Page 119

Robert Romero- 11/13/19

```
 1                    THE WITNESS:  I believe I answered it to
 2     the best of my ability.
 3     BY MR. HOOK:
 4          Q    Just getting competing bids?
 5          A    No.  We look at it.  We talk to the
 6     contractors.  We try to reach agreements.  And if not,
 7     we have to get the competitive bids or get an expert
 8     involved.
 9          Q    Okay.  All right.  So we're on page 16.  Keep
10     going.
11          A    Okay.  The additional item -- 179, the
12     additional coat of finish.  Item 180, dustless sanding.
13               I believe the price of the baseboard -- yeah,
14     we're at $6.77.  Global's at 10.57.  It was a six-inch
15     baseboard.  They're using eight-inch.  So I would have
16     to verify if there's a six-inch or eight-inch, but
17     there's a discrepancy there -- item number 188.
18               The additional coats of finish, the dustless
19     sanding -- item 193 and 194.
20               The built-in freezer/refrigerator remove and
21     reset for 579.58, I'm not --
22                    MR. FELDMAN:  What number --
23                    THE WITNESS:  Item number 199.  I'm not
24     sure if the contents company did that.  So I would have
25     to verify that.  Same thing with the dishwasher.
```

Page 120

| | |
|---|---|
| 1 | Usually they pack everything out.  So that would have to |
| 2 | be something that I would have to review. |
| 3 | BY MR. HOOK: |
| 4 | Q    The contents company will reinstall the |
| 5 | refrigerator -- |
| 6 | A    Yeah. |
| 7 | Q    -- dishwasher? |
| 8 | A    Sometimes.  Not all the time.  That's why I |
| 9 | said I would have to review it, to see the contents |
| 10 | pack-out list and see if it's in there. |
| 11 | The additional coat of urethane, the dustless |
| 12 | sanding -- item 208 and 209. |
| 13 | Now, I'm not sure if the restaurant booth in |
| 14 | the kitchen needs to be detached and reset.  Again, a |
| 15 | reinspection would've can I remembered more on that, or |
| 16 | conversations with the adjuster. |
| 17 | Q    And why didn't you ever go and inspect the |
| 18 | house? |
| 19 | A    I was going to go inspect the house.  And then |
| 20 | Greenspan ended up, for some unknown reason -- he didn't |
| 21 | represent the insured anymore -- and when Ed was able to |
| 22 | coordinate the inspection time with Mackey and Baldwin, |
| 23 | I was not available that day. |
| 24 | Q    When was that? |
| 25 | A    I don't remember.  Whenever the inspection |

Page 121

1    took place, you know, the last time.

2         Q    Okay.  I mean, this was a pretty considerable

3    dispute, wasn't it?  You have three estimates over

4    $350,000 and then an estimate for 170-something.

5         A    I don't remember three --

6              MR. FELDMAN:  Lacks foundations.

7              THE WITNESS:  I don't remember three

8    estimates over 350.  I had two --

9    BY MR. HOOK:

10        Q    You had two estimates over 350, right?

11        A    Yeah, we had the two estimates over 350 and

12   then one estimate that was substantial less.

13        Q    For $170, right?

14        A    Not a hundred --

15        Q    Or $170,000.

16        A    Yeah.  About.

17        Q    Okay.  So typically when that happens, what's

18   the role of the supervisor for the claims file?

19              MR. FELDMAN:  Overbroad.

20              THE WITNESS:  It really depends.  You

21   know, sometimes I will get a call from the customer with

22   the contractor, I'd like you to be involved, and I will.

23   You know, I've talked to Ed, and Ed goes, well, I'm

24   working with the contractors; I'm trying to reach

25   agreements, you know; we're going to reinspect the loss.

Robert Romero- 11/13/19

```
 1    And the time when we inspected the loss at the last time
 2    I wasn't available.  I try to go out with my adjusters
 3    to try to help them out so that we can reach agreements.
 4    BY MR. HOOK:
 5        Q    So you were aware, though, since December of
 6    2018 that the insureds were having serious problems with
 7    Ed, right, that they were asking him to be replaced,
 8    claiming that he was acting in bad faith?  You were
 9    aware of that, right?
10                MR. FELDMAN:  Lacks foundations.
11                THE WITNESS:  I don't remember them
12    saying he -- that there -- I don't remember the insureds
13    telling me that they wanted him replaced.
14    BY MR. HOOK:
15        Q    Did you remember the insureds asking to speak
16    to his supervisor?
17        A    I remember the insureds asking for a
18    supervisor's information.
19        Q    Mm-hmm.  And when that happened, did you
20    provide -- make sure that that was provided to them?
21        A    Yes.  Well, I didn't make sure, but I know it
22    was provided to them.
23        Q    And did they reach out to you or contact you
24    after that?
25        A    Not that I remember, no.
```

Page 123

Robert Romero- 11/13/19

```
 1        Q    Okay.  And when you saw that, you know, there
 2   was this ongoing dispute, didn't you feel like maybe you
 3   should go down to the house and take a look and try to
 4   sort it out?
 5        A    Yeah.  That's why, when they were making the
 6   appointment with Greenspan, I was going to go there.
 7   And I think the diary reflects that, you know, that I
 8   was going to be there.  Greenspan ended up, for some
 9   unknown reason, not representing the customer.  And then
10   the appointment time I wasn't available.
11        Q    Okay.  So we just finished 19.  Let's get
12   going.
13        A    Okay.
14        Q    And then when you say -- before we move on,
15   add dustless floor sanding -- you're saying all of those
16   line items are unnecessary because there's a final
17   cleaning, right?
18        A    And they're masking.  Why -- you're masking to
19   keep all the particles within the area.  And then you
20   have final cleaning.  So why do that if you're going to
21   do -- it's one or the other; it's not usually both.
22        Q    Isn't -- but sometimes it's both, right?  I
23   mean, if you're working in an area with a lot of
24   cabinetry or soft finishes, it might -- it would
25   probably be within the industry standard to do dustless
```

Page 124

Robert Romero- 11/13/19

```
 1    sanding, would you think?
 2        A    Not necessarily, no.
 3        Q    It may be the preference of the insured,
 4    though.  Wouldn't you -- well, wouldn't you agree with
 5    that?
 6        A    I don't know what --
 7                MR. FELDMAN:  Incomplete hypothetical.
 8                THE WITNESS:  I don't know what the
 9    insureds' preferences are.  They never said, oh, I need
10    dustless sanding.  Sometimes it's acceptable; sometimes
11    it's not.  When I see this, the house is vacant, they're
12    not living in the house, and there's masking and
13    cleaning -- there's no reason to dust -- do dustless
14    sanding because you're still masking and cleaning.
15    BY MR. HOOK:
16        Q    Okay.  But, I mean, so you wouldn't want --
17    you still wouldn't want dust flying everywhere from the
18    floors being sanded.  I'm, it gets into premises that
19    are difficult to clean, right?
20        A    That's why they have masking.  They use
21    Visqueen, the plastic.
22        Q    To keep the dust in the room.  But within that
23    room, the dust gets everywhere, doesn't it?
24        A    Well, they mask the walls and the ceiling, and
25    then sand the floor.
```

Page 125

```
 1        Q     Better to save Allstate the money, right?

 2        A     No.

 3              MR. FELDMAN:  Argumentative.

 4   BY MR. HOOK:

 5        Q     Okay.  Let's keep going.  Page 20.

 6        A     It's hard to follow because I don't know where

 7   the subroom closet is.  We'll just skip that because

 8   I -- it's too hard to figure out right now, and we'll go

 9   to bedroom three.  Is that okay?

10        Q     It's your deposition.  I'm asking you to

11   identify all the reasonable charges in this estimate --

12        A     Yeah.

13        Q     -- 'cause this is going to be something that's

14   important.  So ...

15        A     Or bedroom two.  And I would be able to answer

16   more -- in more detail if I had the other estimate as

17   well.

18        Q     Mm-hmm.  Well, you could've brought it.

19              MR. FELDMAN:  Argumentative.  You

20   could've brought it too, Counsel.  He doesn't have to

21   bring --

22              MR. HOOK:  It's not my deposition.

23              MR. FELDMAN:  It actually is.  You're the

24   one asking questions.  That's typically what --

25              MR. HOOK:  He's the one answering about
```

Page 126

Robert Romero- 11/13/19

```
 1    the file and doesn't have information to provide cogent

 2    answers.  That's on him, not me.

 3                    MR. FELDMAN:  Well, we can debate who

 4    it's on, but typically -- he's told you he could've

 5    looked at other documents to provide more information;

 6    you were given the whole file; you chose to bring only

 7    parts of it.  He told you if you wanted -- if he had the

 8    ability to look at another document, he might be able to

 9    give you more information, and you're telling him you

10    don't want to show it to him.  So we can debate it

11    later.

12                    MR. HOOK:  Do you have the documents on

13    your computer there, Counsel?

14                    MR. FELDMAN:  I don't have them

15    accessible on my computer.

16                    MR. HOOK:  I do.  You know what, I have

17    them right here.  You can scroll through all of them.

18    And we can stay here all day.

19                    MR. FELDMAN:  Well, we're not staying

20    here past the time allowed under the federal rule.  So

21    how you want to use it is up to you.

22                    MR. HOOK:  Well, I'm going to use it to

23    make my case.

24                    THE WITNESS:  While you look at that, is

25    it okay if I just take a quick bathroom break?
```

Page 127

Robert Romero- 11/13/19

```
 1                    MR. HOOK:  Yeah.  Let's go --

 2                    MR. FELDMAN:  Sure.

 3                    MR. HOOK:   -- off the record.

 4                    THE WITNESS:  Thank you.

 5                    COURT REPORTER:  We are going off the

 6      record.  The time is approximately 12 -- excuse me --

 7      2:12 p.m.

 8                    (Off the record.)

 9                    COURT REPORTER:  we are going back on the

10      record.  The time is approximately 2:19 p.m.

11      BY MR. HOOK:

12         Q    All right.  Before we took a break we were

13      discussing the Global Consulting Systems estimate, and

14      you wanted to look through the full claims file.  And I

15      provided it to you or at least what was provided to me

16      by your office in the form of a single PDF with over

17      3500 pages.  Do you recognize that document, sir, or

18      that PDF?

19                    MR. FELDMAN:  I think it misstates his

20      testimony slightly.  But you can answer the question.

21                    THE WITNESS:  I mean, like, the photos,

22      stuff like that?

23      BY MR. HOOK:

24         Q    The PDF.

25         A    I've never seen this PDF.  It's all Bates
```

                                                    Page 128

Robert Romero- 11/13/19

```
 1   stamped.  You know, but it is part of our claim file.
 2   So I do recognize it.  I've just never seen this version
 3   of it.
 4        Q    Okay.  So between the binder that you've seen
 5   with the 700 pages and that PDF, is that the complete
 6   claims file?
 7        A    Item, I haven't gone through this X amount of
 8   pages, but it appears to be the complete claim file.  I
 9   mean, I have no reason to believe it's not.
10        Q    Okay.  So now that you have the full claims
11   file in front of you, go ahead and continue on and tell
12   me all the basis for Allstate's conclusion that this was
13   an unreasonable estimate.
14        A    Okay.
15             MR. FELDMAN:  Lacks foundations.  It's a
16   different question than you'd asked him before.  But you
17   can continue doing what you were doing.
18             THE WITNESS:  So let me just review, you
19   know --
20             MR. HOOK:  Sure.  Go ahead.  Take as much
21   time as you want.
22             THE WITNESS:  Thank you.
23             MR. HOOK:  Why don't we go off the record
24   while we're doing that.  Counsel, do you agree to that?
25             MR. FELDMAN:  No because you want to use
```

Page 129

Robert Romero- 11/13/19

```
 1      your time to have him review a 3,000-page document,

 2      and --

 3                      MR. HOOK:  Yeah, okay.

 4                      MR. FELDMAN:   -- that's your choice.

 5      But I'm not going to have him -- if he's going to do it,

 6      it's going to be part of the deposition time.  I don't

 7      think it's reasonable to ask him to review 3,000 pages

 8      off the record and then go back on the record.

 9                      MR. HOOK:  Okay.  Well, I don't think it

10      was reasonable for your office to produce 3500 of

11      duplicate documents.  So we're kind of, you know,

12      dealing with each other's positions in the litigation,

13      are we not?

14                      MR. FELDMAN:  Well, we produced what we

15      have.  And if there's duplicates, we're under an

16      obligation to produce it in the course -- in the normal

17      course of business.  Obviously, if we --

18                      MR. HOOK:  Well, that's not true,

19      actually.  You're not obligated to produce e-mails that

20      way.  And if you're familiar with e-discovery rules,

21      it's actually a violation to produce documents in the

22      way that your office did and it's subject to sanctions,

23      because it's completely unwieldy and improper.  But we

24      can discuss that at a later time.

25                      MR. FELDMAN:  I totally disagree with
```

Page 130

```
 1      that.  If we had picked and chosen what we were going to

 2      produce, we would have been criticized for that.  So --

 3      but you're right; we don't need to talk about it now.

 4                      THE WITNESS:  I've been scrolling for a

 5      few minutes -- at least I think it's been a few

 6      minutes -- and I'm just still going through just

 7      pictures of contents right now.  So give me some time.

 8      BY MR. HOOK:

 9          Q    Do you have a laptop or something, like, with

10      your claims file where we can just -- so you can look at

11      it and we don't have to go through this?

12          A    I don't -- I didn't bring my laptop.

13          Q    Do you have a laptop?

14          A    I do have a laptop.

15          Q    With access to your claims file?

16          A    I do.

17          Q    Is there a reason why you didn't bring it

18      today?

19          A    I didn't see a reason to bring my laptop.

20          Q    Well, wouldn't you think it would be easier to

21      discuss the claim if you had the claim file in front of

22      you?

23                      MR. FELDMAN:  Well, it's argumentative.

24      It's your deposition.

25                      MR. HOOK:  Yeah, and I asked him to bring
```

Page 131

```
 1    a claim file in my document demand, and he didn't.
 2                   MR. FELDMAN:  You have the claim --
 3    Counsel, you asked for the claim file, and then we
 4    already had given you this 3500 claim file.  And on the
 5    one hand you complain we didn't give you something, and
 6    then in the next breath you complain we gave you
 7    something but it's too big 'cause it's 3500 pages.
 8                   So, I mean, we complied with our
 9    obligations under Rule 26.  We gave it to you even
10    before we received a discovery request for you.  And
11    you're actually showing him the whole thing now.
12                   If you want him to look at a specific
13    part of it, he's mentioned a Baldwin estimate from the
14    spring.  If you want him to just go directly to that or
15    you want to show it to him, that might save some time.
16    Or -- but if you still want him to go through all 3500
17    pages, he's willing to do that, too.  Just -- it can be
18    one or the other.
19                   So by your silence, I'm taking it that
20    you still want him to go through the whole 30 -- excuse
21    me -- the whole 3500 pages.
22                   MR. HOOK:  Well, I want him to answer my
23    questions.  How he deals with the claims file that you
24    produced is your issue.
25                   MR. FELDMAN:  All right.  Well, I guess
```

Page 132

1    he's doing the best he can --

2                    MR. HOOK:  Yeah.

3                    MR. FELDMAN:   -- to answer your

4    questions.

5                    Do you want a pen?

6                    THE WITNESS:  No.  I'm just looking for

7    the estimate.  I'm just still going through photos.

8                    Oh, some of these walls were drywalls

9    instead of plaster.  That's a price difference as well.

10                    Believe it or not, I'm still going

11    through all the photos.

12                    MR. FELDMAN:  If you want it to be on the

13    record, you have to say it out loud, if it's an item

14    that you feel --

15                    THE WITNESS:  Yeah.

16                    MR. FELDMAN:   -- to help your answer,

17    you should say it for the record 'cause it's not going

18    to pick up what -- what you say.

19                    THE WITNESS:  Sorry.  I'm just going

20    through the pictures right now.  I'm still looking for

21    the estimate.  There's tons of pictures.  And a lot -- I

22    see a lot of new framing, you know, a renovation done

23    previously where you wouldn't have plaster; it would be

24    drywall.  So that's a discrepancy, too. 'Cause drywall's

25    substantial less money than three-coat plaster.

Personal Court Reporters, A Veritext Company
818-988-1900

1    BY MR. HOOK:

2        Q    Does the Global Consulting Systems estimate

3    not include estimates for replacement of both drywall

4    areas and plaster?  Or is it all plaster?

5        A    What I've seen so far, it looks like all

6    plaster.  So far.

7        Q    So far.  Okay.

8        A    I'm trying to rush it.  I'm sorry.  Is there a

9    way to scroll faster on this, do you know?

10       Q    If you click the middle button of the mouse

11   down, you should be able to like -- here, if you click

12   that down, that might help.

13       A    Thank you.  Oh, it's slower.

14       Q    That's slower?

15       A    Yeah.  Show me?

16       Q    Let's see.  So hold this middle button down

17   and then move up and down.

18       A    Oh, perfect.

19       Q    You can scroll, but if it starts to scroll --

20       A    Thank you.

21            I'm looking at several pictures where a lot of

22   the ceilings are drywall instead of plaster.  I can't

23   identify which rooms those are in without a sketch and

24   assistance from someone who's inspected the property.

25       Q    Okay.

Page 134

Robert Romero- 11/13/19

```
 1        A    Okay.  It almost looks like a four-piece crown
 2   molding.
 3        Q    You almost done?
 4        A    It barely moved this much.
 5        Q    What are you looking for?
 6        A    For the estimate.
 7        Q    For the second Baldwin estimate?
 8        A    The second Baldwin estimate.  I'm also
 9   looking -- I went through the photos.  See, it's --
10              MR. FELDMAN:  You've answered his
11   question.  So -- what are you looking for; you told him.
12   BY MR. HOOK:
13        Q    Okay.  But you can't find it there in the
14   claims file, huh?
15        A    Well, I need some more time.  You have
16   thousands of pages apparently.
17        Q    You have -- Allstate has thousands of pages.
18   I don't have anything.  So I'm just -- again, I'm trying
19   to find out how you guys decided that this was an
20   unreasonable estimate and decided to reject it.
21        A    Well, I pointed several --
22        Q    Yeah, we're gone go through all of them.
23        A    Yeah.
24        Q    Yeah.
25        A    And, again --
```

Page 135

```
 1                    MR. FELDMAN:  You know what, don't argue.
 2      Just -- if you're looking for the Baldwin estimate, keep
 3      scrolling; look for what you need.
 4                    MR. HOOK:  Now, this is ridiculous that
 5      it's taking the deposition time to do this.
 6                    MR. FELDMAN:  That's your choice.  See,
 7      when -- I've been doing this for 25 years.  If I want
 8      the witness to look at the document, I have a copy of it
 9      and I show it to him.  You did the opposite; you took
10      every piece of paper we produced in electronic form,
11      stuck it in front of the witness on your laptop and
12      asked the witness to find it.  He's complying.  He's
13      trying.  And he's looking through it very carefully.  So
14      either, A, where it's ridiculous what you've asked him
15      to do or, B, he should do it.
16                    MR. HOOK:  No.  He --
17                    MR. FELDMAN:  But you can't ask him to do
18      something and then say what you asked him to do is
19      ridiculous.
20                    MR. HOOK:  Sir, your speaking objection
21      is wonderful, but --
22                    MR. FELDMAN:  It's not an objection
23      'cause it's not a question.
24                    MR. HOOK:  Sir --
25                    MR. FELDMAN:  You started a colloquy with
```

Page 136

1   me, and I'm responding to it.

2                   MR. HOOK:  Okay.  Well, you'd think that

3   the supervisor of the claims file would be able to find

4   an estimate within a half hour when having the whole

5   claims file in front of him.  If he can't, then that's

6   probably an issue indicating that there's something

7   wrong, right?

8                   MR. FELDMAN:  It's an issue because

9   you've given him 3500 pages on your laptop as opposed to

10  showing him the estimate.  If you want him to scroll

11  through it faster and not look at every page, then I

12  guess he can do that.

13                  MR. HOOK:  Why don't we do this:  Why

14  don't you bring your laptop and we'll take this -- we'll

15  reconvene next week and finish this deposition so we can

16  do it in an expeditious way and not have to sit here and

17  wait for you to find documents that I asked to be

18  brought to this deposition.

19                  MR. FELDMAN:  You were given the

20  documents before the deposition.  If you wanted --

21                  MR. HOOK:  Sir, he had an obligation to

22  bring them here today again, did he not?

23                  MR. FELDMAN:  No.  I don't agree with

24  that.

25                  MR. HOOK:  Well, you're wrong, okay.

Page 137

```
 1    It's a deposition request including a document request;
 2    it's an independent discovery device from the initial
 3    disclosures.  He had a duty to bring his documents here
 4    today.  He did not; you did not.  All right?
 5                    MR. FELDMAN:  He's not a party to this
 6    case.  An RFP under Rule 34 doesn't apply to him.  But
 7    we provided the whole claim file beforehand.  If you
 8    want him to look through it more quickly and go page up,
 9    page up, page up, he can try to do that.
10                    THE WITNESS:  I'm going as quickly as I
11    can.  I --
12                    MR. HOOK:  Hey.  You know, I got all day.
13    I got seven hours on the record.  No big deal.
14                    THE WITNESS:  I found the ITEL report, if
15    you want to see it.  No?
16                    I'm not even a quarter of the way through
17    it.  Do you want me to continue just doing it with the
18    first one and then maybe we can amend it later?
19    BY MR. HOOK:
20         Q    Well, the purpose of today's deposition is for
21    me to get testimony from you regarding the basis for
22    Allstate's conclusion that -- to reject this estimate.
23    Okay.  That's what I'm asking you for.  And you
24    mentioned that you wanted to look at those documents, so
25    that's what I'm providing to you.
```

```
 1        A    Okay.

 2        Q    So --

 3                MR. FELDMAN:  Keep scrolling until you

 4   find the Baldwin estimate.

 5                THE WITNESS:  I have not stopped.

 6                MR. FELDMAN:  All right.  Why don't we go

 7   off the record?  It won't count against your time if

 8   you're --

 9                MR. HOOK:  Okay.  Let's go off the

10   record.

11                MR. FELDMAN:   -- sort of glazing over.

12                COURT REPORTER:  So we're going off the

13   record.  The time is 3:00 p.m.

14                (Off the record.)

15                COURT REPORTER:  We are going back on the

16   record.  The time is approximately 3:08 p.m.

17   BY MR. HOOK:

18        Q    All right, sir.  We're back on the record.

19   Have you had a chance to review the additional claim

20   file documents?

21        A    I'm still looking for the estimate.

22        Q    Okay.  I thought we were ready to go back on

23   the record.

24                MR. FELDMAN:  We are, but we looked for a

25   while off the recor, but it was your choice to have him
```

Page 139

```
 1    scroll through 3500 pages of documents.

 2                    MR. HOOK:  So we're now back on the

 3    record looking for it.  Okay.  I understand.

 4                    MR. FELDMAN:  He's doing it continuously

 5    after he took a short break, both off and on the record.

 6                    THE WITNESS:  I found Global's.  I must

 7    be getting close.

 8                    MR. HOOK:  How much time do we have on

 9    the record?

10                    COURT REPORTER:  Roughly, a little over

11    three hours.  Left.

12                    MR. HOOK:  Excuse me?

13                    COURT REPORTER:  Roughly over three hours

14    left on the record.

15                    MR. HOOK:  How many hours have we been on

16    the record?

17                    COURT REPORTER:  We've been on the record

18    for approximately a little over three hours 45 minutes.

19                    MR. FELDMAN:  So if Baldwin's going to

20    name someone [ph].

21                    THE WITNESS:  I didn't see it.

22                    MR. FELDMAN:  What?

23                    THE WITNESS:  I didn't see it here.

24    BY MR. HOOK:

25         Q    Did you find, sir?
```

Page 140

```
 1          A     I'm still looking.  I found one.  I just want
 2     to make sure it's the -- well, this is the original.
 3     I'm looking for the revised one.
 4              Do you remember the total dollar one on the
 5     revised one?  I wonder if I should start from the top
 6     down.  Do you remember where you left it at in your --
 7          Q     I don't, sir.  I'm relying on you to be
 8     familiar with the claims file.
 9          A     Oh, I am, but I'm not familiar with your
10     laptop and the electronic version of what you have.
11          Q     I'm just showing you exactly what you have
12     from your counsel.  That's exactly what I received from
13     them.  So I was hoping we could have a conversation
14     about the file today.
15                    MR. FELDMAN:  You know what, I have to go
16     off the record.  I'm not going to play -- I'll let him
17     continue to scroll while we're off the record.
18                    MR. HOOK:  Okay.  Off the record again.
19     Sure.
20                    COURT REPORTER:  We are going off the
21     record.  The time is approximately 3:14 p.m.
22                    (Off the record.)
23                    COURT REPORTER:  We are going back on the
24     record.  The time is approximately 3:23 p.m.
25     BY MR. HOOK:
```

Page 141

Robert Romero- 11/13/19

```
 1        Q     All right, sir.  So I understand you located
 2    the second Baldwin estimate; is that correct?
 3        A     That is correct.
 4        Q     Okay.  Would you mind stating the Bates stamp
 5    ranges of that document, please, starting with the first
 6    page.  And maybe your counsel can help you by pointing
 7    to that number.
 8              MR. FELDMAN:  Yeah, just scroll up.
 9    We'll find the Bates stamp in the corner.
10              THE WITNESS:  It starts at ALL000091.
11              MR. FELDMAN:  I think that's actually
12    part of the previous page.
13              THE WITNESS:  Oh, sorry.
14              MR. FELDMAN:  That's a hard break there.
15    See?
16              THE WITNESS:  Nine two.
17    BY MR. HOOK:
18        Q     Okay.  That is the starting page for the
19    Baldwin estimate.  So towards the beginning of the PDF;
20    is that right --
21        A     Yes.
22        Q     -- the 92nd page?
23        A     Yes.
24        Q     Okay.  All right.  Great.  All right.  So
25    you've looked at the revised Baldwin estimate and the
```

Page 142

Robert Romero - 11/13/19

1    line of questioning that we left off on was Allstate's

2    critique of the Global Consulting Systems estimate,

3    right?  And you wanted to refer back to the second

4    Baldwin estimate.  So that's kind of where we're at

5    here, right?

6        A    Correct.

7        Q    Okay.  So having had a chance to review the

8    revised Baldwin estimate, is there anything that you

9    want to add or modify with respect to the first 20 or so

10   pages that we've discussed on the Global Consulting

11   Systems?

12       A    Well, I didn't -- I found it, and I didn't

13   really go back and re-review it.

14       Q    Okay.

15       A    Here's the thing:  I'm going line-by-line to

16   try to, you know, look at the things that are jumping

17   out at me.  But I'm also going to have to go back and

18   look at the -- right now I'm looking at the pricing that

19   looks substantially or the major scope.  But then I

20   still have to go back and look at the square footage and

21   the linear footage of every individual number.  And I'm

22   going to have to do calculations and stuff like that to

23   figure that out.

24       Q    Okay.

25       A    So, I mean, right now what I'm doing is I'm

Page 143

Robert Romero - 11/13/19

1   just basically giving you what I can find, you know, on

2   a quick review.  But if I had time with the sketch and

3   then, you know, and a ruler to, you know -- because it's

4   too scale, I can fine -- or even looking at the square

5   footage of the walls and the measurements, you know, I

6   can tell you if we're off on square footages as well.

7   So what I'm trying to do is looking at the things that

8   are glaring, that are -- that stand out to me on a quick

9   review basically.

10       Q    Okay.  And so with that understanding that

11  we're more looking for glaring examples, let's continue

12  on with the Global estimate.  We're at page 20.

13       A    Okay.  Page 20, and that's the bathroom number

14  two, correct?

15       Q    Right.

16       A    All right.  Let me find bathroom number two

17  on -- I had to move up to get the Bates stamp.

18       Q    Take your time, sir.

19       A    The problem is that the Baldwin Construction

20  is not the exact -- the sequence of the rooms are

21  different than the Global estimate.  So I don't -- I'm

22  trying to look for it.

23       Q    And I understand that.  I'm sure that's how

24  things are when you're adjusting the file.  So, again,

25  I'm just -- I'm trying to -- it seemed -- what struck me

Page 144

Robert Romero- 11/13/19

```
 1    about reviewing the claims file was that it seemed
 2    totally arbitrary, like Ed just adopted the lowest-
 3    priced vendor quote that he got and just stuck to it.
 4    That was it.  That was the reasonable one.  And I
 5    haven't heard you say or point to any documents that
 6    indicates other than that so far.
 7                   MR. FELDMAN:  It's not a question, so
 8    don't get into an argument.
 9    BY MR. HOOK:
10        Q    I mean, would you agree with that?
11        A    I do not.  I totally disagree with that.
12        Q    Mm-hmm.
13        A    And the reason for that, 'cause there's items
14    in here that they're charging tons of money for that
15    weren't at the property.  You know, like the coffered
16    ceilings and stuff like that.  We need to compare apples
17    to apples and make sure that, you know, we pay for the
18    insured had.
19        Q    Mm-hmm.  So a couple of those we knocked out.
20    And so what else in here were they trying to charge here
21    that the insured didn't have?
22        A    Well, I'm going to look for bathroom number
23    two, and then we'll just continue going on.
24        Q    All right.  Take your time.
25        A    Okay, bathroom number two.  Got it.
```

Page 145

```
 1              Okay, there's a slight problem here on
 2     bathroom number two.  I think they might have switched
 3     bathroom around; so it's hard to tell because one of
 4     them has a bunch of tile and replacement, and this only
 5     has cleaning.  So I need a -- I need to look at the
 6     sketch and determine which bathroom, because the rooms
 7     are labeled differently.  So it's too hard to do it on
 8     the computer.  I'm going to need hard copies and look
 9     for the square footage, you know, the room and the
10     measurements so I can compare which room is the correct
11     room to review.
12          Q    Okay.
13          A    Does that make sense?
14          Q    Is that -- yeah, do you think that's what Ed
15     did?
16          A    I don't know what Ed did.
17          Q    Okay.  Would that have been the appropriate
18     thing to do?
19          A    Well, no, not necessarily because you don't --
20     what you do is you go back to the house and you walk it
21     with the contractor, and you go line-by-line, saying
22     hey, why do you have this or you missed this, Allstate,
23     and we need to add that.  It's very common as a practice
24     to rewalk the losses.  So, I mean, it's not uncommon to
25     have different names for rooms where you're not going to
```

Page 146

Robert Raposo - 11/13/19

```
 1    be able to compare.  Does that make sense?
 2                    MR. FELDMAN:  Well, pick up where you
 3    think you can is probably the best we can do.
 4                    THE WITNESS:  Yeah.  Let's -- what I'll
 5    do is I'll just look at the Global estimate and try to
 6    do my very best.  But it's going to be extremely
 7    difficult without comparing it to another --
 8    BY MR. HOOK:
 9        Q    Hey, you know, whatever you guys do to deny
10    the claim.  I want to -- take me there, what the basis
11    was for that.
12        A    Well, we didn't deny the claim.
13        Q    Well, you denied -- you didn't want to pay for
14    the work that needed to be done, right?
15        A    No, that's incorrect.
16        Q    Okay.  Well, keep -- let's keep going --
17        A    We paid for the estimate that they -- we
18    didn't want to pay for the estimate they submitted
19    because we didn't believe it was proper.
20        Q    Right. 'Cause you got a different estimate
21    from Baldwin.
22        A    Partly.
23        Q    Right.  Okay.  Let's keep going through this.
24                    MR. FELDMAN:  Just walk -- use the Global
25    estimate for reference.
```

Page 147

Robert Rivero - 11/13/19

```
 1                    THE WITNESS:  Yeah, just use the Global
 2      estimate.
 3                    MR. FELDMAN:  If there's a question, ask
 4      your question [ph].
 5                    THE WITNESS:  I'm not sure why on item
 6      number 216 you have a peel and seal zipper and then
 7      protection if we're cleaning the room.  I mean, you
 8      clean the room at the end.  So I'm not sure why you
 9      would have to encapsulate the room and protect the room
10      with 10-mil plastic.  That's really thick plastic.
11      BY MR. HOOK:
12           Q    Where is that?
13           A    Item number two 16 and two 17 on page 20.
14           Q    So those charges for $11.84 and $6.09 are
15      unreasonable?
16           A    Well, I'm not looking at the price right now;
17      I'm looking at the scope right now.  And, and I just --
18           Q    Sir, I'm here to ask you about this estimate
19      and the reason why it was rejected.  Okay?  I'm not here
20      to nickel and dime about plastic 10 milliliter whatever,
21      Visqueen.  So let's keep -- we discussed we were going
22      to go over the big-ticket items that were glaring,
23      right?  I'm not going to sit here and add up $6 line
24      items.
25           A    Okay.  Well, it was maybe my misunderstanding.
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1        Q     Okay.

 2        A     I thought you wanted to see everything that

 3   stood out to me.

 4              MR. FELDMAN:  Do you want to -- look,

 5   Counsel, it's your deposition; it's your question.  But

 6   I think the ball's moving.  So you asked him to talk

 7   about every line.  Now you're talking of big-ticket

 8   items, which I don't think is something that's come up

 9   before.  Did you want to, like, set a threshold and ask

10   him to point out items over a certain dollar amount or

11   not.  I mean, just so we're clear -- he understands the

12   question you're asking him.

13              MR. HOOK:  Well, first I --

14              MR. FELDMAN:   The problem is question's

15   continued over the course of an hour and it kind of

16   changes a little bit when you --

17              MR. HOOK:  Well, I'm trying to

18   accommodate the witness because he seems to be unable to

19   answer the questions based on the claims file there

20   because it's too large or unwieldy.  So he mentioned

21   wanting to just highlight the big-ticket items, which I

22   was in agreement with.

23   BY MR. HOOK:

24        Q     But, you know, I --

25        A     Okay
```

Robert Raposo- 11/13/19

```
 1        Q    -- just really want to get through this
 2   estimate and get through the items that you considered
 3   unreasonable or that were for property that the insured
 4   didn't have.  I want to find out why Ed rejected this
 5   estimate.  Okay?
 6        A    Okay.  So just that I have a clear
 7   understanding, don't look at all the little things; just
 8   look at the things that kind of stand out big time
 9   basically?
10        Q    Yeah.  My question stands.  So go ahead.
11             MR. FELDMAN:  Well, answer the question
12   how you understand it.  Keep going through --
13             THE WITNESS:  Okay.  That's how I
14   understand it.
15   BY MR. HOOK:
16        Q    Okay.
17        A    Okay.  We're in bathroom number two.  We'll go
18   to page 22.  Again, I'm not verifying the square
19   footage; I'm just looking at general scope.  Okay?  And
20   then the landing.
21        Q    Okay.
22        A    I don't want to say something for fear that
23   that's not what you're looking for.  But normally the --
24   we don't paint three coats of -- on a crown molding.
25   You paint two coats.  But, I mean, that's a small issue
```

Page 150

Robert Romero- 11/13/19

```
1    there.
2        Q    Well, if the standards in Hancock Park is
3    three coats of paint, shouldn't the insureds be entitled
4    to that?
5        A    That's not how I'm understanding the standard.
6    Whether it's Beverly Hills or Bel Air, it's -- we paper
7    with the insured had.
8        Q    Okay.
9        A    And then to put them back in their pre-loss
10   condition.  And I don't know if three coats is proper.
11       Q    Well, how many coats of paint were on the
12   molding?
13       A    I don't know how many coats was paint at the
14   time.
15       Q    Okay.
16       A    I just said that may be an issue.
17       Q    I see.  Okay.  Too much paint there.
18       A    Which normally --
19            MR. FELDMAN:  There's no question.  So I
20   don't want you to argue with him, Robert.  Okay?  If he
21   wants to make his little statements, there's no jury
22   here who's going to hear that.  So just answer the
23   questions.  I don't want you guys getting into a
24   discussing.  Okay?
25            THE WITNESS:  I'm sorry if I mean being
```

                                        Page 151

1    argumentative.  I just want today --

2                    MR. FELDMAN:  No, no, no.  I just -- I

3    wanted -- getting into it.  That's -- if anyone needs to

4    do that --

5                    THE WITNESS:  Can you log on, please?

6    BY MR. HOOK:

7        Q    Sure.

8        A    I'm looking for the stairs.  I can't find the

9    stairs.  There's different names of the rooms.  Okay.

10   Page 25, item 239.  An additional layer of thin coat

11   plaster.

12            I don't know what type of stone floor it has.

13   I know it's premium grade.  So that might be an issue,

14   but I don't know.  I would have to take a look at the

15   floor and see what kind of stone it is and --

16       Q    Is it in your claims file there?  ITEL report

17   perhaps?

18       A    I didn't see an ITEL report on the stone.

19       Q    Okay.  So is that charge unreasonable or not?

20       A    I don't know.  Potentially.  I would have to

21   take a look at it and see the size of it, you know, the

22   equality of the stone.

23       Q    Well, Allstate had a duty to investigate that

24   claim and make a determination.  And what was done with

25   that in that regard?

                                            Page 152

Robert Raggero- 11/13/19

```
 1        A     You're going to have to ask Ed.

 2        Q     Okay.  I will.

 3        A     I'm on page 26.  Item 248, you have the thin

 4    coat plaster for 1,063.78.

 5              Okay, this is the same one.  Oh, bedroom

 6    number one.

 7              I'm sorry.  Your computer became split screen.

 8    Do you know how to change it back?

 9        Q     Sure.  Let's see here.  I think -- yeah, just

10    move the double blue line on there.

11        A     Okay.  Sorry about that.

12        Q     No problem.

13        A     All right.  So ...  The square footage and the

14    size of the rooms are different.  I'm noticing that as

15    well.  And it's very possible that the Global Consulting

16    System estimate did not do any deductions for openings.

17    As an example, the Global square foot of walls in

18    bedroom number one is 409 square feet in the Global

19    Consulting estimate, and then on the Baldwin estimate

20    it's 364 square feet.  I know it's 50 square feet, but

21    it's significant when you're talking about flooring and

22    walls and paint and --

23        Q     For bedroom what?

24        A     For bedroom number one.  But I haven't --

25        Q     Global has how many?
```

Page 153

Robert Ranero- 11/13/19

```
 1        A     Global has 409.64.

 2        Q     Uh-huh.

 3        A     And Baldwin has 464.80.

 4        Q     You mean 364?

 5        A     I'm sorry.  My eyes are tired.  I apologize.

 6   That was a mistake.  Three sixty-four eighty.

 7        Q     Sixty-four eighty.

 8        A     So, I mean, I haven't been looking at the

 9   measurements, you know, that closely in the prior rooms,

10   but I mean --

11        Q     Do you know if those are referring to the same

12   rooms?  Because you said that the estimates sometimes

13   refer to the rooms differently.

14        A     Well, it's bedroom number one, and they're

15   both bedroom number one.  And it's pretty close because

16   your square foot a yard on flooring is 28 on Global and

17   on the other one it's 26.87.  And I don't see where

18   Global has put any reference blocks in.  So that may be

19   the difference.

20        Q     All right.  So, again, going back to Global,

21   let's keep going through the estimate.  We'll just

22   powering through this here --

23        A     Okay.

24        Q     -- and kind of identify line items that are

25   unreasonable.
```

Page 154

Robert Roero- 11/13/19

```
1          A     Okay.

2          Q     So pursuant to what you said, is there a

3     particular line item that needs to be adjusted then?

4          A     Two forty-eight for the bedroom number one.

5     Page 26.

6          Q     Two forty-eight?

7          A     Uh-huh, the additional thin coat of plaster.

8          Q     Two forty-eight?

9          A     Two four eight.

10         Q     What about that?

11         A     Well, you already have three coats of plaster

12    right above that.

13         Q     Oh, okay.  That's the one.  I see.  Okay.

14    Right.  Okay.  Let's keep going.  You mentioned that

15    one.

16         A     Yeah.

17         Q     Okay.

18         A     See, here on the Global estimate, you have

19    paint's -- crown molding two coats.  So, I mean, most of

20    the time you do have two coats.  It was just something

21    that was just an observation that stood out to me

22    earlier.

23         Q     Right.

24         A     Here on the Global estimate, it says custom

25    cabinets as if you're replacing nine linear feet for
```

Page 155

```
 1    $6600.  And the Baldwin estimate is to install the full
 2    height at nine linear feet, which is substantial less.
 3    It's only 446.  So I don't know if it's a detach and
 4    reset or if it's a replacement.  There's a discrepancy
 5    in scope, and I would need to verify that with the
 6    parties involved.
 7         Q    Okay.
 8         A    Okay.  So, you know, I don't know if Allstate
 9    missed the flooring in that bedroom, 'cause I don't see
10    it.  But you have the replacement of the flooring.  So
11    we need to verify the scope as well.  I know the pricing
12    on the floor is off because the ITEL is off.
13         Q    And you're talking about 262?
14         A    Two sixty-one and two sixty-two.  And I don't
15    see -- oh, no, I'm sorry.  We do have the replacement.
16    And it's 958, and you're at 1067.  It's very close.
17         Q    Okay.  So those are not --
18         A    Yeah, not -- no big deal.
19         Q    Okay.
20         A    It's hard to look at a laptop and -- I'm doing
21    the best I can.
22         Q    I know.  You're doing a good job.
23         A    The dustless sanding.  And your masking
24    prep -- well, that's for paint.  That may be okay.  It
25    depends on the room.  So that's a situation where he
```

Page 156

```
 1    doesn't have a bunch of cleaning and masking where

 2    dustless may be okay.  The grade of the carpet seems a

 3    little high, based on ITEL, item 265.

 4         Q    They got something like $5, right?

 5         A    And it's the same carpet as the other rooms,

 6    that sounds about right.

 7              Bathroom number one.  Let's take a look.

 8    Okay, bathroom number one.  We have 302.  See, there's a

 9    difference in measurement as well.  You have 302 square

10    feet on the Global estimate, and we have 274 on the

11    other estimate.  And then -- let's see, the square foot

12    of floor is a square yard off.  It's very possible that

13    Global Consulting didn't use the reference blocks;

14    that's why they're different measurements.

15         Q    Okay.

16         A    But, you know, but it affects, you know, the

17    overall amount of the room.

18         Q    Do you know which one is correct, which

19    measurement?

20         A    I don't.

21         Q    Does Ed Carracsco?

22         A    I would assume he does.

23         Q    And did you ever have any discussions with him

24    regarding which measurements were correct, the Global or

25    the Baldwin Construction?
```

Page 157

Robert Ratero- 11/13/19

```
 1        A     No.

 2        Q     Okay.

 3        A     I'm just looking at discrepancies.  But I

 4   don't see the reference blocks on the Global estimate.

 5   See it, how on the --

 6        Q     Sir, I just want you to keep -- just answer my

 7   questions.  Okay?

 8        A     Okay.

 9        Q     So let's keep going through the Global.  We

10   did the carpet, 265.  So let's just keep going through

11   this.

12        A     Slight deviation on pricing per square foot,

13   about a $3 deviation between the tile floor.

14        Q     Which -- okay.

15        A     Okay.

16        Q     Which line item?

17        A     Two seventy.

18        Q     So the Bakers' floor wasn't premium grade?

19        A     I saw the pictures, their four by four tiles.

20   That's not -- I wouldn't think -- it didn't look like

21   high-end tile to me, based on the photographs.  We

22   allowed high grade, which is a good grade.  Premium is

23   really, really nice tile.

24        Q     I know.  Okay.

25        A     Okay.  The -- not a huge difference, but you
```

Page 158

```
 1    have the replacement of the faucets.  And normally water

 2    doesn't damage faucets.  We have the detach and reset of

 3    faucets rather than the replacement.  That's item 277.

 4         Q    What if it's damaged during demolition or as,

 5    you know, during the loss?  Do you know for a fact that

 6    the faucet did not need to be repaired?

 7         A    Well, normally they don't -- I mean, you have

 8    to use dual care when you remove it.  And the pedestal

 9    sink is being -- if the pedestal sink is being reused,

10    there's no reason to remove the faucet from the pedestal

11    sink.  You just remove the whole unit as one piece.

12         Q    Sir, do you have reason to believe that the

13    faucet did not need to be replaced in the Bakers' house

14    in the bathroom?

15         A    Normally they don't.

16         Q    Just the basis that normally they don't?

17         A    When you're detaching and resetting a sink and

18    the faucet is attached to the sink, there's no reason to

19    detach and -- there's no reason to mess with the faucet

20    other than disconnect the hoses so that you can remove

21    it as a unit.  You're not going to break everything

22    apart to take what you can take out as a unit.

23         Q    Yeah.  Sir, you understand that a lot of

24    building material fell from the ceiling of the second

25    floor down; do you understand that?
```

Page 159

Robert Romero- 11/13/19

```
1        A     This bathroom was on the first floor.

2        Q     Okay.

3        A     I mean, on the top floor.

4        Q     Okay.

5        A     And there was no ceilings.  This was a topical

6    loss on the bottom of the -- top of the second floor.

7        Q     Okay.  And the faucet -- their old faucet, are

8    you sure that that could have been reused with the new

9    sink?

10       A     They didn't have a new sink.  It was a

11   pedestal sink.

12       Q     Okay.

13       A     And the faucet was connected to the pedestal

14   sink.

15       Q     Okay.

16       A     So if they detached and reset the pedestal,

17   there wouldn't be no reason to detach and reset the

18   faucet.

19       Q     Okay.  That's your opinion, right?

20       A     That's my opinion.

21       Q     Okay.  Let's keep going.

22             Have you ever had a contractor's license?

23       A     No.  Okay.  Item number 279, rough in

24   plumbing, $1525. There is no reason to rough in.

25   "rough in" means the top-outs that go through the roof.
```

Page 160

Robert Romero- 11/13/19

```
 1    Unless you're doing a remodel or an addition or you're
 2    moving the lines around, water cannot damage the top-
 3    outs, the rough ins.
 4           Okay.  I saw a picture of what I believe was a
 5    blue -- now, I'm not sure if this is the right bathroom,
 6    so I would need to confirm with Ed, but I saw a picture
 7    of a cabinet that was not a high-end cabinet.  And here
 8    you're charging for a premium cabinet $603 a linear
 9    foot.  But based on the photographs, it did not appear
10    to be a high-end bathroom cabinet.  In fact, we --
11    Allstate just allowed just a base unit.  And looking at
12    the photographs, that's what it looked like.
13        Q    Okay.
14        A    Bedroom number three.  Bedroom number three,
15    our square footage is more than Global Consulting's
16    square footage.  So I'm not sure if you're short, but
17    there's a discrepancy in the square footage above [ph].
18                MR. FELDMAN:  What page are you on?  I'm
19    sorry.
20                THE WITNESS:  Page 30.
21    BY MR. HOOK:
22        Q    Again, I'm just looking for line items that
23    were considered excessive or unreasonable.
24        A    Okay.  Well, I'm just looking at things that
25    stand out whether --
```

Page 161

1  Q Sure.  Fair enough.

2  A 'Cause if we're short, we gotta pay the

3 insured.

4  Q You can speak as much as you want.  I'm just

5 specifically asking you to answer my questions.  But if

6 you -- I mean, if you guys want to -- that's fine.

7  A I'm just -- I -- just, my brain works this

8 way.

9  Q It's okay.

10  A I'm not trying to be --

11  Q It's okay.  It's okay.  It's just -- it just

12 makes things take longer; that's all.

13  A All right.  I'll try to just stick to --

14  Q Okay.

15  A Three oh two.  Three fourteen.

16  Q And you dispute the price, right?

17  A Three fourteen, the price of the actual cost

18 of the wood floor.

19  Q Do you know if that was ever resolved with the

20 insureds?

21  A What do you mean?

22  Q Do you know if the selection of wood flooring

23 was ever resolved with the insureds?

24  A I don't know.

25  Q Okay.

Page 162

Robert Romero- 11/13/19

```
 1        A    Three eighteen, the premium grade carpet.

 2        Q    Again, that's a -- you believe that's a dollar

 3   expensive, right, more or less?

 4        A    I believe it doesn't reflect the material that

 5   they had at the loss, based on the ITEL report.

 6             I'm on bathroom number two.  The square

 7   footage is close, about 20 square feet off.

 8             Now, this is odd.  It's not a big dollar

 9   amount.  But normally you don't have underlayment cork

10   under a bathroom because of the moisture.  So I don't

11   know if that's a mistake, but it seems off that you have

12   cork under tile.  I've never seen that in my life.  Item

13   322.

14             Item 331, the tub and shower faucet.  Normally

15   they don't replace the faucets.  We detach and reset.

16   And the bathtub -- I don't know why we would replace a

17   bathtub on a water loss.  But ...

18        Q    Well, was this bathroom up stairs or

19   downstairs?

20        A    It's bathroom number two.  I can't tell from

21   this sketch.  I would have to look at --

22        Q    Well, if the bathtub had been damaged during

23   the water loss, maybe it needed to be repaired, right?

24        A    I would agree.  But I just -- you know,

25   usually bathtubs are not damaged with water loss because
```

Page 163

Robert Romero- 11/13/19

```
 1      that's their function.
 2          Q    Right.  But this was an unusually large water
 3      loss, right?  Remember that e-mail from Ed.  It was one
 4      of the three largest he'd seen in his career?
 5          A    I don't know if that's one of the three
 6      largest.
 7          Q    Well, that's what he said.
 8          A    Okay.
 9          Q    Right?
10          A    I don't know.
11          Q    Do you want to look at the e-mail again?
12      Let's go back to Exhibit 2 where he talks about the bad
13      faith of Allstate.
14          A    Oh, you're talking -- or I thought you were
15      referring to Ed Carracsco.
16          Q    No, no, no, flow.  Oh, excuse me.  I meant
17      Michael Brownstein of Servepro.
18                    MR. FELDMAN:  You said --
19                    THE WITNESS:  Okay.  But you told me Ed.
20      I apologize.
21      BY MR. HOOK:
22          Q    Oh, yeah.  I misspoke.  I said -- I'm sorry.
23      He said this was in the top three largest residential
24      dry-downs I've done in over 11 years, which is a long
25      time.  It's very similar to a commercial-sized flood
```

Page 164

```
1    we'd do in terms of man power.  It was a unique loss due

2    to the size.  So ...

3         A    Yeah, I don't --

4         Q    It was a unique loss, right?

5         A    To him, yeah.  I mean, but --

6         Q    Not to you?

7         A    No, not to me.  We have a lot of historical

8    homes that we have -- that I've dealt with.

9         Q    Mm-hmm.  Okay.

10        A    I don't know -- let me see if we paid for the

11   bathtub.  We did.  So, obviously, there was some damage

12   to the bathtub.

13             On item 336, rough in plumbing, another $1525.

14   There's no reason to rough in plumbing on a water loss

15   unless you're remodeling or moving plumbing around or

16   moving fixtures around.

17             Cabinets.  There's a big price discrepancy on

18   the cabinets.  I would have to see the pictures to see,

19   you know, the quality of the cabinets.  I went through

20   some of it; I don't know which bathroom belongs to which

21   room, but it's -- I don't think it would be $603 a

22   linear foot for bathroom cabinets.

23        Q    What would it be?

24        A    Well, it depends on the quality of it, but

25   it's highly unusual to have, you know, that high of a
```

Page 165

```
 1    quality cabinet in the bathroom.

 2        Q    Well, it was a $3.5 million home in Hancock

 3    Park --

 4        A    I get that.

 5        Q    -- that had very high-end features.  I've been

 6    in the house many times.

 7        A    Yeah, I'm just going based on the photographs.

 8              MR. FELDMAN:  It's not a -- it's --

 9    BY MR. HOOK:

10        Q    I understand.  It just would've helped to have

11    you gone out there, for sure.  Let's go -- let's keep

12    going.  So the premium -- so you don't think the

13    bathroom cabinets were premium and that price was too

14    high on 340, right?

15        A    That is correct.

16        Q    So what do you think that unit price should

17    be?

18        A    I don't know.  I would have to take a look at

19    the photographs to see which cabinets were in that room,

20    and then I could give you a better answer.

21        Q    All right.  Okay.

22        A    Square footage is off again on the master

23    bedroom.  I'm in room -- I'm on page 34.  I can verify

24    the measurement.

25        Q    It's off?  It's off or it's different from
```

Page 166

Robert Romero- 11/13/19

```
 1    Baldwin?

 2         A    They're off.  They don't match.

 3         Q    Okay.  Do you know which one's correct?

 4         A    I don't.

 5         Q    Okay.

 6         A    This is the master bedroom; it's not the

 7    closet.  I'm not sure, but -- I don't know if it's a

 8    mistake, but it looks odd that you would have a closet

 9    organizer in the master bedroom.  30 linear feet.  I

10    don't --

11         Q    Why is that odd?

12         A    Because you -- because the bathroom -- because

13    the closets are separate rooms.  So you wouldn't have it

14    in a bedroom.  You would have it in a closet.  Unless

15    they have it --

16         Q    What page are you on, sir?

17         A    Thirty-five.

18         Q    Okay.  This -- they're referring to the

19    subroom here.

20         A    I don't know what the subroom is.

21         Q    It's not the master bedroom.

22         A    Yeah, but, see, the thing is that if you look

23    at the subroom on page 35, the perimeter linear foot is

24    9.33 linear feet.  Do you see that in the top right-hand

25    corner?
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1        Q     Yeah.

 2        A     But then you have 29 linear feet of closet

 3    organizer.  How can you put 29 linear feet in an area

 4    that you only have 9.33 linear feet?

 5        Q     29 linear feet.

 6        A     Okay, look at item number 359.

 7        Q     Mm-hmm.

 8        A     And then look --

 9        Q     Closet organizer, mm-hmm.

10        A     You have almost 30 linear feet.  See that?

11        Q     Right.

12        A     But then the room perimeter, linear foot, is

13    only 9.33.  How can you fit 30 feet into 9.33?

14        Q     Mm-hmm.  Well, I guess if it's stacked.  If

15    there's, like, nine feet, nine feet, nine --

16        A     That's not how you count it.  You count it on

17    a running foot.

18        Q     Okay.  So that may be -- there may be a --

19        A     Mistake.

20        Q     -- mistake there.  But maybe three times --

21        A     Maybe.  Who knows.

22        Q     Okay.

23        A     I mean, it just --

24        Q     Okay.

25        A     And dustless sanding, item 365.
```

Personal Court Reporters, A Veritext Company
818-988-1900

1       Q     You think that's unreasonable on the subfloor?

2       A     Well, you're not refinishing it.  All you're

3    doing is -- because there's carpet on top, you know, for

4    one floor.  So you're not sanding and refinishing.

5    You're basically laying the finished floor -- the

6    finished carpet on top of the wood floor.  So why would

7    you refinish the floor?

8       Q     Well, it looks like it's part -- they -- it

9    looks like there's --

10      A     Well, the square footage is 420 square foot,

11   and that's --

12      Q     Right

13      A     -- the square footage of the room.

14      Q     I see.

15      A     Unless I'm reading it wrong.  I'm sorry.  My

16   eyes are a little tired.  I may be --

17      Q     Yeah, I, I agree with you it's unclear as is

18   to whether it's carpet or --

19      A     Or the wood floor.

20      Q     -- or wood floor there.

21      A     And I think that was the same issues in a

22   couple of the other bedrooms, too, 'cause I think all

23   the bedrooms have carpet.

24            Master bath looks good.  It's basically just

25   cleaning.

                                        Page 169

```
 1                  We're in -- now we're in the hallway, page 38.
 2      I have the same concern where you're having three coats
 3      of plaster; then you have the additional plaster for
 4      $3,277.  Item number 376.
 5                  It's a little difficult because one person's
 6      calling it a landing and the other person's calling it a
 7      hallway.  So it's hard to determine exactly the
 8      differences in the estimate.  I'm going to try my best.
 9                  There's some bookcases and cabinetry.  I don't
10      know the quality of that.  I would have to look at the
11      photographs.  But I would need to do a little more
12      investigation, but that may be -- it may be right; it
13      may be off.  I don't know.  But, you know, the premium
14      grade at $603 -- I mean, even most of the nice kitchens
15      aren't $603 a linear foot.  Or $740 a linear foot in
16      some cases like these.
17                  Dustless sanding 399.
18                  And item number 402, the additional coat of
19      plaster.
20                  You have -- here you have the carpeting and
21      then you have -- you know, then you have dustless
22      sanding as well, the floor.  Item 416.  And the quality
23      of carpet on 419.
24                  And if I had both estimates, photos to line up
25      with the rooms, I'd be able to give you more
```

Page 170

1    information, but this is the best that I can do with the

2    -- your laptop and the estimate and without actually

3    having physical measurements.

4       Q    Okay.  So that -- the analysis that we've just

5    been doing now for almost two hours, do you think that

6    Mr. Carracsco engaged in that same type of analysis when

7    he received this estimate?

8       A    I don't know if he went in depth like that for

9    two hours.  I think he might have -- I don't know.  I

10   don't want to speculate.

11      Q    Mm-hmm.

12      A    I don't -- if I see an estimate, you know, and

13   I see all these items or see these things that stand

14   out, then I'm going to have a conversation with the

15   contractor and say, hey, let's meet out there because --

16   I mean, I don't think I'm going to go every single line

17   item because you're going to be able to walk in at the

18   loss and be able to come to agreements normally when you

19   walk it with a public adjuster.

20      Q    And Mr. Carracsco, did he walk the job with

21   Mackey?

22      A    I believe twice.

23      Q    And were they able to come to agreements?

24      A    The first time they got a general scope.

25   We -- Ed did his -- not Ed.  Baldwin did their estimate.

Page 171

Robert Romero- 11/13/19

```
 1    They were far apart.  They walked it again.  They got
 2    some more agreements.  But when you do a scope -- when
 3    you do a walk-through, most of the time you actually
 4    basically do the scope.  There's some times that you can
 5    put some prices on things.  It really depends.  You
 6    know, every claim is different, and I don't know if Ed
 7    and Baldwin talked about specific numbers at the loss
 8    site.  But I know they talked about scope.
 9        Q    Mm-hmm.  And what are the Bakers entitles to
10    under their policy?
11        A    They're entitled --
12               MR. FELDMAN:  Vague; overbroad; and
13    potentially calls for a legal conclusion.
14               THE WITNESS:  Entitled in which regards?
15    BY MR. HOOK:
16        Q    In regard to compensation for the property
17    damage to their home?
18               MR. FELDMAN:  Same objections.
19               THE WITNESS:  Yeah, they're entitled to
20    be put back in their pre-loss condition.
21    BY MR. HOOK:
22        Q    And that means they're entitled to recover the
23    replacement cost; right?
24        A    If -- well, it depends.
25        Q    It depends on what?
```

Page 172

Robert Ratero- 11/13/19

```
 1        A    Well, if they don't spend the money or they
 2   don't get the -- they don't complete the repairs, then
 3   they're not entitled to get the full replacement cost.
 4        Q    But if they replace their house, they're
 5   entitled to the replacement costs, right?
 6                  MR. FELDMAN:  Vague; overbroad;
 7   potentially calls for a legal conclusion.
 8                  THE WITNESS:  It depends.  You know, if
 9   our ACV is hypothetically $10 and the replacement cost
10   is 15, and they only spend $8, they're not entitled for
11   the full replacement cost.
12   BY MR. HOOK:
13        Q    Why not?
14        A    Because they didn't spend that money.
15        Q    What if they did?
16        A    If they did spend the money, then they are
17   entitled to receive the FRC of the estimated.
18        Q    And what was that first acronym you used, ACV?
19        A    Actual cash value.
20        Q    Okay.  And here, if the Bakers spend, you
21   know, $350,000 with Mackey, they're entitled to that
22   cost back, right, from Allstate?
23        A    It depends.
24                  MR. FELDMAN:  Vague
25   BY MR. HOOK:
```

Page 173

Robert Ruscero- 11/13/19

```
 1        Q    Depends on what?

 2        A    It depends on did they spend 350 to upgrade

 3   their house?  Did they spend 350 for different items?

 4   We owe for what they had.  And we owe for a reasonable

 5   amount of money to get those repairs done, a fair

 6   amount.

 7        Q    A fair amount.

 8        A    A fair amount.

 9        Q    A reasonable amount, right?

10        A    Correct.

11        Q    Okay.  And how do you determine what's a

12   reasonable amount?

13        A    Well, we use industry guidelines, like

14   Exactimate is a guideline.  We also see if a general --

15   what a licensed general contractor can do the repairs of

16   like kind and quality for.

17        Q    Okay.  Are you familiar with California code

18   of regulations regarding standards for the estimation of

19   replacement value?

20        A    I mean sure I've read it.

21        Q    Are you currently familiar with the California

22   laws regarding insurers' obligations with respect to

23   estimations for replacement value?

24        A    I am --

25                    MR. FELDMAN:  Overbroad.
```

Robert Romero- 11/13/19

```
 1                    THE WITNESS: I have the -- I have the
 2      regs next to my desk.  I don't have them memorized.  So
 3      if you want to --
 4      BY MR. HOOK:
 5           Q    What are the -- what are the regulations?
 6           A    I told you I don't have them memorized.  I
 7      have the regs on my desk.
 8           Q    Well, what generally are the rules regarding
 9      standards for estimates of replacement value?
10           A    We have to replace it with like kind and
11      quality to achieve a reasonable uniform appearance.
12           Q    I'm asking but standards for estimates of
13      replacement value.
14           A    Well --
15           Q    While preparing the estimates, there's certain
16      legal standards that insurance companies need to comply
17      with in preparing estimates for replacement value.  You
18      understand that?
19           A    I do.
20           Q    And what are those standards?
21           A    I don't have it memorized.
22                    MR. FELDMAN:  Calls for a legal --
23      BY MR. HOOK:
24           Q    Do you know what any of those standards are?
25           A    We have to deal fair -- we have to deal in
```

Page 175

Robert Rucero- 11/13/19

```
 1    fair dealings and we have to be ethical.  We -- the

 2    estimate has to be discernable.

 3         Q    Fair dealings, ethical.  And what else?

 4         A    The estimate has to be broken down so they can

 5    understand the estimate.

 6         Q    Estimate has to be broken down.

 7         A    You can't just give them, you know, $30.  We

 8    have to itemize it.

 9         Q    Right.  Any other standards set forth by law.

10         A    I'm sure there are --

11              MR. FELDMAN:  Legal -- calls for a legal

12    opinion.

13              Go ahead.

14              THE WITNESS:  I have to review them.  I'm

15    really tired right now. I don't recall them all right

16    now.

17    BY MR. HOOK:

18         Q    Do you recall any others?

19         A    Presently, I don't.

20              Do you want your laptop back?

21         Q    Do you know if the regulations specify whether

22    an estimate has to be particularized as to whether it's

23    for a single-family home, multiple homes, or tract

24    dwellings?  Or does it not matter?

25         A    I'm not aware of that.
```

Page 176

Robert Romero- 11/13/19

1        Q    So you don't think it matters; it doesn't

2   matter?

3        A    Well, the estimate has to reflect the claim-

4   related damages.

5        Q    Okay.  And when you use industry standards, is

6   it for tract homes or single-family homes; do you know?

7        A    It's for the operation that -- it's for the

8   operation that needs to be done.  If you have a trust

9   system, then we estimate a trust system.  If you have

10  conventional framing, we estimate conventional framing.

11  We estimate for what the insured has.

12       Q    Okay.  And when you prepare a replacement cost

13  estimate, is it permissible to include a deduction for

14  physical depreciation?

15       A    Yes.

16       Q    It is?

17       A    Wait a minute.  Repeat that so I can make sure

18  I understand your question?

19       Q    Sure.  When you prepare a cost estimate for an

20  insured for the replacement value, is it permissible to

21  include a line item for physical depreciation in that

22  estimate?

23       A    We do include --

24            MR. FELDMAN:  Calls for a legal

25  conclusion.

Page 177

Robert Rosero- 11/13/19

```
 1                   THE WITNESS:  We do include depreciation
 2      on our estimates.
 3      BY MR. HOOK:
 4         Q    Okay.  Would it surprise you to learn that
 5      that's a violation of the California code of
 6      regulations?
 7                   MR. FELDMAN:  Lacks foundation; misstates
 8      the law.
 9                   THE WITNESS:  That's not my understanding
10      of the law.
11      BY MR. HOOK:
12         Q    I'm going to have you take a look at this
13      code section.  It's California Code of Regulations
14      section 265 -- 2695.13, standards for estimates and
15      replacement value.  Take a look at it for me, sir.
16         A    You want me to read the entire -- all -- all
17      four pages?
18         Q    Are you familiar with that statute, sir?
19         A    I've read it.  I mean, I don't have it
20      memorized.  I mean, it's --
21         Q    What's your understanding of what it is?
22         A    It's a DOI reg, from my understanding.
23         Q    Regulating insurance companies.  Correct?
24         A    Correct.
25         Q    Isn't Allstate subject to those regulations?
```

Page 178

Robert Rutero- 11/13/19

```
 1        A    Yes.

 2        Q    Are you supposed to comply with those

 3   regulations?

 4        A    Yes.

 5        Q    Is Edward Carracsco supposed to comply with

 6   those regulations?

 7        A    Yes.

 8        Q    Okay.  So on the second page, I'll point to --

 9   and I don't mean to step over you here but -- it

10   describes some of the prohibited conduct.  Subsection C,

11   why don't you go ahead and read that for me into the

12   record.

13        A    The estimate?

14             MR. FELDMAN:  I'm sorry.  Could I --

15   could I read it?

16             THE WITNESS:  The estimate of replacement

17   costs shall not be based upon the resale value of the

18   land or upon the amount of or outstanding balance of any

19   loan.

20   BY MR. HOOK:

21        Q    Right.  And what's the next one say?

22        A    C, the estimate of replacement costs shall not

23   be based on the resale value of the land -- oh, I might

24   have read the same one.  Sorry.

25             The estimate of replacement cost shall not
```

Page 179

```
 1     include a deduction of physical depreciation.
 2         Q    Right.  And do you know why that is?
 3                   MR. FELDMAN:  Lacks foundations.
 4                   THE WITNESS:  I'm sorry.  I'm really
 5     tired, and I'm not sure right now.  But I know that
 6     we're allowed to depreciate.  The Department of
 7     Insurance have reviewed our files.  You know, they do
 8     market conduct reviews.  And it's our -- it's a practice
 9     to depreciate it.  I mean, it is recoverable, but
10     it's -- there's nothing -- the Department of Insurance
11     doesn't tell us we cannot depreciate.
12     BY MR. HOOK:
13         Q    Okay.
14         A    So I'm a little confused right now with this.
15                   MR. FELDMAN:  If you're tired, I'd rather
16     you take a break and not try to answer questions while
17     you're tired.  Catch your breath for five minutes and
18     continue.
19                   MR. HOOK:  Are you asking to take a
20     break?
21                   MR. FELDMAN:  Yeah, I think the witness
22     said -- he's articulated that --
23                   MR. HOOK:  Yeah, let's take a break.
24                   MR. FELDMAN:   -- he's tired.  I want to
25     make sure he's not tired while he's answering your
```

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1    questions.
 2                  MR. HOOK:  She's are going to get
 3    technical, so take what you need to take.
 4                  COURT REPORTER:  We are going off the
 5    record.  The time is approximately 4:25 p.m.
 6                  (Off the record.)
 7                  COURT REPORTER:  We are going back on the
 8    record.  The time is approximately 3:37 [sic] p.m.
 9                  MR. HOOK:  It's actually 4:37.  It's
10    okay.  But we -- it's getting late in the day, and off
11    the record we've discussed that we're all getting tired,
12    including the witness, and not doing our best.  We've
13    agreed to conclude this first session of the deposition
14    and reconvene at a mutually agreeable date within 30
15    days, Counsel?  Or within 60 days?
16                  MR. FELDMAN:  Certainly within 60.  I'm
17    thinking about the holidays and --
18                  MR. HOOK:  Okay.  Fair enough.  Within 60
19    days we're going to reconvene to conclude Mr. Romero's
20    deposition.  And in the interim, the transcript will
21    just be handled pursuant to the Code of -- Federal Code
22    of Civil Procedure, or would you want to do a
23    stipulation?
24                  MR. FELDMAN:  Well, you raise an
25    interesting point.  With an electronic transcript,
```

Page 181

1     'cause that'll --

2                    MR. HOOK:  Well, I --

3                    MR. FELDMAN:  So here's what I would say,

4     a couple things:  I agree with Counsel; we'll suspend

5     the deposition for today.  His counsel will certainly be

6     able to come back and continue and finish the

7     deposition.  We may have some disagreements or we may

8     not have some agreements about how long that second

9     session will go, but that doesn't need to be addressed

10    further.

11                   I would propose, 'cause I'm a little

12    unclear as to the status of this transcript, that we

13    have the court reporter prepare a written transcript of

14    the deposition and forward it to my office so I can give

15    it to Mr. Romero to review.  He could review it and sign

16    it under penalty of perjury within 30 days of our

17    receipt of the transcript.  I will leave it to you as to

18    whether you want to maintain the original or whether you

19    want me to maintain the original.

20                   MR. HOOK:  That's fine.  You can --

21                   MR. FELDMAN:  I can maintain it and

22    notify you of any changes.  I'll also agree to make the

23    original available to the extent it's ever necessary for

24    court on, you know, informal 48-hour notice.  And if for

25    some reason the original is lost or stolen, a certified

                                                   Page 182

Robert Romero- 11/13/19

1    copy can be used for any purpose in the case.

2                    MR. HOOK:  So stipulated.

3                    COURT REPORTER:  This concludes the

4    deposition of Robert Romero.  We are off the record.

5    The time is 4:39 p.m.

6                    (Off the record.)

7                    (Signature reserved.)

8                    (Whereupon, at 4:39 the proceeding was

9                    concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 183

Robert Romero- 11/13/19

```
 1   STATE OF _____ )

                              ) ss.

 2   COUNTY OF _____ )

 3

 4

 5          I, ROBERT ROMERO , hereby certify under

 6   penalty of perjury under the laws of the State of

 7   California that the foregoing is true and correct.

 8          Executed this _____ day of _____,

 9   20___, at _____, _____.

10

11

12                   _____

13                   ROBERT ROMERO

14                   VOLUME I

15

16

17

18

19

20

21

22

23

24

25
```

Page 184

```
 1              CERTIFICATE OF NOTARY PUBLIC
 2              I, LUCAS MAYEDA, the officer before whom the
 3    foregoing proceedings were taken, do hereby certify that
 4    any witness(es) in the foregoing proceedings, prior to
 5    testifying, were duly sworn; that the proceedings were
 6    recorded by me and thereafter reduced to typewriting by
 7    a qualified transcriptionist; that said digital audio
 8    recording of said proceedings are a true and accurate
 9    record to the best of my knowledge, skills, and ability;
10    that I am neither counsel for, related to, nor employed
11    by any of the parties to the action in which this was
12    taken; and, further, that I am not a relative or
13    employee of any counsel or attorney employed by the
14    parties hereto, nor financially or otherwise interested
15    in the outcome of this action.
16       Dated: 11/21/2019
17
18
19
20              LUCAS MAYEDA
21              Notary Public in and for the
22              State of California
23
24    [X] Review of the transcript was requested.
25
```

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

```
 1              CERTIFICATE OF TRANSCRIBER
 2          I, LARRY LARA, do hereby certify that this
 3     transcript was prepared from the digital audio recording
 4     of the foregoing proceeding, that said transcript is a
 5     true and accurate record of the proceedings to the best
 6     of my knowledge, skills, and ability; that I am neither
 7     counsel for, related to, nor employed by any of the
 8     parties to the action in which this was taken; and,
 9     further, that I am not a relative or employee of any
10     counsel or attorney employed by the parties hereto, nor
11     financially or otherwise interested in the outcome of
12     this action.
13        Dated:  11/21/2019
14
15
16
17
18
19        LARRY LARA
20
21
22
23
24
25
                                              Page 186
```

Robert Romero - 11/13/19

**[& - 35000]**

| & | | 2 | 3 |
|---|---|---|---|
| **&** 2:12 117:15,19 118:12 | **12:03** 80:16 | **2** 3:10 22:22 47:5 47:6 164:12 | **3** 3:11 29:15,20 44:19 46:8 66:11 66:18 158:13 |
| | **12:30** 103:13 | | |
| **0** | **13** 1:14 4:10 86:7 94:20 111:12 | **20** 3:9 21:9 33:15 56:10 126:5 143:9 144:12,13 148:13 163:7 184:9 | **3,000** 130:1,7 |
| **0517768081** 21:7 | **1305** 8:15 | | **3,083** 91:2 |
| **08024** 1:6 | **14** 15:9 16:1 37:15 88:6,8 112:10 | | **3,277** 170:4 |
| **1** | **15** 38:1 59:3,7 88:8 173:10 | **20/20** 56:13 | **3,525.79** 105:10 |
| **1** 1:24 3:9 20:9,10 21:6 | **1525** 160:24 165:13 | **2018** 21:9 65:13,17 68:10,15,15 123:6 | **3,933** 88:15 |
| **1,000** 87:25 | **15280** 185:19 | **2019** 1:14 4:10 | **3.5** 166:2 |
| **1,063.78.** 153:4 | **153** 111:25 | **208** 121:12 | **30** 58:23 60:16 61:18 65:11 79:1 80:24 132:20 161:20 167:9 168:10,13 176:7 181:14 182:16 |
| **10** 9:11 36:17 42:21 43:3 44:21 46:8,16 53:24 55:6 148:10,20 173:9 | **154** 111:16 | **209** 121:12 | |
| | **155** 111:18,20 | **20s** 113:17 | |
| | **156** 111:19 | **21** 109:3 | |
| | **16** 88:16 120:9 148:13 | **21,000** 85:3 | |
| **10,000** 94:10 | **166** 112:14 | **21,472** 84:20,25 | **30,000** 91:20 |
| **10.57.** 120:14 | **167** 113:4 114:19 | **216** 148:6 | **300,000** 73:5 |
| **10.59.** 112:4 | **17** 148:13 | **22** 150:18 | **302** 157:8,9 |
| **10.67.** 95:16 | **170** 122:4,13 | **239** 152:10 | **310** 2:8 |
| **100** 15:5 65:19 82:7 91:17 96:4 | **170,000** 122:15 | **24** 7:6 65:13 | **32** 87:24 90:5,10 |
| | **179** 120:11 | **248** 153:3 | **320** 84:19,22 85:14 85:19 86:4 |
| **106** 106:3 | **17929** 186:18 | **24th** 62:8 | |
| **1067** 156:16 | **180** 120:12 | **25** 136:7 152:10 | **322** 163:13 |
| **10:07** 1:15 4:9 | **186** 1:24 | **26** 132:9 153:3 155:5 | **331** 163:14 |
| **10:44** 35:8 | **188** 120:17 | | **336** 165:13 |
| **10:50** 35:11 | **19** 124:11 | **26.87.** 154:17 | **338-6526** 2:16 |
| **11** 164:24 | **1900** 72:19 | **262** 156:13 | **34** 90:14 138:6 166:23 |
| **11.84** 148:14 | **1920** 72:19 90:12 101:21 | **265** 157:3 158:10 178:14 | |
| **11/21/2019** 185:16 186:13 | **1920s** 76:7 | **2695.13** 178:14 | **340** 166:14 |
| | **193** 120:19 | **274** 157:10 | **35** 90:19 167:23 |
| **117** 94:23 | **194** 120:19 | **277** 159:3 | **350** 122:8,10,11 174:2,3 |
| **11:54** 80:13 | **1985** 9:2 10:16 | **279** 160:23 | |
| **12** 15:9 36:24 94:19 111:3 115:1 128:6 | **1989** 10:24 | **28** 154:16 | **350,000** 122:4 173:21 |
| | **199** 120:23 | **29** 111:13 168:2,3 168:5 | |
| | **19th** 2:13 | | **3500** 1:17 63:6 128:17 130:10 132:4,7,16,21 137:9 140:1 |
| **12,000** 94:12 | **1:38** 103:16 | **2:12** 128:7 | |
| **125** 111:9 | | **2:19** 1:6 128:10 | |
| **126** 87:11 111:10 | | | **35000** 4:11 |

Page 1

**[359 - acknowledge]**

**359**  168:6
**3618624**  1:22
**364**  153:20 154:4
**364,297.84**  84:3
**365**  168:25
**376**  170:4
**38**  170:1
**39**  91:1
**397**  113:1
**399**  170:17
**3:00**  139:13
**3:08**  139:16
**3:14**  141:21
**3:23**  141:24
**3:37**  181:8

**4**

**4**  3:12 31:11 32:8
  83:21,22 110:18
**4,000**  7:21 42:16
  44:19 46:8 51:16
**4,169.41**  94:5
**4,440**  115:25
**4,441**  115:7
**4,974.81.**  106:22
**400**  113:24
**402**  170:18
**409**  153:18
**409.64.**  154:1
**416**  170:22
**417**  112:1
**419**  170:23
**420**  169:10
**4264**  2:5
**446**  156:3
**45**  140:18
**464.80.**  154:3
**47**  3:10
**48**  182:24
**4:25**  181:5
**4:37**  181:9

**4:39**  183:5,8

**5**

**5**  3:3,14 86:19,20
  95:16,19 157:4
**5,000**  38:24
**5,746**  90:23,25
**50**  55:8 153:20
**500**  69:23
**500,000**  78:4
**501**  2:13
**52**  84:2
**523**  69:8
**53,222.83.**  42:18
  42:20
**579.58**  120:21
**5th**  47:17

**6**

**6**  148:23
**6.09**  148:14
**6.16.**  108:5
**6.77.**  120:14
**60**  181:15,16,18
**60,000**  45:20
**603**  161:8 165:21
  170:14,15
**619**  2:16
**64**  94:2
**65**  94:7
**66**  3:11 94:6,7,17
**6600**  156:1
**67**  86:3
**689**  95:2
**69**  88:25 89:4

**7**

**7**  101:22
**7,148.25.**  94:4
**7/12**  42:17
**700**  25:20 51:17,18
  53:14 129:5

**707**  1:17 4:10
**71**  94:22
**710**  9:11
**740**  113:1,5,6
  114:1,21 115:1
  170:15

**8**

**8**  32:19 35:17
  173:10
**800**  64:6 109:3
**83**  3:13
**839-5179**  2:8
**86**  3:14
**87**  95:6 104:12
**88**  10:21,22
**89**  10:22 11:4 95:4
  95:15

**9**

**9**  36:8,11
**9.33**  167:24 168:4
  168:13
**9.33.**  168:13
**90017**  1:18 4:11
**90230**  2:6
**91**  104:24
**91803**  8:16
**92**  13:13 105:4
**92101**  2:14
**92nd**  142:22
**93**  13:13
**94**  105:12
**95**  105:10
**958**  156:16
**97**  105:14
**98**  111:2
**99.9**  27:8

**a**

**a.m.**  1:15 4:9 35:8
  35:11 80:13

**ability**  7:7 120:2
  127:8 185:9 186:6
**able**  42:1 56:17
  81:25 121:21
  126:15 127:8
  134:11 137:3
  147:1 170:25
  171:17,18,23
  182:6
**absolutely**  48:10
  70:24 72:13
**ac**  112:15
**accept**  58:23 61:18
  78:21 80:24
**acceptable**  20:6
  125:10
**accepted**  81:1,7,9
  81:10
**accepting**  101:16
**access**  70:19,20
  131:15
**accessible**  127:15
**accommodate**
  149:18
**accompanies**
  20:24
**account**  25:9,12
  25:23,24,25 26:18
  28:4,5 48:5
**accounted**  82:14
**accurate**  48:8,11
  68:25 72:21 81:21
  82:2,4,7 91:5,16
  97:13 99:3 108:10
  185:8 186:5
**accurately**  7:7
**accused**  57:15
**accusing**  49:3
**achieve**  175:11
**acknowledge**
  60:18

Page 2

Robert Romero- 11/13/19

[acknowledged - amount]

**acknowledged**
83:5
**acknowledgeme...**
4:5
**acronym** 173:18
**act** 60:17,18
116:18,19
**acting** 49:3,23
50:3 123:8
**action** 185:11,15
186:8,12
**actions** 49:5
**active** 81:18
**acts** 48:4 58:17
**actual** 64:15
162:17 173:19
**acv** 173:9,18
**add** 88:9 90:14
94:3 105:4 124:15
143:9 146:23
148:23
**adding** 88:19 90:8
90:14,16,22 91:1
92:3,4 95:1
111:24
**addition** 106:3
161:1
**additional** 40:1,2
42:2 43:5,14,15,16
56:22 67:11,16
70:14 83:16 88:20
90:15 92:3 93:14
94:5 105:1,2
111:9,10,17,24
120:11,12,18
121:11 139:19
152:10 155:7
170:3,18
**address** 8:14
116:24

**addressed** 182:9
**addresses** 117:2
**adjust** 39:7 57:23
117:8
**adjusted** 40:4
155:3
**adjuster** 10:25
11:1,5,6,9,10,18
13:9,11 23:15,16
26:20,22,24 48:1,2
49:3,18,25 57:15
83:17 93:4 110:10
110:13 121:16
171:19
**adjusters** 5:22
12:23 13:20 14:16
14:20 15:1,11
16:5 24:14,14
27:4 57:19 60:1,7
60:10,14 123:2
**adjusting** 11:16
24:13 144:24
**adjustments** 33:11
**administer** 4:5
**administered** 6:21
**admonitions** 6:5
19:18
**adopt** 97:22,23
**adopted** 79:16
145:2
**advantage** 54:7,10
**advise** 67:19,22
70:9
**advised** 70:4,11
**affect** 7:7,9
**after's** 10:6
**afternoon** 103:18
103:19
**ago** 16:9 17:13,14
17:16 18:9

**agree** 4:12,20 35:6
50:4 59:12 60:21
82:6,9 98:18 99:5
99:16 101:5 107:4
125:4 129:24
137:23 145:10
163:24 169:17
182:4,22
**agreeable** 181:14
**agreed** 181:13
**agreement** 37:7
49:16 149:22
**agreements** 37:9
119:15 120:6
122:25 123:3
171:18,23 172:2
182:8
**ahead** 19:10 20:7
48:17 56:12 94:18
129:11,20 150:10
176:13 179:11
**air** 43:20 151:6
**al** 1:4,7
**alan** 1:4 2:19 5:1,3
5:20
**alaperty** 118:1
**alder** 113:15
**alhambra** 8:16
**all000091** 142:10
**allow** 6:12,16
**allowed** 127:20
158:22 161:11
180:6
**allowing** 105:2
**allstate** 1:7 4:8 5:6
5:21 9:21 10:4,14
10:19 11:17 12:22
16:7 17:24 18:15
19:7 21:7 28:24
29:1 31:11,17
32:9,19 33:17

34:22 36:8,25
37:6 40:24 41:20
42:21 43:3,25
46:19 54:3,7,10
55:21 56:3,7 60:1
60:23 61:10,22
62:19 64:7,13,20
65:2,12 66:22
67:22 68:6,13,16
70:4,9 80:24 84:5
96:9 97:23 98:7
99:15,24 101:5,17
102:8 103:4
108:12,14,16
118:6,14,19 126:1
135:17 146:22
152:23 156:8
161:11 164:13
173:22 178:25
**allstate's** 21:2
24:10,23 28:23
39:19 57:13 65:20
71:11 102:13
108:23 119:5,12
119:21 129:12
138:22 143:1
**allstate.com** 25:10
**allstate.com.** 26:8
**ambiguous** 66:6
99:18 100:16
101:8 102:4,11,18
108:17
**amend** 138:18
**amended** 3:9
**amount** 15:11
44:10 54:2 55:24
59:16 69:7 91:22
96:6 106:11
109:16 115:19
129:7 149:10
157:17 163:9

Robert Romero- 11/13/19

[amount - authorizations]

174:5,6,7,8,9,12 179:18
**analysis** 96:22 171:4,6
**analyze** 96:15 97:8
**analyzing** 97:2
**andrew** 9:20,22
**angeles** 1:18 4:11 8:23 9:6,8 86:2 101:14
**annually** 33:15
**answer** 6:17 20:1 24:25 25:18 27:20 28:9 29:14 30:13 31:15 33:6,16 34:19 52:22 63:16 65:4,19 66:9 71:7 76:1 82:1 98:25 99:1 100:21 102:6 102:22 119:2 126:15 128:20 132:22 133:3,16 149:19 150:11 151:22 158:6 162:5 166:20 180:16
**answered** 8:5 29:11 51:6 64:23 76:22 100:23 102:12,24 115:9 119:23,25 120:1 135:10
**answering** 119:19 126:25 180:25
**answers** 127:2
**anticipate** 6:13
**anybody** 18:15 78:15
**anymore** 121:21
**anyway** 107:5

**apart** 159:22 172:1
**apologize** 154:5 164:20
**apparently** 104:10 135:16
**appear** 35:19 161:9
**appearance** 175:11
**appears** 69:10 129:8
**apples** 145:16,17
**apply** 39:14,14,16 39:16 40:2 138:6
**appointment** 124:6,10
**appreciate** 8:7 36:6 71:25
**appropriate** 8:5 146:17
**appropriately** 57:25
**approximately** 10:22 16:8 17:13 35:8,11 42:23 80:13,16 91:20 103:13,16 128:6 128:10 139:16 140:18 141:21,24 181:5,8
**arbitrary** 145:2
**arcadia** 15:19,19
**archive** 28:18
**area** 15:20 42:11 74:9 75:17 124:19 124:23 168:3
**areas** 134:4
**argue** 31:8 136:1 151:20

**argument** 97:6 101:25 145:8
**argumentative** 27:14 28:8 30:10 41:8 46:9 48:13 50:10 71:6 77:15 79:12 97:5,11 98:11 100:16 102:3 116:7 126:3 126:19 131:23 152:1
**arising** 21:7 60:20
**articulated** 180:22
**asked** 19:2 24:22 25:24 28:2,2 29:6 29:11 36:17 43:10 46:15 50:20 51:5 52:20 57:6 62:14 64:23 67:14 70:14 76:22 81:24 102:11,24 104:6 107:9 110:13 115:9 119:24 129:16 131:25 132:3 136:12,14 136:18 137:17 149:6
**asking** 23:21 43:5 46:12 64:19,20 65:2 79:21 91:7 92:1,21 101:10,12 101:17 107:11 115:8,14 119:20 123:7,15,17 126:10,24 138:23 149:12 162:5 175:12 180:19
**asks** 21:6 22:22 29:15,20 31:11 32:19 36:24 37:15 38:1

**assigned** 4:3 14:15 75:16,20
**assist** 14:24 105:22,23
**assistance** 40:21 134:24
**assume** 51:11 74:21,23,24 75:14 157:22
**assumes** 102:2
**astronaut** 118:23
**attach** 20:8 47:4 66:11 80:6 83:21 86:19
**attached** 3:16 159:18
**attachments** 63:12 63:13
**attempt** 32:12
**attend** 8:19 9:3,12 10:6
**attendance** 4:22 20:18
**attending** 10:9
**attention** 49:2,7
**attorney** 4:25 17:1 17:6 21:16 22:2 23:4 24:4,6 31:16 32:25 34:7,16,24 35:23 51:12 185:13 186:10
**attorney's** 7:21 33:1
**attorneys** 19:20 21:2,19 34:12
**audio** 4:14 185:7 186:3
**august** 10:22 11:4 70:22
**authorizations** 19:14

Page 4

Robert Romero - 11/13/19

[authorized - better]

**authorized** 4:5
**auto** 13:23
**available** 14:23
  18:10,19 19:12,15
  121:23 123:2
  124:10 182:23
**avenue** 2:5 8:15
**average** 71:12
  108:7
**aware** 5:23 16:18
  123:5,9 176:25
**aye** 9:17

**b**

**b** 3:7 5:1 8:12
  81:19 136:15
**back** 11:22 16:21
  27:11,16 29:17
  35:10,13 42:13
  47:2 52:21 54:12
  56:6 62:10 65:7
  80:15,18 95:13
  103:15 112:23
  113:14,17 115:6
  128:9 130:8
  139:15,18,22
  140:2 141:23
  143:3,13,17,20
  146:20 151:9
  153:8 154:20
  164:12 172:20
  173:22 176:20
  181:7 182:6
**background** 74:22
**bad** 49:3,23 50:3,4
  54:13 57:15,20,22
  57:25 58:3,4
  59:14,18 87:24
  123:8 164:12
**baker** 1:4 2:19 4:8
  5:1,3,3,20 28:5
  45:17 73:17,20

**baker's** 41:25
**bakers** 16:12
  23:13,14 24:3
  30:5 31:7 38:23
  39:16 46:8 75:16
  76:21 79:5 83:5
  101:20 102:23
  158:18 159:13
  172:9 173:20
**balance** 16:2
  179:18
**balances** 60:11,13
**baldwin** 3:14 53:2
  70:4,7 75:4,19
  76:12,18,20 78:3
  79:9,16 80:22,25
  81:20 82:16 83:6
  83:13 89:8 91:3
  92:19 105:17,20
  121:22 132:13
  135:7,8 136:2
  139:4 142:2,19,25
  143:4,8 144:19
  147:21 153:19
  154:3 156:1
  157:25 167:1
  171:25 172:7
**baldwin's** 86:16
  86:17,22 105:15
  110:24 140:19
**ball's** 149:6
**barely** 135:4
**base** 69:23 161:11
**baseboard** 120:13
  120:15
**baseboards** 69:8
**based** 15:13,17
  39:7 41:3 54:17
  54:18 55:14,15
  56:21 64:12 66:9
  69:14,14,16,24

71:11 76:5 78:18
  84:7 87:7 91:14
  92:15 93:9 96:1
  96:21 98:14 114:1
  115:13,18 149:19
  157:3 158:21
  161:9 163:5 166:7
  179:17,23
**basic** 8:10
**basically** 13:16
  69:6 81:1 101:1
  101:24 144:1,9
  150:9 169:5,24
  172:4
**basis** 7:13 53:22
  54:16 76:19 77:1
  87:21 92:24
  101:15 113:9
  129:12 138:21
  147:10 159:16
**bates** 47:10 128:25
  142:4,9 144:17
**bath** 169:24
**bathroom** 127:25
  144:13,16 145:22
  145:25 146:2,3,6
  150:17 157:7,8
  159:14 160:1
  161:5,10 163:6,10
  163:18,20 165:20
  165:22 166:1,13
  167:12
**bathtub** 163:16,17
  163:22 165:11,12
**bathtubs** 163:25
**batty** 89:13
**bedroom** 126:9,15
  153:5,18,23,24
  154:14,15 155:4
  156:9 161:14,14
  166:23 167:6,9,14

167:21
**bedrooms** 169:22
  169:23
**beginning** 4:23
  16:16 105:24,25
  106:9,19 142:19
**behalf** 2:2,10
**behaving** 49:25
**bel** 151:6
**belief** 76:5 77:1
**believe** 12:4,5
  20:16 30:16 35:17
  41:16 42:4 43:10
  43:17 48:21 50:2
  50:3 52:25 61:21
  65:16 67:25 70:14
  76:3,23 77:5
  79:19 82:4,18,21
  82:21 83:14,17
  85:8 97:12 98:4,6
  100:3,5,17,22
  104:11 112:4
  115:10,17 119:23
  120:1,13 129:9
  133:10 147:19
  159:12 161:4
  163:2,4 171:22
**believes** 98:7
**believing** 76:19
**belongs** 165:20
**bernardino** 75:23
**best** 7:3,14 12:5
  19:21 20:1 30:12
  30:13 56:20 120:2
  133:1 147:3,6
  156:21 170:8
  171:1 181:12
  185:9 186:5
**bet** 29:7
**better** 51:12 56:19
  82:1 96:17,19

Page 5

Robert Romero- 11/13/19

[better - carries]

126:1 166:20
**beverly** 151:6
**bid** 60:24 61:22
66:24 68:21,23
75:8,11 82:17,19
100:4,14 101:14
103:1
**bids** 119:17 120:4
120:7
**big** 12:15,16 72:3
88:7 90:7,7 132:7
138:13 148:22
149:7,21 150:8
156:18 163:8
165:17
**bill** 41:21,25 42:2
43:8,10 49:19
50:15 51:3 53:13
54:24 56:21
**bills** 41:22 44:25
56:16
**binder** 51:14,15
51:22 52:1,9,25
63:15 129:4
**bird's** 113:16
**bit** 7:20 12:24 32:1
51:19 82:1 149:16
**bite** 118:5
**blocks** 154:18
157:13 158:4
**bludgeon** 101:15
**blue** 153:10 161:5
**bodily** 13:24
**bolton** 73:17
**bonus** 55:23 56:3
56:4
**bookcases** 170:9
**booklet** 6:9
**booth** 121:13
**boss** 18:2

**boss's** 18:17
**bottom** 42:8 47:10
160:6
**bought** 95:18
**boulevard** 1:17
4:10
**box** 23:22,23,25
24:1
**brain** 162:7
**break** 7:24 35:2
80:7,9,11,21
103:10,23 127:25
128:12 140:5
142:14 159:21
180:16,20,23
**breath** 132:6
180:17
**brian** 18:4
**bring** 21:12 23:1
29:24,25 30:22
31:13 32:21,23
36:11,19 37:1,17
38:4 50:20 52:20
126:21 127:6
131:12,17,19,25
137:14,22 138:3
**brings** 16:22 19:16
57:9
**broadway** 2:13
**broken** 67:2 176:4
176:6
**brothers** 8:21
**brought** 35:19
49:2,6 53:6
126:18,20 137:18
**brown** 88:19
**brownstein**
164:17
**bs** 10:3
**bucks** 71:16 112:4

**building** 12:15,17
40:6 95:19 159:24
**builds** 101:22
**built** 72:19 101:21
113:13 114:9
116:9 117:7
120:20
**bulk** 63:8
**bunch** 26:25 96:8
146:4 157:1
**burns** 17:21
**business** 10:11
130:17
**button** 134:10,16

**c**

**c** 2:1 4:1 179:10,22
**ca** 1:18 2:6,14 4:11
**cabinet** 116:4
161:7,7,8,10 166:1
**cabinetry** 112:25
114:23 115:5
117:10,12 119:11
124:24 170:9
**cabinets** 113:6,7,8
113:14,19,22
114:6,8,9 116:10
155:25 165:17,18
165:19,22 166:13
166:19
**calculations**
143:22
**calendar** 18:18
**california** 1:2 4:6
4:17 8:16 9:6
15:21 58:9 174:17
174:21 178:5,13
184:7 185:22
**call** 14:12 24:17
43:10 56:11 74:17
122:21

**called** 5:12 13:14
41:5 44:24 96:12
**calling** 170:6,6
**calls** 37:19 40:11
45:14 56:11 57:16
58:5 59:19 172:13
173:7 175:22
176:11 177:24
**campus** 9:7,9
**capable** 83:6
**capacity** 11:7,8
13:22,23,25,4
22:11
**captured** 4:13
**care** 100:12 159:8
**career** 164:4
**carefully** 98:25
136:13
**carpenters** 85:14
**carpentry** 113:23
**carpet** 108:5,7,7,8
108:13 109:1,6,15
110:18,20,21,22
157:2,5 158:10
163:1 169:3,6,18
169:23 170:23
**carpeting** 170:20
**carracsco** 5:23
16:4 17:20,22
27:12,16 41:15
43:7 47:1 48:1,3,9
49:5,6,23 53:15
54:21 59:15 67:13
67:15 78:6 79:4
82:16 83:1,3 93:4
116:15 157:21
164:15 171:6,20
179:5
**carrasco** 16:7
**carries** 6:23

Personal Court Reporters, A Veritext Company
818-988-1900

[case - cleaning]

case  1:6 6:1 17:24
19:13 41:5 59:17
61:20 72:25 79:19
99:24 109:24
116:6 118:15
127:23 138:6
183:1
cases  57:20 85:8
170:16
cash  173:19
catastrophe  9:23
catch  180:17
category  21:1,1
31:3,4
cathedral  8:20
cause  37:5,24
38:11 52:10 76:6
87:8,13 93:20
95:21 103:6
113:10 116:2
126:13 132:7
133:17,24 136:23
145:13 147:20
156:9 162:2
169:22 182:1,11
causing  110:3
cautioned  19:21
cdfn  26:2
cdnfn  25:10 26:8
cdx  95:12
ceiling  88:14
125:24 159:24
ceilings  88:9,10
90:23,24 93:1,24
134:22 145:16
160:5
cell  4:19 24:18
central  1:2
cents  109:3
certain  55:24
99:23 149:10

175:15
certainly  8:1
181:16 182:5
certificate  185:1
186:1
certified  4:14
182:25
certify  184:5
185:3 186:2
cghlaw.com  2:7
chance  19:19
20:12 139:19
143:7
chandelier  112:11
chandeliers  93:18
93:21
change  22:19
95:17 153:8
changed  12:24
15:10,13
changes  15:22
19:19,22 149:16
182:22
character  76:11
characterization
48:9
charge  55:7
107:12 111:25
114:13 115:6
119:13 145:20
152:19
charged  44:8
charges  104:7,9,17
108:4 119:22
126:11 148:14
charging  44:5,7
55:6 93:3 114:14
145:14 161:8
cheaper  81:12
check  112:13

checks  12:1 42:11
42:15 74:22
chicago  11:19,20
12:3,8
choice  130:4 136:6
139:25
chose  127:6
chosen  131:1
chris  2:7
christian  8:20
christopher  2:3,4
4:25 5:19
chronological  42:8
circa  90:12
circumstances
39:6 41:3 61:2
65:24 99:23
city  2:6 8:22
civil  181:22
claim  13:15,19,21
16:12,19 17:2,2,3
18:20,24 19:3,3
21:6,7,18,25 22:5
22:8,10,21,25 23:2
23:8,11,13,16,22
24:3,13 25:4,7,25
26:14,16,18 27:10
29:5 31:13 32:11
32:12,16 33:18,19
33:20 36:10,16,19
37:1,11,16 38:16
38:17 39:4,6,7,13
41:2,2,4,16,18
42:6 48:25 49:8
50:21 51:8,12,24
52:1,4,8,16 53:1
53:14 54:12 55:5
55:7 56:17,21
57:14,23,24 58:23
59:5 60:9,15 61:2
61:8,24 62:2

63:12,17,22,25
64:6,21 65:21,23
66:7 67:24 68:25
69:1 70:19 71:13
78:23 79:6 81:14
116:18 129:1,8
131:21,21 132:1,2
132:3,4 138:7
139:19 147:10,12
152:24 172:6
177:3
claimants  59:10
claiming  123:8
claims  11:1,10,11
11:16,18 13:9,11
13:17 14:6,19
15:4 18:6 21:13
22:5,16 25:20
33:11 42:9 48:24
50:20,25 51:11,23
52:16,25 53:23
55:16,24 60:20
67:8 117:8 122:18
128:14 129:6,10
131:10,15 132:23
135:14 137:3,5
141:8 145:1
149:19 152:16
clarification  47:10
66:14
clarified  31:2
clarify  26:10
31:21 32:1,4
classes  9:20,24
clean  28:13 125:19
148:8
cleaning  87:23,25
88:1,1 90:20
105:8 124:17,20
125:13,14 146:5
148:7 157:1

Robert Romero- 11/13/19

[cleaning - construction]

169:25
cleanup  90:18
clear  6:5,10,11
  23:24,25 28:11,12
  90:6,13 149:11
  150:6
click  63:20 64:2
  134:10,11
client  25:12,13
clients  109:15
clip  63:20,20 64:3
close  12:8 56:17
  90:1 140:7 154:15
  156:16 163:7
closely  154:9
closet  126:7 167:7
  167:8,14 168:2,9
closets  167:13
closing  101:25
coat  88:7,16,17,20
  90:15 91:2 94:5
  111:10,13,18
  120:12 121:11
  133:25 152:10
  153:4 155:7
  170:18
coats  90:8,22 91:2
  92:3 93:14 94:2
  105:2,3,11 111:24
  120:18 150:24,25
  151:3,10,11,13
  155:11,19,20
  170:2
code  58:9,13,17
  60:4,8,18 74:18
  75:15,19 110:4
  174:17 178:5,13
  178:13 181:21,21
codes  74:9 75:20
codified  58:8

coffered  88:9
  90:23,24 93:1,24
  94:4 145:15
coffers  104:9
cogent  127:1
coincide  110:25
collect  44:22
collected  118:22
college  9:3 10:2
colloquy  136:25
come  52:21 70:25
  73:6 78:17 96:2
  97:9 112:22 149:8
  171:18,23 182:6
comes  38:24
comfortable  7:25
coming  26:11 45:4
  48:5 89:22
commented  19:23
commercial  12:15
  12:16 164:25
common  90:11
  110:9 146:23
communicate  30:1
communicated
  79:4
communication
  30:3,6 67:25
communications
  22:23 23:1,7,10
  29:20 30:3 31:12
  31:18 32:10 60:19
companies  96:11
  175:16 178:23
company  5:7,22
  13:22 15:14 31:12
  31:18 32:10,20
  36:8,25 40:22
  42:1 45:13,20
  54:9 78:11 87:1
  120:24 121:4

compare  69:22
  86:16 89:8 145:16
  146:10 147:1
comparing  100:1
  147:7
compensation
  172:16
competent  101:19
competing  100:14
  101:13 120:4
competitive  66:24
  68:21,23 75:8
  103:1 119:16
  120:7
complain  132:5,6
complaints  38:2
  38:13 49:22
complete  64:14
  118:17 129:5,8
  173:2
completed  82:22
completely  48:3
  79:17 130:23
complex  43:19,22
complied  132:8
comply  175:16
  179:2,5
complying  60:7
  136:12
comprehensively
  21:25 22:1
compromise  82:11
  82:12
computer  22:19
  24:1 28:22 127:13
  127:15 146:8
  153:7
computers  34:3
conceded  100:3
concern  44:18
  55:5 170:2

concerns  41:22
  49:18 53:17,20,21
  82:23,25 83:4
conclude  181:13
  181:19
concluded  183:9
concludes  183:3
conclusion  40:12
  58:6 59:20 96:2
  129:12 138:22
  172:13 173:7
  177:25
condition  151:10
  172:20
conduct  179:10
  180:8
confirm  161:6
confused  26:1
  180:14
conjunction  36:10
connect  9:24
connected  160:13
consecutive  47:11
consider  59:17
  76:19 108:18
  112:5
considerable
  122:2
considered  53:13
  59:9 150:2 161:23
consistent  28:23
  99:14
consisting  36:3
constantly  48:4
construction  3:11
  60:24 61:12,23
  66:1,2 67:16 71:2
  72:1,4 75:4 76:13
  76:18,20 78:3
  79:10,21 80:23,25
  81:21 82:17,19

Page 8

Robert Romero- 11/13/19

[construction - custom]

83:6,13 85:2
113:18 117:19,20
117:21 118:12
144:19 157:25
**consultant's**
105:15
**consulting** 3:12
80:1 83:18 91:8
104:4 108:11
110:11 128:13
134:2 143:2,10
153:15,19 157:13
**consulting's**
161:15
**contact** 123:23
**contemporary**
99:14
**contents** 93:17
112:12 118:24
120:24 121:4,9
131:7
**continue** 104:11
104:14 108:3
129:11,17 138:17
141:17 144:11
145:23 180:18
182:6
**continued** 149:15
**continuously**
140:4
**contract** 40:14
**contractor** 54:6
68:4 72:6,11,14,18
73:6,16 74:2,12,18
74:19 75:10 77:2
77:7,17 78:1
81:15,17 82:24
100:13,18 101:13
101:19 103:1
117:23 122:22
146:21 171:15

174:15
**contractor's** 50:4
77:20 160:22
**contractors** 72:25
73:25 74:17,25
75:2 77:9,10
102:14 103:5,7
120:6 122:24
**contracts** 36:24
37:5
**control** 15:23,24
**conventional**
177:10,10
**conversation** 27:2
29:8 49:10,11,15
53:16 68:19
141:13 171:14
**conversations**
29:6,15 34:10
121:16
**cooperating** 71:9
**cooperative** 71:3
**coordinate** 121:22
**copies** 146:8
**copy** 22:7,10
136:8 183:1
**copying** 22:21
**cork** 163:9,12
**corner** 142:9
167:25
**corral** 14:19
**correct** 8:7 12:13
13:18 14:8,16,17
16:6 20:3,5 25:17
26:10 35:21,22
40:25 41:6 42:25
43:1 64:10 68:4,7
68:8,10,13 69:25
70:9 74:14 78:14
82:8 83:20 84:3
87:9 91:10 92:20

94:8 96:20,23,25
100:9 103:9
106:16,24 109:17
109:20,21 112:3
117:22 142:2,3
143:6 144:14
146:10 157:18,24
166:15 167:3
174:10 178:23,24
184:7
**corrected** 19:25
**cost** 40:24 50:7
69:16,17,20 71:12
71:12 84:23 85:5
85:5,22 87:11
95:25 98:15 105:1
108:13 112:23
115:24 119:17
162:17 172:23
173:3,9,11,22
177:12,19 179:25
**costs** 67:2 98:17
99:4 117:19 173:5
179:17,22
**could've** 126:18
126:20 127:4
**counsel** 6:18 19:23
25:21 30:20 31:3
31:3 47:9 51:21
101:25 103:11
126:20 127:13
129:24 132:3
141:12 142:6
149:5 181:15
182:4,5 185:10,13
186:7,10
**counsel's** 20:18
**count** 11:4 139:7
168:16,16
**counted** 94:20

**county** 184:2
**couple** 88:6
145:19 169:22
182:4
**course** 8:4 11:17
11:20 12:3 13:2,5
44:21 130:16,17
149:15
**court** 1:1 4:2 5:8
6:6,21,23 35:7,10
62:13 80:12,15
103:12,15 128:5,9
139:12,15 140:10
140:13,17 141:20
141:23 181:4,7
182:13,24 183:3
**coverage** 11:14,25
39:23,24 42:24
59:12
**covered** 61:12
88:10 104:19
**covina** 15:20
**created** 38:3
**criminal** 74:22
**criterias** 96:8
**criticized** 131:2
**critique** 143:2
**critiquing** 26:20
27:5
**crown** 71:23 89:9
135:1 150:24
155:19
**csula** 9:12 10:6,10
**culver** 2:6
**current** 8:14 13:14
14:25
**currently** 174:21
**custom** 113:13
116:10 117:10,12
117:14 155:24

Page 9

Robert Romero- 11/13/19

[customer - deviation]

**customer** 11:14,15 18:18 24:21 54:7 61:11 118:13,17 119:15 122:21 124:9
**customers** 24:17 26:17 45:7,16 82:18 92:24
**cv** 1:6
**cyber** 34:2

**d**

**d** 3:1 4:1
**daily** 44:14 110:8
**damage** 33:19 37:10 38:16 39:10 39:21 40:1 73:5,5 116:5,17 117:6 159:2 161:2 165:11 172:17
**damaged** 114:8,12 159:4 163:22,25
**damages** 11:12,13 12:21 40:8,21 68:25 69:2 81:14 177:4
**dat** 16:14
**date** 1:14 16:8,17 16:18 37:16 42:3 42:15 49:13 62:6 62:7 67:18 181:14
**dated** 185:16 186:13
**day** 60:15,16 79:8 121:23 127:18 138:12 181:10 184:8
**days** 18:9 58:24 59:3,7 61:18 79:1 80:24 181:15,15 181:19 182:16

**deal** 48:3 49:4 75:12,13 98:23 138:13 156:18 175:25,25
**dealing** 105:24 130:12
**dealings** 60:5 176:1,3
**deals** 132:23
**dealt** 117:6 165:8
**debate** 127:3,10
**debris** 86:7,14 87:11,14
**december** 123:5
**decent** 31:5
**decided** 135:19,20
**decipher** 42:1 67:1 67:3 70:1,13
**decision** 54:18 59:23
**deduction** 177:13 180:1
**deductions** 153:16
**defendant** 2:10 14:1
**defendants** 1:8 5:5
**deficiencies** 70:5 70:10,12
**definitely** 72:17 80:2
**defrauding** 43:24
**degree** 9:18,19 10:2
**dehumidifiers** 43:21 57:8
**delays** 27:11
**delete** 23:24 28:18 28:20
**deleting** 29:1
**deluxe** 95:18

**demand** 132:1
**demanding** 20:18
**demo** 86:14 87:1
**demolition** 86:23 159:4
**demotions** 38:2
**denied** 70:18,18 70:20 147:13
**deny** 92:24 147:9 147:12
**denying** 53:23
**department** 14:2 33:14 61:15 180:6 180:10
**depending** 13:25
**depends** 11:7 13:22 39:20 40:5 40:19 41:1,2 43:20 45:25 59:21 61:1 65:23 73:1 73:10 98:21 99:7 99:9,19 119:8 122:20 156:25 165:24 172:5,24 172:25 173:8,23 174:1,2
**deployed** 9:22
**deposition** 1:11 3:9 4:7 6:6 16:23 18:7,10,16 19:8,12 21:4 28:3 31:1 126:10,22 130:6 131:24 136:5 137:15,18,20 138:1,20 149:5 181:13,20 182:5,7 182:14 183:4
**depreciate** 180:6,9 180:11
**depreciation** 177:14,21 178:1

**180:1**
**depth** 171:8
**describes** 179:10
**describing** 53:13
**description** 3:8 69:12
**desire** 68:4
**desk** 14:13 28:13 175:2,7
**destroys** 39:1
**detach** 88:22 106:10,25 112:14 114:21 115:24 116:3 156:3 159:2 159:19 160:17 163:15
**detached** 88:23 114:9 121:14 160:16
**detaching** 106:1,7 107:19 114:4 159:17
**detail** 44:18 68:20 70:14 126:16
**detailed** 79:25 80:2 83:24
**details** 15:25 79:24
**determination** 152:24
**determine** 39:23 57:7 69:4,13 146:6 170:7 174:11
**determined** 40:9 42:24 84:8
**determining** 11:25 119:5,12
**deviation** 158:12 158:13

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero- 11/13/19

[device - dwellings]

| | | | |
|---|---|---|---|
| **device** 138:2 | **direction** 60:11,12 | 128:17 130:1 | **downs** 164:24 |
| **diagonal** 94:25 | **directly** 23:12 | 132:1 136:8 138:1 | **downstairs** 106:17 |
| **diary** 17:3 22:21 | 26:14,18 132:14 | 142:5 | 163:19 |
| 23:11 32:13 41:18 | **disagree** 130:25 | **documented** 63:22 | **doy** 33:12,15 |
| 42:6,9 52:16,18 | 145:11 | 64:21 | **dragged** 46:16 |
| 53:12,14 62:3 | **disagreements** | **documents** 3:10 | **dried** 41:24 46:23 |
| 63:12 78:23 124:7 | 182:7 | 7:20,21 16:22 | 57:7 |
| **diego** 2:14 17:15 | **discernable** 176:2 | 20:19 21:23 30:22 | **driving** 76:6 |
| 17:18 | **disclosures** 138:3 | 31:13 34:5 36:4 | **drugs** 7:5 |
| **difference** 109:3,7 | **disconnect** 159:20 | 36:11,19,22 37:2 | **dry** 40:8,16 41:6,9 |
| 112:25 114:6 | **discount** 57:5 | 37:17 38:4 47:5 | 41:13 43:17 |
| 133:9 154:19 | **discounted** 79:17 | 127:5,12 130:11 | 164:24 |
| 157:9 158:25 | **discovery** 4:16 | 130:21 137:17,20 | **drywall** 13:6 |
| **differences** 170:8 | 130:20 132:10 | 138:3,24 139:20 | 71:16 112:18 |
| **different** 12:17 | 138:2 | 140:1 145:5 | 133:24 134:3,22 |
| 13:23,24,25 14:6,7 | **discrepancies** | **doi** 178:22 | **drywall's** 112:22 |
| 39:4,13 49:17 | 119:16 158:3 | **doing** 13:23,24 | 133:24 |
| 61:8 66:7 71:13 | **discrepancy** | 15:23 33:23 40:17 | **drywalls** 133:8 |
| 71:18,19 129:16 | 105:14 106:13 | 44:22 46:7 51:21 | **dual** 159:8 |
| 144:21 146:25 | 120:17 133:24 | 60:15,16 83:6 | **duct** 106:1,5,8,23 |
| 147:20 152:9 | 156:4 161:17 | 100:8 111:23 | 106:24 107:14 |
| 153:14 157:14 | 165:17 | 116:2 129:17,17 | **ducting** 112:16,17 |
| 166:25 172:6 | **discuss** 18:7 51:1 | 129:24 133:1 | 112:19,24 |
| 174:3 | 130:24 131:21 | 136:7 138:17 | **due** 39:25 49:5 |
| **differently** 146:7 | **discussed** 94:18 | 140:4 143:25 | 53:23 165:1 |
| 154:13 | 143:10 148:21 | 156:20,22 161:1 | **duly** 5:12 185:5 |
| **difficult** 24:13 | 181:11 | 169:3 171:5 | **duplicate** 105:8,11 |
| 48:3 67:1 69:4 | **discussing** 80:21 | 181:12 | 112:13 130:11 |
| 70:13 125:19 | 128:13 151:24 | **dollar** 54:2 69:7 | **duplicates** 130:15 |
| 147:7 170:5 | **discussions** 157:23 | 74:4 106:11 117:7 | **dust** 125:13,17,22 |
| **difficulty** 63:10 | **dishwasher** | 117:15 141:4 | 125:23 |
| **digital** 4:13 6:7 | 120:25 121:7 | 149:10 163:2,8 | **dustless** 90:16,19 |
| 185:7 186:3 | **displaced** 39:19,20 | **dollars** 29:7 53:22 | 92:4 105:5 111:11 |
| **digitally** 4:9 | **dispute** 52:15 | 93:2 101:21 109:3 | 111:18 120:12,18 |
| **dimas** 101:22 | 122:3 124:2 | 112:1 | 121:11 124:15,25 |
| **dime** 148:20 | 162:16 | **domes** 88:9 94:4 | 125:10,13 156:23 |
| **diming** 107:5 | **district** 1:1,2 | 104:9 | 157:2 168:25 |
| **dining** 90:21,24 | **document** 20:8,14 | **donuts** 29:7 | 170:17,21 |
| 112:10 | 20:15,20 21:3,12 | **double** 112:13 | **duty** 138:3 152:23 |
| **direct** 26:22 | 31:4 35:17 55:4 | 153:10 | **dwellings** 176:24 |
| | 80:10 127:8 | | |

Page 11

Robert Romero- 11/13/19

**[e - estimates]**

| e | | | |
|---|---|---|---|
| **e**  2:1,1 3:1,7 4:1,1 8:12,12,15 17:2 22:24 23:11,13 24:3,6,11,12,17,20 24:24 25:6,7,8,11 25:12,13,16,22,24 25:25 26:6,9,13,15 26:16,17,25 27:4 27:12,16,24,24 28:4,4,11,11,16 29:1 30:9 31:6 32:2,13,17 45:6 46:25 47:16,22 48:18,20 49:9,10 63:3,6,8,21,23 64:4,15,16 70:20 96:13 130:19,20 164:3,11 | **edward**  5:22 16:4 67:15 78:6 79:4 93:4 179:5 | **entail**  11:6 39:12 | 84:11 86:5,17,23 |
| **earlier**  155:22 | **effect**  6:24 36:25 | **entailed**  11:16 | 89:2,5,6,8 90:13 |
| **early**  41:16 | **efficiency**  51:22 | **entire**  16:10 20:14 21:6 51:23 52:1 64:25 74:20 106:17 178:16 | 91:3,5,9,12,23 |
| **easier**  42:16 131:20 | **efficient**  53:18 | | 92:2,2,12,18,19 |
| **easy**  43:20 63:9 71:16 | **effort**  35:21 | | 93:20 95:2,10 |
| **economics**  10:11 | **efforts**  54:20 | **entirely**  99:14 | 103:5 104:18 |
| **ed**  17:20,22 27:12 27:16 29:6,8 43:7 44:25 48:1,3 49:23 50:2 53:15 54:21 57:19 67:13 68:18 87:7 100:3 121:21 122:23,23 123:7 145:2 146:14,16 150:4 153:1 157:21 161:6 164:3,15,19 171:25,25 172:6 | **eight**  15:2 16:1 105:17 120:15,16 155:4,6,8,9 | **entitled**  7:14 34:17 34:20 98:12 151:3 172:11,14,19,22 173:3,5,10,17,21 | 105:15,16,20,20 |
| | **eighteen**  163:1 | | 105:25 106:9,11 |
| | **eighty**  154:6,7 | **entitles**  172:9 | 106:20 107:22 |
| | **either**  92:19 113:15 136:14 | **entrepreneurship**  10:11 | 108:11,23 109:7 |
| | **electricians**  85:13 | **equality**  73:1 152:22 | 109:10 110:10,24 |
| | **electronic**  29:3,5,8 30:2,6 51:24 53:14 136:10 141:10 181:25 | **equally**  54:2,5 | 114:16 116:3 |
| | | **equipment**  43:18 44:10 | 117:18 118:14,19 |
| | | **era**  72:4 | 119:20 122:4,12 |
| | | **es**  185:4 | 126:11,16 128:13 |
| | **electronically**  22:18 | **especially**  105:7 | 129:13 132:13 |
| | **elevens**  101:22 | **esquire**  2:3,11 | 133:7,21 134:2 |
| | **em**  18:17 55:7,8 | **estimate**  3:13,14 7:13,14 11:13 12:5,19,20 15:4 46:1 49:17,18 50:4 53:2,2,3,19 53:20 54:6,16 56:7 61:12,19 62:6,7,22,24,25 63:18 65:12,15 66:1,2,13,15,23 67:1,4,12,17,23 68:12,13,17,20,24 69:1,3,3 70:5,10 70:13 72:19,21 73:23 78:22 79:5 79:9,17,18 80:22 80:23,25 81:1,21 83:19,25 84:2,6,7 | 135:6,7,8,20 136:2 |
| **ed's**  57:24 | **email**  26:22 | | 137:4,10 138:22 |
| **education**  10:7 | **employed**  37:8 185:10,13 186:7 186:10 | | 139:4,21 142:2,19 |
| | | | 142:25 143:2,4,8 |
| | **employee**  185:13 186:9 | | 144:12,21 147:5 |
| | **employees**  19:7 | | 147:17,18,20,25 |
| | **employment**  37:7 37:9 | | 148:2,18 150:2,5 |
| | **empty**  90:17 | | 153:16,19,19 |
| | **encapsulate**  148:9 | | 154:21 155:18,24 |
| | **ended**  44:19 121:20 124:8 | | 156:1 157:10,11 |
| | **engaged**  171:6 | | 158:4 170:8 171:2 |
| | **ensure**  32:14,15 43:18 94:14 100:8 | | 171:7,12,25 176:2 |
| | | | 176:4,5,6,22 177:3 |
| | | | 177:9,10,11,13,19 |
| | | | 177:22 179:13,16 |
| | | | 179:22,25 |
| | | | **estimated**  76:21 80:3 173:17 |
| | | | **estimates**  17:4 52:17 55:1 59:17 82:4,7,11 99:25 100:1 101:6 102:9 104:21 115:14 122:3,8,10,11 |

Robert Romero- 11/13/19

[estimates - feldman]

134:3 154:12
170:24 175:9,12
175:15,17 178:2
178:14
**estimating**  11:21
12:1
**estimation**  174:18
**estimations**
174:23
**estimators**  54:13
54:14
**et**  1:4,7
**ethical**  176:1,3
**ethics**  60:4,8
**evaluate**  68:16
84:5 92:21
**evaluated**  66:21
**evaluating**  83:13
119:21
**evaluation**  83:8
**event**  39:10
**events**  42:9 88:2
107:1,18,18
**eventually**  49:21
**everything's**  23:10
82:14
**evidence**  102:3
**exact**  13:10 16:8
16:14,17 144:20
**exactimate**  88:3
107:1,17 109:12
174:14
**exactimates**  44:11
**exacting**  84:23
**exactly**  67:1 69:5
141:11,12 170:7
**exam**  33:14,15
**examination**  3:2
5:15
**examined**  5:14

**example**  38:23
44:10,11 69:22
84:18 119:11
153:17
**examples**  110:5,6
144:11
**excellent**  103:22
**exceptions**  59:8
**excessive**  44:4
161:23
**exchange**  25:17
**exchanges**  27:12
**excuse**  10:18
33:13 66:15 68:12
128:6 132:20
140:12 164:16
**executed**  184:8
**exercise**  104:11
**exhibit**  3:9,10,11
3:12,14 20:9,10
47:5,6 66:11,18
83:21,22 86:19,20
164:12
**exhibits**  3:16
**expected**  59:4
**expecting**  55:8
**expeditious**
137:16
**expenses**  40:2
**expensive**  112:1
115:15 119:4
163:3
**experience**  54:17
72:15
**expert**  43:9,11
57:1,7,11 120:7
**expertise**  54:17
**explain**  43:23 63:5
**explained**  70:12
**explanation**  43:2

**express**  82:23,25
83:1
**expressed**  68:3
**extensive**  86:2
**extent**  34:19 51:25
182:23
**exterior**  117:17
**extremely**  24:13
43:22 69:4 84:20
85:1,15 147:6
**eye**  113:16
**eyes**  89:13 154:5
169:16

**f**

**facility**  114:20
**fact**  52:24 74:24
75:1 110:9,12
159:5 161:10
**factors**  15:14,16
**facts**  7:8 8:10 41:3
59:11,13,16,22,23
60:2 61:1 65:24
66:8,9 102:2
**failing**  60:18
**fair**  54:5 162:1
174:5,7,8 175:25
176:1,3 181:18
**fairly**  82:2 91:16
91:17
**faith**  49:3,24 50:3
50:5 57:15,20,22
57:25 58:3,4
59:18 123:8
164:13
**familiar**  58:13,16
130:20 141:8,9
174:17,21 178:18
**family**  106:15
107:4 176:23
177:6

**fan**  73:15
**fan's**  73:13
**far**  134:5,6,7
145:6 172:1
**fast**  60:23
**faster**  42:12 62:7
134:9 137:11
**faucet**  159:6,10,13
159:18,19 160:7,7
160:13,18 163:14
**faucets**  159:1,2,3
163:15
**fear**  150:22
**features**  166:5
**federal**  127:20
181:21
**feel**  115:14 124:2
133:14
**feet**  38:24 69:8,23
115:22 116:4
153:18,20,20
155:25 156:2
157:10 163:7
167:9,24 168:2,3,4
168:5,10,13,15,15
**feldman**  2:11 5:4,4
17:7,10,11,20,20
20:23 21:20 24:5
27:13,22 28:8
29:11 30:10,24
31:8,20 32:4 33:6
34:9,12 35:1,4
36:1 37:19 38:6
38:20 39:3 40:11
40:18 41:8 45:14
45:24 46:9 47:9
47:14 48:13 50:1
50:10,21 51:5,21
52:3,7,12,15,23
53:6,9,25 55:11,17
55:25 56:11 57:16

Page 13

[feldman - footage]

| | | | |
|---|---|---|---|
| 58:5,10 59:19 | 180:21,24 181:16 | **financially** 40:13 | **fixtures** 94:19 |
| 60:25 61:6,13 | 181:24 182:3,21 | 185:14 186:11 | 105:16 165:16 |
| 62:1 64:23 65:3 | **fell** 159:24 | **find** 25:22 40:1 | **flood** 164:25 |
| 65:22 66:5,13,16 | **felt** 43:8 54:21 | 42:7,12 50:22 | **floor** 2:13 38:25 |
| 69:19 70:6 71:5 | 56:23 81:11 83:5 | 51:19 65:8 78:20 | 77:11,12 90:12,15 |
| 72:22 73:8 74:6 | 84:14 | 82:3 117:11 | 92:4 95:4,23 96:5 |
| 76:1,22 77:15 | **field** 11:24 13:20 | 135:13,19 136:12 | 96:6,7 97:14 |
| 78:8 79:11 80:8 | 14:16,19 24:14,19 | 137:3,17 139:4 | 98:21 100:7 111:5 |
| 81:22 89:21 90:2 | 43:11 57:1 | 140:25 142:9 | 111:6,15,16,17,21 |
| 97:5,11,18 98:11 | **fifth** 65:3 | 144:1,16 150:4 | 111:23 114:5 |
| 98:20 99:6,17 | **fight** 48:6 | 152:8 | 124:15 125:25 |
| 100:15,23 101:2,8 | **figure** 126:8 | **finding** 82:10 | 152:12,15 156:12 |
| 101:23 102:11,18 | 143:23 | **fine** 7:11 20:2,2 | 157:12 158:13,18 |
| 102:24 107:23 | **file** 7:22,22 16:15 | 52:19 89:20 144:4 | 159:25 160:1,3,6 |
| 108:17,24 109:18 | 17:2,3 21:6,13,18 | 162:6 182:20 | 162:18 169:4,5,6,7 |
| 110:2 115:9 116:7 | 21:25 22:5,8,10,13 | **finish** 9:17,19,24 | 169:19,20 170:22 |
| 117:1 118:7 119:7 | 22:16,18 23:13,16 | 22:14 48:18 52:19 | **flooring** 77:10 |
| 119:24 120:22 | 25:4,7,20 26:14,16 | 88:19 90:15 92:3 | 90:6 95:15,20 |
| 122:6,19 123:10 | 26:18,21 27:5 | 94:14 104:4 | 111:10,25 114:10 |
| 125:7 126:3,19,23 | 29:5,7,9 32:16 | 111:18,23 112:17 | 153:21 154:16 |
| 127:3,14,19 128:2 | 48:9,24,25 50:20 | 120:12,18 137:15 | 156:9,10 162:22 |
| 128:19 129:15,25 | 50:22,25 51:8,23 | 182:6 | **floors** 71:24 76:11 |
| 130:4,14,25 | 52:1,4,8,16,25 | **finished** 112:18 | 87:3 96:14 125:18 |
| 131:23 132:2,25 | 53:1 57:24 61:24 | 124:11 169:5,6 | **florida** 98:22 |
| 133:3,12,16 | 62:2,5 64:9,25 | **finishes** 124:24 | **flow** 164:16 |
| 135:10 136:1,6,17 | 65:4 79:6 122:18 | **fire** 76:8 | **flying** 125:17 |
| 136:22,25 137:8 | 127:1,6 128:14 | **first** 5:12 11:3,8 | **follow** 41:23 61:14 |
| 137:19,23 138:5 | 129:1,6,8,11 | 13:8 14:12 16:13 | 61:15 62:24 126:6 |
| 139:3,6,11,24 | 131:10,15,21 | 38:18 39:1,23 | **follows** 5:14 |
| 140:4,19,22 | 132:1,3,4,23 | 40:7 45:17 47:19 | **foot** 71:17 95:20 |
| 141:15 142:8,11 | 135:14 137:3,5 | 57:18 85:9 138:18 | 111:2 112:2 113:1 |
| 142:14 145:7 | 138:7 139:20 | 142:5 143:9 | 113:2,24,25 |
| 147:2,24 148:3 | 141:8,14 144:24 | 149:13 160:1 | 114:22,25 153:17 |
| 149:4,14 150:11 | 145:1 149:19 | 171:24 173:18 | 154:16 157:11 |
| 151:19 152:2 | 152:16 | 181:13 | 158:12 161:9 |
| 161:18 164:18 | **filed** 5:21 | **fit** 168:13 | 165:22 167:23 |
| 166:8 172:12,18 | **files** 16:17 60:9,10 | **five** 9:13,15,17 | 168:12,17 169:10 |
| 173:6,24 174:25 | 60:15 180:7 | 38:4 55:7 80:8 | 170:15,15 |
| 175:22 176:11 | **filters** 44:12,13,14 | 85:18,20 112:4 | **footage** 91:10,22 |
| 177:24 178:7 | **final** 87:25 88:1 | 167:17 180:17 | 115:19,21 143:20 |
| 179:14 180:3,15 | 91:3,5,9 124:16,20 | | 143:21 144:5 |

Robert Romero- 11/13/19

[footage - going]

146:9 150:19
153:13 161:15,16
161:17 163:7
166:22 169:10,13
**footages** 144:6
**force** 6:24
**foregoing** 184:7
185:3,4 186:4
**form** 128:16
136:10
**formal** 21:3
**forth** 27:11,16
58:17 176:9
**forty** 155:4,6,8
**forward** 37:15
182:14
**found** 115:7
138:14 140:6
141:1 143:12
**foundation** 27:14
30:24 39:3 45:15
46:10 50:1 178:7
**foundations** 53:25
55:11 58:10 61:6
66:5 71:5 72:22
73:8 74:6 78:8
79:11 97:18
100:15 102:2
108:24 116:8
119:24 122:6
123:10 129:15
180:3
**four** 9:17,19 69:6
69:6 71:23 86:11
86:12 89:11 109:2
111:3 135:1 154:6
154:7 155:9
158:19,19 178:17
**fourteen** 162:15
162:17

**foyer** 89:9
**framers** 85:13
**framing** 133:22
177:10,10
**franco** 49:20
**frc** 173:17
**free** 21:4
**freezer** 120:20
**friday** 83:10
**front** 10:5 13:14
46:15 52:9 76:9
76:18 92:15
129:11 131:21
136:11 137:5
**frustration** 63:11
**full** 6:12,17 8:11
11:5 22:5 78:10
118:14,19 128:14
129:10 156:1
173:3,11
**function** 164:1
**funny** 75:25
**further** 10:6 62:13
182:10 185:12
186:9

**g**

**g** 2:3,4 4:1
**gcs** 72:25
**general** 75:17 77:2
77:7 106:16
150:19 171:24
174:14,15
**generally** 77:9,17
175:8
**generic** 108:6,10
**geographic** 15:20
**getting** 30:18
57:21 89:13 100:8
100:9 120:4 140:7
151:23 152:3
181:10,11

**gist** 49:9
**give** 6:1 7:2 10:22
12:5 15:22 16:16
19:21 20:1 26:5
50:17 63:16 65:7
65:18 66:8 89:13
96:15 100:6 103:1
109:2 110:5,6,6
117:1 118:24
127:9 131:7 132:5
166:20 170:25
176:7 182:14
**given** 53:3 127:6
132:4 137:9,19
**gives** 108:8
**giving** 30:13 144:1
**glare** 89:22,24
**glaring** 144:8,11
148:22
**glasses** 90:3
**glazing** 139:11
**global** 3:12 80:1
83:18 91:8 95:10
96:18 97:16 104:4
105:15,19 108:11
110:10 114:16
128:13 134:2
143:2,10 144:12
144:21 147:5,24
148:1 153:15,17
153:18,25 154:1
154:16,18,20
155:18,24 157:10
157:13,24 158:4,9
161:15
**global's** 120:14
140:6
**go** 4:21 6:4 11:13
11:24 13:3,4
16:21 19:10 20:7
20:20 22:4,20

24:1,18 29:19
32:15 35:6 38:17
44:17 48:16,17,24
50:18 51:6,19
54:12 56:12 61:25
62:5 63:9 69:9
82:2,2 87:17 89:1
89:3,5,7 92:5
93:22 94:18 98:14
104:6,15,24 108:3
112:10 113:10
121:17,19 123:2
124:3,6 126:8
128:1 129:11,20
129:23 130:8
131:11 132:14,16
132:20 135:22
138:8 139:6,9,22
141:15 143:13,17
143:20 146:20,21
148:22 150:10,17
160:25 164:12
166:11 171:16
176:13 179:11
182:9
**goes** 26:14,18
44:25 112:20
122:23
**going** 6:4,8,11,13
6:16 7:18 12:5
20:7,8 26:5,10
31:15 35:7,10
42:7,16 46:25
51:8,18 52:21
53:19 57:21 64:3
64:14,17 72:5,21
80:6,9,12,15 83:21
87:22 89:5 90:4
94:18 95:12
103:12,15 104:2,3
104:5,20 111:1

Page 15

Robert Romero- 11/13/19

**[going - holland]**

112:8,15 119:3,17
120:10 121:19
122:25 124:6,8,12
124:20 126:5,13
127:22 128:5,9
130:5,5,6 131:1,6
133:7,10,17,19
138:10 139:12,15
140:19 141:16,20
141:23 143:15,17
143:22 145:22,23
146:8,25 147:6,16
147:23 148:21,23
150:12 151:22
153:1 154:20,21
155:14 158:9,10
159:21 160:21
166:7,12 170:8
171:14,16,17
178:12 181:2,4,7
181:19

**good**   4:2 5:17
16:22 54:13 69:21
78:1 103:18 108:7
156:22 158:22
169:24

**gotta**   162:2
**grade**   90:6 108:5
108:11 111:17
152:13 157:2
158:18,22,22
163:1 170:14
**graduate**   8:24
**grand**   84:3
**great**   6:16 8:9 63:2
65:10 142:24
**green**   117:15
**greene**   117:15,15
117:19,19 118:12
118:12

**greenspan**   121:20
124:6,8
**grew**   71:24 77:5
**ground**   6:6
**group**   118:4
**guess**   7:15 22:20
108:18 132:25
137:12 168:14
**guessing**   97:13
**guideline**   41:23
69:21 174:14
**guidelines**   174:13
**guy**   118:22
**guys**   42:22 59:5
74:12 91:14 92:17
96:23 97:23
101:12 112:5
115:7 117:18
135:19 147:9
151:23 162:6

**h**

**h**   3:7
**half**   42:7 74:4
95:12 101:20
137:4
**hallway**   110:23,25
111:2,4,5 170:1,7
**hampton**   2:12
**hancock**   74:4 86:1
116:6,12 151:2
166:2
**hand**   5:9 132:5
167:24
**handbook**   68:2
**handle**   15:20
55:23 56:8
**handled**   48:9 56:7
56:9 61:8 116:17
181:21
**handling**   9:23
11:11 26:21 33:18

33:19,24 36:10,18
57:15,24 67:8
70:19
**hanging**   28:12
**happened**   19:3
82:15 109:24
123:19
**happens**   11:12
93:19 109:23
122:17
**happy**   47:23 82:19
118:18 119:1
**harassment**   33:5
**hard**   43:22 89:16
126:6,8 142:14
146:3,7,8 156:20
170:7
**haul**   86:14
**hear**   151:22
**heard**   57:19 145:5
**height**   156:2
**helmets**   118:23
**help**   26:13 49:20
83:12 123:3
133:16 134:12
142:6
**helped**   117:8
166:10
**helpful**   52:13
**helps**   72:16,17
**hereto**   185:14
186:10
**hey**   45:7 57:21
73:19 138:12
146:22 147:9
171:15
**high**   4:13 8:19,20
8:21,24 9:3 43:8
54:20,22,24 85:2
86:9 95:17 101:14
111:20 113:5

115:11 116:4
157:3 158:21,22
161:7,10 165:25
166:5,14
**higher**   98:1
**highlight**   104:6
149:21
**highly**   165:25
**hills**   151:6
**hindsight**   56:10,13
**hired**   10:24,25
11:3 16:7 45:12
45:19 83:17
101:12
**historic**   72:14,15
72:19,20 73:4,7,14
73:23 74:4 75:21
75:23 76:8,19
99:12
**historical**   71:22
116:20 117:16
165:7
**history**   54:10,11
54:13
**hit**   9:20
**hmm**   18:14 47:25
55:2 57:13 68:3
69:11 70:16 72:2
77:20 79:23 98:17
99:22 100:11
104:22 108:12
117:10 123:19
126:18 145:12,19
165:9 168:7,9,14
171:11 172:9
**hold**   10:12 18:19
134:16
**holidays**   181:17
**holland**   43:10
56:23,25

Page 16

[home - income]

| | | | i |
|---|---|---|---|
| **home**  24:15,20 38:18,25,25 39:10 39:19 72:14,19,20 73:4,6,7,14,23 74:4 76:21 78:4 100:12 166:2 172:17 176:23 **homeowners** 95:18 **homes**  12:21 72:12 75:21,24 90:12 117:5,7 165:8 176:23 177:6,6 **honest**  60:4 **honestly**  57:18 **hook**  2:3,4 3:3 4:25,25 5:16,20 21:5,22 24:9 27:17 28:1,14 29:13 30:14 31:10 32:7 33:9 34:11 34:15 35:3,6,12 36:5,7 37:22 38:9 38:22 39:8 40:15 40:23 41:11 45:18 46:4,17 47:4,13,15 48:15 50:6,13,24 51:10 52:2,5,10,14 52:20 53:5,8,10 54:8 55:13,19 56:2,24 58:1,7,12 59:24 61:4,9,16 62:9,14,16,18 65:1 65:6,25 66:10,15 66:20 70:3,8 71:10 73:3,12,19 73:21 74:11 76:4 76:25 77:19 78:9 79:15 80:6,11,17 82:5 90:1,9 97:7 97:15,21 98:16,24 | 99:8,21 100:20,25 101:3,11 102:7,16 102:20 103:3,10 103:17 107:25 108:20,25 109:19 110:16 116:11 117:9 118:10 119:10 120:3 121:3 122:9 123:4 123:14 125:15 126:4,22,25 127:12,16,22 128:1,3,11,23 129:20,23 130:3,9 130:18 131:8,25 132:22 133:2 134:1 135:12 136:4,16,20,24 137:2,13,21,25 138:12,19 139:9 139:17 140:2,8,12 140:15,24 141:18 141:25 142:17 145:9 147:8 148:11 149:13,17 149:23 150:15 152:6 161:21 164:21 166:9 172:15,21 173:12 173:25 175:4,23 176:17 178:3,11 179:20 180:12,19 180:23 181:2,9,18 182:2,20 183:2 **hope**  8:18 79:2 **hoping**  141:13 **hoses**  159:20 **hour**  42:7 137:4 149:15 182:24 **hours**  7:6 84:19,22 85:14,19 86:4 | 87:24 138:13 140:11,13,15,18 171:5,9 **house**  11:12 12:16 39:14,15,17,25 43:4 45:19 54:19 57:2,9 71:18,20,22 71:24,25 72:6,8,9 72:11 76:6,8,9,18 82:3,22 88:9,13 90:17 95:9,11 113:18 116:10,12 116:18,20,22,23 116:25 117:14,15 117:15,19 118:12 121:18,19 124:3 125:11,12 146:20 159:13 166:6 173:4 174:3 **hpoz**  71:21 **hpozs**  117:6 **huge**  158:25 **huh**  42:22 59:7 61:20 86:17 114:20 135:14 154:2 155:7 **human**  30:12 56:14 **humidifiers**  55:6 **hundred**  42:19 95:20 99:12 100:11 122:14 **hundreds**  16:17 23:20 55:1 **hurricane**  9:20,22 **hypothetical** 38:21 45:24 72:23 73:9 125:7 **hypothetically** 173:9 | **idea**  51:7 78:5,7 **identification** 20:11 47:7 66:19 83:23 86:21 **identified**  104:8 **identify**  4:23 104:17 108:4 126:11 134:23 154:24 **identifying**  119:4 **iicrc**  41:23 43:12 **illinois**  12:8 **immediately**  42:24 **important**  6:9 19:21 55:4 67:7 67:10 77:21 126:14 **impossible**  16:18 55:3 **impression**  35:22 **improper**  130:23 **inch**  95:12 120:14 120:15,16,16 **inches**  115:2 **incident**  21:8 **inclined**  20:4 **include**  134:3 177:13,21,23 178:1 180:1 **included**  44:13 107:1,13 112:23 **includes**  17:4 53:2 85:11 88:3 106:1 106:7 107:19,19 **including**  22:23 52:25 104:9 107:15 138:1 181:12 **income**  55:14 |

Robert Romero- 11/13/19

[incomplete - item]

incomplete  38:20
45:24 72:23 73:9
125:7
incorrect  50:9
147:15
incurred  87:21
independent  43:9
45:1 96:10 100:6
108:15 109:13
138:2
indicates  145:6
indicating  137:6
indication  114:11
individual  41:4
54:16 88:4 143:21
industry  46:21,24
69:22 87:20 98:8
98:15,17 99:3,15
117:11,13 124:25
174:13 177:5
inflated  45:3 46:1
69:10,13,14 84:14
84:20,21 85:1,3,15
115:17
influence  15:14
informal  112:10
182:24
information  32:18
35:23 37:20 42:2
43:6,14,15,16
44:25 46:12,14,20
56:21,22 63:23
64:16,18,19 67:4
67:11,16 79:22
92:12 93:10
123:18 127:1,5,9
171:1
initial  69:3 138:2
initially  11:19
injureds  49:24

injury  13:24
innovation  74:2
74:15,24 75:3,9
78:10 103:6
117:24,25 118:4
innovations  74:17
75:12 78:12,13,18
ins  113:13 161:3
inside  12:16
inspect  121:17,19
inspected  68:18
88:13 95:24 123:1
134:24
inspection  84:8
105:22 121:22,25
inspections  70:15
install  156:1
installed  90:12
114:10
instantly  79:16
81:1,7
insufficiencies
67:23
insurance  1:7 5:7
5:22 31:12,17
32:10,20 33:14
36:8,25 45:13,20
46:19 58:8,13,17
59:11 60:2,18,20
61:15 96:11 110:4
175:16 178:23
180:7,10
insured  39:9,18
40:20,21 54:2
119:1 121:21
125:3 145:18,21
150:3 151:7 162:3
177:11,20
insured's  68:3
insureds  38:17
39:2 45:5,9,11

53:23 57:20 71:3
71:8 82:16 83:15
98:9,12 100:2
101:16 110:3
118:5 123:6,12,15
123:17 125:9
151:3 162:20,23
insurers  174:22
intended  4:15
107:21
intentional  47:12
47:13
intentionally
59:13,16
interest  51:22
interested  185:14
186:11
interesting  181:25
interim  181:20
interior  117:17
intern  10:20
internal  31:11,17
32:9
internship  11:2
interpretation
107:22
introduce  5:19
introduced  5:17
inundates  38:25
invades  55:18
investigate  11:14
152:23
investigated  66:2
investigation
65:21 170:12
invoice  3:11 44:3
44:17 56:9 64:13
66:12 68:9,11
79:25
involved  46:6
49:20 50:12 56:18

120:8 122:22
156:6
involves  39:10
issue  26:24 28:24
59:12 90:7 111:7
118:17,22,23
132:24 137:6,8
150:25 151:16
152:13
issued  42:11
issues  26:20 54:5
69:25 82:3 169:21
issuing  12:1
it'd  55:3
it'll  62:6 63:21
itel  95:16 96:13
97:20 98:22 100:5
108:8,15 110:9,11
110:13 112:3,6
138:14 152:16,18
156:12 157:3
163:5
item  44:16 69:5
84:18 86:11,12,23
86:24 87:6 88:2,6
88:8,16 90:5,18
91:1 94:1,2,6,21
95:4,15 104:12,13
104:24 105:4,10
105:12,14,25
106:3,22 107:17
108:6 109:11
111:9,10,13,16,18
111:19 112:13,14
120:11,12,17,19
120:23 121:12
129:7 133:13
148:5,13 152:10
153:3 155:3 157:3
158:16 159:3
160:23 163:12,14

Page 18

Robert Romero- 11/13/19

**[item - las]**

| | | | |
|---|---|---|---|
| 165:13 168:6,25 | 143:4 149:15 | 85:16 86:18 87:21 | 185:9 186:6 |
| 170:4,18,22 | 150:8 152:15 | 88:4,5,11 91:4,14 | **knows** 52:9 168:21 |
| 171:17 177:21 | 154:24 174:16 | 92:11,25 93:2 | |
| **itemize** 176:8 | 175:10 | 94:10,11 96:2 | **l** |
| **itemized** 70:2 | **kitchen** 105:9 | 97:19 101:25 | **l** 96:13 |
| **items** 50:18 88:4 | 121:14 | 103:23 104:6,23 | **l.a.** 17:15 117:3 |
| 93:23 106:16 | **kitchens** 170:14 | 105:5,21 107:15 | **lab** 108:15,15 |
| 107:8 124:16 | **knocked** 145:19 | 107:21 108:6 | 109:13 |
| 145:13 148:22,24 | **know** 8:1 9:15 | 109:10,22 113:15 | **labeled** 146:7 |
| 149:8,10,21 150:2 | 11:11,12 12:18,24 | 113:18 114:8 | **labor** 85:4,5 |
| 154:24 161:22 | 13:5,6,6 15:22,25 | 116:1,16 118:25 | **laboratory** 95:24 |
| 171:13 174:3 | 16:2,8,19 18:17,19 | 119:2 122:1,21,23 | 96:11 98:22 100:6 |
| | 19:2,13,13,15 20:3 | 122:25 123:21 | **laborers** 87:13 |
| **j** | 20:13 22:17 23:23 | 124:1,7 125:6,8 | **lacks** 27:13 30:24 |
| **j** 2:11 | 24:2,14,15,17,19 | 126:6 127:16 | 39:3 45:15 46:9 |
| **jack** 17:21 | 25:19 26:12 27:5 | 129:1,19 130:11 | 50:1 53:25 55:11 |
| **january** 47:17 | 27:6 28:6,7,16 | 133:22 134:9 | 58:10 61:6 66:5 |
| 49:12 92:18 | 29:2 30:5,12 | 136:1 138:12 | 71:5 72:22 73:8 |
| **jim** 43:10 56:23,25 | 31:16 32:15,16,17 | 141:15 143:16 | 74:6 78:8 79:11 |
| **job** 1:22 11:6,8 | 33:22 34:3,17,20 | 144:1,3,3,5 145:15 | 97:18 100:15 |
| 13:19,21 54:4 | 39:13 40:5,20 | 145:17 146:9,16 | 102:2 108:24 |
| 56:18 77:18 85:3 | 41:24 43:7,8,19 | 147:9 149:24 | 116:7 119:24 |
| 118:17 156:22 | 45:7,16,23,25 46:1 | 151:10,13 152:12 | 122:6 123:10 |
| 171:20 | 49:9,17 51:12,15 | 152:13,14,20,21 | 129:15 178:7 |
| **journey** 85:7 | 52:8,23 53:1,15,15 | 153:8,20 154:9,11 | 180:3 |
| **jumping** 143:16 | 53:16 54:11 56:16 | 156:3,8,8,11,22 | **land** 179:18,23 |
| **june** 10:21,22 | 56:19 57:10,10,22 | 157:16,16,18 | **landing** 150:20 |
| **jury** 151:21 | 58:8 59:22 63:4 | 158:24 159:5,5 | 170:6 |
| | 65:7 67:20 68:1 | 162:19,22,24 | **laptop** 131:9,12,13 |
| **k** | 68:18,19 69:8,21 | 163:11,16,24 | 131:14,19 136:11 |
| **keep** 23:10 94:18 | 70:11 71:15,16,16 | 164:5,10 165:10 | 137:9,14 141:10 |
| 112:8 119:3,3 | 71:17,17,21,23 | 165:19,20,25 | 156:20 171:2 |
| 120:9 124:19 | 72:3,4,16,24,25 | 166:18 167:3,7,20 | 176:20 |
| 125:22 126:5 | 73:2,15,15,24 74:7 | 169:3 170:10,13 | **lara** 186:2,19 |
| 136:2 139:3 | 74:8,10,16,22,24 | 170:13,21 171:8,9 | **large** 7:22 9:23 |
| 147:16,16,23 | 75:1,3,5,6,15,21 | 171:12 172:6,6,8 | 39:1 57:14 75:12 |
| 148:21 150:12 | 75:23 76:7,12 | 173:8,21 175:24 | 100:18 107:8 |
| 154:21 155:14 | 77:9,11 78:6,15,18 | 176:7,21 177:6 | 149:20 164:2 |
| 158:6,9,10 160:21 | 78:24,25 79:4,7,24 | 180:2,5,7 182:24 | **largest** 164:4,6,23 |
| 166:11 | 81:18,19 82:12,13 | **knowledge** 54:17 | **larry** 186:2,19 |
| **kind** 89:16 101:15 | 82:20 83:9 85:12 | 93:8,9 98:14 | **las** 21:9 71:19 |
| 107:5 130:11 | | | |

Page 19

[late - loss]

| | | | |
|---|---|---|---|
| late  79:9 181:10 | limit  118:16,22,23 | 169:16 170:5,11 | 124:3 127:8,24 |
| lath  71:22 76:10 | limited  22:24 | 180:14 182:11 | 128:14 131:10 |
| 88:8 94:3 100:5 | linda  5:1,20 | live  76:7 | 132:12 136:3,8 |
| 111:14 | line  10:5 13:14 | living  40:1,2 93:22 | 137:11 138:8,24 |
| law  2:4 6:23 30:25 | 26:15 42:2 44:16 | 94:20 106:14 | 143:16,18,20 |
| 58:11 176:9 178:8 | 45:2 67:3,3 69:13 | 125:12 | 144:22 145:22 |
| 178:10 | 81:8,11 84:8,18 | llp  2:12 | 146:5,8 147:5 |
| laws  174:22 184:6 | 86:23,24 87:6 | load  14:25 15:10 | 149:4 150:7,8 |
| lawsuit  5:21,23 | 88:2,4 91:22 92:6 | 86:25 | 152:14,21 156:20 |
| 32:2,13,14 | 93:23 94:6,17 | loan  179:19 | 157:7 158:20 |
| lawyer  36:2 | 104:12,13 105:25 | locate  34:21 | 163:21 164:11 |
| layer  152:10 | 106:22 107:17 | located  9:10 142:1 | 166:18 167:22 |
| laying  169:5 | 108:6 109:11 | location  1:16 | 168:6,8 170:10 |
| leader  10:5 13:15 | 124:16 143:1,15 | 14:13 | 178:12,15 |
| 18:6 | 143:15 146:21,21 | lock  34:3 | looked  27:23 |
| learn  16:13 56:14 | 148:23 149:7 | log  152:5 | 43:13 48:12 81:8 |
| 178:4 | 153:10 154:24 | logs  41:25 43:17 | 127:5 139:24 |
| leave  182:17 | 155:3 158:16 | 46:23 57:7 | 142:25 161:12 |
| left  9:20 35:16 | 161:22 170:24 | long  9:12 10:14 | looking  43:17 |
| 104:11,23 140:11 | 171:16 177:21 | 11:23 12:4 13:8 | 47:23 52:19 54:12 |
| 140:14 141:6 | linear  69:8,23 | 13:12 33:22,23 | 56:6 63:1 64:6 |
| 143:1 | 91:22 113:2,24,24 | 50:7 56:15 78:21 | 66:25 85:14 86:6 |
| legal  1:16 31:23 | 114:22,25 115:19 | 85:16 116:2 | 86:15 91:7 94:25 |
| 36:3 40:12 58:5 | 115:21,22 116:4 | 164:24 182:8 | 109:2 111:12 |
| 59:19 172:13 | 143:21 155:25 | longer  48:16 | 133:6,20 134:21 |
| 173:7 175:16,22 | 156:2 161:8 | 162:12 | 135:5,9,11 136:2 |
| 176:11,11 177:24 | 165:22 167:9,23 | look  19:14 20:8 | 136:13 139:21 |
| letters  22:24 26:25 | 167:24 168:2,3,4,5 | 22:18 23:7,18 | 140:3 141:1,3 |
| letting  53:16 | 168:10,12 170:15 | 24:19 25:12 27:18 | 143:18 144:4,7,11 |
| level  48:2 56:5 | 170:15 | 27:21,24 28:4,7,17 | 148:16,17 150:19 |
| license  10:12 77:7 | lines  92:8 161:2 | 29:10 30:2,7,19,21 | 150:23 152:8 |
| 160:22 | list  48:17 121:10 | 34:5 35:21 36:22 | 154:8 158:3 |
| licensed  77:2 | listen  98:25 | 42:6,15 43:7,9 | 161:11,22,24 |
| 81:17 102:25 | litigation  19:4 | 44:16,25 48:17 | looks  45:2 83:24 |
| 174:15 | 130:12 | 50:17 52:10 54:16 | 94:22 134:5 135:1 |
| life  16:2,3 163:12 | little  15:17 32:1 | 54:25 55:1 57:23 | 143:19 167:8 |
| light  89:16 94:19 | 51:19 63:12,19 | 61:24 62:6 65:4 | 169:8,9,24 |
| 105:16 | 82:1 86:8 88:5 | 66:12 69:5 78:23 | los  1:18 4:11 8:23 |
| lights  89:18 | 95:17 140:10,18 | 79:6 85:5 88:2 | 9:6,8 86:2 101:14 |
| likewise  6:16 | 149:16 150:7 | 89:7 96:5,5 | loss  16:13 21:8 |
| | 151:21 157:3 | 110:24,25 120:5 | 24:19 38:16,18 |

Robert Romero- 11/13/19

[loss - measurements]

40:3 42:22 53:24
61:12 81:24,24,25
100:18 101:7
104:19 110:12
122:25 123:1
151:9 159:5 160:6
163:5,17,23,25
164:3 165:1,4,14
171:18 172:7,20
**losses**  9:23 11:11
11:13 75:13,13
146:24
**lost**  182:25
**lot**  7:22 13:3 27:10
27:11 57:22 62:6
75:22 104:1
124:23 133:21,22
134:21 159:23
165:7
**lots**  11:15 57:10
60:10
**loud**  133:13
**lower**  101:16
110:17
**lowest**  145:2
**lucas**  1:23 4:3
185:2,20
**luminite**  96:6
**lunch**  103:11

**m**

**m**  8:12,15
**mackey**  3:11 53:3
61:22 62:5,7,20
65:12 66:11 67:5
67:6,9,15 68:9,19
70:7,9,11 79:21
80:22,25 90:13
100:4 121:22
171:21 173:21
**mackey's**  64:13

**magnitude**  67:24
**mail**  23:11 24:3,6
24:12,17,20 25:6,7
25:9,12,13,22,24
25:25 26:6,9,14,16
26:17 27:12,24
28:4 31:6 32:2
45:7 47:1,16,22
48:18,20 49:9,10
63:21,23 64:16
164:3,11
**mailed**  26:15
70:20
**mails**  17:2 22:24
23:13 24:11,24
25:11,16 26:25
27:4,16,25 28:4,11
28:11,16 29:1
30:9 32:13,17
63:3,6,8 64:4,15
130:19
**main**  15:21 106:19
**maintain**  182:18
182:19,21
**maintaining**  24:23
**major**  10:9 117:16
119:16 143:19
**making**  6:7 40:17
53:24 82:13 124:5
**man**  165:1
**manageable**  15:25
**manager**  13:15,17
13:21 14:6,19
15:4
**manager's**  13:19
**managers**  11:23
14:6,23
**mandate**  48:1
**manner**  102:15
**mansion**  116:6

**manual**  17:2 33:21
**maple**  113:16
**mapping**  41:24
**marc**  2:11 5:4 17:7
17:10
**mark**  102:2
**marked**  20:10
47:6 66:18 83:22
86:20
**market**  117:4,4
180:8
**marsh**  18:4,8,21
19:2
**marsh's**  18:5 19:6
**mask**  125:24
**masking**  105:7
124:18,18 125:12
125:14,20 156:23
157:1
**massive**  41:6 73:5
114:23 115:5
116:5
**master**  46:13
166:22 167:6,9,21
169:24
**match**  97:20 167:2
**material**  53:1,1
95:13 99:10,10
104:2 109:12
159:24 163:4
**materials**  12:18
32:20,22 33:2,4,10
33:17 34:21 35:18
35:21 36:9,15
99:13
**math**  69:9
**matter**  4:8 77:13
77:17 82:10,13
98:9 176:24 177:2
**matters**  177:1

**mayeda**  1:23 4:3
185:2,20
**mean**  9:14 10:3
11:15 13:23 14:11
14:12,13,21 16:15
16:15 17:3 23:19
23:20 25:13 27:3
34:1,24 49:5,24
53:11 66:13 69:9
69:25 72:18 75:19
82:2 84:10 85:8
91:17 93:20 98:22
107:2 108:19
109:8,14 113:6
115:12 116:23
117:7 118:8 122:2
124:23 125:16
128:21 129:9
132:8 143:25
145:10 146:24
148:7 149:11
150:25 151:25
154:4,8,10 155:19
159:7 160:3 162:6
162:21 165:5
168:23 170:14
171:16 174:20
178:19,20 179:9
180:9
**means**  160:25
172:22
**meant**  164:16
**measure**  12:20
**measurement**
69:25 157:9,19
166:24
**measurements**
69:24 91:21 144:5
146:10 154:9
157:14,24 171:3

**[mechanically - neither]**

mechanically   112:14
mechanism   101:4
medication   7:5,9
meet   171:15
meeting   17:5,19
memorized   31:24   58:21 175:2,6,21   178:20
memory   31:6
men   85:8
mention   19:17
mentioned   103:22   104:12,13 132:13   138:24 149:20   155:14
merchandise   40:20
merit   39:7 61:8
mess   159:19
message   19:11
messages   22:25
met   17:11 45:17
mfeldman   2:15
michael   164:17
michelle   73:13,15
microphones   4:18
microscope   97:3,8
microsoft   25:14   25:16
middle   134:10,16
midwest   78:19
mil   148:10
milliliter   148:20
million   74:4   101:21 117:6,14   166:2
mills   116:18,19
mind   62:16 142:4
minor   20:4

minute   80:9   177:17
minutes   131:5,6   140:18 180:17
misrepresenting   59:10,13,16 60:2
missed   9:24   146:22 156:9
missing   63:14,15
misspoke   19:9   68:12 113:2   164:22
misstates   30:25   58:11 128:19   178:7
mistake   90:25   154:6 163:11   167:8 168:19,20
misunderstanding   148:25
mitigate   40:20
mitigating   39:5
mitigation   40:22   41:23 42:1 43:8   43:19 49:19 86:25
mitigations   54:20
mm   18:14 47:25   55:2 57:13 68:3   69:11 70:16 72:2   77:20 79:23 98:17   99:22 100:11   104:22 108:12   117:10 123:19   126:18 145:12,19   165:9 168:7,9,14   171:11 172:9
mmm   87:15
modify   22:20   143:9
moisture   41:24   46:23 57:9 163:10

molding   71:17,23   89:9 135:2 150:24   151:12 155:19
money   44:23 45:5   50:7 55:20,21   57:21 82:22 85:9   126:1 133:25   145:14 173:1,14   173:16 174:5
month   28:20   85:20
months   10:23   16:19 42:21 43:3   44:22 46:8,16   53:24 85:18
morning   4:2 5:17
motels   75:22
mouse   134:10
move   56:17 80:9   90:21 110:23   124:14 134:17   144:17 153:10
moved   135:4
movers   43:20
moving   149:6   161:2 165:15,16
mullin   2:12 21:24
multi   117:6,14
multiple   176:23
must've   27:23
mutually   181:14

**n**

n   2:1 3:1 4:1 14:12
nail   48:6
name   4:2 5:2 8:11   14:9,11,14 18:3   78:10 140:20
name's   5:19
names   78:15 110:6   146:25 152:9

necessarily   71:13   109:8 125:2   146:19
necessary   56:23   72:17 88:21 90:17   105:22 115:20   182:23
need   7:24 29:17   30:6 31:8 32:4   33:6 41:24,24   43:16 45:1 47:2   59:21 64:3,15,24   66:8 67:25 69:12   90:4,19 91:9   92:11 100:24   103:23 114:9   125:9 131:3   135:15 136:3   145:16 146:5,5,8   146:23 156:5,11   159:6,13 161:6   170:11 175:16   181:3 182:9
needed   42:2 43:14   67:4,12,16 70:13   100:13 111:22   147:14 163:23
needs   15:14 18:18   40:21 65:4 115:5   121:14 152:3   155:3 177:8
negative   38:1,11
negotiate   49:20   57:4
neighborhood   76:7,8
neighborhoods   86:2
neither   185:10   186:6

Robert Romero - 11/13/19

**[never - okay]**

never   10:1,3 27:4
54:19,19 62:16
67:9 72:20 73:7
87:8,15 88:13
116:3 125:9
128:25 129:2
163:12
new   33:24 94:15
94:15 105:22
133:22 160:8,10
nice   158:23 170:14
nickel   107:5
148:20
nine   104:12,23
105:16 142:16
155:25 156:2
168:15,15,15
nnn   14:13
noises   4:19
normal   119:14
130:16
normally   26:16
119:14 150:23
151:18 159:1,7,15
159:16 163:9,14
171:18
northbrook   12:8
northridge   54:9
notary   1:23 4:4
185:1,21
note   4:18 6:21
55:5,7
notes   25:21 51:24
52:18 53:11,13
62:3 63:17,22,25
64:6,9,12,22
114:10
notice   3:9 20:17
21:4 31:1 182:24
noticing   153:14

notification   32:14
notify   182:22
november   1:14
4:10
number   14:15
21:7 22:22 23:22
29:15,20 31:11
32:8,19 35:17
36:8,11,17,24
37:15 38:1 84:19
86:11,12,24 87:6
88:6,8,8 90:5,6,11
94:21 95:4,6,15
104:24 105:4,10
105:12,14 106:3
106:22 110:18
111:9,13,16,18
113:3 120:17,22
120:23 142:7
143:21 144:13,16
145:22,25 146:2
148:6,13 150:17
153:6,18,24
154:14,15 155:4
157:7,8 160:23
161:14,14 163:6
163:20 168:6
170:4,18
numbers   43:18
172:7

**o**

o   4:1 8:12,12,13,15
oak   90:5 95:4,15
95:20
oath   6:22 35:14
80:19 103:20
oaths   4:5
object   27:13
objection   37:19
38:6 40:18 68:6
136:20,22

objections   36:4
93:23 172:18
obligated   130:19
obligates   6:24
obligation   54:4
130:16 137:21
obligations   132:9
174:22
obliged   30:19,21
observation
155:21
obtain   22:5 101:18
obtained   100:1
obtaining   102:9
obviously   130:17
165:11
occurred   21:8
october   62:8 65:11
65:13,17 68:10
odd   163:8 167:8
167:11
offers   36:4
office   2:4 7:21
15:21 20:18,24,25
24:16 32:11 33:1
128:16 130:10,22
182:14
officer   185:2
offices   15:18
oh   25:15,24 43:24
55:10 73:20 125:9
133:8 134:13,18
141:9 142:13
153:5 155:13
156:15 162:15
164:14,16,22
179:23
okay   5:25 6:19,20
7:5,18 9:9,12
10:12 13:8,12
14:2,9,25 15:7,10

17:11 18:12 19:10
19:16 21:18 22:4
22:9,15,22 23:6
24:8 25:3,16 26:2
26:19 28:15,21
29:2,10,14,14 30:2
32:6,19 33:8
34:14,18 35:1,13
35:16,25 36:17
37:10 39:9,18,24
40:3,24 41:5,12,20
44:2,21 45:19
47:14,19,21 48:20
48:24 49:1,14
51:2 52:14 53:9
53:21 54:15,18
56:6 58:16 59:15
59:25 60:17,23
63:2 64:5,8,12
65:7,8,20 67:5
68:6,9 69:14
71:11 73:13 74:12
75:8 76:17 77:23
78:3,6 80:5,18
81:17,20 82:6,10
82:15 83:12,15,19
84:2,5,10,18 85:19
86:5,6,14 87:5,10
87:15,18 89:4,12
89:24 90:5,10
91:13,24,25 92:7
92:12,14,17 93:13
93:16,25 94:9,17
95:14 96:1,3,17
99:2,22 103:4,8,10
103:22,24 104:16
104:20,21,25
105:6,13,18 106:5
108:3,3,12,21
109:5,6,14 110:8
110:17,20,23

Personal Court Reporters, A Veritext Company
818-988-1900

[okay - parties]

| | | | |
|---|---|---|---|
| 111:2 112:9 | 160:7 | 65:22 98:20 99:17 | 132:7,17,21 |
| 114:13,16 115:4 | **oliver** 5:1,21 | 102:3 109:18 | 135:16,17 137:9 |
| 115:23 117:18,23 | **once** 22:19 51:19 | 119:7 122:19 | 140:1 143:10 |
| 118:19 119:3 | 112:22 | 172:12 173:6 | 178:17 |
| 120:9,11 122:2,17 | **one's** 90:13 109:8 | 174:25 | **paid** 42:3,22 44:20 |
| 124:1,11,13 | 167:3 | **overhead** 94:11 | 45:8,8,10,12 47:24 |
| 125:16 126:5,9 | **ones** 91:15 | **overland** 2:5 | 55:20 56:15,21 |
| 127:25 129:4,10 | **ongoing** 124:2 | **overlap** 93:20 | 84:22 118:25 |
| 129:14 130:3,9 | **online** 13:3 52:16 | **oversight** 93:19 | 119:2 147:17 |
| 134:7,25 135:1,13 | 52:18 | **owe** 174:4,4 | 165:10 |
| 137:2,25 138:23 | **open** 104:20 | **owed** 98:5,6,7,10 | **paint** 13:6 150:24 |
| 139:1,9,22 140:3 | **openings** 153:16 | | 150:25 151:3,11 |
| 141:18 142:4,18 | **operation** 177:7,8 | **p** | 151:13,17 153:22 |
| 142:24 143:7,14 | **opinion** 57:4,6 | **p** 2:1,1 4:1 8:15 | 156:24 |
| 143:24 144:10,13 | 81:13 98:13,13 | **p.m.** 80:16 103:13 | **paint's** 155:19 |
| 145:25 146:1,12 | 160:19,20 176:12 | 103:16 128:7,10 | **palmas** 21:9 71:19 |
| 146:17 147:16,23 | **opposed** 110:18 | 139:13,16 141:21 | **paper** 63:20,20 |
| 148:19,25 149:1 | 114:1 137:9 | 141:24 181:5,8 | 64:3 136:10 151:6 |
| 149:25 150:5,6,13 | **opposite** 136:9 | 183:5 | **paragraph** 102:1 |
| 150:16,17,19,21 | **order** 59:23 | **pack** 121:1,10 | **parameters** 75:9 |
| 151:8,15,17,20,24 | **organizer** 167:9 | **pad** 109:6 110:20 | **park** 74:5 86:1 |
| 152:9,19 153:2,5 | 168:3,9 | 110:21,22 | 116:6,13 151:2 |
| 153:11 154:23 | **organizing** 40:16 | **page** 3:2,8 20:22 | 166:3 |
| 155:1,13,13,14,17 | **original** 44:2 | 25:20 53:14 69:8 | **part** 41:13 59:6,8 |
| 156:7,8,17,19,24 | 62:21 70:19 71:24 | 84:2 89:10,11 | 67:7,10 68:15 |
| 157:2,8,15 158:2,7 | 95:9,11 111:6 | 92:8 104:7,7,11,23 | 71:21 75:6 94:17 |
| 158:8,14,15,24,25 | 141:2 182:18,19 | 106:21,22 111:12 | 104:17 118:4 |
| 160:2,4,7,12,15,19 | 182:23,25 | 112:9 120:9 126:5 | 129:1 130:6 |
| 160:21,23 161:4 | **originally** 14:3 | 130:1 137:11 | 132:13 142:12 |
| 161:13,24 162:9 | 15:3 | 138:8,9,9 142:6,12 | 169:8 |
| 162:11,11,14,25 | **outcome** 185:15 | 142:18,22 144:12 | **particles** 124:19 |
| 164:8,19 165:9 | 186:11 | 144:13 148:13 | **particular** 155:3 |
| 166:21 167:3,5,18 | **outlets** 88:22,23 | 150:18 152:10 | **particularized** |
| 168:6,18,22,24 | **outlook** 25:14,15 | 153:3 155:5 | 176:22 |
| 171:4 173:20 | **outs** 160:25 161:3 | 161:18,20 166:23 | **particularly** 23:6 |
| 174:11,17 177:5 | **outsource** 74:13 | 167:16,23 170:1 | **parties** 4:12,20 |
| 177:12 178:4 | **outstanding** | 179:8 | 54:5 56:18 74:21 |
| 179:8 180:13 | 179:18 | **pages** 1:24 7:21 | 118:2 156:6 |
| 181:10,18 | **overall** 157:17 | 42:10,16 51:17,18 | 185:11,14 186:8 |
| **old** 76:7 95:20 | **overbroad** 38:20 | 63:6 64:6 69:7 | 186:10 |
| 99:13 100:12 | 57:16 60:25 61:13 | 112:8 128:17 | |
| | | 129:5,8 130:7 | |

Personal Court Reporters, A Veritext Company
818-988-1900

[partly - portion]

partly  147:22
parts  84:15 127:7
party  74:16 103:8
   118:3 138:5
pasadena  117:4
passage  48:16
pause  8:5
pay  11:14 40:25
   41:20 42:17 43:3
   44:2 45:21 54:1
   55:8,14 56:16
   85:2,7,9,21 98:4
   118:14,19 145:17
   147:13,18 162:2
paychecks  37:16
   37:24
paying  69:5 84:24
   86:3 88:17
payment  47:23
   53:23
payments  48:4
pdf  128:16,18,24
   128:25 129:5
   142:19
pedestal  159:8,9
   159:10 160:11,13
   160:16
peel  148:6
pegged  77:12
   111:6
pen  133:5
penalty  182:16
   184:6
penciling  82:13
pending  8:4,6 32:5
people  26:16 27:1
   46:20 49:22 84:24
   85:12,22 93:17
   112:12 117:11
percent  15:6 27:8
   55:8 65:19 82:7

91:17 96:4
perfect  6:4 7:12,15
   30:8,12 134:18
perfectly  20:6
perform  118:11
performance  10:5
   13:15 15:13,17
   38:2 55:15,23
perimeter  167:23
   168:12
perjury  182:16
   184:6
permanent  10:21
   10:25
permissible
   177:13,20
permitted  4:16
   70:16 110:7
person  14:18
   26:25 45:1
person's  170:5,6
personal  23:12
   25:8 26:3,4,4,6,9
   26:21 27:12 28:4
   48:5 93:8,9
personally  30:21
   117:7
pertaining  24:2
pertains  29:5
pertinent  25:6
   59:11 60:2
ph  25:10 44:12
   56:18 73:13 77:3
   81:19 84:23 88:5
   96:6 102:15
   105:19 107:3
   118:1 140:20
   148:4 161:17
phone  4:19 24:18
   27:9

photographs
   37:10,12 95:3
   158:21 161:9,12
   166:7,19 170:11
photos  93:6,7
   128:21 133:7,11
   135:9 170:24
physical  22:13
   40:6 171:3 177:14
   177:21 180:1
physically  41:12
pick  74:12 107:7
   133:18 147:2
picked  109:11
   131:1
picking  27:8 88:3
pickup  86:25
picture  161:4,6
pictures  88:12,14
   94:25 95:9 111:8
   131:7 133:20,21
   134:21 158:19
   165:18
piece  71:23 135:1
   136:10 159:11
place  60:1,6 101:6
   101:18 102:9
   122:1
plaintiff  2:2,19 5:3
plaintiffs  1:5 5:1
   5:20 29:16,21
   30:1
plan  9:13
plans  8:17
plaster  71:22
   76:10 86:7 87:3
   88:7,16,18,20,24
   90:22 91:2 93:14
   94:2,3,6,13,15,16
   99:11 100:4,5
   104:9 105:2,3,12

111:14 133:9,23
   133:25 134:4,4,6
   134:22 152:11
   153:4 155:7,11
   170:3,3,19
plastic  125:21
   148:10,10,20
play  141:16
please  4:18,23 5:8
   8:10 20:13 29:18
   47:3 62:10 101:10
   104:15 108:4
   142:5 152:5
plugs  95:16
plumbing  160:24
   165:13,14,15
plus  94:11 95:20
   100:12
plywood  104:13
point  16:1,22
   19:17 31:3,3
   56:20 70:25 93:25
   104:7 109:9 145:5
   149:10 179:8
   181:25
pointed  135:21
pointing  17:7
   142:6
policies  24:23 60:6
policy  11:22,22
   12:6,9 17:2 24:10
   28:23 29:1,2,4
   46:19,24 57:13
   59:11,25 60:3,20
   61:5,7,10 67:22
   95:19 102:8,13
   118:16,23 119:5
   119:12,21 172:10
pops  112:6
portion  39:1 70:19

Robert Romero- 11/13/19

**[pose - provide]**

pose  6:18
position  11:5
  13:14 54:3
positions  130:12
possible  4:15 25:4
  25:5 53:19 153:15
  157:12
possibly  59:22
  117:2
potentially  40:11
  55:17 152:20
  172:13 173:7
powder  111:12,16
power  87:19 165:1
powering  154:22
practice  59:10
  110:12 119:14
  146:23 180:8
practices  58:18
pre  151:9 172:20
predictor  99:4
preface  71:6
preference  125:3
preferences  125:9
premises  125:18
premium  108:5,7
  108:11 113:6,8,9
  113:14,19,22
  116:10 152:13
  158:18,22 161:8
  163:1 166:12,13
  170:13
prep  156:24
preparation  19:7
  28:3
prepare  103:5
  177:12,19 182:13
prepared  19:18
  80:1 186:3
preparing  22:2
  72:18 75:8 175:15

175:17
present  2:18 17:5
  17:9,10,19,21,21
  37:1,17 39:24
  41:12
presently  176:19
preserved  35:5
preserving  24:10
president  47:1
presumably  91:15
pretty  23:25 31:5
  48:11 63:25 71:15
  83:24 118:3 122:2
  154:15
prevent  60:1
previous  142:12
previously  17:12
  133:23
price  84:22 95:25
  96:16,18,19,20
  97:9,14 109:13,14
  112:3,25 113:5,23
  114:2 119:6
  120:13 133:9
  148:16 162:16,17
  165:17 166:13,16
priced  145:3
prices  85:21 99:15
  100:10 172:5
pricing  95:1 97:20
  110:15 143:18
  156:11 158:12
primary  49:3
  57:14
primrose  8:15
printed  63:13
prior  71:2 80:21
  154:9 185:4
privacy  38:7 110:4
private  37:20

privilege  35:4
privileged  24:7
  31:21 34:10,13
probably  15:9
  16:14,15 19:20
  22:7 42:12 124:25
  137:6 147:3
problem  51:4,20
  103:23 144:19
  146:1 149:14
  153:12
problems  101:24
  123:6
procedural  4:17
procedure  39:19
  39:22 101:18
  102:9 181:22
procedures  59:25
proceeding  4:4,9
  4:13,14 6:6,8 8:6
  183:8 186:4
proceedings  185:3
  185:4,5,8 186:5
process  39:11,12
  39:15 66:22 67:8
  67:11 68:22 74:20
  75:6,7,14,15
processed  66:3
processing  65:21
produce  20:19
  36:4 130:10,16,19
  130:21 131:2
produced  7:21
  20:21 31:1 32:11
  37:13 51:24 52:24
  63:5 130:14
  132:24 136:10
professional  10:12
profit  94:11
program  12:22
  95:21,22

prohibited  58:16
  60:17 179:10
project  85:16,17
  85:20 87:12
promise  53:18
promoted  13:13
prompt  65:21
promptly  41:20
  60:19 66:2 70:4,9
proper  147:19
  151:10
properly  11:25
  12:1,20
properties  72:15
  102:10
property  11:10,21
  12:6,10,12,20 14:4
  14:5 33:11,19,24
  37:10 38:16 39:10
  40:3,8 57:14
  68:18 70:15,21
  98:18 99:5 101:19
  102:17,19,21
  104:10 116:5,17
  134:24 145:15
  150:3 172:16
propose  182:11
protech  117:20
  118:4,5,11,20
  119:1
protect  117:21
  148:9
protected  37:20
  38:6 110:3,4
protection  148:7
protocol  22:17
provide  11:18
  33:4 46:20 73:22
  75:11 76:20 83:19
  97:23 101:13
  123:20 127:1,5

Page 26

Robert Romero- 11/13/19

**[provided - record]**

provided  20:25
21:24 33:1 36:3
123:20,22 128:15
128:15 138:7
providence  116:20
providing  7:13
31:22 99:25 101:6
138:25
provisions  59:11
60:3
public  1:23 83:17
110:9,13 171:19
185:1,21
pulled  115:6
pumped  95:21,22
purportedly  21:24
purpose  4:16
138:20 183:1
pursuant  155:2
181:21
put  18:18 24:12
25:3 26:21 32:12
32:16 52:9 75:9
75:12 110:14
115:6 151:9
154:18 168:3
172:5,20
putting  94:15

**q**

qualifications
73:11,14,22,24
82:24
qualified  57:11
72:7,12 75:10
76:20,24 77:4,6
83:13 103:1,5
116:18 185:7
quality  4:13 113:1
165:19,24 166:1
170:10,22 174:16
175:11

quarter  138:16
quarters  9:25
question  6:12,18
8:3,4,6 26:12
27:21 32:5 33:7
34:20 36:12 48:14
55:12 62:9,14,21
62:22,23,24 65:5
71:6 76:1 82:1
99:1 100:21,24
101:2,24 102:1,5
107:24 119:19
128:20 129:16
135:11 136:23
145:7 148:3,4
149:5,12 150:10
150:11 151:19
177:18
question's  149:14
questioning  143:1
questions  32:24
33:15 52:22
126:24 132:23
133:4 149:19
151:23 158:7
162:5 180:16
181:1
quick  127:25
144:2,8
quickly  7:19,23
138:8,10
quite  7:20 118:2
quote  83:16
101:19 145:3

**r**

r  2:1 4:1 8:12,12
8:12,12,15,15
raise  5:8 181:24
ranges  142:5
rate  108:9

reach  120:6
122:24 123:3,23
reaching  119:15
read  20:14 28:25
29:1 46:25,25
47:8 57:7 62:9
89:17 174:20
178:16,19 179:11
179:15,24
reading  68:1 90:2
169:15
readings  46:23
ready  139:22
real  14:14
really  15:25 40:19
44:15 72:16 73:1
98:18 101:13
107:4 122:20
143:13 148:10
150:1 158:23,23
172:5 176:15
180:4
reason  6:11 7:2
19:25 54:6 65:16
114:4 121:20
124:9 125:13
129:9 131:17,19
145:13 148:19
159:10,12,18,19
160:17,24 165:14
182:25
reasonable  41:1
48:2 53:22 56:8
68:17 79:17 84:6
85:19 97:24,25
99:25 112:6
126:11 130:7,10
145:4 174:4,9,12
175:11
reasonableness
119:13,21

reasonably  59:4
60:19
reasons  77:8
rebuild  39:11
rebuilding  76:10
recall  7:7 23:12,17
26:23 27:7,15
31:6 33:23 38:14
44:15 59:2 110:5
110:12 176:15,18
receipt  182:17
receive  25:11 30:9
43:6 46:13 61:22
62:19,23 64:16
173:17
received  22:23
29:16,21 32:20
33:3,10 34:21
35:18 41:25 63:6
63:18 64:13,20,21
65:2,12,14,17
66:22,23,24 79:9
92:17 132:10
141:12 171:7
receiving  23:12,17
33:24
recessed  94:19
105:16
recite  6:22
recognize  128:17
129:2
recognized  76:14
recollection  7:12
7:15 30:8
reconvene  137:15
181:14,19
recor  5:18 139:25
record  4:4,6,12,20
4:21,23 5:18 8:11
20:23 31:2 35:6,7
35:9,11,13 36:1,6

Page 27

Robert Rapero- 11/13/19

[record - report]

| | | | |
|---|---|---|---|
| 52:3 62:1,11,15 80:13,14,16,18 103:13,14,16 128:3,6,8,10 129:23 130:8,8 133:13,17 138:13 139:7,10,13,14,16 139:18,23 140:3,5 140:9,14,16,17 141:16,17,18,21 141:22,24 179:12 181:5,6,8,11 183:4 183:6 185:9 186:5 **recorded** 4:9 185:6 **recording** 6:7,10 185:8 186:3 **records** 29:3,5 **recover** 172:22 **recoverable** 180:9 **redocument** 64:17 **reduced** 185:6 **reducing** 44:19 **redundant** 63:22 64:18 **redwood** 100:5 **refer** 22:25 38:3 40:22 143:3 154:13 **reference** 147:25 154:18 157:13 158:4 **referenced** 36:18 **referred** 33:22 **referring** 99:11,11 99:12 119:9 154:11 164:15 167:18 **refinish** 169:7 **refinishing** 169:2 169:4 | **reflect** 63:17 69:1 163:4 177:3 **reflected** 81:14 **reflects** 41:18 68:25 124:7 **refreshment** 7:25 **refrigerator** 120:20 121:5 **reg** 178:22 **regard** 21:21 152:25 172:16 **regarding** 17:24 23:2,7 29:6,8 36:15 60:2 67:4 138:21 157:24 174:18,22 175:8 **regards** 33:18 172:14 **regional** 15:18 18:6 **register** 106:15,25 107:3 112:15 **registers** 106:8 107:20 **regs** 61:15 175:2,7 **regulating** 178:23 **regulations** 58:14 174:18 175:5 176:21 178:6,13 178:25 179:3,6 **reinspect** 81:23,25 122:25 **reinspecting** 105:21 **reinspection** 121:15 **reinstall** 121:4 **reinstallation** 114:13 **reject** 58:23 61:18 62:22,25 78:21 | 80:25 135:20 138:22 **rejected** 148:19 150:4 **rejection** 79:4 **rejections** 91:15 **relate** 22:25 **related** 28:5 41:2 68:25 69:2 81:14 177:4 185:10 186:7 **relating** 31:12 32:10 37:11 59:11 **relative** 185:12 186:9 **reliable** 98:18 **relied** 36:18 **relocate** 8:17 **rely** 103:8 **relying** 141:7 **remain** 4:20 **remediation** 43:3 **remember** 13:10 15:9 16:14,18 48:25 49:13 53:17 53:19 54:25 65:14 67:18 83:14 86:25 102:5 117:2,5 118:3,16,21,22 121:25 122:5,7 123:11,12,15,17 123:25 141:4,6 164:3 **remembered** 121:15 **remodel** 161:1 **remodeling** 165:15 **removal** 117:11 119:11 | **remove** 120:20 159:8,10,11,20 **removed** 86:8 87:3 87:4 114:20 **renovation** 133:22 **rental** 44:14 **repair** 59:17 76:21 83:19 85:17 **repaired** 38:18 159:6 163:23 **repairing** 72:5,11 99:13 **repairs** 83:7 84:3 100:19 102:15 103:2 114:20 117:22 119:1,18 173:2 174:5,15 **repeat** 177:17 **rephrase** 101:10 **replace** 106:23,24 109:15 112:16 163:15,16 173:4 175:10 **replaced** 48:1 123:7,13 159:13 **replacement** 95:19 99:4 112:24 114:14 134:3 146:4 156:4,10,15 159:1,3 172:23 173:3,5,9,11 174:19,23 175:9 175:13,17 177:12 177:20 178:15 179:16,22,25 **replacing** 99:13 106:5,8 114:5,7 155:25 **replayed** 62:11,15 **report** 97:20 108:15 110:14 |

Robert Romero- 11/13/19

[report - rip]

138:14 152:16,18
163:5
**reported** 1:23
**reporter** 4:2,3 5:8
6:7,21 35:7,10
62:11,13,15 80:12
80:15 103:12,15
128:5,9 139:12,15
140:10,13,17
141:20,23 181:4,7
182:13 183:3
**reports** 22:24
**represent** 5:20
52:2 121:21
**represented** 31:2
51:25
**representing**
124:9
**request** 20:19,20
21:3,6 31:4,14
34:6 35:17,20
36:12,20 37:2,18
38:5 75:9 132:10
138:1,1
**requested** 56:22
62:12,15 110:10
185:24
**requesting** 46:20
68:19
**requirement**
46:18
**reregister** 9:25
**resale** 179:17,23
**researched** 117:13
**reservations** 104:3
**reserved** 183:7
**reset** 88:22 106:10
106:25 112:14
114:10,22 115:24
116:3 120:21
121:14 156:4

159:2 160:16,17
163:15
**resetting** 106:2,7
107:20 114:4
159:17
**residence** 101:20
**residential** 12:21
84:19 164:23
**residents** 21:9
**resistant** 96:7
**resolved** 49:21
162:19,23
**respect** 6:1 16:12
24:23 32:8 54:24
55:15 57:14 58:18
60:19 61:11,11
66:1 98:13 106:15
107:3 143:9
174:22
**respond** 6:18 59:3
60:24 83:3
**responded** 31:3,21
**responding** 61:11
137:1
**response** 20:25
21:1,3 31:23,25
59:4
**responses** 36:3
**responsibility**
15:22
**responsible** 14:22
40:10,13,16
**responsive** 31:13
34:6 35:20 36:11
36:19,22 37:2,17
38:5
**restaurant** 121:13
**retail** 95:25 96:16
100:7 109:14
**retaining** 24:24

**retention** 29:3,4
**reused** 159:9
160:8
**review** 16:15,22
16:25 18:20 19:19
20:12 21:18,23
22:1 59:22 60:9,9
60:15 84:10
107:10 115:13,13
121:2,9 129:18
130:1,7 139:19
143:7,13 144:2,9
146:11 176:14
182:15,15 185:24
**reviewed** 17:1
34:7 49:18 81:7
93:6,7 180:7
**reviewing** 22:3
60:15 145:1
**reviews** 38:2,11
60:16 180:8
**revised** 43:13 91:4
91:5 141:3,5
142:25 143:8
**rewalk** 146:24
**rfp** 138:6
**richter** 2:12
**ride** 11:23 60:10
**ridiculous** 136:4
136:14,19
**riding** 60:14
**right** 4:24 5:9 8:1
9:11 11:1 14:7
16:21 20:1,17
30:16,18 36:5
37:15 38:7 44:16
45:5 46:2,3,5,7
47:12 50:5,8,11
52:10,11 54:1,20
56:14 64:7 65:18
68:3,14 70:1,22,24

70:25 71:12,14
72:9,12,15 74:13
77:4,25 79:18
80:22 81:2 82:11
83:16,19 86:1,3
87:7,12,16,22,23
89:7 91:19 92:16
92:21 93:5,11
94:2,19 96:14
97:4,9,9,24 98:1,6
98:10 100:9
101:23 104:1
105:9 107:10
108:1,16 109:8,8
110:3,4 112:6,8
113:10,12 115:7
120:9 122:10,13
123:7,9 124:17,22
125:19 126:1,8
127:17 128:12
131:3,7 132:25
133:20 137:7
138:4 139:6,18
142:1,20,24,24
143:3,5,18,25
144:15,16 145:24
147:14,20,23
148:16,17,23
153:13 154:20
155:12,14,23
157:4,6 160:19
161:5 162:13,16
163:3,23 164:2,3,9
165:4 166:14,21
167:24 168:11
169:12 170:12
172:23 173:5,22
174:9 176:9,15,15
179:21 180:2,5,14
**rip** 42:10

Personal Court Reporters, A Veritext Company
818-988-1900

**[robert - sequence]**

**robert**  1:11 4:7 5:6
    5:11 8:12 26:2
    151:20 183:4
    184:5,13
**role**  13:12,16
    122:18
**romero**  1:11 4:7
    5:6,11,17 8:12,12
    31:2,22 35:13
    36:2 51:23 80:18
    103:18 182:15
    183:4 184:5,13
**romero's**  21:2
    26:3 181:19
**roof**  160:25
**room**  71:15 90:21
    90:24 93:2,22
    94:10,12,20
    106:14,15 107:4
    109:4 111:12,16
    112:10 125:22,23
    146:9,10,11 148:7
    148:8,9,9 156:25
    157:17 165:21
    166:19,23 168:12
    169:13
**rooms**  93:21
    110:24 134:23
    144:20 146:6,25
    152:9 153:14
    154:9,12,13 157:5
    167:13 170:25
**rough**  160:23,24
    160:25 161:3
    165:13,14
**roughly**  140:10,13
**row**  9:25
**ruben**  49:19
**rule**  127:20 132:9
    138:6

**ruler**  144:3
**rules**  4:17 6:6
    130:20 175:8
**running**  43:18
    168:17
**rush**  134:8

**s**

**s**  2:1 3:7 4:1 8:15
**sake**  5:18
**sample**  95:23
**san**  2:14 17:15,18
    75:23 101:22
**sanctions**  130:22
**sand**  111:23
    125:25
**sanded**  125:18
**sanding**  90:16,19
    92:4 105:5 111:11
    111:19 120:12,19
    121:12 124:15
    125:1,10,14
    156:23 168:25
    169:4 170:17,22
**save**  55:20 65:9
    88:25 126:1
    132:15
**saved**  25:16,19
**saw**  47:19 75:22
    76:9 88:12 124:1
    158:19 161:4,6
**saying**  24:4 78:1,2
    93:23 95:6 107:13
    113:21 123:12
    124:15 146:21
**says**  98:15 155:24
**scale**  144:4
**school**  8:19,20,21
    8:24 9:3 11:21
    12:7
**scope**  114:7
    143:19 148:17

    150:19 156:5,11
    171:24 172:2,4,8
**scratch**  88:18 96:7
**screen**  153:7
**scroll**  127:17
    134:9,19,19
    137:10 140:1
    141:17 142:8
**scrolling**  131:4
    136:3 139:3
**seal**  148:6
**search**  23:22
**second**  16:21 35:2
    38:24 89:14 109:2
    135:7,8 142:2
    143:3 159:24
    160:6 179:8 182:8
**secondary**  10:7
**secretary**  18:17
    19:6 22:7,12,16
**section**  178:13,14
**secured**  107:3
**securing**  68:21,22
**security**  34:2
**see**  21:9 24:8
    25:21 29:21 30:3
    46:22 47:10,16
    48:6,20 49:20
    54:5 57:24,25
    58:3 64:15 69:13
    75:21 76:15 87:6
    91:9,20,23 94:24
    95:2,2,5,6,8
    105:20 107:6,9
    110:20,21 111:7
    112:25 114:11,15
    114:16,17 119:17
    121:9,10 125:11
    131:19 133:22
    134:16 135:9
    136:6 138:15

    140:21,23 142:15
    149:2 151:17
    152:15,18,21
    153:9 154:17
    155:13,18 156:9
    156:15 157:8,11
    158:4,5 165:10,18
    165:18 166:19
    167:22,24 168:10
    169:14 171:12,13
    171:13 174:14
**seeing**  48:25 54:19
    76:17
**seen**  20:15 52:17
    81:24 87:15 88:14
    116:3 128:25
    129:2,4 134:5
    163:12 164:4
**select**  74:18 90:13
**selected**  100:19
    117:24 118:5,9,11
**selecting**  100:13
**selection**  162:22
**sell**  96:14
**send**  27:4 30:5,9
    109:12
**sending**  31:6 45:1
**sends**  26:25
**senior**  48:2
**sense**  63:24 146:13
    147:1
**sensitive**  4:19
**sent**  11:19 19:11
    20:17 22:23 29:16
    29:21 95:23
**separate**  23:9
    167:13
**separately**  63:14
**september**  21:8
**sequence**  144:20

Robert Romero- 11/13/19

[series - spoke]

| | | | |
|---|---|---|---|
| **series**  3:10 33:15 47:5 | 136:9 | 159:12,23 167:16 178:15,18 | **sooner**  61:2 |
| **serious**  39:9 123:6 | **showed**  12:18,19 12:19 | **sit**  27:7 30:17 137:16 148:23 | **sorry**  17:21 22:14 24:22,25 29:19 51:14 73:20 89:13 90:10 95:5 113:2 133:19 134:8 142:13 151:25 153:7,11 154:5 156:15 161:19 164:22 169:15 179:14,24 180:4 |
| **serve**  11:18 13:12 | **shower**  163:14 | **site**  87:8 172:8 |
| **servepro**  43:25 44:22 46:19 47:1 47:22 50:15 53:2 53:16 54:9 56:7 57:5 164:17 | **showing**  51:23 132:11 137:10 141:11 | **sitting**  24:16 64:6 |
| **shutters**  105:19 | **situation**  156:25 |
| **sic**  26:2 46:13 111:13 181:8 | **situations**  101:6 |
| **servepro's**  41:21 41:22 51:3 53:13 | **six**  16:9,19 92:8 106:22 110:19 115:22 116:3 120:14,16 |
| **side**  86:9 |
| **server**  25:17 | **sign**  76:14,15,17 182:15 |
| **service**  11:15 46:13 | **sixty**  154:6,7 156:14,14 | **sort**  124:4 139:11 |
| **signature**  183:7 185:19 186:18 | **sounds**  65:18 157:6 |
| **session**  181:13 182:9 | **size**  152:21 153:14 165:2 |
| **significance**  14:14 | **south**  8:15 |
| **set**  58:17 149:9 176:9 | **significant**  93:3 153:21 | **sized**  164:25 | **spaces**  96:6 |
| **sketch**  69:24 111:8 134:23 144:2 146:6 163:21 | **speak**  6:9 123:15 162:4 |
| **settlement**  101:16 | **signing**  40:14 |
| **settling**  55:15 | **signs**  76:9 | **speaking**  36:2 136:20 |
| **seven**  16:9 60:15 138:13 | **silence**  132:19 | **skill**  77:20 |
| **similar**  38:3 72:3 76:11 164:25 | **skilled**  84:24 85:7 85:12,13,13,13,22 | **special**  100:12 |
| **seventy**  158:17 | **specific**  66:9 106:15 117:1 132:12 172:7 |
| **single**  14:18 16:19 128:16 171:16 176:23 177:6 | **skills**  185:9 186:6 |
| **sexual**  33:5 | **skim**  94:15 |
| **shades**  90:1 | **skimmed**  94:13 | **specifically**  9:9 54:23 162:5 |
| **share**  37:24 | **skip**  126:7 |
| **shared**  30:20 | **sink**  159:9,9,11,17 159:18 160:9,10 160:11,14 | **slight**  146:1 158:12 | **specifics**  118:24 |
| **sheathing**  95:1,5,7 95:8 104:12 | **specify**  176:21 |
| **slightly**  128:20 | **speculate**  56:19 171:10 |
| **sheeting**  94:24 | **sir**  5:8,23 8:11,14 8:19 17:8 20:15 21:10 23:2 24:22 28:2 29:22 31:14 32:22 36:12,20 37:2,14 98:25 102:21 104:14 128:17 136:20,24 137:21 139:18 140:25 141:7 142:1 144:18 148:18 158:6 | **slower**  134:13,14 |
| **sheppard**  2:12 21:24 | **slows**  28:22 | **speculation**  45:14 56:12 57:17 |
| **small**  11:11 15:20 75:13 106:11 150:25 | **spell**  8:11 |
| **sheppardmullin....** 2:15 | **spend**  173:1,10,14 173:16,20 174:2,3 |
| **smooth**  94:14 |
| **shoe**  69:23 | **soft**  124:24 | **spending**  15:23,24 |
| **short**  140:5 161:16 162:2 | **soliloquy**  102:6 | **spent**  68:20 |
| **solutions**  1:16 | **split**  153:7 |
| **show**  12:17 49:9 50:22 63:4 65:8 86:22 92:5 127:10 132:15 134:15 | **somebody**  84:25 101:22 | **spoke**  34:7 43:7 67:9,14 |

Page 31

Robert Romero- 11/13/19

[spoken - sure]

spoken 17:23 19:7
spring 132:14
square 38:24
71:17 91:10 95:19
111:2 112:2 113:1
143:20 144:4,6
146:9 150:18
153:13,17,18,20
153:20 154:16
157:9,11,12
158:12 161:15,16
161:17 163:6,7
166:22 169:10,10
169:13
ss 184:1
stacked 63:7
168:14
stages 12:17
stain 90:8 111:23
stairs 152:8,9
163:18
stall 46:8
stalling 46:12,14
stalls 48:4
stamp 142:4,9
144:17
stamped 129:1
stamps 47:10
stand 144:8 150:8
161:25 171:13
standard 46:21,24
69:17,20 87:20
90:6 99:15 110:11
117:11 124:25
151:5
standards 43:12
43:13 46:22 65:20
69:22 98:8 99:3
117:13 151:2
174:18 175:9,12
175:16,20,24

176:9 177:5
178:14
standing 52:17
stands 150:10
start 10:18 22:21
84:18 141:5
started 10:20
14:12 136:25
starting 71:3
142:5,18
starts 134:19
142:10
state 4:6 5:2 8:10
9:6 20:24 104:4
184:1,6 185:22
statement 99:5
107:23
statements 6:17
151:21
states 1:1
stating 49:4 142:4
status 182:12
statute 178:18
stay 127:18
staying 127:19
step 14:24 38:19
39:1 179:9
steps 32:8 34:20
38:16
stick 162:13
stipulated 183:2
stipulation 181:23
stitch 108:9
stole 8:5
stolen 182:25
stone 152:12,15,18
152:22
stood 149:3
155:21
stop 24:21

stopped 34:24
139:5
stress 45:22
stressful 45:11
strictly 85:23,24
struck 144:25
structure 56:4
stuck 136:11
145:3
stuff 13:6 17:4
24:18 32:15 34:3
44:13,15 57:10
86:8 91:10 128:22
143:22 145:16
style 27:3
sub 100:4
subcontractors
73:1,2 77:10,18
87:14
subfloor 169:1
subject 22:25 23:2
26:15 31:12 32:10
36:10,19 37:1,11
37:16 49:24 52:15
104:3 130:22
178:25
submit 32:17
38:17
submitted 68:9,13
147:18
subpoena 32:18
subpoenaed 30:25
subroom 126:7
167:19,20,23
subs 78:2
subsection 179:10
subsequent 92:18
substantial 39:11
41:9 69:10 108:10
122:12 133:25
156:2

substantially
143:19
substantively
18:20
suffers 39:9
suggested 95:24
96:16 100:7
109:13,14
suite 1:17 4:10
summation 42:14
summer 10:20
11:2
supervise 13:20
supervised 15:11
16:5
supervises 14:19
supervising 15:1
supervision 84:19
85:23,25 86:1
supervisor 14:16
16:10 51:11 85:2
85:24 122:18
123:16 137:3
supervisor's
123:18
supervisors 17:24
supplement 91:20
supplied 21:17,19
23:4 31:16,17
32:25 35:23 56:23
supply 32:17
supporting 88:2
107:1,18,18
supposed 45:21
179:2,5
sure 8:3 11:24
15:16,24 20:21
25:13 32:2,9 34:2
34:25 35:3,4 37:8
40:7,17 46:2
50:25 51:4 54:4

Page 32

Robert Romero- 11/13/19

**[sure - thought]**

60:7 63:25 66:24
68:24 74:20 75:10
81:8 82:2,13
89:15 91:10,21
92:11 93:17,19
99:25 101:12
102:14 104:1,22
111:1,5,7 112:11
113:14 116:19
118:3 120:24
121:13 123:20,21
128:2 129:20
141:2,19 144:23
145:17 148:5,8
152:7 153:9 160:8
161:5,16 162:1
166:11 167:7
174:20 176:10
177:17,19 180:5
180:25
**surprise**   79:8,14
178:4
**suspend**   182:4
**switched**   146:2
**sworn**   5:12 185:5
**system**   56:3
100:18 101:1,5
108:11 114:24
115:5 153:16
177:9,9
**systems**   3:12 80:1
83:18 91:8 128:13
134:2 143:2,11

**t**

**t**   3:7 8:12 71:17
96:13
**t&g**   71:24 77:11
111:6
**take**   4:4,5 7:9,19
7:24 10:22 13:5
20:7 32:9 33:15

35:1 38:15,23
39:2 42:7 43:9
48:17 51:8,18
54:7 66:12 78:21
80:7,8,11 85:18
87:14 103:10,23
124:3 127:25
129:20 137:14
144:18 145:24
147:10 152:14,21
157:7 159:22,22
162:12 166:18
178:12,15 180:16
180:19,23 181:3,3
**taken**   4:8 7:5
185:3,12 186:8
**talk**   7:22 24:5 27:1
34:10 49:8 80:4
120:5 131:3 149:6
**talked**   18:13,15
34:24 54:21,22
112:9 122:23
172:7,8
**talking**   27:9 35:16
112:2 149:7
153:21 156:13
164:14
**talks**   164:12
**taught**   12:20
**teach**   13:4
**technical**   11:21
12:7,11,12 181:3
**technician**   88:1
**technicians**   87:23
**techy**   25:18
**tell**   5:13 6:23,24
23:21 27:8 34:23
39:15 45:2 49:14
54:23 64:13 66:21
67:5,6,11,15 68:22
78:17 92:8,10

109:24 129:11
144:6 146:3
163:20 180:11
**telling**   45:7 64:5
77:21,24 123:13
127:9
**tells**   107:18
**temporary**   87:19
87:19
**terms**   14:25 36:3
165:1
**test**   33:12
**testament**   62:20
**testified**   5:14
**testify**   7:7
**testifying**   185:5
**testimony**   6:1 7:3
7:10 19:20,22
101:25 128:20
138:21
**text**   19:11 22:24
**thank**   8:2 73:18
103:18,25 128:4
129:22 134:13,20
**thick**   148:10
**thickness**   96:5
**thin**   88:16 91:1
111:13 152:10
153:3 155:7
**thing**   46:2,3,5,7
50:5,12 88:5
100:9 114:3
120:25 132:11
143:15 146:18
167:22
**things**   7:12 11:15
15:23 30:19 44:6
44:7 59:9 88:6
119:4 143:16
144:7,24 150:7,8
161:24 162:12

171:13 172:5
182:4
**think**   7:4 10:21
12:7 13:2,13 16:2
25:25 26:12,13,24
27:1 28:24 30:25
42:13 43:6,11
44:5,7,19 45:6,6,9
45:11 46:1,11
47:21 49:19 50:15
52:5,13 53:21
56:8 62:4 63:8,14
66:25 68:11 71:8
71:9 72:17 76:16
78:19 79:13,21
81:18,20 82:1
83:5 84:13 89:16
89:24 95:16 96:19
96:23 98:9 100:7
100:12,23 101:17
105:18 107:11,12
111:15,20 113:5
117:25 119:4
124:7 125:1
128:19 130:7,9
131:5,20 137:2
142:11 146:2,14
147:3 149:6,8
153:9 158:20
165:21 166:12,16
169:1,21,22 171:5
171:9,16 177:1
180:21
**thinking**   181:17
**third**   74:16,21
103:8 118:2,3
**thirty**   167:17
**thought**   43:24
44:5 51:1 62:21
87:11 96:17,20
104:7,18 113:20

Robert Ranero- 11/13/19

[thought - type]

139:22 149:2
164:14
**thousand** 42:17
53:22
**thousands** 93:2
135:16,17
**threads** 63:7
**three** 11:20 12:2,7
12:10 32:21 33:2
33:11,25 34:1,22
35:18 69:6 74:4
84:19 88:7,17
90:8,22 91:2 94:2
101:20 105:11
111:3 122:3,5,7
126:9 133:25
140:11,13,18
150:24 151:3,10
154:6 155:11
161:14,14 162:15
162:15,17 163:1
164:4,5,23 168:20
170:2
**threshold** 149:9
**throw** 57:22
**ticket** 148:22
149:7,21
**tile** 146:4 158:13
158:21,23 163:12
**tiles** 158:19
**time** 1:15 4:22
6:10 7:19 9:21
10:14 11:4,5,23
12:4 16:10 27:8
33:22,23 35:8,11
36:25 45:17 47:16
47:19 51:19 53:18
56:15 57:19 65:3
65:9 68:21 80:13
80:16 103:13,16
109:23 116:2

121:8,22 122:1
123:1,1 124:10
127:20 128:6,10
129:21 130:1,6,24
131:7 132:15
135:15 136:5
139:7,13,16 140:8
141:21,24 144:2
144:18 145:24
150:8 151:14
155:20 164:25
171:24 172:3
181:5,8 183:5
**times** 36:6 166:6
168:20 172:4
**tired** 154:5 169:16
176:15 180:5,15
180:17,24,25
181:11
**title** 10:4 13:9,10
18:5
**today** 6:1 7:3,10
7:19 16:23 19:22
20:19 21:13 22:4
23:2 27:7 28:3
29:24 30:17,22
31:14 32:22 35:19
36:20 37:2 45:17
50:20 52:21 53:7
53:8 131:18
137:22 138:4
141:14 152:1
182:5
**today's** 19:8 95:25
138:20
**toilet** 87:19
**told** 9:25 18:9 49:9
65:4 74:3,8 82:16
87:7 127:4,7
135:11 164:19
175:6

**tons** 28:11 133:21
145:14
**tooth** 48:6
**top** 111:24 141:5
160:3,6,25 161:2
164:23 167:24
169:3,6
**topical** 160:5
**torrance** 15:18
**toss** 30:3
**total** 84:3 141:4
**totally** 20:2 94:7
130:25 145:2,11
**touch** 4:19
**tough** 16:20
**tract** 176:23 177:6
**train** 11:18
**training** 11:17,22
12:3,6,9,22 13:3
32:20,22 33:2,4,5
33:10,17,21,24
34:21 35:17 36:9
36:15 98:14
**transcribed** 6:8
**transcriber** 186:1
**transcript** 4:14
6:11 19:18,23
20:5 181:20,25
182:12,13,17
185:24 186:3,4
**transcriptionist**
185:7
**trial** 4:15 19:23
**trim** 105:17
**truckloads** 86:7
**true** 30:16 94:14
97:22 98:2 99:19
100:4 130:18
184:7 185:8 186:5
**trust** 177:8,9

**truth** 5:13,13,14
6:23,24 98:3,4
**truthful** 30:13
**try** 6:14,15 7:18
7:23 16:2 24:12
25:3,3 26:10
30:12 44:22 47:25
56:20 61:15 104:2
119:15 120:6
123:2,3 124:3
138:9 143:16
147:5 162:13
170:8 180:16
**trying** 24:25 52:12
53:17,18 62:4
80:23 102:22
122:24 134:8
135:18 136:13
144:7,22,25
145:20 149:17
162:10
**tub** 163:14
**turn** 89:18
**turned** 103:20
**twice** 171:22
**two** 9:20,24,25
12:6,9 13:2 17:13
17:13,16 42:17,19
69:6 71:16 106:22
111:15 122:8,10
122:11 126:15
142:16 144:14,16
145:23,25 146:2
148:13,13 150:17
150:25 155:4,6,8,9
155:19,20 156:14
156:14,14 158:17
162:15 163:6,20
171:5,9
**type** 11:17 26:25
71:25 85:12 90:11

Page 34

Robert Romero- 11/13/19

[type - wait]

95:13 108:8
113:17,18 118:2
152:12 171:6
**types** 111:16
**typewriting** 185:6
**typical** 38:15
**typically** 19:17
60:23 99:15
122:17 126:24
127:4

---

**u**

**uh** 61:20 114:20
154:2 155:7
**unable** 149:18
**unclear** 169:17
182:12
**uncommon** 146:24
**underlayment**
163:9
**underneath** 114:6
**understand** 5:25
6:2,25 7:16 19:16
19:24 26:11 35:14
80:19,23 87:25
101:9 103:20
115:3 140:3 142:1
144:23 150:12,14
159:23,25 166:10
175:18 176:5
177:18
**understanding**
21:16 23:3 32:24
37:12 65:11 96:3
96:4 107:8 144:10
150:7 151:5 178:9
178:21,22
**understands**
149:11
**undertake** 12:23
35:20

---

**unfair** 58:18 59:10
**uniform** 175:11
**uninhabitable**
39:25
**union** 85:9
**unique** 98:18 99:4
101:7,19 102:9,17
102:21 165:1,4
**unit** 13:15,17,19
13:21 14:5,5,6,9
14:11,12,14 19:11
67:2 69:16,17
71:11 84:23 85:4
85:21 114:2 115:1
119:6,13,22
159:11,21,22
161:11 166:16
**united** 1:1
**units** 14:7
**university** 9:6
**unknown** 121:20
124:9
**unnecessary** 94:7
124:16
**unqualified**
101:13
**unreasonable** 49:4
49:23 50:16 51:3
53:14 86:3,4 92:2
92:9,22 97:25
104:8,18 107:12
108:4 115:7 119:6
129:13 135:20
148:15 150:3
152:19 154:25
161:23 169:1
**unrelated** 104:19
**unusual** 165:25
**unusually** 164:2
**unwieldy** 130:23
149:20

---

**upgrade** 174:2
**ups** 38:2
**urethane** 121:11
**usage** 87:20
**use** 4:15 25:12
68:4 72:25 77:9
77:17,18 96:8,11
100:1 103:6 108:7
109:9 110:8,11,14
117:18 125:20
127:21,22 129:25
147:24 148:1
157:13 159:8
174:13 177:5
**uses** 4:16 99:15
108:16
**usually** 63:19
87:20 121:1
124:21 163:25

---

**v**

**v** 1:6
**vacant** 90:18
125:11
**vacation** 14:22
**vague** 21:20 27:22
39:3 40:11 41:8
55:17,25 60:25
61:13 65:22 66:5
69:4,19,19 70:6
81:22 98:20 99:6
99:17 100:15
101:8 102:3,11,18
108:17 118:7
172:12 173:6,24
**valid** 78:4
**value** 117:16
173:19 174:19,23
175:9,13,17
177:20 178:15
179:17,23

---

**vandalism** 11:12
**various** 20:19
**vendor** 40:17
45:12,19 49:2
56:8 67:11,23
96:9,10 108:13,14
108:16,19 110:17
145:3
**vendor's** 108:23
**vendors** 41:23
68:1 71:4 97:23
**vents** 106:2
**verbally** 67:21
**verify** 103:4
120:16,25 156:5
156:11 166:23
**verifying** 150:18
**veritext** 1:16 4:3
**version** 129:2
141:10
**vertical** 94:25
**vet** 73:25 74:17,19
75:1,5
**vets** 74:24 103:6
**vetted** 74:2,8 75:3
102:14
**vetting** 75:14,15
**video** 6:10
**view** 54:4 113:22
**violation** 130:21
178:5
**visqueen** 125:21
148:21
**voice** 27:9,9
**volume** 1:12 63:6
184:14
**vs** 4:8

---

**w**

**wages** 85:9
**wait** 53:24 56:15
90:10,10 95:5

Page 35

[wait - works]

137:17 177:17
**waiting**  24:16,21
**walk**  56:18 146:20
147:24 171:17,19
171:20 172:3
**walked**  172:1
**walls**  93:15 111:2
112:20 125:24
133:8 144:5
153:17,22
**want**  7:15,23 15:5
15:7,24 20:14,24
27:20 35:2 37:24
42:10 45:8 46:2,3
50:5,11,22 52:18
56:16,16 66:17
68:24 72:6,11,14
73:6 74:9,23,23
75:14 89:6 92:5
98:25 104:10
107:7 110:5
125:16,17 127:10
127:21 129:21,25
132:12,14,15,16
132:20,22 133:5
133:12 136:7
137:10 138:8,15
138:17 141:1
143:9 147:10,13
147:18 149:4,9
150:1,4,22 151:20
151:23 152:1
158:6 162:4,6
164:11 171:10
175:3 176:20
178:16 180:24
181:22 182:18,19
**wanted**  19:15 20:1
44:24 45:9 49:17
57:11 81:23 91:23
110:14 115:6

123:13 127:7
128:14 137:20
138:24 143:3
149:2 152:3
**wanting**  149:21
**wants**  56:15
151:21
**waste**  53:17
**watch**  84:25
**water**  11:13 16:13
21:8 38:16,24,25
39:21 40:1 43:3
53:24 159:1 161:2
163:17,23,25
164:2 165:14
**way**  24:20 26:20
49:25 56:6,8,9
88:18 110:2
130:20,22 134:9
137:16 138:16
162:8
**we've**  52:23,24
53:3 140:17
143:10 171:4
181:11,12
**wear**  90:2
**website**  75:22
**wednesday**  1:14
**week**  11:20 12:2
13:2 55:1 137:15
**weeks**  12:6,7,9,10
17:13,14,16
**weigh**  54:2
**weight**  108:9
**went**  11:22 12:25
19:3 20:25 41:16
45:9 83:15 84:7
114:5 135:9
165:19 171:8
**west**  2:13 15:19

**whispering**  4:19
**width**  105:19
**willing**  132:17
**wilshire**  1:17 4:10
**window**  89:22
**witness**  5:6,12
21:21 24:8 27:15
27:23 28:10 29:12
30:11 31:5 32:1,6
33:8 34:14 37:21
38:8 39:4 40:13
40:19 41:9 45:16
45:25 46:11 47:8
50:2,11 51:7 52:6
52:7,19 54:1 56:1
56:13 57:18 59:21
61:1,7,14 62:4
64:24 65:23 66:7
69:20 70:7 71:8
72:24 73:10,18
74:7 76:3,23
77:16 79:13 81:23
89:23 90:4 97:12
97:19 98:12,21
99:7,19 100:17
101:9 102:13,19
102:25 108:18
110:8 115:10
116:9 117:3 118:8
119:8 120:1,23
122:7,20 123:11
125:8 127:24
128:4,21 129:18
129:22 131:4
133:6,15,19 136:8
136:11,12 138:10
138:14 139:5
140:6,21,23
142:10,13,16
147:4 148:1,5
149:18 150:13

151:25 152:5
161:20 164:19
172:14,19 173:8
175:1 176:14
178:1,9 179:16
180:4,21 181:12
185:4
**wonder**  141:5
**wonderful**  136:21
**wondering**  22:15
**wood**  71:22,24
76:10 88:8 94:3
95:20 96:14 97:14
98:21 111:23
113:17 114:5,10
162:18,22 169:6
169:19,20
**wooden**  114:23
**word**  57:22
**work**  14:9 16:2
23:25 24:15,18
25:8 26:6,9 27:5
28:10 45:20 72:12
73:6,14 74:9
75:17,23 84:24,25
85:12 86:7 101:14
101:15 106:1,5,8
106:23,25 107:14
115:19 118:2
147:14
**worked**  72:20 73:7
78:3 116:12
117:10,14
**workers**  85:23
**working**  9:21
85:24 122:24
124:23
**workmanship**
102:15
**works**  73:16 74:18
78:15 88:18 162:7

Personal Court Reporters, A Veritext Company
818-988-1900

Robert Romero - 11/13/19

**[worry - zipper]**

| | |
|---|---|
| **worry** 62:16 | 106:6,24 107:11 |
| **worth** 101:20 | 112:3,21 113:11 |
| **would've** 24:1 | 114:18,21 115:3 |
| 56:9 121:15 | 115:16 120:13 |
| 166:10 | 121:6 122:11,16 |
| **write** 38:2 66:17 | 124:5 126:12 |
| **writing** 31:22 | 128:1 130:3 |
| 43:13 67:19,20 | 131:25 133:2,15 |
| **writings** 36:9,17 | 134:15 135:22,23 |
| 38:3 | 135:24 142:8 |
| **written** 20:25 21:1 | 146:14 147:4 |
| 22:22 23:1 29:15 | 148:1 150:10 |
| 29:20 31:24 36:3 | 153:9 155:16 |
| 182:13 | 156:18 159:23 |
| **wrong** 15:6 50:14 | 164:22 165:3,5 |
| 70:2 96:24 108:2 | 166:7 167:22 |
| 108:3 109:8 | 168:1 169:17 |
| 111:17 137:7,25 | 172:19 180:21,23 |
| 169:15 | **year** 8:17 9:1,13 |
| **wrote** 43:12 45:6 | 9:17,19,23 10:18 |
| 46:19 47:1 | 16:19 95:20 99:12 |
| **x** | 100:12 |
| **x** 3:1,7 129:7 | **years** 9:16,17 |
| 185:24 | 12:25 15:11 16:9 |
| **y** | 32:21 33:2,11,25 |
| **yard** 154:16 | 34:1,22 35:18 |
| 157:12 | 38:4 136:7 164:24 |
| **yarn** 108:9,9 | **yesterday** 17:1,10 |
| **ye** 7:17 | 47:20 48:23 51:13 |
| **yeah** 13:10 15:5 | **z** |
| 17:13 19:25 20:2 | **zip** 74:9,18 75:15 |
| 22:15 25:6 28:22 | 75:19,20 |
| 33:19 34:11 41:17 | **zipper** 148:6 |
| 44:15 46:18 47:3 | |
| 55:20 70:22 71:9 | |
| 72:10 76:14 77:9 | |
| 80:4,8,11 82:23 | |
| 85:6 86:13 87:13 | |
| 91:9 93:12,16 | |
| 99:12 101:12 | |

Personal Court Reporters, A Veritext Company
818-988-1900

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.