1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    ALAN BAKER, ET AL.,        )
                                )
5              PLAINTIFFS,      )   CASE NO. 2:19-cv-08024
                                )
6    v.                         )
                                )
7    ALLSTATE INSURANCE CO.,    )
     ET AL.,                    )
8                               )
               DEFENDANTS.      )
9    _____)

10

11

12

13

14

15     VIDEO-RECORDED DEPOSITION OF EDWARD CARRASCO

16              FRIDAY, NOVEMBER 15, 2019

17                    VOLUME I

18

19

20

21

22

23   JOB NO. 3618621

24   REPORTED BY MARY K. MEDLEY, CSR NO. 9557

25   PAGES 1-138

                                          Page 1

```
1          VIDEO-RECORDED DEPOSITION OF EDWARD CARRASCO, VOLUME
2     I, TAKEN ON BEHALF OF THE PLAINTIFF, AT 10:11 A.M.,
3     FRIDAY, NOVEMBER 15, 2019, AT 707 WILSHIRE
4     BOULEVARD, LOS ANGELES, CALIFORNIA, BEFORE MARY K.
5     MEDLEY, CSR NO. 9557.
6
7     APPEARANCES OF COUNSEL:
8
9     FOR THE PLAINTIFF:
10              LAW OFFICES OF CHRISTOPHER G. HOOK
                BY:  CHRISTOPHER G. HOOK, ESQ.
11              4264 OVERLAND AVENUE
                CULVER CITY, CALIFORNIA 90230
12              (310) 839-5179
                CHRIS@CGHLAW.COM
13
14    FOR THE DEFENDANT:
15              SHEPPARD MULLIN RICHTER & HAMPTON LLP
                BY:  MARC J. FELDMAN, ESQ.
16              501 WEST BROADWAY, NINETEENTH FLOOR
                SAN DIEGO, CALIFORNIA 92101
17              (619) 338-6500
                MFELDMAN@SHEPPARDMULLIN.COM
18
19    ALSO PRESENT:  RYAN SCHAEFER, VIDEOGRAPHER
                     ALAN BAKER
20
21
22
23
24
25
```

Page 2

```
 1                            INDEX
 2    DEPONENT              EXAMINATION              PAGE
 3    EDWARD CARRASCO
 4                          MR. HOOK                   6
 5
 6
 7
 8                          EXHIBITS
 9    NO.          PAGE          DESCRIPTION
10    EXHIBIT 1     136          AMENDED NOTICE OF
                                 DEPOSITION OF
11                               EDWARD CARRASCO
12    EXHIBIT 2     86           2695.183. STANDARDS FOR
                                 ESTIMATES OF REPLACEMENT
13                               VALUE
14    EXHIBIT 3     116          SERVPRO ESTIMATE
15    EXHIBIT 4     136          DOCUMENTS PRODUCED AT
                                 DEPOSITION
16
17
18
19
20
21
22
23
24
25
                                              Page  3
```

```
 1              LOS ANGELES, CALIFORNIA

 2         FRIDAY, NOVEMBER 15, 2019; 10:11 A.M.

 3                    *****

 4      THE VIDEOGRAPHER:  Good morning.  We are going

 5   on record at 10:11 a.m. on November 15th, 2019.      10:11:49

 6           Please note that the microphones are

 7   sensitive and may pick up whispering, private

 8   conversations and cellular interference.  Please

 9   turn off all cell phones or place them away from the

10   microphones, as they could interfere with the        10:12:03

11   deposition audio.  Audio and video recording will

12   continue to take place unless all parties agree to

13   go off the record.

14           This is Media Unit Number 1 of the

15   video-recorded deposition of Edward Carrasco taken   10:12:14

16   by counsel for plaintiff in the matter of Baker

17   versus Allstate, filed in the United States District

18   Court, Central District of California.

19           This deposition is being held at Veritext

20   Los Angeles located at 707 Wilshire Boulevard,       10:12:31

21   Suite 3500, Los Angeles, California 90017.

22           My name is Ryan Schaefer from the firm

23   Veritext, and I am the videographer.  The court

24   reporter is Katie Medley from the firm Veritext.

25           I am not related to any party in this        10:12:52
```

Page 4

| | |
|---|---|
| 1 | action, nor am I financially interested in the |
| 2 | outcome. |
| 3 | Counsel and all present in the room and |
| 4 | everyone attending remotely will now state their |
| 5 | appearances and affiliations for the record.  If |
| 6 | there are any objections to the proceeding, please |
| 7 | state them at the time of your appearance, beginning |
| 8 | with the noticing attorney. |
| 9 | MR. HOOK:  Good morning.  My name is Christopher |
| 10 | Hook.  I'm the attorney for the plaintiffs, Alan |
| 11 | Baker and Linda B. Oliver. |
| 12 | MR. BAKER:  I'm Alan Baker.  I'm one of the |
| 13 | plaintiffs. |
| 14 | MR. FELDMAN:  Marc Feldman, attorney |
| 15 | representing Allstate Insurance Company and Edward |
| 16 | Carrasco, the defendants. |
| 17 | THE VIDEOGRAPHER:  Will the court reporter |
| 18 | please swear in the witness. |
| 19 | |
| 20 | EDWARD CARRASCO, |
| 21 | having been first duly sworn by the reporter, |
| 22 | was examined and testified as follows: |
| 23 | (Continued on following page.) |
| 24 | |
| 25 | |

Timestamps: 10:12:54, 10:13:02, 10:13:10, 10:13:22

Page 5

```
 1                       EXAMINATION

 2       BY MR. HOOK:

 3            Q.   Good morning, sir.  Can you please state

 4       and spell your full name for the record.

 5            A.   Edward Carrasco.  Edward is spelled        10:13:44

 6       E-D-W-A-R-D, Carrasco spelled C-A double -R-A-S-C-O.

 7            Q.   What's your middle name, sir?

 8            A.   I don't have a middle name.

 9            Q.   What's your date of birth?

10            A.   July 18, 1961.                             10:13:59

11            Q.   What's your current address?

12            A.   10053 Greenwood Avenue, Montclair,

13       California 91763.

14            Q.   Do you have any plans to relocate in the

15       next year?                                          10:14:16

16            A.   No.

17            Q.   And where are you currently employed, sir?

18            A.   I'm employed with Allstate Insurance

19       Company.

20            Q.   Full-time?                                 10:14:26

21            A.   Yes.

22            Q.   How long have you been employed with

23       Allstate Insurance Company?

24            A.   Approximately six years.

25            Q.   So you started in or around 2013?          10:14:40
```

Page 6

| | | |
|---|---|---|
| 1 | A.   The end of it. | 10:14:45 |
| 2 | Q.   At the end of 2013. | |
| 3 | A.   Yes. | |
| 4 | Q.   Have you ever had your deposition taken | |
| 5 | before, sir? | 10:14:58 |
| 6 | A.   For this case or another case? | |
| 7 | Q.   In any case. | |
| 8 | A.   Yes. | |
| 9 | Q.   On how many occasions? | |
| 10 | A.   Once. | 10:15:07 |
| 11 | Q.   And when was that? | |
| 12 | A.   I'm trying to recall.  Two years ago.  I'm | |
| 13 | not sure exactly what date. | |
| 14 | Q.   A few years ago? | |
| 15 | A.   Yes. | 10:15:22 |
| 16 | Q.   And in what type of matter were you | |
| 17 | deposed? | |
| 18 | A.   It was a water loss. | |
| 19 | Q.   And what happened in that water loss? | |
| 20 | A.   There were some issues with the mitigation | 10:15:37 |
| 21 | company. | |
| 22 | Q.   What type of issues? | |
| 23 | A.   They had done a lot of demo that was | |
| 24 | unnecessary. | |
| 25 | Q.   The mitigation company did -- | 10:15:50 |

Page 7

```
 1          A.   Unnecessary demo.                      10:15:53

 2          Q.   Okay.  And so then what happened?

 3          A.   Vaguely remember we went to court.  I --

 4          Q.   So did they sue Allstate?

 5          A.   They -- they -- I'm not sure if they were   10:16:07

 6     suing Allstate, but they went to court.  I'm not too

 7     clear on the suing part or how that is.

 8          Q.   Did you deny the mitigation company's bill

 9     in a water loss event?

10          A.   I can't recall in that one.  I don't     10:16:21

11     recall.

12          Q.   What was the name of the case?

13          A.   I don't remember that name.  I'm sorry.

14          Q.   You don't remember the name of the

15     plaintiff?                                          10:16:31

16          A.   No.

17          Q.   Do you remember the name of the attorney?

18          A.   No, I don't.

19          Q.   I'm entitled to this information, sir, and

20     I'm going to find out what this case was, and I'm   10:16:38

21     going to get your transcript.  So I'll leave a blank

22     space in the deposition, and you're going -- Do you

23     have this written down somewhere, what case this was

24     in?

25          A.   I do not have it.                         10:16:48
```

Page 8

1          Q.    Okay.  You don't have -- Does Allstate have    10:16:49

2     any written record of what that case was?

3          A.    I would presume they probably do.

4          Q.    And is that within your power to obtain,

5     that information?                                        10:16:59

6          A.    I'm not sure if it's in my power to get it.

7          Q.    Who could obtain that information?  Tell me

8     their specific name.

9          A.    My manager.

10         Q.    Okay.  Was his deposition taken in that       10:17:10

11    matter as well?

12         A.    I'm not too sure about -- if he was in the

13    deposition.

14         Q.    Okay.  So what did they ask you about at

15    that deposition?                                         10:17:21

16         A.    I can't remember.  It was -- It was a while

17    back.

18         Q.    Can you remember any question that they

19    asked you at the deposition?

20         A.    I cannot, no.  I can't --                     10:17:31

21         Q.    Can you remember a single question that

22    they asked you at your deposition?

23         MR. FELDMAN:  Asked and answered, argumentative.

24         MR. HOOK:

25         Q.    Can you remember a single question?          10:17:39

                                                          Page 9

```
1          A.   I cannot answer that.  I -- I don't          10:17:41

2     remember.

3          Q.   You don't remember any of the issues at all

4     in that case whatsoever?

5          A.   Repeat that.                                 10:17:50

6          Q.   You don't remember any of the specific

7     issues in that case that you were deposed in?

8          A.   It was the demolition that they performed.

9          Q.   Okay.  Was Allstate accused of bad faith in

10    that matter?                                           10:18:04

11         A.   I don't know the specifics.

12         Q.   Were you accused of improperly denying the

13    mitigation bill for that -- for that vendor?

14         A.   I --

15         Q.   Was that one of the accusations?            10:18:14

16         A.   I don't remember.

17         Q.   Is it possible that it was?

18         MR. FELDMAN:  Calls for speculation.

19         THE WITNESS:  I don't remember that.

20         MR. HOOK:                                         10:18:22

21         Q.   Okay.  And how was that case resolved?

22         A.   They went to court, but I forgot what

23    happened, what the outcome was.

24         Q.   Don't know anything about what happened,

25    huh?                                                   10:18:35
```

Page 10

```
 1        A.   Right.                                    10:18:36

 2        Q.   Right.  And then after that, did -- Were

 3   there any changes in the way you handled claims

 4   after that lawsuit?

 5        A.   No.                                       10:18:47

 6        Q.   Did Mr. Romero speak to you about -- Did he

 7   review that file with you and what happened and how

 8   to adjust the claims after that lawsuit?

 9        A.   No.  I don't remember if he talked to me

10   about that.                                         10:18:58

11        Q.   Okay.  Did Allstate -- anybody from

12   Allstate kind of, like, after that reevaluate what

13   was going on, say, "Oh," like, "let's double" --

14   "Let's look at some of the rules relating to claims

15   adjustment" or anything like that after the lawsuit? 10:19:09

16        A.   No.

17        Q.   Okay.  Who was the water loss company there

18   that was involved in the litigation?

19        A.   I don't recall that one.  I --

20        Q.   What --                                   10:19:26

21        A.   I don't recall who the company was.  I

22   believe -- I forgot who the company was.  I don't

23   want to say something I don't know.

24        Q.   What's your best recollection?  You believe

25   it was somebody.  Who do you believe it was?        10:19:34
```

Page 11

```
 1          MR. FELDMAN:  I'd just caution -- You gave the      10:19:35

 2     witness no admonitions whatsoever.  So one of the

 3     admonitions that you would give the witness is don't

 4     guess.  If you have an idea that's based in reason,

 5     you can answer it.  But if you have to guess or        10:19:44

 6     speculate, don't speculate.

 7          THE WITNESS:  I don't want to speculate.

 8          MR. HOOK:

 9          Q.   Was this a vendor that you dealt with on

10     the initial claim?                                     10:19:52

11          MR. FELDMAN:  Vague.

12          THE WITNESS:  I don't recall.

13          MR. HOOK:

14          Q.   So, then, why were you involved in the

15     litigation if you weren't involved with this water     10:20:02

16     loss company?  Why were you brought into the case?

17          A.   I was the adjuster.

18          Q.   So you did deal with the water loss

19     company.

20          A.   Yes.                                         10:20:12

21          Q.   Okay.  And you don't remember any --

22     anything about the identity of that water loss

23     company.  You don't remember any -- any suggestion

24     in your mind as to what the name possibly might have

25     been.                                                  10:20:22
```

                                                              Page 12

```
 1          MR. FELDMAN:  Asked and answered.          10:20:22

 2          THE WITNESS:  I don't recall.  I --

 3      MR. HOOK:

 4          Q.   The name of any other person?

 5          A.   I don't want to give the wrong name, so I  10:20:29

 6      don't know.

 7          Q.   Okay.  Where was the property involved?

 8          A.   I -- It's so far back, I don't remember.

 9          Q.   How far back?

10          A.   Couple years.                           10:20:45

11          Q.   Two years back?

12          A.   Something like that.

13          Q.   And you don't remember anything about it?

14          A.   It's been a while.

15          Q.   Too bad.                                10:20:56

16          Okay.  And prior to that, had your

17      deposition been taken before?

18          A.   No.

19          Q.   So your deposition's only been taken once

20      before?                                         10:21:10

21          A.   Just once.

22          Q.   Was your deposition taken in your

23      bankruptcy claim?

24          A.   Bankruptcy claim?

25          Q.   Did you file for bankruptcy?            10:21:21
```

Page 13

```
 1          A.   Me?                                    10:21:23

 2          Q.   Yes, you personally.

 3          A.   Have I filed for bankruptcy before?

 4          Q.   Yes, yes.

 5          A.   I've had -- Yeah, I had a bankruptcy    10:21:30

 6     before.

 7          Q.   And was your deposition taken in that

 8     bankruptcy?  Was your examination taken?

 9          A.   I'm not understanding.

10          Q.   This is a deposition; right?           10:21:42

11          A.   Right.

12          Q.   Okay.  Was your deposition taken in the

13     bankruptcy case?

14          A.   During my bankruptcy, no, there was no

15     deposition taken.                                10:21:51

16          Q.   There was no deposition taken.  Okay.  I'm

17     just asking you.

18               Did you graduate from high school, sir?

19          A.   Yes.

20          Q.   Where?                                 10:22:01

21          A.   Bell Gardens High School.

22          Q.   What is it called?

23          A.   Bell Gardens High School.

24          Q.   What year did you graduate?

25          A.   1979.                                  10:22:10
```

Page 14

| | | | |
|---|---|---|---|
| 1 | Q. | What did you do after high school? | 10:22:16 |
| 2 | A. | Went to college. | |
| 3 | Q. | Which college? | |
| 4 | A. | I went first to East L.A. College.  Then I | |
| 5 | | went to L.A. Trade Tech College. | 10:22:26 |
| 6 | Q. | How long did you attend East L.A. College? | |
| 7 | A. | About a year. | |
| 8 | Q. | What course of study did you pursue? | |
| 9 | A. | General education. | |
| 10 | Q. | How were your grades? | 10:22:45 |
| 11 | A. | Average. | |
| 12 | Q. | Average?  What happened after a year? | |
| 13 | A. | I went to L.A. Trade Tech College. | |
| 14 | Q. | Why?  Why the change? | |
| 15 | A. | Wanted to do architectural drafting. | 10:22:57 |
| 16 | Q. | Is that what you studied at the L.A. Trade | |
| 17 | | Tech College? | |
| 18 | A. | Yes. | |
| 19 | Q. | For how long? | |
| 20 | A. | Two years. | 10:23:08 |
| 21 | Q. | Did you earn a degree or certificate in | |
| 22 | | architectural drafting? | |
| 23 | A. | Yes. | |
| 24 | Q. | What did you earn? | |
| 25 | A. | A.A. degree. | 10:23:17 |

Page 15

| | | |
|---|---|---|
| 1 | Q.   A.A. degree in what? | 10:23:21 |
| 2 | A.   Architectural drafting. | |
| 3 | Q.   What year did you earn that from the trade | |
| 4 | tech college? | |
| 5 | A.   '84. | 10:23:34 |
| 6 | Q.   What did you do after that? | |
| 7 | A.   I went back to East L.A. College. | |
| 8 | Q.   And what type of course of study did you | |
| 9 | pursue? | |
| 10 | A.   Architectural design, science. | 10:23:56 |
| 11 | Q.   Did you earn a degree? | |
| 12 | A.   No. | |
| 13 | Q.   Why not? | |
| 14 | A.   I moved on to other things. | |
| 15 | Q.   Did you fail out? | 10:24:13 |
| 16 | A.   No, I did not. | |
| 17 | Q.   What did you move on to? | |
| 18 | A.   Got into real estate. | |
| 19 | Q.   What year did you move on from East L.A. | |
| 20 | College? | 10:24:29 |
| 21 | A.   I can't remember that exact date. | |
| 22 | Q.   What was your best estimate of the year? | |
| 23 | A.   '86, around there. | |
| 24 | Q.   And what did you do in 1986 for education | |
| 25 | or employment? | 10:24:45 |

Page 16

```
 1          A.   Worked for -- If I can recollect, I worked   10:24:53

 2     for a intermediate school as a teacher's aide.

 3          Q.   I thought you wanted to go into real

 4     estate.

 5          A.   Well, real estate was something I did       10:25:13

 6     pretty much on the side with my brother.

 7          Q.   So you were a teacher's aide?

 8          A.   Teacher's aide, yeah.

 9          Q.   Okay.  How long were you a teacher's aide?

10          A.   Approximately a year and a half.           10:25:22

11          Q.   Where?

12          A.   What was the name of the school?  I can't

13     remember.  In East L.A.  I don't remember the

14     school.

15          Q.   It was in East L.A.?                       10:25:37

16          A.   Yeah.

17          Q.   Why did you leave that job?

18          A.   I went to work for a engineering company.

19          Q.   Which company?

20          A.   Electrical -- electrical engineering.      10:25:47

21          Q.   What's it called?

22          A.   At the time, it was called Pacific

23     Engineers Group.

24          Q.   When did you start there?

25          A.   I don't recall.  It was '86, '87, estimate.  10:26:02
```

Page 17

```
 1          Q.    What was your job?                    10:26:08

 2          A.    Drafting.

 3          Q.    How long did you have that job at Pacific

 4     Engineers Group?

 5          A.    I estimate a couple years.            10:26:21

 6          Q.    Why did you leave?

 7          A.    Wanted to be a little bit closer to home.

 8     I had an opportunity I took.

 9          Q.    What opportunity?

10          A.    To work for a contractor.            10:26:38

11          Q.    Who?

12          A.    Company name was called Rosemead

13     Construction.

14          Q.    When did you start with Rosemead?

15          A.    I don't remember the exact dates.     10:26:55

16          Q.    What's your best estimate?

17          A.    '87, '88, '89, around there.

18          Q.    What was your position with Rosemead

19     Construction?

20          A.    Architectural draftsman.              10:27:08

21          Q.    How long did you hold that position?

22          A.    Approximately three years.

23          Q.    How many?

24          A.    Approximately three years.

25          Q.    Why did you leave that job?           10:27:20
```

Page 18

```
 1          A.   Found another opportunity to work somewhere   10:27:22
 2     else.
 3          Q.   Where?
 4          A.   Another contractor.
 5          Q.   What's the name of that contractor?          10:27:29
 6          A.   Singley Construction.
 7          Q.   How do you spell that?
 8          A.   I believe it's spelled S-I-N-G-L-E-Y.
 9          Q.   What year was that?
10          A.   Like '90.  Somewhere in the '90s.  It's an   10:27:50
11     estimate, '90s.
12          Q.   Early '90s?
13          A.   Early '90s or after '90.
14          Q.   What was your position with Singley
15     Construction?                                          10:27:59
16          A.   Architectural draftsman.
17          Q.   How long did you have that position?
18          A.   Approximately couple years.
19          Q.   Then where did you go?  Why did you leave
20     that job?                                              10:28:18
21          A.   Found another opportunity.
22          Q.   Where?
23          A.   It was a restoration company.
24          Q.   What's the name of that company?
25          A.   At the time, it was called Pyrotech          10:28:30
```

                                                    Page 19

```
 1      Restoration.                                        10:28:32

 2           Q.   What type of work did they do?

 3           A.   Did architectural drafting and estimates.

 4           Q.   For Pyrotech Restoration?

 5           A.   Yes.                                       10:28:48

 6           Q.   That company was involved in fire damage

 7      remediation?

 8           A.   Fire, yes.

 9           Q.   What year did you start with them?

10           A.   I think it was '91, I believe.  I --      10:28:54

11           Q.   I thought you worked for Singley --

12           A.   '9- -- I can't remember the exact date.

13      Let's see.

14           Q.   You worked for Singley coast in the early

15      '90s for three years; right?                        10:29:09

16           A.   Yeah.

17           Q.   Okay.

18           A.   So I think it was '96.  I think it was '96.

19           Q.   That was your next job; right?

20           A.   Yes.                                       10:29:16

21           Q.   Okay.  So in '96, you started with Pyrotech

22      Restoration.  As what type of position?

23           A.   Architectural draftsman and estimator.

24           Q.   And how long did you have that position?

25           A.   Pyrotech, about 19 years.  Estimate 19     10:29:38
```

```
 1    years.                                          10:29:43

 2        Q.   You were there for 19 years?

 3        A.   Yeah.

 4        Q.   What was your title when you left?

 5        A.   Well, architectural drafts- --          10:29:52

 6    draftsman/estimator.   Sort of both.

 7        Q.   That was your title the whole time?

 8        A.   Yeah.

 9        Q.   Did you ever get a promotion?

10        A.   In terms of pay or --                    10:30:12

11        Q.   Title.

12        A.   Title, no.

13        Q.   So what year did you leave pyrotechnic

14    restoration?

15        A.   Pyrotech was about --                    10:30:27

16        Q.   But first, before I ask you that, who was

17    your supervisor when you left that job?  What was

18    his name?

19        A.   Kinam Choi.

20        Q.   How do you spell that?                   10:30:39

21        A.   K-I-N-A-M, Choi, C-H-O-I.

22        Q.   Is that a man or a woman?

23        A.   Man.

24        Q.   How long did you work with Mr. Choi?

25        A.   Approximately ten years.                 10:31:00
```

Page 21

```
 1        Q.    And what year did you leave that company?   10:31:03

 2        A.    Around 2013.  Pyrotech turned into another

 3   company with the same firm called PCM.  So same

 4   firm.

 5        Q.    And did you stay with PCM?             10:31:26

 6        A.    Yes, I do.  After -- With Kinam Choi for,

 7   like -- it was, like, nine years, they sold the

 8   company, the same firm, to them, and they called it

 9   PCM.  It's around 2012 or '13 is when I left that

10   company.                                         10:31:44

11        Q.    You left PCM?

12        A.    Yeah.

13        Q.    Why?

14        A.    Had an opportunity to work for Allstate.

15        Q.    And you were hired by Allstate in 2013?  10:32:09

16        A.    At the end.  At the end of 2013.

17        Q.    Did you have any jobs in between PCM and

18   Allstate?

19        A.    No.

20        Q.    Were you handling -- Were you dealing with  10:32:20

21   insurance coverage at pyrotechnic restoration?

22        MR. FELDMAN:  Vague.

23        MR. HOOK:

24        Q.    Were you a claims adjuster, an insurance

25   adjuster there?                                  10:32:32
```

Page 22

```
 1        A.   No, I was not a claims adjuster at PCM.     10:32:33

 2        Q.   Sir, you understand you're under oath here.

 3   It's the same oath that you would tell in a court of

 4   law.  You have the same obligation to tell the truth

 5   here as you would in a formal court of law.  Do you     10:32:49

 6   understand that?

 7        A.   Yes.

 8        Q.   Okay.  Do you understand what the

 9   difference is between a truth and a lie?

10        A.   Yes.                                          10:32:57

11        Q.   What is it?

12        MR. FELDMAN:  Argumentative.

13        MR. HOOK:

14        Q.   I'm not trying to be argumentative.  I just

15   want your definition.  That's all.                     10:33:06

16        A.   Well, someone could say that that's a white

17   paper and someone could say it's a black paper.

18   There's a difference.

19        Q.   Which would be the lie?

20        A.   Well, if it's a white paper, it's the        10:33:21

21   truth.  If it's black paper, it's a lie.

22        Q.   Right.  So stating -- Stating a fact is

23   telling the truth, and misstating a fact is telling

24   a lie.  Would you agree with me?

25        MR. FELDMAN:  Argumentative, misstates the law.    10:33:34
```

Page 23

```
 1          MR. HOOK:                              10:33:37

 2      Q.   Would you agree with me if you misstate a

 3   fact, it's telling a lie?

 4          MR. FELDMAN:  Argumentative.

 5          MR. HOOK:                              10:33:43

 6      Q.   If I said that paper's black, I'd be

 7   misstating a fact and that would be a lie; correct?

 8          MR. FELDMAN:  Not if you were blind.

 9          MR. HOOK:  Sir, don't make speaking objections.

10          MR. FELDMAN:  It's argumentative.      10:33:53

11          MR. HOOK:  Just keep it to the point.  Okay?

12   Don't interrupt my deposition.

13          MR. FELDMAN:  Okay.  It's argumentative.  It

14   misstates the law to suggest the way you phrased it.

15   It's vague and ambiguous.                     10:34:01

16          MR. HOOK:

17      Q.   If I misstate a fact by saying that that

18   paper is black, that would be telling a lie;

19   correct?

20          MR. FELDMAN:  Argumentative, misstates the law.  10:34:09

21          THE WITNESS:  I don't understand what you're

22   saying.

23          MR. HOOK:

24      Q.   You don't understand what I'm saying?

25      A.   No.                                   10:34:14
```

Page 24

```
 1          Q.   If I said -- I'm going to take it out and      10:34:15

 2     hand it to you.  This is a cover for a binder here.

 3     Just take that piece of paper and hold it up to the

 4     camera.  And that paper, it's a white paper; right?

 5     We agree with each other it's a white paper; right?      10:34:28

 6          A.   Yes.

 7          Q.   Okay.  And if I said that was a black

 8     paper, that would be a lie; right?

 9          MR. FELDMAN:  Argumentative, misstates the law.

10          THE WITNESS:  It depends.                           10:34:39

11          MR. HOOK:

12          Q.   It depends?  What would it depend on?

13          A.    It depends if this is white, this is truth,

14     then --

15          Q.   Right.  So if I said, "Alan" -- To my          10:34:47

16     client over there, if I said, "Alan, Edward's

17     holding up a black paper right now," is that -- am I

18     telling Alan the truth or a lie?

19          MR. FELDMAN:  Argumentative, false dichotomy.

20          THE WITNESS:  I don't understand what you're        10:35:02

21     trying to say.  I'm sorry.

22          MR. HOOK:

23          Q.   I'm asking you a simple question, and I'm

24     asking you this:  Do you see my client over there,

25     Alan Baker?  Do you see him to the right?               10:35:11
```

Page 25

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:35:13 |
| 2 | Q.   Okay.  You met with him before? | |
| 3 | A.   Yes. | |
| 4 | Q.   Okay.  He's one of Allstate's insured; | |
| 5 | right?  Had a policy, that's why we're here today; | 10:35:17 |
| 6 | correct? | |
| 7 | A.   Correct. | |
| 8 | MR. HOOK:  And -- Hello, Alan.  Do you see me? | |
| 9 | MR. BAKER:  Yes. | |
| 10 | MR. HOOK:  Okay. | 10:35:27 |
| 11 | Q.   There's a black paper in front of Edward | |
| 12 | Carrasco.  Was that statement a truthful statement, | |
| 13 | or was it a lie? | |
| 14 | MR. FELDMAN:  Argumentative, assumes a false | |
| 15 | distinction. | 10:35:39 |
| 16 | THE WITNESS:  It's just -- You're basing a fact | |
| 17 | that this is white, this is white. | |
| 18 | MR. HOOK: | |
| 19 | Q.   Right.  So if I told Alan that it's a black | |
| 20 | paper, that would be a lie; correct? | 10:35:48 |
| 21 | MR. FELDMAN:  Argumentative, assumes a false | |
| 22 | distinction. | |
| 23 | THE REPORTER:  (Indicating.) | |
| 24 | THE WITNESS:  Stating a fact that this is white, | |
| 25 | and if he says it's black, he's stating a fact that | 10:36:25 |

Page 26

1        it's not black, it's white.                          10:36:28

2            MR. HOOK:

3            Q.   Right.  So if I state it's black, that's a

4        lie; correct?

5            MR. FELDMAN:  Argumentative.                      10:36:34

6            THE WITNESS:  It isn't a lie.

7            MR. FELDMAN:  Asked and answered.

8            MR. HOOK:

9            Q.   Excuse me?

10           A.   It's not a lie.                              10:36:37

11           Q.   It's not a lie?

12               Okay.  Let the record reflect that the

13       document in front of Mr. Carrasco is a black page,

14       not a white page.  Right?  Is that an accurate

15       record?                                              10:36:50

16           A.   It's a white page.

17           Q.   Okay.  So what I said was a lie; right?

18           MR. FELDMAN:  Argumentative.  Assumes that

19       there's only a truth and there's only a lie.  It's a

20       false distinction.                                   10:36:58

21           MR. HOOK:  There's only -- So you're saying that

22       saying that paper's black is a truthful statement?

23           MR. FELDMAN:  No, it's not a truthful statement,

24       Counsel, but it's --

25           MR. HOOK:  It's not necessarily --              10:37:08

                                                    Page 27

```
 1           MR. FELDMAN:  No.  It's not a truth or a lie.      10:37:09
 2      Did you intentionally say it was black?  Did you say
 3      it was black because you have a distinction -- you
 4      can't distinguish color --
 5           MR. HOOK:  Right.                                  10:37:18
 6           MR. FELDMAN:  -- because you're color-blind?
 7      Did you do it because you don't have sight?
 8           MR. HOOK:  Okay.  Let's clarify.
 9      Q.   If I say -- If I intentionally tell my
10      client over there -- Alan Baker -- "Don't look,         10:37:26
11      Alan.  Mr. Carrasco has a piece of paper in front of
12      him that says Alan Baker is stupid," is that a
13      truthful statement or is that a lie?
14      A.   I'm not saying Mr. Baker's --
15      Q.   I know you're not.                                 10:37:41
16           MR. FELDMAN:  Listen to the question.
17           MR. HOOK:
18      Q.   I'm not saying you are.
19      A.   Okay.
20      Q.   Okay?                                              10:37:45
21           The paper does not say that.  I'm telling
22      Alan it does.  So is that a truthful statement or is
23      that a lie?
24      A.   I -- I don't understand your question.  I'm
25      sorry.                                                  10:37:56
```

                                                    Page 28

| | | |
|---|---|---|
| 1 | Q.   Okay.   Okay.   I'm glad this is being | 10:37:58 |
| 2 | videotaped, because if you can't, you know, just | |
| 3 | state for the record what's a truth and what's the | |
| 4 | lie, that's not going to look good in front of a | |
| 5 | jury, and this is going to be played in front of a | 10:38:08 |
| 6 | jury.  Do you understand that?  That's -- | |
| 7 | A.   Yes. | |
| 8 | Q.   -- why we're here today.  Okay. | |
| 9 | So I'm here for you to give truthful | |
| 10 | testimony, not false testimony.  You should be aware | 10:38:17 |
| 11 | of the admonitions that the same penalties of | |
| 12 | perjury attach as if you were testifying in a court | |
| 13 | of law.  Do you understand that, sir? | |
| 14 | A.   Yes. | |
| 15 | Q.   Okay.  Have you been advised that you have | 10:38:28 |
| 16 | a right to your own attorney here, not an attorney | |
| 17 | for Allstate?  Have you been advised of that? | |
| 18 | A.   Yes. | |
| 19 | Q.   Okay.  Have you signed a conflict waiver | |
| 20 | with the Sheppard Mullin law firm? | 10:38:35 |
| 21 | MR. FELDMAN:  That's privileged. | |
| 22 | THE WITNESS:  Yes. | |
| 23 | MR. HOOK: | |
| 24 | Q.   Excuse me? | |
| 25 | A.   I signed. | 10:38:43 |

```
 1        Q.   You signed a conflict waiver with respect      10:38:45

 2   to your representation in this matter?

 3        MR. FELDMAN:   Well, you can say that you've

 4   signed an agreement.   The content of the agreement

 5   is privileged, so that's all you can say.              10:38:54

 6        THE WITNESS:   Yeah.

 7        MR. HOOK:

 8        Q.   Do you understand that you're being accused

 9   of intentional torts in this lawsuit?   Do you

10   understand that?                                       10:39:02

11        A.   I don't know what "tort" means.

12        Q.   Okay.   Like, not just that the contract

13   with the Bakers was breached but that you committed

14   torts:   that you intentionally inflicted emotional

15   distress, that you committed elder abuse, that you     10:39:18

16   committed fraud in conjunction with your handling of

17   this file.   Do you understand that?

18        A.   I didn't commit any fraud or --

19        Q.   Okay.   I understand that that's -- You're

20   saying that you have not.   It's alleged that you      10:39:28

21   did -- do you understand that? -- in the complaint

22   that's been filed with the court.

23        A.   I'm not aware of that, but if that's what

24   they're saying, but --

25        Q.   That's what's in the lawsuit.   And if       10:39:39
```

Page 30

```
 1      you're found liable for that, Allstate may or may      10:39:41

 2      not cover those -- that judgment.  Do you understand

 3      that?  And that's -- Do you understand that, sir?

 4          MR. FELDMAN:  Lacks foundation.

 5          MR. HOOK:                                          10:39:52

 6          Q.  I need an oral response from you.  Sir, the

 7      court reporter to your right can only record verbal

 8      statements.  Okay?  She can't record you just going

 9      like this (indicating).  I need a "Yes" or a "No."

10      Okay?                                                  10:40:05

11          A.  Yes.

12          Q.  Do you understand my question?

13          A.  Repeat that again, sir.

14          Q.  Do you understand that there's claims in

15      this lawsuit that you can be held personally liable    10:40:11

16      for?  Do you understand that?

17          A.  Yes.

18          Q.  Okay.  And you're still ready to give your

19      best testimony here today on this matter?

20          A.  Yes.                                           10:40:22

21          Q.  Okay.  I'm going to go ahead and attach as

22      Exhibit 1 Amended Notice Of Deposition Of Edward

23      Carrasco.

24          MR. FELDMAN:  Do you want to go with whatever we

25      left off last time?                                    10:40:38
```

Page 31

```
 1          MR. HOOK:  I'm going to do fresh notice, all      10:40:39

 2     from scratch.

 3          Q.   Please take a look at this, sir.  Let me

 4     know after you've had a chance to review it.  And if

 5     you don't mind, could you hand me that page that      10:40:50

 6     says Volume II, please.  Thank you.  Black piece of

 7     paper.

 8          MR. HOOK:  Counsel, can we take a brief break

 9     for a moment, please?

10          MR. FELDMAN:  Sure.                               10:41:55

11          MR. HOOK:  Thank you.

12          THE VIDEOGRAPHER:  We are going off record.

13     This is the end of Media Unit 1, and the time is

14     10:42 a.m.

15               (Interruption in proceedings.)              10:42:02

16          THE VIDEOGRAPHER:  We are back on record.  This

17     is the beginning of Media Unit Number 2, and the

18     time is 10:50 a.m.

19          MR. HOOK:

20          Q.   All right.  Good morning, Mr. Carrasco.     10:50:44

21     You understand you're still under oath, sir?

22          A.   Yes.

23          MR. HOOK:  Okay.  I'm just going to state for

24     the record, we are going to make a -- just a

25     settlement demand here today for the policy limits   10:50:53
```

Page 32

| | | |
|---|---|---|
| 1 | of the extended replacement coverage that the Bakers | 10:50:55 |
| 2 | had in effect at the time of the loss on September | |
| 3 | 20th and -- 2018.  That demand is going to remain | |
| 4 | open 'til the close of business today.  Just going | |
| 5 | to state that so it is on the record. | 10:51:10 |
| 6 | MR. FELDMAN:  I'm not sure -- If you're making a | |
| 7 | demand, I'm not sure what it means -- | |
| 8 | MR. HOOK:  The demand is -- | |
| 9 | MR. FELDMAN:  -- the extended limits. | |
| 10 | MR. HOOK:  For the Bakers, they paid for | 10:51:20 |
| 11 | extended replacement limits on their insurance | |
| 12 | policy, and that limit, which is a monetary number, | |
| 13 | is what our demand is today and the price at which | |
| 14 | this case can be settled today, inclusive of all | |
| 15 | costs and fees, all claims against all parties. | 10:51:35 |
| 16 | Q.   All right.  Sir, did you have a chance to | |
| 17 | look at this amended notice of deposition for | |
| 18 | Mr. Carrasco? | |
| 19 | A.   Yes. | |
| 20 | Q.   All right.  Go ahead and look on the second | 10:51:47 |
| 21 | page.  There's a request for production to the | |
| 22 | deponent at the time of the deposition for the | |
| 23 | entire claim file for Claim Number 0517768081 | |
| 24 | arising from the water loss incident that occurred | |
| 25 | on or around September 20th, 2018, at Las Palmas | 10:52:07 |

Page 33

```
 1     Avenue.                                              10:52:11

 2            Do you see that, sir?

 3        A.   I'm sorry.  I got a little lost.  Where was

 4     that at, sir?

 5        Q.   So we're -- I'm going to go through this      10:52:15

 6     notice of deposition.  On page 2, there's a series

 7     of document requests.  Do you see that?

 8        A.   Number -- All written.

 9        Q.   Yes.  These are requests for things that I

10     asked you to bring here today.  Do you understand    10:52:27

11     that?

12        A.   Yes.

13        Q.   Okay.  Number 1 asks for your entire claim

14     file for the subject claim.  Do you see that?

15        A.   Yes.                                          10:52:36

16        MR. FELDMAN:  It misstates -- Go ahead.  My

17     apologies.

18        MR. HOOK:

19        Q.   Do you see that, sir?

20        A.   Number 1?                                     10:52:42

21        Q.   Yes.  Was that brought here today?

22        A.   The claim file?

23        Q.   Yes.

24        A.   Allstate produced the claim file.

25        Q.   As far as you know, Allstate has produced     10:52:50
```

Page 34

```
1     the entire claim file --                          10:52:51

2        A.   Yes.

3        Q.   -- is that correct?  Okay.

4        MR. FELDMAN:  Well, I'll just state for the

5     record we provided written responses, and he's not  10:52:57

6     an attorney, and Allstate's produced the

7     nonprivileged portions of the same file.

8        MR. HOOK:

9        Q.   It's your understanding that all parts of

10    the claim file have been produced to your attorneys;  10:53:06

11    is that true?

12       A.   I believe they produced the claim file.

13       Q.   Okay.  Number 2 asks for "All written

14    communications you...sent or received, including but

15    not limited to e-mails, letters, reports, text       10:53:21

16    messages, and notes, that refer or relate to the

17    SUBJECT CLAIM."

18           Do you see that, sir?

19       A.   Yeah.

20       Q.   Did you bring documents responsive to that   10:53:28

21    request here today?

22       A.   The claim file is provided.

23       Q.   Okay.

24       A.   There are some additional ones we -- we did

25    find in my folders, my desktop.                      10:53:40
```

Page 35

```
 1        Q.    Okay.  And that was, I believe, a stack of       10:53:43

 2    documents that your counsel was kind enough to hand

 3    to me at the beginning of the proceeding; is that

 4    correct?

 5        A.    Yes.                                              10:53:51

 6        Q.    Okay.  I'm going to hand that stack of

 7    documents back to you, sir.  Can you please take a

 8    look at them and read the Bates range on the bottom

 9    of these additional documents that you brought here

10    today.                                                     10:54:04

11          In other words -- Do you know what the

12    Bates number is, sir?  I'm sorry.  I didn't mean to

13    hand you an unruly stack.  What -- Let's take that

14    off.  There we go.  Okay.

15          Does that look like the stack of additional          10:54:16

16    documents that you brought here today, sir?

17        A.    It looks like, yes.

18        Q.    Okay.

19      MR. FELDMAN:  We'll just clarify for the record,

20    obviously it was my office that put the Bates             10:54:25

21    numbers on the documents.

22      MR. HOOK:  Okay.

23      MR. FELDMAN:  And we've also provided written

24    responses to the RFPs contained in the depo notice

25    which I gave you earlier today, which I'd ask be         10:54:34
```

Page 36

```
 1     attached as an exhibit now, or I'll ask to do it      10:54:40

 2     later.

 3         MR. HOOK:  All right.  So the additional

 4     documents, it looks like the first page is

 5     Bates-stamped on the bottom right ALL003319.          10:54:52

 6         Q.   Is that correct, sir?

 7         A.   Yes.

 8         Q.   And flipping to the very last document,

 9     it's a photograph, and it looks like it's

10     Bates-stamped, when looked at in landscape            10:55:02

11     orientation, to be ALL003698.  Is that correct, sir?

12         A.   That's correct.

13         Q.   Okay.  Thank you.

14             And if you don't mind, sir, just setting

15     that back in order, and let's just place that to the  10:55:23

16     side for now.

17         A.   (Indicating.)

18         Q.   So are those all the additional documents

19     that you had on the Baker claim?

20         A.   That's all I have that I can find.          10:55:36

21         Q.   So as far as you know, everything that you

22     have I have; right?  It's been produced --

23         A.   Yes.

24         Q.   -- in the litigation?

25         A.   Yes.                                         10:55:43
```

Page 37

```
 1        Q.    Okay.  Is there any manual -- an Allstate     10:55:44

 2   manual that you use when you're adjusting a claim?

 3        A.    I'm not sure if they have a manual.  I

 4   don't use a manual.

 5        Q.    Did they ever give you a manual?              10:55:58

 6        A.    Not to my knowledge.

 7        Q.    Okay.  So there's no specific claims

 8   adjustment manual that you look to for the policies

 9   and procedures?

10        A.    No.                                           10:56:12

11        Q.    No?  Okay.  That was never given to you?

12        A.    Not that I'm aware of.

13        Q.    When you first started at Allstate in 2013,

14   what was the on-boarding training like?

15        A.    They gave us a two-week training.             10:56:41

16        Q.    Where did that take place?

17        A.    Chicago.

18        Q.    Is that paid training?

19        A.    Yes.

20        Q.    And what did you get trained in?              10:57:02

21        A.    Estimates, hands-on training for fire,

22   wind, water.

23        Q.    And so tell me about the training.  What

24   happened on the first day?

25        A.    I remember we sat down in a classroom.        10:57:32
```

Page 38

```
 1          Q.   Okay.  What did you guys learn?           10:57:35

 2          A.   Explained an overall view what was going to

 3     be trained, what they're going to train us on.

 4          Q.   Okay.  What else did you learn?

 5          A.   The next day or the same day?            10:57:47

 6          Q.   Same day.

 7          A.   Just sort of a tour around the area.

 8          Q.   All right.  Anything else you can remember

 9     from the first day?

10          A.   That --                                   10:58:01

11          Q.   A tour around --

12          THE REPORTER:  So no answer?

13          THE WITNESS:  Tour around -- tour around the

14     facility.

15          MR. HOOK:                                      10:58:13

16          Q.   A tour around the facility.  Okay.

17               Sir, keep in mind the court reporter needs

18     an audible response.  Even though I can understand

19     what you're saying, it's for her benefit.  Thank

20     you.                                                10:58:21

21               So then what did you do on the second day

22     of training?

23          A.   I can't recall, but there was a lot of

24     handouts for us to read.

25          Q.   About what?                               10:58:28
```

                                                      Page 39

```
 1        A.   Estimating practices.                   10:58:29

 2        Q.   So you were trained to estimate on the

 3   second day?

 4        A.   Yes.

 5        Q.   And then what about the third day?       10:58:42

 6        A.   I can't recall the third day, exactly what

 7   I did.  It was estimating.

 8        Q.   What about the fourth and fifth day?

 9        A.   Same thing, estimating.

10        Q.   So when you say estimating, like, how are  10:59:01

11   they teaching that?

12        A.   Well, they would have, like, a prop in

13   another room, a fire or wind, and we had to go in

14   there and estimate it.  And it would be, like, a

15   damaged room, say with fire or smoke, and we'd have  10:59:15

16   to measure and draw a sketch, and on that sketch we

17   would write down everything that's -- we see is

18   damaged in that room, that prop room.

19        Q.   How big was the room?

20        A.   I would estimate like an eight-by-ten.    10:59:39

21        Q.   And how was the -- How would the rooms be

22   mocked up?

23        A.   They would have, like, carpet, wallpaper,

24   drywall, maybe some furniture by -- I vaguely

25   remember some furniture there.                      11:00:05
```

Page 40

1      Q.   Did you get training on how to estimate      11:00:08

2    for, like, rooms with plaster?

3      A.   In that facility, it was drywall, that --

4    The props had drywall.  They didn't have plaster.

5      Q.   Okay.  Did they do some training during      11:00:23

6    that two-week course for estimating where the

7    property was, like, a historic -- like, an antique

8    property?

9      A.   I don't think it was historic, no.

10     Q.   Did they give you any training on how to      11:00:40

11   deal with a property loss relating to historic

12   homes?

13     A.   No.

14     Q.   No training at all?

15     A.   For historic homes?                          11:00:51

16     Q.   Yeah.

17     A.   That depends, because plaster could be --

18   They have that in their training, estimating

19   practices.  That would be considered --

20     Q.   No.  I'm asking you specifically, did        11:01:05

21   they -- did Allstate offer you training on how to

22   estimate losses that occur in a historic home?

23     A.   No.

24     Q.   No training at all?

25     A.   No.                                          11:01:19

Page 41

```
 1          Q.   Okay.  Did they provide you with any       11:01:20
 2     written practice material to help govern the process
 3     of adjusting a claim for a loss at a historic home?
 4          A.   No.
 5          Q.   Like guidelines or rules for that.         11:01:35
 6          A.   No.
 7          Q.   No?  Nothing?
 8          A.   Not a historical home.
 9          Q.   No?  Never?
10          A.   Wouldn't say never, but I don't think it   11:01:43
11     was a historical home.
12          Q.   Okay.  Did you get training for, like,
13     different grades of housing?  Like, this is
14     low-income housing; this is, like, a moderate house;
15     this is a high-end luxury condo.  Was that part of   11:01:59
16     your two-week training?
17          A.   The props they had there were limited, so
18     it didn't have a high end or a low end or an average
19     end.  It was just one prop, and it was drywall,
20     wallpaper, carpet.                                   11:02:17
21          Q.   Did it look like the Bakers' house?
22          A.   No.  It didn't have crown molding.  It did
23     have crown -- If I remember correctly, it had small
24     crown molding.  Mr. Baker had a very large crown
25     molding.                                             11:02:33
```

                                                    Page 42

```
 1         Q.    Yeah.  It wasn't very similar at all, was      11:02:34

 2    it?

 3         A.    His was historical.  It had some high

 4    ceilings.  Yeah, this one did -- It had 8-foot

 5    standard ceilings.                                          11:02:44

 6         Q.    Did Allstate -- Has Allstate provided you

 7    with training about how to select an appropriate

 8    contractor for a loss where the insured has a

 9    replacement value policy?

10         MR. FELDMAN:  Vague.                                   11:03:06

11         THE WITNESS:  I'm not sure I understand that.

12         MR. FELDMAN:  Lacks foundation.

13         MR. HOOK:

14         Q.    Okay.  Did Allstate ever provide you with

15    training regarding the type of property damage             11:03:11

16    coverage they offer to their customers?

17         A.    Property damage coverage.  Their estimating

18    platform is based on ZIP codes, and the basis for

19    that is to see -- some unit costs are reflective of

20    those ZIP codes.  So that's how they base their            11:03:41

21    platform, on ZIP codes, and ZIP codes some -- in

22    areas are higher than others.

23         Q.    Did Allstate train you about different

24    types of property damage coverage that's offered

25    through their policies?                                     11:03:59
```

Page 43

```
 1          A.    Coverages like other structures?  Dwelling?  11:04:01

 2          Q.    All that, yeah.

 3          A.    Yeah.

 4          Q.    What did you learn in that training?

 5          A.    Well, other structures, fences, sheds.      11:04:09

 6          Q.    Sir, what's the difference between an open

 7      versus a valued policy?

 8          MR. FELDMAN:  Calls for a legal conclusion.

 9          THE WITNESS:  I -- I'm -- I don't know.

10          MR. HOOK:                                       11:05:03

11          Q.    What's the difference between a policy that

12      provides for actual cash value versus replacement

13      cost coverage?

14          A.    The difference?

15          Q.    Yeah.                                     11:05:12

16          A.    The actual cash value has a de- --

17      depreciation taken away.  Replacement cost has

18      depreciation -- has -- I'm sorry.  The recoverable

19      cash value has depreciation on it.

20          Q.    Excuse me?                                11:05:28

21          A.    Okay.  The RCV, the recoverable cash

22      value --

23          MR. FELDMAN:  I think you're misspeaking.

24          THE WITNESS:  Oh.

25          MR. FELDMAN:  Slow down.  RCV or ACV?           11:05:36
```

Page 44

1          MR. HOOK:                                      11:05:40

2          Q.   What's RCV?

3          A.   RCV, recoverable cash value.

4          Q.   And what is that?

5          A.   That includes the depreciation, the total   11:05:47

6     amount.

7          MR. FELDMAN:  I think you're misspeaking because

8     at first you said -- I want the record to be clear.

9     It's actual cash value; right?

10         THE WITNESS:  Actual --                         11:05:54

11         MR. HOOK:  Sir, don't coach the witness.  Okay?

12         MR. FELDMAN:  I'm not --

13         MR. HOOK:  Just let him -- It's all on video.  I

14    mean, you want to make it look worse, that's fine.

15         Q.   What's the replacement cost value, sir?    11:06:03

16         A.   Replacement cost value is the total cost of

17    the estimate.

18         Q.   And is depreciation included in there?

19         A.   Yes.

20         Q.   It is.  So depreciation is reduced from    11:06:13

21    what the insured receives; correct?

22         A.   ACV amount is what we issue to our -- our

23    insured less depreciation.

24         Q.   And that's what they were entitled to here;

25    correct?                                             11:06:29

                                                  Page 45

```
 1          A.   Yes.                                   11:06:30

 2          Q.   Is that based on your review of the policy?

 3     That's --

 4          A.   Yes.

 5          Q.   -- what they were entitled to?         11:06:35

 6          A.   They -- They're -- They're owed, yes, the

 7     actual cash value at the time we settled --

 8          Q.   That's --

 9          A.   -- plus depreciation.

10          Q.   That's all they're owed?               11:06:46

11          A.   Well, they get depreciation after --

12          Q.   After when?

13          A.   After the repairs are completed.

14          Q.   And did you tell them that?  Did you tell

15     the Bakers that?                                 11:06:54

16          A.   I don't recall if I told them that or not.

17     I don't recall.

18          Q.   Would that have been something important

19     you think that they should have been made aware of?

20          A.   Yes.                                   11:07:06

21          Q.   When did you tell them that, sir?

22          A.   I -- I -- I remember the ACV amount.  We

23     walked the loss with him, and we went over the

24     estimate during our walk-through, our second

25     walk-through.                                    11:07:24
```

                                                   Page 46

```
 1          Q.   Sir, when did you tell the Bakers         11:07:25

 2     specifically that they could recover the difference

 3     between the ACV and the RCV?

 4          A.   I did not tell them that.

 5          Q.   Why wouldn't you?  Aren't you the claims    11:07:32

 6     adjuster for the file?

 7          A.   Yes, yes.

 8          Q.   Why would you not tell your insureds that?

 9          A.   I did not tell them.

10          Q.   Why?  I'm asking you why you did not.      11:07:41

11          A.   I -- I don't have a good answer.  I forgot

12     to tell them.

13          Q.   Did Allstate instruct you not to tell the

14     insureds this?  I mean, is this --

15          A.   No.                                        11:07:53

16          Q.   -- was this a plan by your employer to

17     deprive them of their benefits?

18          A.   No.

19          Q.   Okay.  You understand that when there's a

20     loss, you're supposed to review the insured's policy  11:08:02

21     and advise them as to what types of coverage is

22     available?

23          A.   Yes.

24          Q.   Did you do that here?

25          A.   I -- I believe I did that when I was       11:08:11
```

Page 47

```
 1    walking the loss with him.  I went over it.          11:08:16

 2         Q.  What did you tell Mr. Baker specifically

 3    about what he could recover?  I want to know

 4    exactly, because this is very important, sir.

 5         A.  Well, he's -- He's entitled to his -- his    11:08:26

 6    undisputed amount at this time.

 7         Q.  No.  Sir, what did you tell Mr. Baker

 8    during the initial walk-through about what he was

 9    entitled to under his deluxe homeowners policy?

10    That's what I want to know.  That's what you were     11:08:41

11    responsible for, is telling him what his benefits

12    were.  So what did you tell him?

13         MR. FELDMAN:  Lacks foundation.

14         THE WITNESS:  I don't recall.  I don't recall.

15         MR. HOOK:                                        11:08:55

16         Q.  Did you tell him that he was going to have

17    to wait for one of Allstate's vendors to provide an

18    estimate before Mackey Construction could proceed?

19         A.  No.

20         Q.  You never told the insureds that?           11:09:07

21         A.  (Indicating.)

22         Q.  You sure?  You never said that "I'm waiting

23    on an estimate from Baldwin," that Baldwin

24    couldn't -- that Mackey was not permitted to proceed

25    until you made an evaluation?  You never said that?  11:09:17
```

                                                      Page 48

```
 1        A.    I never told him that he couldn't proceed.    11:09:21

 2        Q.    Did you imply that to them?

 3        A.    No.

 4        MR. FELDMAN:   Argumentative.

 5        MR. HOOK:                                            11:09:26

 6        Q.    You never did, sir, huh?

 7        MR. FELDMAN:   Argumentative, asked and answered.

 8        MR. HOOK:

 9        Q.    You didn't tell the insureds -- You didn't

10   tell the insureds that they could proceed with           11:09:31

11   rebuilding their home with the contractor of their

12   choice, did you?

13        A.    I never told him that he could not use

14   Mackey.  They could use Mackey if they want.

15        Q.    But you said you weren't going to pay their    11:09:43

16   estimate; right?

17        A.    I disagreed with their estimate, with

18   Mackey's estimate.

19        Q.    Yeah.  And what did you do to try to work

20   that out?                                                 11:09:51

21        A.    With Mackey and Baldwin?

22        Q.    No.  Just with Mackey, just with the --

23   just with the contractors that your insureds wanted.

24        A.    We -- We set up a -- another time to do a

25   rewalk of the loss.                                       11:10:02
```

                                                    Page 49

```
 1          Q.   When was that?                        11:10:04

 2          A.   That was, like -- I'm going to say April --

 3     about April, I believe.

 4          Q.   How many months after the loss was that?

 5          A.   Well, September was when the loss happened,  11:10:17

 6     and we had already paid the initial amount.

 7          Q.   Okay.  And so then you waited seven months

 8     to do another walk-through with the insureds'

 9     preferred contractor while your elderly insureds

10     were displaced from their residence; right?        11:10:35

11          MR. FELDMAN:  Lacks foundation, assumes facts

12     not in evidence, argumentative.

13          THE WITNESS:  He had hired Greenspan.

14          MR. HOOK:

15          Q.   Sir, just answer my question.            11:10:43

16          MR. FELDMAN:  He's answering your question.

17     Don't interrupt him.

18          THE WITNESS:  He had Greenspan come into the

19     picture, and that's why it took a little longer.

20     And we had to deal with Greenspan.                 11:10:52

21          MR. HOOK:

22          Q.   That drew things out, huh?

23          A.   Well, I tried to make an attempt to

24     resolve, and I -- I understand his concerns, and

25     I -- I tried to get, you know, his -- an agreement   11:11:06
```

Page 50

| | |
|---|---|
| 1 | with Mr. Baker.  After the initial estimate, I made | 11:11:10 |
| 2 | attempts to go out there a second time with Baldwin. |
| 3 | Q.   Sir, are you trained by Allstate to delay |
| 4 | and deny claims to try to bludgeon your insureds |
| 5 | into settling a claim? | 11:11:28 |
| 6 | A.   No. |
| 7 | MR. FELDMAN:   Argumentative. |
| 8 | MR. HOOK: |
| 9 | Q.   No?  That's not part of Allstate's |
| 10 | training? | 11:11:33 |
| 11 | A.   To delay?  I'm not trying to delay |
| 12 | anything. |
| 13 | Q.   Yeah.  You never tried to delay the claim? |
| 14 | A.   That was -- My intention was not to delay |
| 15 | the claim. | 11:11:40 |
| 16 | Q.   What was your intention? |
| 17 | A.   To resolve the claim with Mr. Baker. |
| 18 | Q.   And how were you trying to resolve it? |
| 19 | A.   By trying to get another second |
| 20 | walk-through with Baldwin. | 11:11:49 |
| 21 | Q.   Did you -- Did you hire an expert to try to |
| 22 | evaluate why the estimates were so different? |
| 23 | A.   An expert meaning -- |
| 24 | Q.   An expert.  A neutral -- you know, maybe an |
| 25 | expert in historic homes, something like that. | 11:12:04 |

Page 51

| | | |
|---|---|---|
| 1 | A.    Baldwin was qualified to do that. | 11:12:09 |
| 2 | Q.    Sir, I asked you did you hire an expert -- | |
| 3 | A.    I did not. | |
| 4 | Q.    -- to try to resolve the discrepancy | |
| 5 | between the estimate for replacement value provided | 11:12:20 |
| 6 | by Baldwin and that provided by Mackey?  Did you | |
| 7 | hire an expert to try to look into that? | |
| 8 | A.    An expert -- Another expert other than | |
| 9 | Baldwin?  Is that what you're saying? | |
| 10 | Q.    Yeah.  The -- Baldwin's not an expert. | 11:12:34 |
| 11 | MR. FELDMAN:  Lacks foundation. | |
| 12 | THE WITNESS:  We had a plaster contractor, if | |
| 13 | that's what you call an expert. | |
| 14 | MR. HOOK: | |
| 15 | Q.    Is that what you call an expert to resolve | 11:12:41 |
| 16 | that type of issue? | |
| 17 | MR. FELDMAN:  Argumentative. | |
| 18 | THE WITNESS:  You know, Baldwin was more than | |
| 19 | qualified to do the job, and -- They're more than | |
| 20 | qualified, and they told me they can do it for that | 11:12:50 |
| 21 | amount, so I went with Baldwin because -- | |
| 22 | MR. FELDMAN:  Just answer the question.  Did you | |
| 23 | hire anybody else? | |
| 24 | THE WITNESS:  No. | |
| 25 | MR. HOOK: | 11:12:59 |

Page 52

```
 1           Q.   But when -- When Servpro sent you a bill   11:13:00

 2      for what, $56,000, for the mediation, you guys got

 3      an expert involved, didn't you?

 4           A.   We got Jim Holland involved.

 5           Q.   Yeah.  Why was that?                        11:13:14

 6           A.   Well, mitigation on that scale, I get

 7      others involved with Franco, and I --

 8           Q.   What scale?  What scale?

 9           A.   Large scale.  That was a big mitigation

10      bill.                                                11:13:30

11           Q.   How much was the bill?

12           A.   Think it was, like I said, 56,000.

13           Q.   So for that it was warranted to get an

14      expert involved?

15           A.   I needed to get an expert, yeah.           11:13:37

16           Q.   Why?

17           A.   There were some items I didn't understand

18      that I think that an expert would help me out on

19      that.

20           Q.   Okay.  And what ultimately ended up        11:13:47

21      happening with that bill?

22           A.   We ended up paying it.  We ended up

23      paying -- It was a little short.  Wasn't 56,000.

24      Maybe 50,000, somewhere around there.

25           Q.   You paid over 53,000, didn't you?          11:13:59
```

Page 53

```
 1        A.   We paid around 50,000.  I forget the        11:14:01

 2   number.  I don't remember.

 3        Q.   After how long?

 4        A.   I don't remember the -- how many months.

 5   Seven months, something like that.  Seven, eight        11:14:08

 6   months.

 7        Q.   Is that a reasonable amount of time to

 8   handle a bill for emergency water remediation for

 9   your insureds that have a deluxe homeowners policy?

10        MR. FELDMAN:  Overbroad.                           11:14:22

11        MR. HOOK:  Huh?

12        MR. FELDMAN:  Overbroad, calls for a legal

13   conclusion.

14        MR. HOOK:

15        Q.   Sir, is that a reasonable amount of time?    11:14:26

16        MR. FELDMAN:  Same objections.

17        THE WITNESS:  It's -- It's what I had to do at

18   the time.

19        MR. HOOK:

20        Q.   Had to do for what?                           11:14:33

21        A.   To re- -- To resolve his mitigation bill.

22        Q.   Why didn't you just pay it?

23        A.   Well, I have to -- have to look at these

24   estimates.  I just can't just pay them based on what

25   they submit.  There were some things that were wrong  11:14:45
```

Page 54

```
 1     with the estimate, like there was filters or          11:14:47

 2     excessive equipment, so I had it done with an

 3     expert.

 4          Q.   Okay.  So when there was a over $200,000

 5     discrepancy between the building estimates, why        11:14:58

 6     didn't you hire an expert then?

 7          A.   The expert I -- The only expert you're

 8     talking about that I can say is Baldwin was hired to

 9     do that for --

10          Q.   No.  Baldwin was hired by Allstate, not by   11:15:11

11     your insureds.

12               Who did you hire to try to resolve the

13     discrepancy between the contractor that your

14     insureds wanted to use and the Allstate vendor?

15          A.   I didn't hire any --                         11:15:24

16          Q.   Why?

17          A.   -- vendors.

18          Q.   Why?

19          MR. FELDMAN:  Asked and answered.

20          THE WITNESS:  I -- I tried get Baldwin to agree   11:15:27

21     and resolve the situation with Mr. Baker's estimate,

22     Mackey's estimate --

23          MR. HOOK:

24          Q.   Sir --

25          A.   -- and --                                    11:15:37
```

Page 55

1      Q.   Okay.  You tried -- You hired an expert to      11:15:37

2   save $3,000 on a water remediation bill, but you

3   didn't hire an expert to try to resolve a $200,000

4   difference in a replacement cost estimate.  Does

5   that seem like a reasonable decision, in hindsight,      11:15:52

6   from a claims adjustment perspective?

7      A.   I think Baldwin was more than qualified to

8   estimate the loss.

9      Q.   So you didn't think that you needed to do

10   any further investigation with respect to the      11:16:06

11   discrepancy in replacement cost estimates; is that

12   true?

13      A.   As I said, I used Baldwin to do the

14   estimate.

15      Q.   Okay.  Right.      11:16:19

16      A.   And they were more than qualified to do it.

17      Q.   Based on -- How did you know they were more

18   than qualified?

19      A.   Well, I've had experience with Baldwin, and

20   when I met out there with Michelle Phan, she said      11:16:29

21   she works this area, which --

22      Q.   Did you get a portfolio from them of

23   high-end homes they had remodeled?

24      A.   I did not.

25      Q.   Okay.  Did you ask them how many high-end      11:16:43

Page 56

```
 1        homes they had remodeled?                          11:16:45

 2            A.    I did not ask them that.

 3            Q.    Did you get any pictures of homes over a

 4        million dollars they had worked on?

 5            A.    No.                                       11:16:52

 6            Q.    Did you ask them if they had ever worked on

 7        a historic home?

 8            A.    I did not ask them that.

 9            Q.    Don't you think that might be an important

10        thing for your insureds to know about the contractor  11:17:00

11        you were selecting, whether they had experience with

12        historic homes?

13            A.    I thought they were more than qualified to

14        do it.  They have subcontractors.  I've had --

15            Q.    What --                                   11:17:14

16            MR. FELDMAN:  Let him finish.

17            THE WITNESS:  They had other contractors, and

18        they have a lot of good subcontractors.  I had some

19        claims with Baldwin, who did a good job.  They

20        were -- they were outstanding.                      11:17:26

21            MR. HOOK:

22            Q.    On a historic home?

23            A.    Not a historic ho- -- it was a house.

24            Q.    What house?  What's the address?

25            A.    I don't have the address -- I don't know   11:17:33
```

                                                      Page 57

```
 1        offhand what the address --                    11:17:34

 2            Q.   Where is it?

 3            A.   I believe it's somewhere in Riverside.

 4            Q.   How much was that house worth?

 5            A.   The value of the house?                11:17:39

 6            Q.   Yeah.

 7            A.   I -- I don't know the value of the house.

 8            Q.   What did they do there?

 9            A.   It was a water loss.

10            Q.   Okay.  And what kind of remediation did it  11:17:46

11        call for?

12            A.   You know, dehu's.

13            Q.   Excuse me?

14            A.   Dehumidifiers, fans, demo -- demolition.

15            Q.   What did they demolish?                11:18:00

16            A.   Drywall.  There was -- They even -- They

17        did the build-back -- Excuse me.  Let me back up.

18                 I'm sorry.  They did the build-back --

19        another company did the demo -- and it consists of

20        drywall, flooring, painting, cabinetry.          11:18:17

21            Q.   Drywall -- Baldwin Construction did

22        drywall, painting, flooring, and what else?

23            A.   Cabinetry.

24            Q.   Okay.  And this was a single-family house

25        in Riverside; correct?                           11:18:47
```

Page 58

```
 1          A.   I believe it was in Riverside, yes.        11:18:48

 2          Q.   And when did they do this work?

 3          A.   That was two, three years ago.  Can't

 4     remember the date.

 5          Q.   And how big of a job was it for Baldwin?   11:19:04

 6     Was it more than a $50,000 job?

 7          A.   Yes.

 8          Q.   Was it more than a hundred-thousand-dollar

 9     job?

10          A.   No.                                        11:19:14

11          Q.   How many bedrooms is the home?

12          A.   I don't remember exactly, but it was in the

13     realms of four bedrooms, I believe.

14          Q.   Was it a custom home or was it a tract

15     home?                                                11:19:31

16          A.   I don't know if it was a tract home.  It

17     was an older home, but not too old.  Like, built in

18     the '90s, I believe.

19          Q.   All right.  What other projects have you

20     worked on with Baldwin?                              11:19:46

21          A.   I can't recall some other projects, but I

22     did have a couple other ones with them.

23          Q.   Well, give me your best recollection.  This

24     is your day to show that this was reasonable, so I

25     want to know all the bases for you deciding that     11:20:02
```

Page 59

```
 1        that was a qualified contractor, and on that basis,    11:20:06

 2        you're going to deny my clients the benefits that

 3        they were entitled to.

 4            MR. FELDMAN:  That's argumentative.  It's an

 5        improper question.                                      11:20:14

 6            MR. HOOK:  All right.

 7            MR. FELDMAN:  It's not his day to show it's

 8        reasonable.  It's his day to answer questions,

 9        Counsel.  It's not his day nor is it your day to

10        make speeches about the case and then ask a question   11:20:22

11        at the end of it and attempt to get him to agree

12        with whatever speech that you made.

13            MR. HOOK:  Wonderful speaking objection.

14            MR. FELDMAN:  Yeah, you're right.  If you're

15        going to ask improper questions, I'm going to point    11:20:31

16        out the improprieties in the questions.  So ask him

17        a question, but don't give a speech and then ask a

18        question at the end of it to try to sneak that

19        speech into the record.

20            MR. HOOK:                                           11:20:44

21        Q.   Do you remember what I asked you, sir?

22        A.   Can you repeat that.

23        Q.   What other projects have you worked with

24        Baldwin Construction on?

25        A.   I can't remember any other projects I've          11:20:51
```

Page 60

```
 1    done with them, but I can't recollect off my head      11:20:53

 2    right now.

 3         Q.   So what -- Other than your experience with

 4    them on the -- a house in Riverside where they did

 5    less than a hundred thousand dollars in work, what      11:21:04

 6    was the basis for your belief that they were

 7    qualified to provide a replacement cost estimate for

 8    the Bakers' home at 344 South Las Palmas in

 9    Los Angeles?

10         A.   Well, based on my experience and seeing how   11:21:17

11    they did that loss and that she works in that area,

12    I believe that they're qualified.  They're a

13    company, and they have good subcontractors that can

14    perform plaster.  They can perform hardwood floors,

15    carpeting, painting, cabinetry, tile.  They've done    11:21:34

16    it all.  They're a general contractor and -- Well,

17    they -- they do drywall -- drywall, does plaster,

18    stucco.  They do everything.

19         Q.   Okay.  Anything -- Any other factual basis

20    for your conclusion that they were qualified?          11:21:53

21         A.   Yeah.  Based -- Like I said, they're --

22    Baldwin is a good company.  They're -- They're out

23    of San Dimas, I understand, but they -- they -- she

24    told me she works in this area, I -- I understood,

25    like, "You work this area.  You work the area where    11:22:13
```

Page 61

```
 1        the Bakers are at."                              11:22:16

 2             Q.   You understood Michelle Phan to mean that

 3        they completed projects in the Hancock Park

 4        neighborhood?

 5             A.   In that area.  Not Hancock, but they --  11:22:24

 6        that's their area.

 7             Q.   Do you understand that Hancock Park is a

 8        Historic Preservation Overlay Zone?

 9             A.   Yes.

10             Q.   What does that mean?                    11:22:33

11             A.   HPOZ, Historical Preservation Overlay Zone.

12             Q.   And what does that mean?

13             A.   This district's set out for homes that are

14        older and unique and -- in nature so --

15             Q.   Okay.  And with respect to a -- an insured  11:22:47

16        whose home is in the HPOZ, what special precautions

17        might one need to take as an insurance adjuster to

18        make sure that a replacement cost estimate would be

19        accurate?

20             MR. FELDMAN:  Lacks foundation, overbroad.   11:23:01

21             THE WITNESS:  Prices are fair and that they're

22        reasonably priced.

23             MR. HOOK:

24             Q.   Yeah.  What about making sure a contractor

25        would be able to conform with architectural       11:23:08
```

                                                    Page 62

```
 1        standards required to keep the project eligible for    11:23:11

 2        the Mills Act?

 3            MR. FELDMAN:  Vague, lacks foundation.

 4            THE WITNESS:  Mills Act?  I'm not sure what that

 5        is.                                                     11:23:21

 6            MR. HOOK:

 7            Q.   Do you know what the Mills Act is?

 8            A.   I'm not too familiar with the Mills Act.

 9            Q.   Okay.  Didn't think so.

10            So let's just take the claim step by step           11:23:36

11        and go through the whole thing.

12            When did you first find out about the

13        Bakers' water loss?

14            A.   The assignment was -- the FNOL was

15        September.  And when that was assigned to me, I         11:23:51

16        called for an inspection in October, our initial

17        inspection.

18            Q.   Okay.  Sir, what -- I'm going to -- it's

19        okay.  We're going to get into a technical part of

20        the deposition now where it's important that you        11:24:12

21        answer my questions, referring to the claim notes if

22        you need to.

23            But I want to know the exact date that you,

24        Edward Carrasco, were notified of this claim.

25            A.   I can't remember offhand, but I think the      11:24:25
```

Page 63

```
 1    claim file would have that information.              11:24:27

 2         Q.   The claim notes would have that?

 3         A.   The claim notes, yes.  Do you have --

 4         Q.   I'm going to hand those to you, and you go

 5    ahead and take a look (indicating).                  11:24:34

 6         A.   FNOL was --

 7         THE REPORTER:  (Indicating.)

 8              (Interruption in proceedings.)

 9         THE WITNESS:  First notice of loss was

10    9-20-2018.                                           11:25:38

11         MR. HOOK:

12         Q.   And when did you become involved in the

13    claim file?

14         A.   Right after the FNOL, they assigned it to

15    me.  The exact date -- May I --                      11:25:51

16         Q.   I'd like to -- the exact date, please.

17         A.   Okay.  The dwelling was assigned to me on

18    September 26.

19         Q.   And at that point, had a coverage

20    determination been made by Allstate?                 11:27:58

21         A.   As far as a covered loss?  Not determined

22    yet until I go out there and --

23         Q.   So you were assigned the claim on 9-26, and

24    what did you do on that first day the claim was

25    assigned to you?                                     11:28:16
```

Page 64

```
 1        A.   Well, I was aware there was a new loss        11:28:24

 2   there, so I called to make an appointment for the

 3   inspection.

 4        Q.   Called the insureds?

 5        A.   Yes.                                          11:28:34

 6        Q.   And what was the next thing you did?

 7        A.   I called for an inspection -- see, what

 8   date was that?  Called for an inspection at 1:30 at

 9   9-27.

10        Q.   Okay.  Anything else on 9-26 that you did    11:29:10

11   that you recall or that you see in the claim notes?

12        A.   I don't see anything else that I did before

13   that, so it's -- it was -- an FNOL got assigned to

14   me, and I set the inspection.

15        Q.   Okay.  And then 9-27, did you conduct an     11:30:04

16   inspection?

17        MR. FELDMAN:  Vague.

18        MR. HOOK:

19        Q.   Did you conduct an inspection of the

20   Bakers' residence on -- at 344 South Las Palmas?      11:30:12

21        A.   Was at 1:30.

22        Q.   Excuse me?

23        A.   1:30 at -- it was on 1:30, the inspection

24   was set.

25        Q.   1:30 p.m.?                                    11:30:24
```

Page 65

```
 1          A.    And it says today, yeah, so went out there.   11:30:25

 2          Q.    Who else was present?

 3          A.    Baldwin Construction.

 4          Q.    They were present on the 27th?

 5          A.    Yes.                                           11:30:36

 6          Q.    And who else?

 7          A.    The Bakers.

 8          Q.    Uh-huh.

 9          A.    Mackey Construction.

10          Q.    Okay.  And who else was at the site on the    11:30:52

11    27th?

12          A.    There were some --

13          MR. FELDMAN:  Lacks foundation.

14          THE WITNESS:  There was some mitigation company,

15    but I don't remember -- some men working there.  I        11:31:02

16    don't know their names, but they were busy doing

17    something.

18          MR. HOOK:

19          Q.    There was a mitigation company there?

20          A.    Yeah.                                          11:31:09

21          Q.    Okay.  And tell me everything you --

22    everything you did at that inspection.  What time

23    did you arrive?

24          A.    1:30.

25          Q.    Okay.                                          11:31:20
```

Page 66

1           MR. FELDMAN:  Counsel, can we go off the record   11:31:20

2     for a second?

3           MR. HOOK:  Sure.

4           THE VIDEOGRAPHER:  We're going off record.  This

5     is the end of Media Unit Number 2, and the time is   11:31:25

6     11:31 a.m.

7                (Interruption in proceedings.)

8           THE VIDEOGRAPHER:  We are back on record.  This

9     is the beginning of Media Unit Number 3, and the

10    time is 11:38 a.m.                                    11:38:37

11          MR. HOOK:

12          Q.   Good morning, Mr. Carrasco.

13          A.   Morning.

14          Q.   You understand you're still under oath?

15          A.   Yes, I do.                                11:38:46

16          Q.   Let's continue.

17               We were talking about the first

18    walk-through of the subject property; correct?

19          A.   Correct.

20          Q.   Okay.  And that occurred on September 27th,   11:38:53

21    2018, beginning at 1:30 p.m.; correct?

22          A.   I called -- I called the insured today to

23    set the inspection for 1:30, but it happened

24    October -- I'm not sure when it happened.  Think it

25    happened after that call.                            11:39:12

                                              Page 67

 1          Q.   Oh, well, let's find out.  Tell me from the   11:39:15

 2     claim notes the exact day that you first walked the

 3     property.

 4          MR. FELDMAN:  Chris, can you get the wire out.

 5     It may be trapped there.                                   11:42:26

 6          THE VIDEOGRAPHER:  (Indicating.)

 7          MR. FELDMAN:  Thanks.

 8               (Interruption in proceedings.)

 9     MR. HOOK:

10          Q.   Are the claims notes pretty well organized,   11:43:51

11     would you say?

12          A.   Yeah.  Just a lot of paperwork, so --

13          Q.   Sure.

14               Did you find it yet, sir?

15          A.   I'm looking for it.  I see that there's a      11:50:43

16     note here indicating we had a scheduled appointment

17     for 10:00 tomorrow, on the 8th.

18          Q.   Okay.  So --

19          A.   And it's around this time, but -- see where

20     the actual date is at.  I'm sorry.  It's a lot of       11:50:57

21     notes here.  I could see it.  I'm trying to find the

22     actual meeting date here.  It's in October.

23          Q.   I have all day, sir, set aside for this, so

24     take your time.

25          A.   Okay.                                          11:52:26

                                                   Page 68

```
 1              Okay.  On the 10-22.                    11:56:04

 2      Q.   Excuse me?

 3      A.   It was on 10-22.  I got the site inspection

 4   here, met with insured.

 5      Q.   On October 22nd.  So you waited over a      11:56:14

 6   month to go out to the property?

 7      A.   I tried to get a -- we went, I think, back

 8   and forth trying to get some inspection done and

 9   trying to get the -- our contractor as well on board

10   to do the inspection.                              11:56:36

11      Q.   Okay.  What's the -- What is the typical

12   response time for a massive water loss event,

13   residential water loss event?  How quickly are you

14   supposed to respond to that?

15      A.   We're supposed to respond -- I don't know   11:56:53

16   the exact time, but supposed to be immediately.

17      Q.   And what were all of the reasons that you

18   did not respond immediately?

19      MR. FELDMAN:  Lacks foundation, misstates the

20   evidence.                                          11:57:15

21      MR. HOOK:

22      Q.   You were notified of the claim on September

23   26th; correct?

24      A.   Yes.

25      Q.   All right.  And tell me all the efforts      11:57:18
```

Page 69

```
 1        that you undertook to set up a site inspection.        11:57:26

 2            A.   Tried to get everybody on board.

 3            Q.   When did you do that first?

 4            A.   I'd have to go back here.  There's a note,

 5        like --                                                11:57:35

 6            Q.   That's what we're here for.

 7            A.   Okay.

 8                 Yeah.  On 10-8-2018, there's a note here I

 9        called the insured to schedule a meeting, see the

10        loss.  Insured was supposed to call -- call his        12:02:20

11        contractor to meet out there.  Some reason, didn't

12        happen.

13                 But I -- I attempted to schedule the

14        meeting with the insured.  I guess he called

15        Friday -- late Friday and asked if we could meet       12:02:34

16        Monday morning, and it was a short notice.  But as

17        you could see, I was making attempts to see the loss

18        as soon as possible.

19            Q.   I don't see that at all.

20            A.   I always try to make my --                    12:02:48

21            MR. FELDMAN:  Argumentative.

22            MR. HOOK:

23            Q.   So what day did you first go to the loss,

24        sir?  What day did you first go to the loss site?

25            A.   I just -- back on -- 10-22.  It's --          12:03:01
```

Page 70

```
 1          MR. FELDMAN:  That's a different thing.          12:03:14

 2          MR. HOOK:  I was more interested in the witness'

 3     response, Counsel.

 4          MR. FELDMAN:  I just wanted to look at the

 5     documents since we only have one version, not one      12:04:17

 6     for him and one for me to follow along.

 7          MR. HOOK:  I have another copy here actually,

 8     sir.

 9          MR. FELDMAN:  Oh, okay.

10          MR. HOOK:  Yeah (indicating).                     12:04:25

11              Marc, it's noon.  I'm going to suggest that

12     we go for a lunch break.  Maybe the witness can

13     review his claim file, become more familiar with it.

14     Then we can reconvene at 1:00.

15          MR. FELDMAN:  That's fine.                        12:06:43

16          MR. HOOK:  That work?

17          MR. FELDMAN:  Sure.

18          MR. HOOK:  Okay.

19          THE VIDEOGRAPHER:  We are going off record.

20     This is the end of Media Unit Number 3, and the time   12:06:49

21     is 12:06 p.m.

22              (A lunch recess is taken.)

23          THE VIDEOGRAPHER:  We are back on record.  This

24     is the beginning of Media Unit Number 4, and the

25     time is 1:10 p.m.                                       01:10:07
```

Page 71

```
 1        MR. HOOK:                                    01:10:11

 2     Q.   Good afternoon, Mr. Carrasco.  You

 3   understand you're still under oath, sir?

 4     A.   Yes.

 5     Q.   Any reason why we can't proceed here with   01:10:18

 6   your testimony?

 7     A.   No reason.

 8     Q.   Have you taken any alcohol or drugs that

 9   would affect your ability to recall or testify

10   accurately in the last 24 hours?                  01:10:26

11     A.   No.  I haven't taken no alcohol.

12     Q.   Have you ever been convicted of a felony?

13     A.   No.

14     Q.   Going back -- Before we get more into the

15   claim, I wanted to finish the topic of what training  01:10:41

16   you've received from Allstate.

17          So we talked about the first week of

18   training in Chicago basically being about

19   estimating; right --

20     A.   Yes.                                        01:10:51

21     Q.   -- with fire damage?

22     A.   Yes.  Wind damage, water damage.

23     Q.   And just to refresh your recollection, the

24   court reporter to your right needs us to be really

25   kind of careful about not speaking over one another.  01:11:01
```

Page 72

```
 1        Okay?                                              01:11:04

 2            A.    Okay.

 3            Q.    So let me get the full question out.

 4                  So we talked about estimating in the first

 5        week.  Do you recall anything else that you covered   01:11:09

 6        substantively in the first week of training with

 7        Allstate?

 8            A.    They provide, like, an interview, sort of

 9        like a role play --

10            Q.    Okay.                                      01:11:24

11            A.    -- as if you were settling a loss with a --

12        a customer.

13            Q.    And tell me more about that role-playing.

14        How does that work?

15            A.    One of Allstate's employees is playing the  01:11:41

16        role as the customer, and you're the adjuster, and

17        you pretty much -- you're explaining the estimate to

18        the customer.

19            Q.    And what are you taught from Allstate about

20        explaining the estimate to the customer?             01:11:55

21            A.    To go over all the items, to go over the

22        total recoverable cost value of -- of the estimate,

23        and explain the deductible if it's been deducted,

24        depreciation, and basic -- go by detail what the

25        estimate was about.                                  01:12:20
```

Page 73

1        Q.   And the -- Before you discuss the estimate      01:12:22

2    with the customer, did they train you about, like,

3    determining what type of coverage the customer had?

4        A.   Yes, they talk about coverages.

5        Q.   Okay.  And what did they train you with         01:12:34

6    respect to determining coverage?

7        A.   To determine coverage, to see -- first to

8    determine coverage to see if it's an actual loss for

9    fire.  It's -- You know, long as it was not

10   intentional, it's a covered loss.                        01:12:51

11            If it was a water loss, it would be -- you

12   know, if it's accidental, sudden accidental, it's

13   covered lost.

14       Q.   And specifically, though -- like, certain

15   customers would be entitled to different types of        01:13:07

16   compensation depending on the type of policy they

17   purchased; is that correct?

18       A.   I could say yes, okay.  Yes.

19       Q.   How -- And could you describe how that --

20   those differences would work?                            01:13:17

21       A.   Some policies are ACV only, so they don't

22   get the depreciation back.  And some could recover

23   the depreciation.

24       Q.   And what types of policies can you recover

25   the depreciation?                                        01:13:35

                                            Page 74

```
 1          A.    Replacement cost policies.              01:13:36

 2          Q.    Okay.  And are there variations in

 3     replacement cost policies?

 4          A.    There's --

 5          MR. FELDMAN:  Overbroad.                      01:13:50

 6          THE WITNESS:  Your -- There's good policies in

 7     terms of different kind of policies.  Some have

 8     building codes; some don't have building code.

 9          MR. HOOK:

10          Q.    Any other differences?                  01:14:02

11          A.    There's condo policies.

12          Q.    And so what's building code?  What is that

13     called?

14          A.    Building code.

15          Q.    Building code endorsement?  Building code 01:14:15

16     rider?  What is it -- Does it have any sort of a

17     more technical term than just building code?

18          A.    I refer to it as a BC coverage.

19          Q.    BC coverage?

20          A.    A acronym for building code.            01:14:26

21          Q.    And what is BC coverage?

22          A.    It -- Well, if -- if you have a loss and

23     you have, let's say, the City -- you pull permits

24     and the City does an inspection, and they call

25     something on it that's mandated by the City and it  01:14:47
```

                                                     Page 75

```
 1     wasn't there, then the building code would pay for      01:14:49
 2     it because it's mandated by the City.
 3         Q.   So that's a special -- How would you define
 4     that?  As a special feature of a policy?
 5         A.   It's -- It's just in -- some policies carry   01:15:00
 6     it; some don't.  Most of our deluxe policies do
 7     carry building code, but then our -- your homeowners
 8     policy, some do and some don't, depending on what
 9     they purchase.
10         Q.   Okay.  And what did the Bakers have?          01:15:13
11         A.   I -- I'm not -- I believe they have
12     building code on their -- on their policy.
13         Q.   Do you know or not?  Do you --
14         A.   I don't remember correctly if I don't have
15     the policy in front of me.                             01:15:28
16         Q.   Would that have been an important fact in
17     determining what the replacement cost estimate would
18     have been after first seeing the loss?
19         MR. FELDMAN:  Lacks foundation.
20         THE WITNESS:  Well, that depends, because that     01:15:41
21     pretty much comes after when the City gets involved
22     and -- because the only way you can award the BC
23     coverage is if the inspector calls something out on
24     them and notes it or documents it, then we can pay,
25     yeah, building code coverages on it.                   01:15:56
```

Page 76

```
 1          MR. HOOK:                                      01:15:59

 2          Q.   And --

 3          A.   But it wouldn't be in the front end because

 4     it hasn't been through inspection.

 5          Q.   Okay.  So how do you determine at the front  01:16:04

 6     if that's going to be required in the course and

 7     scope of a project such as a massive water loss?

 8          MR. FELDMAN:  Lacks foundation.

 9          THE WITNESS:  That goes -- depends on the

10     building -- the building inspector going out there  01:16:16

11     and documenting that these things are mandated.

12          MR. HOOK:

13          Q.   Okay.  So when you went to the Bakers'

14     house, did you think that there was going to be a

15     substantial remediation or rebuild effort required?  01:16:27

16          MR. FELDMAN:  Lacks foundation, vague.

17          THE WITNESS:  Initially when they were out

18     there, they were in the midst of mitigating, so

19     they -- they were -- they were in the middle of it,

20     so I -- I couldn't tell you that it was going to be  01:16:48

21     a big loss or a small loss because they were in the

22     midst of it.  But we can at least get some grasp of

23     what it was.

24          MR. HOOK:

25          Q.   Okay.  So we're getting a little far       01:16:57
```

Page 77

```
 1    afield.                                            01:16:59

 2         So going back to the training, we talked

 3    about the role-playing, and you talked about, you

 4    know, telling a customer about an estimate.  Did

 5    Allstate teach you how to deal with customers who   01:17:12

 6    were upset about the estimate quoted?

 7       A.   No.  I -- They didn't train -- I don't

 8    think we had any training on that, if somebody was,

 9    you know, upset.

10       Q.   Did they ever teach you strategies for      01:17:24

11    trying to settle a claim with a customer who was

12    being difficult or unreasonable?

13       A.   I don't recall having that.

14       Q.   No training in that whatsoever?

15       A.   I don't recall having that -- that training 01:17:38

16    on that.

17       Q.   It's possible that you did?

18       A.   I -- I don't think so, that there was a --

19    No, I don't think we had that kind of training.

20       Q.   No?                                         01:17:48

21       A.   I don't recall they had it on me, so --

22       Q.   You never had that type of training?

23       A.   No.

24       Q.   Did you ever receive written materials from

25    Allstate or any supervisor at Allstate regarding    01:17:56
```

Page 78

```
 1        policies and procedures for dealing with an insured    01:17:59

 2        when you're having difficulty settling a portion of

 3        the claim with them?

 4            A.   I didn't get any information like that from

 5        my superiors, no.  I --                                01:18:12

 6            Q.   Never?

 7            A.   No.

 8            Q.   You were never trained -- That was never a

 9        topic of training?

10            A.   For difficult -- Are you saying upset         01:18:19

11        customer?  Are you talking about --

12            Q.   Resolving a difficult --

13            A.   Situation.

14            Q.   Yeah.

15            A.   I pretty -- You know, I try to solve it        01:18:27

16        myself.  They don't say how to solve the difficult

17        customer.  You know, I think that comes with

18        experience.

19            Q.   Okay.  I'm just asking if they provided --

20        if Allstate Insurance Company provided you with any    01:18:37

21        training on that topic.

22            A.   No, I haven't got any training on that.

23            Q.   Okay.  So what happened during the second

24        week of your insurance training in Chicago?

25            A.   So if I remember correctly, we moved on to    01:18:55
```

Page 79

| | | |
|---|---|---|
| 1 | different such coverages, like fire, and then it | 01:19:00 |
| 2 | would be wind, and it would be water.  We started | |
| 3 | getting up on these makeshift roofs to get on top, | |
| 4 | and we counted how many shingles were missing so we | |
| 5 | could put into the estimate.  If it was more than a | 01:19:13 |
| 6 | certain amount, we would replace it. | |
| 7 | Q.   And what else in the second week? | |
| 8 | A.   Think here.  It was just -- just | |
| 9 | estimating.  Rooms.  We got into framing -- | |
| 10 | estimating framing, stud walls, roof rafters. | 01:19:35 |
| 11 | Q.   Okay.  So of the two weeks, what percentage | |
| 12 | of the training was dedicated to estimating? | |
| 13 | A.   Well, it was all -- It was dedicated to | |
| 14 | estimating practices.  I would say a good portion of | |
| 15 | it was -- The estimate kind of goes hand in hand | 01:19:57 |
| 16 | with the training, so we're -- we're -- we're using | |
| 17 | the Xactimate estimating system in conjunction with | |
| 18 | the -- all the props that are out there so we can | |
| 19 | come to a -- | |
| 20 | Q.   And how -- How much training did you | 01:20:13 |
| 21 | receive from Allstate regarding the California | |
| 22 | regulations governing the practice of insurance? | |
| 23 | A.   We take a yearly test on that. | |
| 24 | Q.   How much training did you receive from | |
| 25 | Allstate regarding the specific requirements of | 01:20:32 |

Page 80

1    California law dealing with the adjustment of          01:20:36

2    property loss claims?

3         A.   We received some training, but I think our

4    superiors try to do ride-alongs with us.

5         Q.   Tell me about the training.  I want to know  01:20:54

6    about the training that you received from Allstate

7    regarding specifics of California law.  What

8    specific training did you receive?

9         A.   We tried to -- They try to get, you know,

10   our e-mails done in a certain time manner, our         01:21:06

11   estimates up in a certain time manner.

12        Q.   And what are the California regulations

13   pertaining to those timeliness rules?

14        MR. FELDMAN:  Calls for a legal conclusion.

15             You can give your understanding.            01:21:20

16        THE WITNESS:  Well, for, like, returning calls

17   and e-mails, it's, like, 15 days.

18        MR. HOOK:

19        Q.   What else?

20        A.   Estimate's like 40 days.                     01:21:42

21        Q.   What else?

22        A.   That's all I could think of at this point.

23        Q.   So specifically what were you told about

24   estimates in 40 days?

25        A.   We have to get estimates up, but it          01:22:03

                                                  Page 81

```
 1      depends.  Sometimes we can have a public adjuster      01:22:04

 2      involved, and it takes a little longer, or depends

 3      on the nature of the estimate.

 4          Q.   Tell me what Allstate told you about the

 5      40-day estimate deadline, specifically.  That's all   01:22:14

 6      I want to know from you right now.

 7          A.   Well, the -- the tests that we take on --

 8      the test tell us we gotta get our estimates up at a

 9      certain time.

10          Q.   I don't understand what you mean, "gotta     01:22:31

11      get our estimates up."  What are you --

12          A.   Our estimates are -- Our estimate's to be

13      uploaded and settled and -- and try to get our

14      estimates in a timely manner.  40 days is my

15      understanding that we are supposed to get those to    01:22:45

16      our customers.

17          Q.   So if a customer submits an estimate to you

18      for construction to rebuild their house --

19          A.   Yes.

20          Q.   Okay.                                        01:22:54

21               -- you're supposed to respond within 40

22      days; correct?

23          A.   Correct.  But --

24          Q.   Is that what Allstate trained you?

25          A.   It depends --                                01:23:01
```

Page 82

```
 1          Q.   Okay.                                    01:23:03

 2          A.   -- the nature of the estimate.  Some are

 3     ambiguous.  Some could be small.  I don't think they

 4     hold me to the rule that you have to do it on 40

 5     days.  It depends.                                  01:23:12

 6          Q.   So Allstate said it depends.  You don't

 7     have to respond in 40 days?

 8          A.   I didn't say that, but that's my

 9     understanding.

10          Q.   Okay.  And what other specifics did       01:23:22

11     Allstate train you in with respect to California

12     law?

13          A.   I can't recall.

14          Q.   Did you ever receive training in how to

15     properly prepare an estimate for replacement cost   01:23:38

16     value?

17          MR. FELDMAN:  Vague.

18          THE WITNESS:  That's -- Our training was in

19     Chicago.  That's the training we got to estimate.

20          MR. HOOK:                                      01:23:50

21          Q.   Okay.  Did they ever provide you specific

22     training with regard to California requirements for

23     a replacement cost estimate?

24          A.   Well, that's what we -- we are trained in,

25     in that respect to California, because that's where  01:24:07
```

Page 83

```
 1      we take our test and that's where we put estimates      01:24:10

 2      together.

 3          Q.   Okay.

 4          A.   And so the training pretty much becomes

 5      something where we just gotta -- with experience, we    01:24:15

 6      get better and better from there.

 7          Q.   Okay.  So you don't have to comply with the

 8      regulations on day one of the job; right?

 9          MR. FELDMAN:  Lacks foundation, misstates his

10      testimony.                                               01:24:25

11          THE WITNESS:  I'm not sure if that's true.

12          MR. HOOK:

13          Q.   So you do have to comply with the

14      regulations on day one of your job; right?

15          A.   I would say so.                                01:24:33

16          Q.   So what did you tell me specifically what

17      they taught you, Allstate Insurance Company, about

18      preparing a replacement cost estimate as opposed to

19      an actual cost estimate?

20          A.   Well, replacement --                           01:24:50

21          MR. FELDMAN:  Lacks foundation because it

22      misstates the terms.

23              But go ahead.

24          THE WITNESS:  The actual costs -- The ACV

25      amount, or we call it the actual cost value, is --      01:25:05
```

Page 84

```
 1      does not include depreciation.                    01:25:08

 2          MR. HOOK:

 3          Q.   Actual cost value does not include

 4      depreciation?

 5          A.   I'm sorry.  It does include depreciation.  01:25:16

 6      My mistake.

 7          Q.   But with respect to -- Did Allstate ever

 8      tell you that there were special procedures that

 9      needed to be followed when you communicate a

10      replacement cost estimate to a customer?          01:25:29

11          A.   They want us, yes, to explain to our

12      customers our -- our estimates to --

13          Q.   Sir, I'm asking you a really specific

14      question.  Okay?

15              I'm just talking about a replacement cost  01:25:44

16      estimate, not --

17          A.   Yes.

18          Q.   -- an actual cost estimate.

19          A.   Yes.

20          Q.   Do you understand what I mean?            01:25:52

21          A.   Yes.

22          Q.   A replacement cost estimate.

23              Did Allstate ever tell that you there were

24      particular requirements regarding written

25      replacement cost estimates that were transmitted to  01:26:03
```

                                                 Page 85

```
 1     your insured?                                    01:26:06

 2          A.   I'm not understanding.

 3          MR. FELDMAN:  Vague.

 4          THE WITNESS:  I'm sorry.  I'm not understanding

 5     you.                                             01:26:13

 6          MR. HOOK:

 7          Q.   Did Allstate ever tell that you there were

 8     special rules relating to communicating a

 9     replacement cost estimate to an insured?

10          A.   To explain it to them, is my understanding.  01:26:25

11     To explain the estimate to the insured, yes.

12          Q.   But not an actual cost value?

13          A.   An actual cost value, yes, because we would

14     tell -- we would tell them that there's depreciation

15     being held back.                                 01:26:37

16          Q.   Take a look at this, sir.

17          THE REPORTER:  Can I have one.

18          MR. HOOK:  Yes (indicating).

19               We're going to attach this as -- What are

20     we at?  Exhibit 2.                               01:27:08

21               (Whereupon the document referred to

22               is marked by the reporter as

23               Plaintiff's Exhibit 2 for identification.)

24               (Interruption in proceedings.)

25          MR. HOOK:                                   01:27:38
```

Page 86

```
 1          Q.   Sir, can you read off the section of code    01:27:39
 2      that I set before you, please.
 3          A.   This one here?
 4          Q.   Yes.  At the top.
 5          A.   "No licensee shall communicate" --           01:27:45
 6          Q.   No.  The title of the code section.
 7          A.   Oh, title.  I'm sorry.
 8               "Barclays Official Code of Regulations
 9      Currentness.
10               "Title 10. Investment.                        01:27:58
11               "Chapter 5. Insurance Commissioner.
12               "Subchapter 7.5. Unfair" for Deceptive Acts
13      or Practices in the Business Insurance.
14               "Article 1.3. Valuations of Homes."
15          Q.   Okay.  Go ahead.  Keep reading.               01:28:13
16          A.   "10 CCR 2695.183. Standards for Estimates
17      of Replacement Value."
18          Q.   Okay.  Now, go ahead.  Keep reading.
19          A.   "No licensee shall communicate an estimate
20      or replacement cost to an applicant or insured in     01:28:30
21      connection with an" applicant "for...renewal of a
22      homeowners' insurance policy that provides coverage
23      on a replacement cost basis, unless the" requirement
24      standard "set forth in subdivisions (a) through (e)
25      below are met."                                        01:28:51
```

Page 87

```
 1          Q.    Keep reading.                          01:28:53

 2          A.    "The estimate of replacement cost shall

 3     include the expenses that would reasonably be

 4     incurred to rebuild the insured structure in its

 5     entirety, including at least the following."       01:29:02

 6          Q.    Keep reading.

 7          A.    "Cost of labor, building materials and

 8     supplies;

 9                "Overhead and profit;

10                "Cost of demolition and debris removal;    01:29:14

11                "Cost of permits and architect plans;...

12                "Consideration of components and features

13     of the insured structure, including at least the

14     following:

15                "(A) Type...foundation;                 01:29:26

16                "(B) Type of frame;

17                "(C) Roofing" material "and type of roof;

18                "(D) Siding materials and type of siding;

19                "(E) Whether the structure is located on a

20     slope;                                            01:29:44

21                "(F)  The square footage of the living

22     space;

23                "(G)" the "Geographic location of" the

24     "property;

25                "(H) Number of stories and any nonstandard  01:29:58
```

Page 88

```
 1     wall heights;                                          01:30:02

 2            "(I) Materials used in...generic types of

 3     interior features and finishes, such as, where

 4     applicable, the type of heating and air conditioning

 5     system, walls," floors, "ceilings, fireplaces,         01:30:14

 6     kitchen, and bath(s);

 7            "(J) Age of the structure or the year it

 8     was built; and

 9            "(K) The size and type of the attached

10     structure."                                            01:30:30

11       Q.    Please keep reading.

12       A.    "(b) The estimate of" the "replacement cost

13     shall be based on" the "estimate of the cost to

14     rebuild or replace the structure taking into account

15     the cost" of "reconstruct the single property being    01:30:42

16     evaluated, as compared to the cost to build

17     multiple, or tract, dwellings.

18            "(c) The estimate of replacement cost shall

19     not be based upon the resale value of the land, or

20     upon amount or outstanding balance of any loan.        01:31:00

21            "The estimate of the replacement cost

22     shall...include a deduction for physical

23     depreciation."

24       Q.    Actually, you misread that.  Can you read

25     that again.                                            01:31:13
```

Page 89

1          A.    I'm sorry.                              01:31:14

2               "(e) -- "(d) The estimate of replacement

3          cost shall not include a deduction for physical

4          depreciation.

5               (e) The licensee shall no less frequently   01:31:24

6          than annually take reasonable steps to verify that

7          the sources and methods used" in -- "to generate the

8          estimate of replacement cost are kept current to

9          reflect changes in the costs of reconstruction and

10         rebuilding, including changes in labor, building    01:31:41

11         material, and supplies, based upon the geographic

12         location of the insured structure.  The estimate" or

13         "replacement cost shall be created using such"

14         reasonable "current sources and methods.

15              "Except as provided in subdivision (k) of   01:32:02

16         this Section 2695.183, the provisions of this

17         article are binding upon" licenses, "notwithstanding

18         the fact that information, data or statistical

19         methods used or relied upon by a licensee to

20         estimate replacement costs may be obtained through a   01:32:21

21         third party source.  Any and all information

22         received" in "Department pursuant to this article

23         shall be accorded the degree of" confident

24         "treatment required by section 735.5 of the

25         Insurance Code or Chapter 2 of Part 1 of Division 3   01:32:41

Page 90

```
1        of Title 2 of the Government Code, commencing" on        01:32:46

2        "11180.

3             (g)(1) If a licensee communicates an

4        estimate of replacement cost to an applicant or

5        insured in connection with" the -- "with an          01:33:04

6        application for renewal of a homeowners' insurance

7        policy that provides coverage on a replacement cost

8        basis, the licensee must provide a copy of the

9        estimate of" the "replacement cost to the applicant

10       or insured at the time the estimate is communicated.  01:33:24

11       However, in the event the estimate of replacement

12       cost is communicated by a licensee to an applicant

13       to whom the licensee determines an insurance policy

14       shall not be issued, then the licensee is not

15       required pursuant to the preceding sentence to        01:33:42

16       provide a copy of the estimate of" the "replacement"

17       costs.  "In the event the estimate of the

18       replacement cost is communicated by telephone to an

19       insured, the copy of the estimate shall be mailed to

20       the insured no later than three days after the time   01:33:59

21       of the telephone conversation.  In the event the

22       estimate of replacement cost is communicated by

23       telephone to an applicant, the copy of the estimate

24       shall be mailed to the applicant no later than three

25       business days after the applicant agrees to purchase  01:34:19
```

                                                    Page 91

```
 1        the coverage.                                       01:34:22

 2             "(2) An estimate of replacement cost

 3        provided in connection with...application for or

 4        renewal of the homeowners' insurance policy that

 5        provides coverage on a replacement cost basis must  01:34:33

 6        itemize the projected costs for each element

 7        specified...paragraphs (a)(1) through (a)(4), and

 8        shall identify the assumptions made for each of the

 9        components and features listed in paragraph (a)(5),

10        of this Section 2695.183.                           01:34:51

11             "If an estimate of replacement cost is

12        updated or revised by, or on" the "behalf...the

13        licensee and the revised estimate of replacement

14        cost is communicated to the applicant or insured in

15        connection with" the "application for...renewal of a 01:35:09

16        homeowners' insurance policy that provides coverage

17        on a replacement cost basis, the licensee shall

18        provide a copy of the revised or updated estimate of

19        replacement cost to the" app- -- and provide a --

20        "in paragraph (g)(1) of this Section 2695.183, or to 01:35:27

21        the insured simultaneously with the renewal offer,

22        as the case may be.  This subdivision (h) shall not

23        apply when the update or revision to the estimate of

24        the replacement cost or the policy" limits "results

25        solely from...application of" inflush- -- infla- --  01:35:49
```

Page 92

| | | |
|---|---|---|
| 1 | I cannot -- "inflationary" provisions "in a policy | 01:35:55 |
| 2 | or...inflation factor.  This subdivision (h) shall | |
| 3 | not obligate a licensee to recalculate an estimate | |
| 4 | of replacement cost on" the -- "on an annual basis." | |
| 5 | Q.   Right.  Go down to (j), please.  Skip (i). | 01:36:15 |
| 6 | Okay. | |
| 7 | A.   "To communicate an estimate of replacement | |
| 8 | value not" comfort -- "not comporting with | |
| 9 | subdivisions (a) through (e) of this | |
| 10 | Section 2695.183 to an applicant or insured in | 01:36:32 |
| 11 | connection with an" applicant "for" a "renewal of a | |
| 12 | homeowners' insurance policy that provides coverage | |
| 13 | on a replacement cost basis constitutes making a | |
| 14 | statement with" the "respect" of "the business of | |
| 15 | insurance which is misleading and which" is | 01:36:50 |
| 16 | "by...exercise of reasonable care should be known to | |
| 17 | be misleading, pursuant to Insurance Code | |
| 18 | Section 790.03." | |
| 19 | Q.   Thank you.  Are you familiar with this | |
| 20 | provision of the California Code of Regulations, | 01:37:08 |
| 21 | sir? | |
| 22 | A.   I am now after reading this, yes. | |
| 23 | Q.   Allstate doesn't provide you with a copy of | |
| 24 | these? | |
| 25 | A.   I can't say if I ever got this and read it | 01:37:19 |

Page 93

```
 1    in this detail.                                    01:37:21

 2         Q.   Allstate Insurance Company never gave you

 3    these regulations, as far as you know?

 4         A.   They could --

 5         MR. FELDMAN:  Hold.  It's a different question, 01:37:32

 6    so it's vague.

 7         MR. HOOK:

 8         Q.   This is where it would be nice for you to

 9    have your own attorney present.  I'm just going to

10    throw that out there.                              01:37:39

11         MR. FELDMAN:  I just want you to -- It's a vague

12    question, because first you called it --

13         MR. HOOK:  It's not a vague question.

14         Q.   Did you get these regulations or not?

15         MR. FELDMAN:  Which -- This regulation?  That   01:37:46

16    was the first question.  This one, 2695.183.

17         MR. HOOK:  California Code of -- yes.

18         MR. FELDMAN:  Okay.  Well, it wasn't clear.

19    That's why it was vague.  Now you've clarified.

20         Did you get this regulation 2695.183?          01:37:59

21         THE WITNESS:  I don't recall getting this.

22         MR. HOOK:

23         Q.   You don't recall receiving that?

24         A.   No.

25         Q.   Did you ever receive any training on that  01:38:06
```

Page 94

```
 1      from Allstate?                                    01:38:09

 2          A.   I -- I believe I did.  It was a course that

 3      you go through, an LRN course that you --

 4          THE REPORTER:  A what course?

 5          THE WITNESS:  An LRN course.  I forgot what the  01:38:24

 6      acronym stands for, but it's to keep everybody up to

 7      date on the regulations.

 8          MR. HOOK:

 9          Q.   When?

10          A.   I forget the -- I think it's every year.   01:38:31

11          Q.   When did you take an LRN on CCR 2695.183?

12          MR. FELDMAN:  Lacks foundation.  Assumes facts

13      not in evidence.

14          THE WITNESS:  I don't know when that was.  I

15      can't identify this one.                           01:38:49

16          MR. HOOK:

17          Q.   Just be really honest, sir.  Did you ever

18      receive any specific training from Allstate

19      regarding these specific requirements?

20          MR. FELDMAN:  Argumentative.  And you're talking  01:38:59

21      about 2695.183?

22          MR. HOOK:  Yeah.

23          Q.    The specific -- The requirements that we

24      just read through, preparing a replacement cost

25      estimate.  Did Allstate ever train you specifically  01:39:07
```

Page 95

```
 1      regarding those detailed requirements?                01:39:10

 2          MR. FELDMAN:  Well, it misstates the document,

 3      so you're referring specifically to --

 4          MR. HOOK:  Just state your objection.

 5          MR. FELDMAN:  You're misstating the document       01:39:17

 6      because the document says a lot about replacement

 7      cost estimates, but it's all in connection with an

 8      application or renewal for a policy of insurance.

 9      So if you're going to omit that from your

10      characterization of the document, you're misstating   01:39:30

11      the document.  I'm fine if you don't want to refer

12      to it by its section name so that's clear.

13          MR. HOOK:  Are you done?

14          MR. FELDMAN:  Yeah.

15          MR. HOOK:                                          01:39:38

16          Q.  Did you hear the question, sir?

17          A.  Go ahead.  I'm sorry.

18          Q.  Did Allstate ever train you in the

19      specifics regarding the preparation of the standards

20      of estimates of replacement value that you just       01:39:45

21      read?

22          A.  I -- I don't recall this particular one,

23      the one you handed to me.  I don't recall.

24          Q.  Did you recall them training you on any of

25      those standards that are described in those           01:39:58
```

                                                        Page 96

```
 1      regulations?                                    01:40:01

 2          A.   You know, there's so much more in here, I

 3      cannot give you my honest opinion.  I don't recall.

 4      But we do take courses, and we go through them and

 5      try to --                                       01:40:26

 6          Q.   So would you say that estimates -- the

 7      estimate that you got from Baldwin that you used to

 8      adjust this claim complied with this statute?

 9          MR. FELDMAN:  Lacks foundation, misstates the

10      law, assumes facts not in evidence.             01:40:37

11          THE WITNESS:  I can't say that.  That depends.

12      I mean I --

13          MR. HOOK:

14          Q.   Did you consider whether it complied with

15      any of these standards before you communicated it to 01:40:49

16      the Bakers?

17          MR. FELDMAN:  Lacks foundation, based on a false

18      assumption.

19          THE WITNESS:  Yeah.  I -- I -- I can't tell you

20      if it was or not.  I couldn't tell you that.    01:41:05

21          MR. HOOK:

22          Q.   What I just want to know, did you or did

23      you not --

24          A.   I --

25          Q.   -- consider these regulations, you know,  01:41:11
```

                                                        Page 97

```
 1     whether it was by -- any of these factors when you    01:41:15

 2     saw the Baldwin estimate?

 3          A.   Overhead.  I considered overhead on

 4     Baldwin's estimate, yes.

 5          Q.   Okay.                                        01:41:25

 6          A.   (Unintelligible) and profit, yes.

 7          Q.   And did it contain a budget for permits and

 8     architect plans?

 9          A.   Well, it wouldn't have the actual value,

10     but we'll leave that as an open item because we       01:41:39

11     don't know the actual value of permits and plans.

12          Q.   What did you tell the Bakers regarding

13     getting a designer involved for their house?

14          A.   I didn't tell them about getting a

15     designer.  He submitted his paperwork.                01:41:53

16          Q.   Did you pay his bills?

17          A.   Yes.

18          Q.   You did?  When?

19          A.   I don't know the exact date.

20          Q.   Did you pay all of them?                    01:42:01

21          A.   As much as he submitted, I tried to pay all

22     of them, yes.  I tried to pay most of his bills that

23     he submitted.

24          Q.   So you'll pay all of the bills for the

25     architect --                                          01:42:11
```

Page 98

```
 1        A.    I didn't say I'm going to pay all the bill.    01:42:11

 2   I say I'm going to pay whatever he submitted.

 3        Q.    You'll pay whatever he submits?

 4        A.    Well, I have to evaluate and make sure that

 5   it makes sense, that it's related to the claim.        01:42:20

 6        Q.    Okay.  So you agree that an architect

 7   should be consulted?

 8        A.    I'm not certain that an architect should be

 9   consulted in -- in his house.  From my experience,

10   my understanding, it varies.  It depends.  Depends    01:42:38

11   on what city you're in, depends the nature of the

12   job.

13        Q.    What if you're in a hundred-year-old

14   historic house in Hancock Park worth 3 and a half

15   million dollars, you think it might be important to    01:42:55

16   get some consultants involved?

17        MR. FELDMAN:  Incomplete hypothetical,

18   overbroad.

19        THE WITNESS:  That depends.

20        MR. HOOK:                                        01:43:02

21        Q.    Depends.

22        A.    Well, it depends, because some Cities are

23   different.  His may be qualified for that because

24   it's under HPOZ.  I'm not certain, because I don't

25   have anything from the City saying that it's          01:43:11
```

Page 99

```
 1    required.                                           01:43:13

 2         Q.   Did you investigate that?

 3         A.   I did not, but if -- if Mr. -- Bakers

 4    submitted their bill for that, I did my due

 5    diligence to try to help move the claim forward and  01:43:22

 6    I paid for it.

 7         Q.   You were busy trying to stiff Servpro out

 8    of a few thousand dollars.

 9         A.   I was not --

10         MR. FELDMAN:   Argumentative.                  01:43:32

11         THE WITNESS:   I was not trying to stiff anybody.

12    I'm sorry, but I don't -- I don't want to stiff the

13    mitigation company.

14         MR. HOOK:

15         Q.   All right.                                01:43:38

16         So let's get back to the claim, then, and

17    we'll get back to the specifics, timeline, then, of

18    how you handled it and see if that's true.

19         So when was that first -- We spent about an

20    hour for you looking through the claim notes to      01:43:55

21    discern what day you first visited the subject

22    property.

23         Do you have an answer for me that you can

24    give under oath as to what was the first day you

25    went to the property after the subject loss?         01:44:06
```

Page 100

```
 1          MR. FELDMAN:  It's argumentative, misstates what   01:44:08

 2     happened here.  Didn't spend an hour looking for it.

 3          THE WITNESS:  I looked through the claim file,

 4     and I inspected the loss on the 9th of October, but

 5     I did put a note of going further beyond that just   01:44:25

 6     to show I -- I indicated that I inspected the loss.

 7          MR. HOOK:

 8          Q.   What time did you inspect the loss?

 9          A.   About 10:00ish, 10:00 o'clock in the

10     morning.                                             01:44:45

11          Q.   Who was there?

12          A.   Michelle Phan from Baldwin Construction.

13     Mackey Construction was there.

14          Q.   Who else?

15          A.   Mr. Baker was there.                       01:45:09

16          Q.   The gentleman sitting to my right?

17          A.   Yes.  Mr. Alan Baker, yes.

18          Q.   Who else?

19          A.   I think the Servpro team was there the

20     first --                                             01:45:22

21          Q.   Anyone else?

22          A.   Let me think here.  I don't know his name,

23     but Dana Mackey Construction had senior -- I believe

24     it was his father that was there.

25          Q.   Can you recall anybody else being present?   01:45:46
```

Page 101

```
 1        A.    Linda Oliver was there.                    01:45:56

 2        Q.    Linda Oliver, the insured?

 3        A.    Yes, yes.

 4              I -- Some other people from Servpro.  I

 5   know there was a gentleman, then, who was the        01:46:10

 6   supervisor, but I can't remember his name.

 7        Q.    What supervisor?

 8        A.    I think it was a supervisor for the Servpro

 9   team.

10        Q.    Describe Linda Oliver to me when you first  01:46:38

11   observed her.

12        MR. FELDMAN:  Vague.

13        THE WITNESS:  Appears to be a nice lady.

14        MR. HOOK:

15        Q.    What is her physical appearance?           01:46:46

16        A.    She -- Physical appearance?

17        Q.    White?  Black?  6 feet?  5 feet?

18        A.    I think -- If I remember, she was a little

19   tall.  Yeah, she was --

20        Q.    Was she white-skinned?  Brown-skinned?     01:47:02

21   Black-skinned?

22        A.    White skin.

23        Q.    White skin, tall.

24              Thin?  Heavy-set?

25        A.    I don't think she was heavy.               01:47:12
```

Page 102

```
 1            Q.    Medium build?                        01:47:14

 2            A.    Medium build.

 3            Q.    Okay.  What color hair?

 4            A.    I can't remember a color hair.

 5            Q.    How old was she?                      01:47:21

 6            A.    I don't know how old she was.

 7            Q.    Teenager?

 8            A.    No, not a teen- -- I don't know.

 9            Q.    Mr. Baker's age probably?

10            A.    Probably close --                     01:47:31

11            Q.    How old do you think Mr. Baker is?  You're

12      an estimator; right?

13            MR. FELDMAN:  Well, argumentative.

14            THE WITNESS:  I don't estimate age, but I can

15      give a guess.                                     01:47:41

16            MR. HOOK:

17            Q.    What's your best estimate?

18            A.    68.

19            Q.    Okay.  What was your estimate for how old

20      Linda Baker was?                                  01:47:48

21            MR. FELDMAN:  Lacks foundation.

22            MR. HOOK:

23            Q.    Linda Oliver.

24            A.    I don't know her actual age.  I --

25            Q.    But you just estimated his and you saw her,  01:47:54
```

Page 103

```
 1      too; right?  So what's your best estimate?  Give me    01:47:56
 2      a range.
 3          MR. FELDMAN:  Lack of foundation, calls for
 4      speculation.
 5          THE WITNESS:  Yeah.  I don't know her -- I can't    01:48:01
 6      remember.
 7          MR. HOOK:
 8          Q.   You can give me any range, and as long as
 9      it's like, you know, 40 to 80 -- Just give me the
10      best range you can.  Like, she's definitely between    01:48:10
11      five and a hundred; right?
12          A.   Between maybe 50 and 70, somewhere in
13      there.
14          Q.   Okay.  Fair enough.
15               And what did you -- And you saw Mr. Baker      01:48:25
16      there.  He looked about the same, right, in terms of
17      age?
18          A.   Yes.
19          Q.   Didn't look substantially older or younger
20      at the time?                                           01:48:36
21          A.   No.  He looked the same.
22          Q.   Was the same.  Okay.
23               And what did you first observe about the
24      loss?
25          A.   Well, the entryway, right away, we could      01:48:45
```

                                                    Page 104

| | | |
|---|---|---|
| 1 | see that there was damage in the ceiling. | 01:48:48 |
| 2 | Q.   So tell me -- So you arrived at the | |
| 3 | property.  What's the neighborhood like? | |
| 4 | A.   Lot of older homes, nice homes. | |
| 5 | Q.   What's the neighborhood called? | 01:49:00 |
| 6 | A.   I don't recall the neighborhood.  I don't | |
| 7 | remember. | |
| 8 | Q.   Big homes? | |
| 9 | A.   Good size homes. | |
| 10 | Q.   Anything else strike you about the homes? | 01:49:11 |
| 11 | A.   They're nice homes, nice neighborhood. | |
| 12 | Q.   Okay.  Then what did you observe about the | |
| 13 | Bakers' home when you first showed up on the 9th? | |
| 14 | Is that the first time you had been to the property? | |
| 15 | A.   First time I was at the property, I saw his | 01:49:29 |
| 16 | house was at -- he had a nice house. | |
| 17 | Q.   And was there water coming out of the house | |
| 18 | when you showed up or -- | |
| 19 | A.   No, there was no water coming out. | |
| 20 | Q.   So you showed up.  What was the state of | 01:49:40 |
| 21 | the house? | |
| 22 | A.   Well, it was being, at the time, demoed, | |
| 23 | and there was equipment that was trying to dry | |
| 24 | things and people moving around.  Just people trying | |
| 25 | to organize and coordinate the efforts, I guess, to | 01:49:59 |

Page 105

```
 1     start, you know, getting things moving on that          01:50:06

 2     claim, so --

 3          Q.   Did it look like a pretty large water loss

 4     event had occurred to you?

 5          A.   Yeah.  It -- It was pretty -- It was --        01:50:17

 6     Yeah, it's a good -- It was a large loss, yes.

 7          Q.   What had been damaged?

 8          A.   Plaster.  I remember seeing the wood floors

 9     were buckling.  There was plaster upstairs.

10     Wallpaper, wood floors.  I think one of the rooms        01:50:36

11     had carpet on it that was -- they pulled it back.

12     And just a lot of wood floors throughout the house,

13     lot of plaster.  There was also crown molding.

14          Q.   What was your estimate of the size of the

15     house?  And again, you can give me a range of your       01:51:08

16     recollection of what the house was.

17          A.   Over -- My first recollection of what I

18     thought it cost to --

19          Q.   No, no, no.  The size of the house.

20          A.   Oh, the size.                                  01:51:22

21          Q.   Yeah, square footage.  Was it a --

22          A.   Square footage, 3- to 4,000 square feet.

23          Q.   And how much of the house -- two-story

24     house; right?

25          A.   Yes.                                           01:51:31
```

                                        Page 106

| | | |
|---|---|---|
| 1 | Q.   Hardwood floors? | 01:51:32 |
| 2 | A.   Yes. | |
| 3 | Q.   Plaster walls? | |
| 4 | A.   Yes. | |
| 5 | Q.   High-end furnishings and decorations? | 01:51:36 |
| 6 | MR. FELDMAN:  Vague. | |
| 7 | THE WITNESS:  I didn't see that part. | |
| 8 | MR. HOOK: | |
| 9 | Q.   Most had been removed? | |
| 10 | A.   Yes.  They -- They were moved.  I couldn't | 01:51:43 |
| 11 | see those. | |
| 12 | Q.   Would that have been consistent with the | |
| 13 | neighborhood and type of house, to see high-end | |
| 14 | furnishings inside? | |
| 15 | MR. FELDMAN:  Lacks foundation, calls for | 01:51:53 |
| 16 | speculation. | |
| 17 | THE WITNESS:  I didn't see the furniture so I -- | |
| 18 | I don't know what they had there. | |
| 19 | MR. HOOK: | |
| 20 | Q.   Okay.  And then so of the 3- to 4,000 | 01:51:59 |
| 21 | square-foot two-story house, how much had been | |
| 22 | inundated with water? | |
| 23 | MR. FELDMAN:  Argumentative, vague. | |
| 24 | THE WITNESS:  That's -- I couldn't tell at the | |
| 25 | time how -- how much damage, but there was -- there | 01:52:13 |

Page 107

```
 1     was damage to the first floor and -- and second          01:52:15

 2     floor.  I don't know -- Approximately -- I don't

 3     know how much was damaged because --

 4         MR. HOOK:

 5         Q.  Was it -- Was it less than half of the           01:52:23

 6     house or more than half of the house?

 7         A.  Well, I think was maybe half.  I would lean

 8     towards half of the house.

 9         Q.  So about half of the house had suffered

10     water damage; right?                                    01:52:37

11         A.  Yes.

12         Q.  Was the water damage mild, moderate or

13     severe?

14         MR. FELDMAN:  Vague.

15         THE WITNESS:  Some areas were hit harder than       01:52:50

16     other areas, so upstairs was probably -- As you go

17     away from the water, it doesn't get as hard, so the

18     more concentrated areas that I saw was the entryway,

19     hallway.

20         MR. HOOK:                                           01:53:07

21         Q.  And when you arrived at the house, what did

22     you think about the value of the house?  Did you

23     think, "Wow, this is $10 million house," or "This is

24     a $2 million house"?  Did you have a thought in

25     mind?                                                   01:53:18
```

Page 108

```
 1        A.   I might have figured probably a million     01:53:26

 2   plus.  I couldn't tell you exactly what that was.  I

 3   didn't do any research on the house or anything, so

 4   I kind of maybe thought, "Oh, it's a nice house."

 5   About a million, yeah.                                 01:53:35

 6        Q.   Probably a million dollars.

 7             So what -- So what did you see?  You

 8   walked -- Did you walk through upstairs and

 9   downstairs?

10        A.   We started downstairs.  We worked our way    01:53:45

11   up.

12        Q.   And what did you see downstairs?

13        A.   We saw there was damaged plaster in the

14   ceiling.  There was damaged plaster in the living

15   room, dining room.  Upstairs, there was damaged       01:54:02

16   plaster in the bedroom.  There was two bedrooms --

17   actually there's three bedrooms.  I'm trying to

18   remember.

19             There was damaged hardwood floors.  I

20   remember seeing buckling on the living room area.     01:54:24

21   There was damaged flooring in -- also in the dining

22   room, family room, and it went to a nook area but

23   not that much.  It started fading off at that point.

24   There was damage upstairs, wood floors, hardwood

25   floors, and the family room, I believe, had these     01:54:54
```

Page 109

```
 1      carpet tiles on the --                          01:54:58

 2           Q.   Okay.  Did you take pictures?

 3           A.   Yes.

 4           Q.   And were your pictures uploaded to the

 5      claims file?                                     01:55:09

 6           A.   Yes.  I -- We put those on there, yes.

 7           Q.   And how long do you think you were at the

 8      site for?

 9           A.   I would say range from hour, hour and a

10      half.                                            01:55:26

11           Q.   And did you have conversations with people

12      from Mackey Construction?

13           A.   The father, we spoke mostly to him.

14           Q.   What did you -- What did you and the father

15      discuss?                                         01:55:39

16           A.   Well, we discussed, you know, the damages,

17      which ranged from plaster, wood floors, the finish

18      carpentry.  He saw that there's crown molding that

19      was oversized.  Think, if I remember correctly,

20      there was some lights, but we couldn't tell how many  01:56:00

21      there were, but there were some lights there.

22      Didn't look like a lot, but there were some lights

23      that were affected because the water came down.

24           Q.   Do you remember this gentleman's name?  The

25      father?                                          01:56:13
```

Page 110

```
 1          A.   I wish I did.                          01:56:14

 2          Q.   Is it Dana Mackey or Steven?

 3          A.   Sheesh, I wish I knew.

 4          Q.   All right.  So -- And how did you find

 5     Mr. Mackey?  Did he seem to be a reasonable person?  01:56:25

 6          A.   In terms of working with him or --

 7          Q.   Did he seem to be a competent contractor

 8     when you met him and -- walk through -- I'm sorry,

 9     Marc, that was inadvertent.

10          (Interruption in proceedings.)             01:56:53

11     MR. FELDMAN:  I had a brilliant objection.

12     MR. HOOK:  I'm sorry.

13          Q.   So this gentleman, was he a contractor?

14          A.   Dana Mackey.

15          Q.   Dana Mackey -- Was the person that you're  01:57:06

16     saying that --

17          A.   It was the father.

18          Q.   Was that Dana Mackey or this is a different

19     person?

20          A.   I don't know his name.                01:57:13

21          Q.   But this person that you think is Mr. -- a

22     Mackey, was he a contractor?

23          A.   I believe he was.  I believe he'd be the

24     one with the license.  I'm not -- I wasn't too sure

25     who holds the license on that.                  01:57:23
```

Page 111

 1          Q.    And did you --                              01:57:25

 2          A.    But he was with Dana, yeah.

 3          Q.    And did you get the sense that he was a

 4    competent contractor from your discussions with him?

 5          MR. FELDMAN:   Lacks foundation, vague.           01:57:35

 6          THE WITNESS:   Well, I don't know him that well.

 7    My first time meeting with him.

 8          MR. HOOK:

 9          Q.    What were your impressions of him?

10          A.    I didn't have much of an impression because 01:57:42

11    I really didn't know him.

12          Q.    Okay.  And did you start discussing costs

13    at all with this individual at the time?

14          A.    We didn't go over costs.  I don't remember

15    going over costs with him.                              01:57:57

16          Q.    Okay.  Did you have any other -- Did you

17    have any conversations with Alan the first day you

18    were there?

19          A.    I think I remember talking about USC, had

20    some conversations about what he does and --            01:58:12

21          Q.    And what do you remember Mr. Baker telling

22    you about the loss and what they planned to do with

23    the house?

24          A.    What they planned to do with the house?  I

25    don't remember him telling me anything about what       01:58:30

                                            Page 112

```
 1       they planned to do but that we were here to help      01:58:32

 2       them out, get them back to their preloss condition,

 3       get the house back to preloss condition.

 4            Q.   Preloss or better position?

 5            A.   We like to put it back to the way it was.    01:58:45

 6       That's --

 7            Q.   So not better.

 8            A.   Preloss.  Preloss condition.

 9            Q.   And so you -- It was your understanding

10       that Mr. Baker wanted to rebuild the house; right?     01:59:10

11       Repair the house?

12            A.   Repair the house.

13            Q.   Return it back; right?

14            A.   Yes.

15            Q.   And was he -- Would you say he was anxious    01:59:15

16       about that?

17            MR. FELDMAN:  Lack of foundation.

18            THE WITNESS:  I didn't get the feeling of any --

19       being in a rush or anything.  He didn't share that

20       with me, no.                                           01:59:29

21            MR. HOOK:

22            Q.   Did Linda -- Did you have any conversations

23       with Linda Baker?

24            A.   I don't recall.  Maybe -- I don't remember

25       what it was if I had.  Maybe it was small, but I       01:59:40
```

Page 113

1    don't remember what it was, if I talked to her.        01:59:42

2        Q.   Okay.  And did you have any other

3    substantive conversations from that first day's

4    visit to the loss site that you can recall?

5        A.   I'm sorry.  I'm sorry.  Repeat that.        01:59:58

6        Q.   Yeah.

7             Did you have any, like, significant

8    conversations at the site that you remember, like

9    somebody saying that they saw the pipe burst or

10   anything else that comes to memory that you recall   02:00:08

11   about that first visit at the subject property that

12   we haven't discussed?

13       A.   I don't recall.  I just -- They -- They

14   said it was -- it was water damage, pretty bad, and

15   they could see that -- they could see there was      02:00:24

16   water damage, and it went through the house.

17            When I got there, you know, I had to get a

18   feel for it, so we had to walk the entire house.

19       Q.   And what was your impression?

20       A.   That there -- There was some damage, yes.   02:00:38

21   There was quite a bit of damage.

22       Q.   Quite a bit of damage; right?

23       A.   Yes.

24       MR. HOOK:  Okay.  All right.  Why don't we take

25   a break.                                             02:00:44

Page 114

```
 1              THE VIDEOGRAPHER:  We are going off record.      02:00:46

 2       This is the end of Media Unit Number 4, and the time

 3       is 2:00 p.m.

 4              (Interruption in proceedings.)

 5              THE VIDEOGRAPHER:  We are back on record.  This   02:15:41

 6       is the beginning of Media Unit Number 5, and the

 7       time is 2:15 p.m.

 8          MR. HOOK:

 9          Q.   All right.  Good afternoon, sir.  You

10       understand you're still under oath?                     02:15:51

11          A.   Yes.

12          Q.   Okay.  So during that first day that you

13       visited the loss, did you have a private

14       conversation with Dana Mackey and Mike from Servpro

15       at any point?                                           02:16:06

16          A.   Private conversation?

17          Q.   Yeah.

18          A.   I don't think we had a private

19       conversation, no.  I don't -- I don't recall a

20       private conversation.                                   02:16:15

21          Q.   Do you recall any discussions with anybody

22       from Servpro on that day?

23          A.   Did I have a discussion with Servpro?  We

24       talked about the loss, but I don't recall what we

25       talked about.                                           02:16:30
```

                                                    Page 115

```
 1          Q.   Okay.  Sir, I'm going to hand you a stack      02:16:31

 2     of documents that we're going to mark as Exhibit 3,

 3     and I'm going to ask that you take a look at them,

 4     and I'm going to ask some questions about the

 5     documents.  Be careful.  The way I stapled them,       02:16:46

 6     they're kind of hazardous on the top corner, so

 7     watch your fingers.

 8          THE REPORTER:  (Indicating.)

 9          MR. HOOK:  The court reporter's going to mark

10     that.                                                  02:17:03

11               (Whereupon the document referred to

12               is marked by the reporter as

13               Plaintiff's Exhibit 3 for identification.)

14          MR. HOOK:

15          Q.   Could you flip through that packet, sir.     02:17:31

16     This is -- I'm going to represent to you that this

17     is a Servpro estimate that was produced by your

18     counsel.  And I want you to just look through and

19     make sure that we're looking at the same thing, that

20     we have the entire report, et cetera.                  02:17:49

21               Do you recognize the document, sir?

22          A.   Yes.

23          Q.   Okay.  Does this look like the full Servpro

24     report to you?

25          A.   Let me just --                               02:20:01
```

Page 116

```
 1        Q.   Yeah, sure.  Go ahead.                    02:20:03

 2        THE REPORTER:   I think he's done.

 3        MR. HOOK:

 4        Q.   All right.  Sir, did you take a look at the

 5   packet?                                             02:24:06

 6        A.   Yes.

 7        Q.   Describe for me what that is, please.

 8        A.   Mitigation estimate.

 9        Q.   Okay.  And that was prepared for the

10   mitigation of what?                                 02:24:16

11        A.   For the water loss at Mr. Baker's house.

12        Q.   In last year -- Last year; right?

13        A.   Yes, last year, yes.

14        Q.   Okay.  This was a covered loss, correct --

15        A.   Yes.                                       02:24:26

16        Q.   -- under the policy?  Right.

17             Okay.  And do these pictures accurately

18   reflect the conditions that you observed at the

19   Baker house, more or less?

20        MR. FELDMAN:  Vague, overbroad.                 02:24:41

21        THE WITNESS:  Appears like some pictures were

22   the time I saw it, and then some was done after, so

23   they took out more wall, my second inspection, so --

24        MR. HOOK:

25        Q.   Do you have any doubt that these pictures   02:24:57
```

Page 117

```
 1      depict what they purport to depict, and that is the    02:24:59

 2      Baker residence immediately following the loss?

 3          A.   Yes.  This shows Mr. Baker's house, yes.

 4          Q.   And it shows the work that Servpro did;

 5      right?                                                  02:25:10

 6          A.   Correct.

 7          Q.   Okay.  And what was the estimate for the

 8      work that they did, that -- here in Exhibit 3?

 9          A.   Exhibit 3?

10          Q.   Exhibit 3 is the Servpro report --           02:25:30

11          A.   Right.

12          Q.   -- and estimate.

13               So what's the amount of the estimate?

14          A.   Total amount?

15          Q.   Yes.                                          02:25:36

16          A.   56,361.83.

17          Q.   Where do you see that?

18          A.   (Indicating.)

19          Q.   What page, sir?

20          A.   ALL000195.                                    02:25:46

21          Q.   ALL000195.  Okay.

22               And when did you receive this estimate,

23      sir?

24          A.   Can't remember the date.  Probably is in

25      the claim file.  I don't recall the date.              02:26:05
```

Page 118

```
 1          Q.   Claim file's right there.  Go for it.        02:26:09

 2               This estimate on the front page, it says it

 3      was completed on October 19th.  Do you see that?

 4          A.   Date estimate, yes.

 5          Q.   Would you have received this on or about      02:26:24

 6      that date?

 7          A.   I could agree, yes, that's probably when I

 8      received --

 9          Q.   And when you received this estimate, what

10      did you do with it?                                    02:26:34

11          A.   Well, I tried to get this resolved.  I had

12      reached out to other people in my team, in Allstate

13      to help me try to resolve this estimate.

14          Q.   Okay.  Read the paragraph on the bottom of

15      the first page, please.                                02:26:54

16          A.   "This is an estimate for this large EMS.

17      The home was hit by a failed supply line in the

18      upstairs bath which ran for" a "couple of days

19      creating extreme class 3 damage to the large high

20      end home.  We met adjuster ED C, on site" with "a      02:27:12

21      couple of days of loss and explained that this loss

22      was like no other residential we have seen due to

23      its sheer size, extreme amounts of contents in the

24      affected areas which had to be secured before

25      demolition.  Also, there was plaster and lath wood     02:27:34
```

Page 119

```
 1    boards so the demolition took extra time.  All of      02:27:41

 2    these factors contributed to extra time that were

 3    unavoidable."

 4        Q.   Did you read that when you received the

 5    report, sir?                                           02:27:55

 6        MR. FELDMAN:  Lacks foundation.

 7        THE WITNESS:  I don't -- I -- I can't tell if I

 8    read it or not.

 9        MR. HOOK:

10        Q.   Would there have been any reason for you      02:28:02

11    not to have read it?

12        A.   I got this and I -- I read through it and I

13    noticed it was a big loss, and so I needed a team to

14    help me resolve it because of the size of it.

15        Q.   Okay.  So you read the -- You read the        02:28:23

16    Servpro report, including the description of the

17    loss on the first page -- right? -- when you

18    received it?

19        A.   I don't remember reading this bottom

20    portion.                                               02:28:33

21        Q.   Do you typically read the first page of an

22    estimate?

23        A.   I read the address, the company, yes.

24        Q.   You don't read the description of the work

25    that's done?                                           02:28:48
```

Page 120

```
 1          A.    I -- In this particular -- I read to the --   02:28:48

 2     the estimate itself, line items.

 3          Q.    Do you disagree now with anything that is

 4     written here in the first page of this Servpro

 5     report?  Do you disagree with any of those            02:29:02

 6     statements, sir?

 7          A.    I don't recall if it was a Class 3.  I'm

 8     not sure from a failed supply line.  I'm not sure

 9     where they came up with a Class 3, so --

10          Q.    So it wasn't a Class 3?                     02:29:16

11          A.    I don't think it was from a supply line.

12          Q.    So what was it?

13          A.    I would say maybe a Class 1 or 2 at the

14     most, but not a Class 3.

15          Q.    What are the classes?                       02:29:28

16          A.    1, 2, and 3.

17          Q.    And what differentiates those?  I don't

18     know that terminology.

19          A.    A 3 comes from sewage out of the toilet.

20          Q.    That's the only -- That's the only          02:29:40

21     situation that's described as a Class 3 loss, when

22     there's raw sewage?

23          A.    From what I understand, yes.

24          Q.    Okay.  Other than the characterization of

25     this loss as a Class 3, do you see any other           02:29:51
```

Page 121

```
 1    misstatements in this paragraph?                    02:29:55

 2        MR. FELDMAN:  Lacks foundation, calls for

 3    speculation.

 4        THE WITNESS:  I don't.

 5        MR. HOOK:                                        02:30:14

 6        Q.   So you agree that there was water running

 7    for a couple days in the house; right?

 8        A.   Yeah.

 9        Q.   It was a high -- large, high-end home;

10    right?                                               02:30:21

11        A.   It was a large, high -- home was high end,

12    yes.  Okay?  It was a nice home, yes.

13        Q.   Okay.

14        A.   Historic home.

15        Q.   And Servpro thought it was like no other   02:30:30

16    loss -- residential loss they'd seen due to its

17    sheer size and extreme amount of contents.  Was that

18    your -- also your conclusion?

19        MR. FELDMAN:  Vague.

20        THE WITNESS:  I don't know if I -- I don't know 02:30:41

21    if they've ever seen anything like that.  I don't

22    know if --

23        MR. HOOK:

24        Q.   Had you worked on a residential loss like

25    that before?  Partial loss?                         02:30:55
```

Page 122

```
 1        A.    Yeah.                                      02:30:57

 2        Q.    Where?

 3        A.    I worked -- There are several losses that

 4   we had in L.A.  I can't know the address or anything

 5   like that.                                            02:31:04

 6        Q.    Tell me specifically about them.

 7        A.    Water goes out from the line, especially

 8   when people are not home, and it gets everywhere,

 9   and it flows out through all the rooms.

10        Q.    Okay.  What's the largest part of the loss  02:31:14

11   claim that you worked on?

12        A.    That I worked on?  The water?  Let me think

13   here.  They're so -- Trying to pick one.

14              Okay.  I had one.  I believe it's somewhere

15   in El Segundo.  I believe it's a three-story unit     02:31:44

16   where it came from the three story all the way down.

17        Q.    It was a three-story house?

18        A.    It was three levels, yes.  First level,

19   second level, third level.

20        Q.    So three different units, or was that a     02:32:03

21   single?

22        A.    That was one single, yes, and the water

23   started from the very top.

24        Q.    Okay.  When was that?

25        A.    That was three years ago.                  02:32:11
```

                                            Page 123

```
 1          Q.   What type of coverage did that insured     02:32:17

 2     have?

 3          MR. FELDMAN:  Vague.

 4          THE WITNESS:  It was -- Can't remember if it was

 5     a homeowners policy, but I believe there was -- had   02:32:23

 6     an HOA so it was a condominium-type policy.

 7          MR. HOOK:

 8          Q.   Was it a -- Did they have replacement cost

 9     coverage?

10          A.   It was more for betterments and            02:32:34

11     improvements.

12          Q.   So "No" would be the answer?

13          A.   Right.

14          Q.   Okay.  Have you ever worked on a loss this

15     large where there was replacement cost coverage or   02:32:42

16     extended replacement cost coverage involved?

17          A.   Yes.

18          Q.   And describe that loss for me.

19          A.   Think here.  Let me see which one I can --

20     I don't remember the location, but it was a          02:33:06

21     good-size loss.  It went everywhere.  Water went

22     everywhere and got into all the rooms.  It damaged a

23     lot of floors, lot of drywall.

24          Q.   How -- Describe the house for me.

25          A.   I think it was a two-story home.           02:33:23
```

                                            Page 124

```
 1          Q.    How many square feet?                    02:33:29

 2          A.    5,000-square-foot home.

 3          Q.    How many -- How much of the house was

 4     damaged by water?

 5          A.    Say 35 to 40 percent.                     02:33:41

 6          Q.    Okay.  It was a high-end home?

 7          A.    High-end home, yes.

 8          Q.    And how much was the -- How much did it

 9     cost to replace that damage, approximately?

10          A.    About 150-, 200,000, approximately.       02:34:08

11          Q.    Okay.  So after you received this estimate

12     from Servpro, what did you do with it?

13          A.    I reviewed its contents.  I -- I noticed

14     there is a lot of equipment, filters there that we

15     don't normally pay.  There was just this new stuff    02:34:43

16     with the mitigator pulling stuff out.  A lot of

17     equipment, negative air fans, air movers, dehu's, a

18     lot of equipment.

19          Q.    There was a lot of equipment in the house,

20     wasn't there?                                         02:35:05

21          A.    Yes, there was.

22          Q.    Okay.  So which line items of this invoice

23     did you think were suspect?

24          A.    I think it was -- There was a lot of line

25     items, so typically something this size I give out    02:35:14
```

Page 125

```
1    to one of my ITs to help me out with because -- to     02:35:19

2    gauge more on how long and how many, he was more

3    familiar with that.

4         Q.   Why didn't you just pay it?

5         A.   Because this estimate -- I could see there     02:35:34

6    was a lot, but there was a little bit on the heavy

7    side with equipment so --

8         Q.   How do you know that?

9         A.   Well, based on what I saw out there and

10   what they wrote here, they were -- it seemed like       02:35:47

11   there was more on there than that they had on the

12   site.

13        Q.   How many days were they on the site?

14        A.   I couldn't tell you that because I was

15   there just that one day.                                02:35:57

16        Q.   Right.  It says here that they started on

17   the job -- They were assigned on September 25th and

18   that they completed the job on October 8th; right?

19   Is that right?

20        A.   That's what they're saying.                   02:36:12

21        Q.   Okay.  You didn't believe that?

22        A.   I don't think -- I wasn't there so I need

23   to see by just the -- the size of the home, I take

24   into consideration, and -- and because of the

25   equipment they were using, looks a little excessive,    02:36:26
```

Page 126

```
 1      so I had one of my ITs try to take care of this for      02:36:28

 2      me.

 3           Q.    Excessive based on what?

 4           A.    Just a lot of equipment.

 5           Q.    Based -- Based on what?  Are you in --        02:36:36

 6           A.    Because --

 7           Q.    -- the remediation business?

 8           A.    I am not.  I don't do mitigation work.

 9      It's something -- I probably say one of my

10      weaknesses.  That's why I give it to somebody else      02:36:48

11      to take care of it for me.

12           Q.    Why didn't you just pay the invoice?

13           A.    Because, like I said, I didn't agree with

14      it, so I gave it to somebody else to take care of it

15      for me.  It's -- Mitigation is -- Something this        02:37:00

16      size, I don't handle.  I can handle the structure,

17      but I can't handle this, so --

18           Q.    Well, if you didn't suspect that the --

19      Well, I'm wondering, if you didn't have a reasonable

20      basis for suspecting that this was a improper          02:37:10

21      billing amount, I just -- I don't understand why you

22      didn't just pay it.  Allstate makes billions of

23      dollars; right?

24           MR. FELDMAN:  Argumentative.

25           MR. HOOK:                                          02:37:22
```

Page 127

```
 1          Q.   They make billions of dollars of profit      02:37:22

 2     every year; is that correct?

 3          MR. FELDMAN:  Calls for speculation.

 4          THE WITNESS:  I don't know how much they make.

 5     I don't know how much Allstate makes.                   02:37:29

 6          MR. HOOK:

 7          Q.   They have plenty of money to pay the claims

 8     that come due; right?

 9          MR. FELDMAN:  Argumentative.

10          THE WITNESS:  I don't know how much money they     02:37:36

11     have to -- how much money they're saying that they

12     have.  I don't know.

13          MR. HOOK:

14          Q.   What were the reserves set for this claim?

15          A.   Offhand, I can't remember how much I set      02:37:47

16     up.  I don't have -- The claim would probably have

17     it.

18          Q.   Take a look.

19          A.   In this file here?

20          Q.   I --                                          02:38:00

21          A.   I usually go to my laptop for that where we

22     have our reserve set.

23          Q.   That's your claim notes.  This is

24     everything that -- I've been told that this is the

25     entire claim file.  It's been produced by your law      02:38:09
```

                                          Page 128

```
 1      firm, so hopefully you can find it here in this        02:38:12

 2      5,000 pages.

 3          MR. FELDMAN:  Do you want him to look through

 4      the 5,000 pages?

 5          MR. HOOK:                                           02:38:19

 6          Q.   I want to know what the reserves are for

 7      the case, so if you want to go get your laptop and

 8      drive back to wherever and get it and come back here

 9      or access it on his laptop or go to the law library,

10      whatever the case may be.  But I want to get answers  02:38:29

11      to my questions about the reserves for this case

12      today.

13          A.   Yeah.  It's -- My laptop has it because I

14      go to that when I put reserves.  I don't document it

15      says, "Hey, I put 'X' amount of reserves," so --      02:38:46

16          Q.   So that's not in the claim notes?  That's

17      not something that Allstate keeps in the claims --

18      claim notes, what the reserves are?

19          A.   I put it on my -- Next Gen computer is

20      where I put my reserves at.                           02:39:00

21          Q.   Is your computer connected to the Internet?

22          A.   I'm not sure if it is or if it will allow

23      access.  I'm not sure if Allstate would do that.

24      But it's in my laptop, and that's where I put my

25      reserves.                                             02:39:18
```

Page 129

```
 1           Q.    Where is your laptop right now?          02:39:19

 2           A.    In parking.

 3           Q.    Where?

 4           A.    In the parking lot.

 5           Q.    Downstairs?                               02:39:23

 6           A.    No.

 7           Q.    Where is the parking lot?

 8           A.    It's in the building over there by his

 9      office, the parking lot.

10           Q.    All right.  Let's take a break.  I want you  02:39:32

11      to get your laptop --

12           MR. FELDMAN:  We're not going to do that.  He's

13      not getting his laptop.

14           MR. HOOK:

15           Q.    You're not going to get your laptop?       02:39:37

16           MR. FELDMAN:  He's not required to bring a

17      laptop and dig through it at a deposition.  And

18      we've produced the entire claim file, and there's

19      documents that contain the information on reserves.

20           MR. HOOK:  Then find it.                          02:39:48

21           MR. FELDMAN:  But -- So if you want to have him

22      look through 5,000 documents --

23           MR. HOOK:  I do.

24           MR. FELDMAN:  -- on the record and we can spend

25      our day doing that --                                 02:39:54
```

Page 130

```
 1           MR. HOOK:  I'll tell you this:  I went through   02:39:55

 2     all 5,000 pages, and it's not there, so --

 3           MR. FELDMAN:  You want me to tell you where it

 4     is?

 5           MR. HOOK:  Yeah, I do.                            02:40:02

 6           MR. FELDMAN:  -- time.

 7           MR. HOOK:  No.  You tell me where it is, and you

 8     can tell him.

 9           MR. FELDMAN:  All right.

10           MR. HOOK:                                         02:41:11

11           Q.  Do you remember what the reserves were,

12     sir?

13           A.  I don't recall.

14           Q.  Do you have any recollection?

15           A.  No, I don't.                                  02:41:15

16           Q.  Not even a range?

17           A.  I couldn't tell you.  I don't know.

18           Q.  What is that number?  What is a reserve?

19           A.  Well, you set some money aside to pay the

20     claim.                                                  02:41:28

21           Q.  That's all you have to just pay it; right?

22           MR. FELDMAN:  Lacks foundation.

23           THE WITNESS:  Not pay it but reserve it.

24           MR. HOOK:

25           Q.  So you're nodding your head.  That's all      02:41:36
```

Page 131

| | | |
|---|---|---|
| 1 | you got?  To pay the claim once you reserve it, | 02:41:37 |
| 2 | that's all you got; right? | |
| 3 | MR. FELDMAN:  Misstates his testimony. | |
| 4 | MR. HOOK: | |
| 5 | Q.   The goal is to resolve it in that reserve; | 02:41:43 |
| 6 | right? | |
| 7 | A.   We put the reserves as an estimate of what | |
| 8 | it's going to cost, what -- | |
| 9 | Q.   With the goal of trying to resolve the | |
| 10 | claim in that reserve; right? | 02:41:54 |
| 11 | MR. FELDMAN:  Misstates his testimony. | |
| 12 | THE WITNESS:  Not the entire thing, but just to | |
| 13 | put some reserves out there, some money out there on | |
| 14 | what we base what the damages are to include | |
| 15 | mitigation. | 02:42:06 |
| 16 | MR. HOOK: | |
| 17 | Q.   So it's kind of your -- like your rough | |
| 18 | estimate of what the claim's going to cost, yeah. | |
| 19 | And the expectation by Allstate is that | |
| 20 | it's resolved for pretty close to that -- | 02:42:14 |
| 21 | MR. FELDMAN:  Lacks foundation. | |
| 22 | MR. HOOK: | |
| 23 | Q.   -- is that right? | |
| 24 | A.   I don't know it's a result close to it, but | |
| 25 | it takes in account permits, plans, mitigation, | 02:42:21 |

Page 132

```
 1        tests.                                              02:42:26

 2            Q.   How is that number set?

 3            A.   What number?

 4            Q.   The reserves.

 5            A.   What is the amount?  I don't know what the  02:42:31

 6        amount --

 7            Q.   Who sets it?

 8            A.   I set them.

 9            Q.   You set it.  Okay.

10                 Yeah, we need to find out what that number  02:42:37

11        was for this claim.

12            MR. FELDMAN:  Well, that lacks foundation that

13        there's one number.  But if you give me five

14        minutes, I can point you to a page.

15            MR. HOOK:  Should we take a break?            02:42:51

16            MR. FELDMAN:  Five minutes?

17            MR. HOOK:  Okay.  Great.

18            THE VIDEOGRAPHER:  We are going off record.

19        This is the end of Media Unit Number 5, and the time

20        is 2:43 p.m.                                     02:42:59

21                 (Interruption in proceedings.)

22            THE VIDEOGRAPHER:  We're back on record.  This

23        is the beginning of Media Unit Number 6, and the

24        time is 2:54 p.m.

25            MR. HOOK:  Okay.  It's 2:54, sir.  We had some  02:54:12
```

                                                      Page 133

| | | |
|---|---|---|
| 1 | discussions off -- off the record about continuing | 02:54:15 |
| 2 | today's deposition.  I had hoped to complete as much | |
| 3 | as we can today, but I understand you'd prefer to | |
| 4 | come back; is that true? | |
| 5 | THE WITNESS:  Yeah.  I'm tired at this point.  I | 02:54:25 |
| 6 | don't think I can give you my best testimony at this | |
| 7 | time moving on forward. | |
| 8 | MR. HOOK:  Okay.  Because you're tired; correct? | |
| 9 | THE WITNESS:  Yes. | |
| 10 | MR. HOOK:  Okay.  Can we -- Can I ask a couple | 02:54:35 |
| 11 | questions about the initial reserve setting in the | |
| 12 | claim? | |
| 13 | On the very back of that binder -- | |
| 14 | MR. FELDMAN:  I thought we were -- we were going | |
| 15 | to be done. | 02:54:51 |
| 16 | MR. HOOK:  That's fine.  That's fine.  Let's | |
| 17 | complete.  Yeah, that's fine.  You identified the | |
| 18 | records.  Okay.  That's fine. | |
| 19 | MR. FELDMAN:  I just wanted to make sure.  I | |
| 20 | promised you I would. | 02:54:58 |
| 21 | MR. HOOK:  And the last thing that we're going | |
| 22 | to go do on the record is that Mr. Carrasco did | |
| 23 | bring about -- quite a few additional documents that | |
| 24 | we're going to attach today as Exhibit 4.  They | |
| 25 | start at Bates stamp Number ALL003319, and they | 02:55:08 |

Page 134

```
 1     conclude at a picture Bates-stamped ALL003698.          02:55:16

 2            I've agreed to conclude Volume I of today's

 3     deposition and continue it to another date within 60

 4     days of today's date to be mutually agreed upon by

 5     counsel.                                                 02:55:37

 6            And then I'm going to propose the following

 7     stipulation:

 8            That the court reporter be relieved of her

 9     custodial duties under the applicable code; that

10     counsel for the deponent maintain -- be sent the        02:55:49

11     original transcript and maintain custody of same;

12     that he will review the transcript with the witness

13     and have 30 days to notify my office of any changes

14     thereto.  Counsel shall maintain the original and

15     make it -- provide it at trial.  And if it should be    02:56:11

16     lost or stolen, a certified copy shall be suitable

17     for use in its stead.

18        MR. FELDMAN:  And I agree to provide it on

19     informal notice.  Agreed.

20        MR. HOOK:  Thank you, sir, for your time today.      02:56:27

21     And I look forward to completing our deposition

22     soon.  Thank you.

23        THE VIDEOGRAPHER:  We are off record at 2:56

24     p.m., and this concludes today's testimony given by

25     Edward Carrasco.  The total number of media units       02:56:37
```

Page 135

```
 1        used was six and will be retained by Veritext.      02:56:40

 2                    (Whereupon the documents referred to

 3                    are marked by the reporter as

 4                    Plaintiff's Exhibit 1 and Exhibit 4

 5                    for identification.)

 6                    (The proceedings concluded at 2:56 p.m.)

 7                              *****

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Personal Court Reporters, A Veritext Company
818-988-1900

1    STATE OF CALIFORNIA    )

                             ) ss:

2    COUNTY OF LOS ANGELES )

3

4            I, EDWARD CARRASCO, hereby certify under

5    penalty of perjury under the laws of the State of

6    California that the foregoing is true and correct.

7

8            Executed this _____ day

9    of

10   _____,_____, at _____,

11   California.

12

13

14           _____

15                   EDWARD CARRASCO, VOLUME I

16

17

18

19

20

21

22

23

24

25

                                         Page 137

1    STATE OF CALIFORNIA    )

                          ) ss.

2    COUNTY OF LOS ANGELES )

3        I, MARY K. MEDLEY, CSR NO. 9557, in and for the

4    State of California, do hereby certify:

5        That prior to being examined, the witness named

6    in the foregoing deposition was by me duly sworn to

7    testify the truth, the whole truth, and nothing but

8    the truth;

9        That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter reduced to typewriting under my

12    direction, and the same is a true, correct, and

13    complete transcript of said proceedings;

14        That if the foregoing pertains to the original

15    transcript of a deposition in a Federal Case, before

16    completion of the proceedings, review of the

17    transcript {X} was {  }  was not required.

18        I further certify that I am not interested in

19    the event of the action.

20    Witness my hand this 19th day of November, 2019.

21

22

23                              CSR No. 9557

24        Certified Shorthand Reporter

25          State of California

Page 138

**[& - 96]**

| & | | | |
|---|---|---|---|
| **&**   2:15 | | | |

**19th**   119:3 138:20
**1:00**   71:14
**1:10**   71:25
**1:30**   65:8,21,23,23
  65:25 66:24 67:21
  67:23

106:22 107:20
116:2,13 118:8,9
118:10 119:19
121:7,9,10,14,16
121:19,21,25
**3,000**   56:2
**30**   135:13
**310**   2:12
**338-6500**   2:17
**344**   61:8 65:20
**35**   125:5
**3500**   4:21
**3618621**   1:23

**6**

**6**   3:4 102:17
  133:23
**60**   135:3
**619**   2:17
**68**   103:18

**7**

**7.5.**   87:12
**70**   104:12
**707**   2:3 4:20
**735.5**   90:24
**790.03.**   93:18

**0**

**0517768081**   33:23
**08024**   1:5

**1**

**1**   3:10 4:14 31:22
  32:13 34:13,20
  90:25 91:3 92:7
  92:20 121:13,16
  136:4
**1-138**   1:25
**1.3.**   87:14
**10**   87:10,16 108:23
**10-22**   69:1,3 70:25
**10-8-2018**   70:8
**10053**   6:12
**10:00**   68:17 101:9
**10:00ish**   101:9
**10:11**   2:2 4:2,5
**10:42**   32:14
**10:50**   32:18
**11180**   91:2
**116**   3:14
**11:31**   67:6
**11:38**   67:10
**12:06**   71:21
**13**   22:9
**136**   3:10,15
**15**   1:16 2:3 4:2
  81:17
**150**   125:10
**15th**   4:5
**18**   6:10
**18710**   138:23
**19**   20:25,25 21:2
**1961**   6:10
**1979**   14:25
**1986**   16:24

**2**

**2**   3:12 32:17 34:6
  35:13 67:5 86:20
  86:23 90:25 91:1
  92:2 108:24
  121:13,16
**200,000**   55:4 56:3
  125:10
**2012**   22:9
**2013**   6:25 7:2 22:2
  22:15,16 38:13
**2018**   33:3,25 67:21
**2019**   1:16 2:3 4:2
  4:5 138:20
**20th**   33:3,25
**22nd**   69:5
**24**   72:10
**25th**   126:17
**26**   64:18
**2695.183**   90:16
  92:20 93:10 94:20
  95:11,21
**2695.183.**   3:12
  87:16 92:10 94:16
**26th**   69:23
**27th**   66:4,11 67:20
**2:00**   115:3
**2:15**   115:7
**2:19**   1:5
**2:43**   133:20
**2:54**   133:24,25

**3**

**3**   3:14 67:9 71:20
  90:25 99:14

**4**

**4**   3:15 71:24 92:7
  115:2 134:24
  136:4
**4,000**   106:22
  107:20
**40**   81:20,24 82:5
  82:14,21 83:4,7
  104:9 125:5
**4264**   2:11

**5**

**5**   87:11 92:9
  102:17 115:6
  133:19
**5,000**   125:2 129:2
  129:4 130:22
  131:2
**50**   104:12
**50,000**   53:24 54:1
  59:6
**501**   2:16
**53,000**   53:25
**56,000**   53:2,12,23
**56,361.83.**   118:16

**8**

**8**   43:4
**80**   104:9
**839-5179**   2:12
**84**   16:5
**86**   3:12 16:23
  17:25
**87**   17:25 18:17
**88**   18:17
**89**   18:17
**8th**   68:17 126:18

**9**

**9**   20:12
**9-20-2018**   64:10
**9-26**   64:23 65:10
**9-27**   65:9,15
**90**   19:10,13
**90017**   4:21
**90230**   2:11
**90s**   19:10,11,12,13
  20:15 59:18
**91**   20:10
**91763**   6:13
**92101**   2:16
**9557**   1:24 2:5
  138:3,23
**96**   20:18,18,21

Page 1

[9th - appointment]

| | | | |
|---|---|---|---|
| **9th**   101:4 105:13 | **adjust**   11:8 97:8 | 28:10,11,12,22 | 127:21 129:15 |

**a**

**a.a.**   15:25 16:1
**a.m.**   2:2 4:2,5
 32:14,18 67:6,10
**ability**   72:9
**able**   62:25
**abuse**   30:15
**access**   129:9,23
**accidental**   74:12
 74:12
**accorded**   90:23
**account**   89:14
 132:25
**accurate**   27:14
 62:19
**accurately**   72:10
 117:17
**accusations**   10:15
**accused**   10:9,12
 30:8
**acronym**   75:20
 95:6
**act**   63:2,4,7,8
**action**   5:1 138:19
**acts**   87:12
**actual**   44:12,16
 45:9,10 46:7
 68:20,22 74:8
 84:19,24,25 85:3
 85:18 86:12,13
 98:9,11 103:24
**acv**   44:25 45:22
 46:22 47:3 74:21
 84:24
**additional**   35:24
 36:9,15 37:3,18
 134:23
**address**   6:11
 57:24,25 58:1
 120:23 123:4

**adjust**   11:8 97:8
**adjuster**   12:17
 22:24,25 23:1
 47:6 62:17 73:16
 82:1 119:20
**adjusting**   38:2
 42:3
**adjustment**   11:15
 38:8 56:6 81:1
**admonitions**   12:2
 12:3 29:11
**advise**   47:21
**advised**   29:15,17
**affect**   72:9
**affiliations**   5:5
**afield**   78:1
**afternoon**   72:2
 115:9
**age**   89:7 103:9,14
 103:24 104:17
**ago**   7:12,14 59:3
 123:25
**agree**   4:12 23:24
 24:2 25:5 55:20
 60:11 99:6 119:7
 122:6 127:13
 135:18
**agreed**   135:2,4,19
**agreement**   30:4,4
 50:25
**agrees**   91:25
**ahead**   31:21 33:20
 34:16 64:5 84:23
 87:15,18 96:17
 117:1
**aide**   17:2,7,8,9
**air**   89:4 125:17,17
**al**   1:4,7
**alan**   14 2:19 5:10
 5:12 25:15,16,18
 25:25 26:8,19

28:10,11,12,22
 101:17 112:17
**alcohol**   72:8,11
**all000195**   118:20
 118:21
**all003319**   37:5
 134:25
**all003698**   37:11
 135:1
**alleged**   30:20
**allow**   129:22
**allstate**   1:7 4:17
 5:15 6:18,23 8:4,6
 9:1 10:9 11:11,12
 22:14,15,18 29:17
 31:1 34:24,25
 38:1,13 41:21
 43:6,6,14,23 47:13
 51:3 55:10,14
 64:20 72:16 73:7
 73:19 78:5,25,25
 79:20 80:21,25
 81:6 82:4,24 83:6
 83:11 84:17 85:7
 85:23 86:7 93:23
 94:2 95:1,18,25
 96:18 119:12
 127:22 128:5
 129:17,23 132:19
**allstate's**   26:4 35:6
 48:17 51:9 73:15
**alongs**   81:4
**ambiguous**   24:15
 83:3
**amended**   3:10
 31:22 33:17
**amount**   45:6,22
 46:22 48:6 50:6
 52:21 54:7,15
 80:6 84:25 89:20
 118:13,14 122:17

127:21 129:15
 133:5,6
**amounts**   119:23
**angeles**   2:4 4:1,20
 4:21 61:9 137:2
 138:2
**annual**   93:4
**annually**   90:6
**answer**   10:1 12:5
 39:12 47:11 50:15
 52:22 60:8 63:21
 100:23 124:12
**answered**   9:23
 13:1 27:7 49:7
 55:19
**answering**   50:16
**answers**   129:10
**antique**   41:7
**anxious**   113:15
**anybody**   11:11
 52:23 100:11
 101:25 115:21
**apologies**   34:17
**app**   92:19
**appearance**   5:7
 102:15,16
**appearances**   2:7
 5:5
**appears**   102:13
 117:21
**applicable**   89:4
 135:9
**applicant**   87:20,21
 91:4,9,12,23,24,25
 92:14 93:10,11
**application**   91:6
 92:3,15,25 96:8
**apply**   92:23
**appointment**   65:2
 68:16

Page 2

[appropriate - believe]

**appropriate** 43:7
**approximately**
6:24 17:10 18:22
18:24 19:18 21:25
108:2 125:9,10
**april** 50:2,3
**architect** 88:11
98:8,25 99:6,8
**architectural**
15:15,22 16:2,10
18:20 19:16 20:3
20:23 21:5 62:25
**area** 39:7 56:21
61:11,24,25,25
62:5,6 109:20,22
**areas** 43:22
108:15,16,18
119:24
**argumentative**
9:23 23:12,14,25
24:4,10,13,20 25:9
25:19 26:14,21
27:5,18 49:4,7
50:12 51:7 52:17
60:4 70:21 95:20
100:10 101:1
103:13 107:23
127:24 128:9
**arising** 33:24
**arrive** 66:23
**arrived** 105:2
108:21
**article** 87:14 90:17
90:22
**aside** 68:23 131:19
**asked** 9:19,22,23
13:1 27:7 34:10
49:7 52:2 55:19
60:21 70:15
**asking** 14:17
25:23,24 41:20

**asks** 34:13 35:13
**assigned** 63:15
64:14,17,23,25
65:13 126:17
**assignment** 63:14
**assumes** 26:14,21
27:18 50:11 95:12
97:10
**assumption** 97:18
**assumptions** 92:8
**attach** 29:12 31:21
86:19 134:24
**attached** 37:1 89:9
**attempt** 50:23
60:11
**attempted** 70:13
**attempts** 51:2
70:17
**attend** 15:6
**attending** 5:4
**attorney** 5:8,10,14
8:17 29:16,16
35:6 94:9
**attorneys** 35:10
**audible** 39:18
**audio** 4:11,11
**available** 47:22
**avenue** 2:11 6:12
34:1
**average** 15:11,12
42:18
**award** 76:22
**aware** 29:10 30:23
38:12 46:19 65:1

**b**

**b** 5:11 88:16 89:12
**back** 9:17 13:8,9
13:11 16:7 32:16
36:7 37:15 58:17
58:17,18 67:8

69:7 70:4,25
71:23 72:14 74:22
78:2 86:15 100:16
100:17 106:11
113:2,3,5,13 115:5
129:8,8 133:22
134:4,13
**bad** 10:9 13:15
114:14
**baker** 1:4 2:19
4:16 5:11,12,12
25:25 26:9 28:10
28:12 37:19 42:24
48:2,7 51:1,17
101:15,17 103:11
103:20 104:15
112:21 113:10,23
117:19 118:2
**baker's** 28:14
55:21 103:9
117:11 118:3
**bakers** 30:13 33:1
33:10 42:21 46:15
47:1 61:8 62:1
63:13 65:20 66:7
76:10 77:13 97:16
98:12 100:3
105:13
**balance** 89:20
**baldwin** 48:23,23
49:21 51:2,20
52:1,6,9,18,21
55:8,10,20 56:7,13
56:19 57:19 58:21
59:5,20 60:24
61:22 66:3 97:7
98:2 101:12
**baldwin's** 52:10
98:4
**bankruptcy** 13:23
13:24,25 14:3,5,8

14:13,14
**barclays** 87:8
**base** 43:20 132:14
**based** 12:4 43:18
46:2 54:24 56:17
61:10,21 89:13,19
90:11 97:17 126:9
127:3,5,5
**bases** 59:25
**basic** 73:24
**basically** 72:18
**basing** 26:16
**basis** 43:18 60:1
61:6,19 87:23
91:8 92:5,17 93:4
93:13 127:20
**bates** 36:8,12,20
37:5,10 134:25
135:1
**bath** 89:6 119:18
**bc** 75:18,19,21
76:22
**bedroom** 109:16
**bedrooms** 59:11
59:13 109:16,17
**beginning** 5:7
32:17 36:3 67:9
67:21 71:24 115:6
133:23
**behalf** 2:2 92:12
**belief** 61:6
**believe** 11:22,24
11:25 19:8 20:10
35:12 36:1 47:25
50:3 58:3 59:1,13
59:18 61:12 76:11
95:2 101:23
109:25 111:23,23
123:14,15 124:5
126:21

Personal Court Reporters, A Veritext Company
818-988-1900

[bell - city]

bell  14:21,23
benefit  39:19
benefits  47:17
  48:11 60:2
best  11:24 16:22
  18:16 31:19 59:23
  103:17 104:1,10
  134:6
better  84:6,6
  113:4,7
betterments
  124:10
beyond  101:5
big  40:19 53:9
  59:5 77:21 105:8
  120:13
bill  8:8 10:13 53:1
  53:10,11,21 54:8
  54:21 56:2 99:1
  100:4
billing  127:21
billions  127:22
  128:1
bills  98:16,22,24
binder  25:2
  134:13
binding  90:17
birth  6:9
bit  18:7 114:21,22
  126:6
black  23:17,21
  24:6,18 25:7,17
  26:11,19,25 27:1,3
  27:13,22 28:2,3
  32:6 102:17,21
blank  8:21
blind  24:8 28:6
bludgeon  51:4
board  69:9 70:2
boarding  38:14

boards  120:1
bottom  36:8 37:5
  119:14 120:19
boulevard  2:4
  4:20
breached  30:13
break  32:8 71:12
  114:25 130:10
  133:15
brief  32:8
brilliant  111:11
bring  34:10 35:20
  130:16 134:23
broadway  2:16
brother  17:6
brought  12:16
  34:21 36:9,16
brown  102:20
buckling  106:9
  109:20
budget  98:7
build  58:17,18
  89:16 103:1,2
building  55:5 75:8
  75:8,12,14,15,15
  75:17,20 76:1,7,12
  76:25 77:10,10
  88:7 90:10 130:8
built  59:17 89:8
burst  114:9
business  33:4
  87:13 91:25 93:14
  127:7
busy  66:16 100:7

c

c  6:6,6 21:21 88:17
  89:18 119:20
cabinetry  58:20
  58:23 61:15
california  1:2 2:4
  2:11,16 4:1,18,21

6:13 80:21 81:1,7
  81:12 83:11,22,25
  93:20 94:17 137:1
  137:6,11 138:1,4
  138:25
call  52:13,15 58:11
  67:25 70:10,10
  75:24 84:25
called  14:22 17:21
  17:22 18:12 19:25
  22:3,8 63:16 65:2
  65:4,7,8 67:22,22
  70:9,14 75:13
  94:12 105:5
calls  10:18 44:8
  54:12 76:23 81:14
  81:16 104:3
  107:15 122:2
  128:3
camera  25:4
care  93:16 127:1
  127:11,14
careful  72:25
  116:5
carpentry  110:18
carpet  40:23 42:20
  106:11 110:1
carpeting  61:15
carrasco  1:15 2:1
  3:3,11 4:15 5:16
  5:20 6:5,6 26:12
  27:13 28:11 31:23
  32:20 33:18 63:24
  67:12 72:2 134:22
  135:25 137:4,15
carry  76:5,7
case  1:5 7:6,6,7
  8:12,20,23 9:2
  10:4,7,21 12:16
  14:13 33:14 60:10
  92:22 129:7,10,11

138:15
cash  44:12,16,19
  44:21 45:3,9 46:7
caution  12:1
ccr  87:16 95:11
ceiling  105:1
  109:14
ceilings  43:4,5
  89:5
cell  4:9
cellular  4:8
central  1:2 4:18
certain  74:14 80:6
  81:10,11 82:9
  99:8,24
certificate  15:21
certified  135:16
  138:24
certify  137:4
  138:4,18
cetera  116:20
cghlaw.com  2:12
chance  32:4 33:16
change  15:14
changes  11:3 90:9
  90:10 135:13
chapter  87:11
  90:25
characterization
  96:10 121:24
chicago  38:17
  72:18 79:24 83:19
choi  21:19,21,24
  22:6
choice  49:12
chris  2:12 68:4
christopher  2:10
  2:10 5:9
cities  99:22
city  2:11 75:23,24
  75:25 76:2,21

[city - contract]

99:11,25
claim   12:10 13:23
    13:24 33:23,23
    34:13,14,22,24
    35:1,10,12,17,22
    37:19 38:2 42:3
    51:5,13,15,17
    63:10,21,24 64:1,2
    64:3,13,23,24
    65:11 68:2 69:22
    71:13 72:15 78:11
    79:3 97:8 99:5
    100:5,16,20 101:3
    106:2 118:25
    119:1 123:11
    128:14,16,23,25
    129:16,18 130:18
    131:20 132:1,10
    133:11 134:12
claim's   132:18
claims   11:3,8,14
    22:24 23:1 31:14
    33:15 38:7 47:5
    51:4 56:6 57:19
    68:10 81:2 110:5
    128:7 129:17
clarified   94:19
clarify   28:8 36:19
class   119:19 121:7
    121:9,10,13,14,21
    121:25
classes   121:15
classroom   38:25
clear   8:7 45:8
    94:18 96:12
client   25:16,24
    28:10
clients   60:2
close   33:4 103:10
    132:20,24

closer   18:7
coach   45:11
coast   20:14
code   75:8,12,14,15
    75:15,17,20 76:1,7
    76:12,25 87:1,6,8
    90:25 91:1 93:17
    93:20 94:17 135:9
codes   43:18,20,21
    43:21 75:8
college   15:2,3,4,5
    15:6,13,17 16:4,7
    16:20
color   28:4,6 103:3
    103:4
come   50:18 80:19
    128:8 129:8 134:4
comes   76:21 79:17
    114:10 121:19
comfort   93:8
coming   105:17,19
commencing   91:1
commissioner
    87:11
commit   30:18
committed   30:13
    30:15,16
communicate   85:9
    87:5,19 93:7
communicated
    91:10,12,18,22
    92:14 97:15
communicates
    91:3
communicating
    86:8
communications
    35:14
company   5:15
    6:19,23 7:21,25
    11:17,21,22 12:16

12:19,23 17:18,19
    18:12 19:23,24
    20:6 22:1,3,8,10
    58:19 61:13,22
    66:14,19 79:20
    84:17 94:2 100:13
    120:23
company's   8:8
compared   89:16
compensation
    74:16
competent   111:7
    112:4
complaint   30:21
complete   134:2,17
    138:13
completed   46:13
    62:3 119:3 126:18
completing   135:21
completion   138:16
complied   97:8,14
comply   84:7,13
components   88:12
    92:9
comporting   93:8
computer   129:19
    129:21
concentrated
    108:18
concerns   50:24
conclude   135:1,2
concluded   136:6
concludes   135:24
conclusion   44:8
    54:13 61:20 81:14
    122:18
condition   113:2,3
    113:8
conditioning   89:4
conditions   117:18

condo   42:15 75:11
condominium
    124:6
conduct   65:15,19
confident   90:23
conflict   29:19 30:1
conform   62:25
conjunction   30:16
    80:17
connected   129:21
connection   87:21
    91:5 92:3,15
    93:11 96:7
consider   97:14,25
consideration
    88:12 126:24
considered   41:19
    98:3
consistent   107:12
consists   58:19
constitutes   93:13
construction
    18:13,19 19:6,15
    48:18 58:21 60:24
    66:3,9 82:18
    101:12,13,23
    110:12
consultants   99:16
consulted   99:7,9
contain   98:7
    130:19
contained   36:24
content   30:4
contents   119:23
    122:17 125:13
continue   4:12
    67:16 135:3
continued   5:23
continuing   134:1
contract   30:12

[contractor - dealing]

**contractor**  18:10
19:4,5 43:8 49:11
50:9 52:12 55:13
57:10 60:1 61:16
62:24 69:9 70:11
111:7,13,22 112:4
**contractors**  49:23
57:17
**contributed**  120:2
**conversation**
91:21 115:14,16
115:19,20
**conversations**  4:8
110:11 112:17,20
113:22 114:3,8
**convicted**  72:12
**coordinate**  105:25
**copy**  71:7 91:8,16
91:19,23 92:18
93:23 135:16
**corner**  116:6
**correct**  24:7,19
26:6,7,20 27:4
35:3 36:4 37:6,11
37:12 45:21,25
58:25 67:18,19,21
69:23 74:17 82:22
82:23 117:14
118:6 128:2 134:8
137:6 138:12
**correctly**  42:23
76:14 79:25
110:19
**cost**  44:13,17
45:15,16,16 56:4
56:11 61:7 62:18
73:22 75:1,3
76:17 83:15,23
84:18,19,25 85:3
85:10,15,18,22,25
86:9,12,13 87:20

87:23 88:2,7,10,11
89:12,13,15,16,18
89:21 90:3,8,13
91:4,7,9,12,18,22
92:2,5,11,14,17,19
92:24 93:4,13
95:24 96:7 106:18
124:8,15,16 125:9
132:8,18
**costs**  33:15 43:19
84:24 90:9,20
91:17 92:6 112:12
112:14,15
**counsel**  2:7 4:16
5:3 27:24 32:8
36:2 60:9 67:1
71:3 116:18 135:5
135:10,14
**counted**  80:4
**county**  137:2
138:2
**couple**  13:10 18:5
19:18 59:22
119:18,21 122:7
134:10
**course**  15:8 16:8
41:6 77:6 95:2,3,4
95:5
**courses**  97:4
**court**  1:1 4:18,23
5:17 8:3,6 10:22
23:3,5 29:12
30:22 31:7 39:17
72:24 116:9 135:8
**cover**  25:2 31:2
**coverage**  22:21
33:1 43:16,17,24
44:13 47:21 64:19
74:3,6,7,8 75:18
75:19,21 76:23
87:22 91:7 92:1,5

92:16 93:12 124:1
124:9,15,16
**coverages**  44:1
74:4 76:25 80:1
**covered**  64:21
73:5 74:10,13
117:14
**created**  90:13
**creating**  119:19
**crown**  42:22,23,24
42:24 106:13
110:18
**csr**  1:24 2:5 138:3
138:23
**culver**  2:11
**current**  6:11 90:8
90:14
**currently**  6:17
**currentness**  87:9
**custodial**  135:9
**custody**  135:11
**custom**  59:14
**customer**  73:12,16
73:18,20 74:2,3
78:4,11 79:11,17
82:17 85:10
**customers**  43:16
74:15 78:5 82:16
85:12
**cv**  1:5

**d**

**d**  6:6,6 88:18 90:2
**damage**  20:6
43:15,17,24 72:21
72:22,22 105:1
107:25 108:1,10
108:12 109:24
114:14,16,20,21
114:22 119:19
125:9

**damaged**  40:15,18
106:7 108:3
109:13,14,15,19
109:21 124:22
125:4
**damages**  110:16
132:14
**dana**  101:23 111:2
111:14,15,18
112:2 115:14
**data**  90:18
**date**  6:9 7:13
16:21 20:12 59:4
63:23 64:15,16
65:8 68:20,22
95:7 98:19 118:24
118:25 119:4,6
135:3,4
**dates**  18:15
**day**  38:24 39:5,5,6
39:9,21 40:3,5,6,8
59:24 60:7,8,9,9
64:24 68:2,23
70:23,24 82:5
84:8,14 100:21,24
112:17 115:12,22
126:15 130:25
137:8 138:20
**day's**  114:3
**days**  81:17,20,24
82:14,22 83:5,7
91:20,25 119:18
119:21 122:7
126:13 135:4,13
**de**  44:16
**deadline**  82:5
**deal**  12:18 41:11
50:20 78:5
**dealing**  22:20 79:1
81:1

Personal Court Reporters, A Veritext Company
818-988-1900

[dealt - drafts]

dealt   12:9
debris   88:10
deceptive   87:12
deciding   59:25
decision   56:5
decorations   107:5
dedicated   80:12
   80:13
deducted   73:23
deductible   73:23
deduction   89:22
   90:3
defendant   2:14
defendants   1:8
   5:16
define   76:3
definitely   104:10
definition   23:15
degree   15:21,25
   16:1,11 90:23
dehu's   58:12
   125:17
dehumidifiers
   58:14
delay   51:3,11,11
   51:13,14
deluxe   48:9 54:9
   76:6
demand   32:25
   33:3,7,8,13
demo   7:23 8:1
   58:14,19
demoed   105:22
demolish   58:15
demolition   10:8
   58:14 88:10
   119:25 120:1
deny   8:8 51:4 60:2
denying   10:12
department   90:22

depend   25:12
depending   74:16
   76:8
depends   25:10,12
   25:13 41:17 76:20
   77:9 82:1,2,25
   83:5,6 97:11
   99:10,10,11,19,21
   99:22
depict   118:1,1
depo   36:24
deponent   3:2
   33:22 135:10
deposed   7:17 10:7
deposition   1:15
   2:1 3:10,15 4:11
   4:15,19 7:4 8:22
   9:10,13,15,19,22
   13:17,22 14:7,10
   14:12,15,16 24:12
   31:22 33:17,22
   34:6 63:20 130:17
   134:2 135:3,21
   138:6,9,15
deposition's   13:19
depreciation
   44:17,18,19 45:5
   45:18,20,23 46:9
   46:11 73:24 74:22
   74:23,25 85:1,4,5
   86:14 89:23 90:4
deprive   47:17
describe   74:19
   102:10 117:7
   124:18,24
described   96:25
   121:21
description   3:9
   120:16,24
design   16:10

designer   98:13,15
desktop   35:25
detail   73:24 94:1
detailed   96:1
determination
   64:20
determine   74:7,8
   77:5
determined   64:21
determines   91:13
determining   74:3
   74:6 76:17
dichotomy   25:19
diego   2:16
difference   23:9,18
   44:6,11,14 47:2
   56:4
differences   74:20
   75:10
different   42:13
   43:23 51:22 71:1
   74:15 75:7 80:1
   94:5 99:23 111:18
   123:20
differentiates
   121:17
difficult   78:12
   79:10,12,16
difficulty   79:2
dig   130:17
diligence   100:5
dimas   61:23
dining   109:15,21
direction   138:12
disagree   121:3,5
disagreed   49:17
discern   100:21
discrepancy   52:4
   55:5,13 56:11
discuss   74:1
   110:15

discussed   110:16
   114:12
discussing   112:12
discussion   115:23
discussions   112:4
   115:21 134:1
displaced   50:10
distinction   26:15
   26:22 27:20 28:3
distinguish   28:4
distress   30:15
district   1:1,2 4:17
   4:18
district's   62:13
division   90:25
document   27:13
   34:7 37:8 86:21
   96:2,5,6,10,11
   116:11,21 129:14
documenting
   77:11
documents   3:15
   35:20 36:2,7,9,16
   36:21 37:4,18
   71:5 76:24 116:2
   116:5 130:19,22
   134:23 136:2
doing   66:16
   130:25
dollar   59:8
dollars   57:4 61:5
   99:15 100:8 109:6
   127:23 128:1
double   6:6 11:13
doubt   117:25
downstairs   109:9
   109:10,12 130:5
drafting   15:15,22
   16:2 18:2 20:3
drafts   21:5

Page 7

[draftsman - exhibit]

**draftsman**  18:20 19:16 20:23 21:6
**draw**  40:16
**drew**  50:22
**drive**  129:8
**drugs**  72:8
**dry**  105:23
**drywall**  40:24 41:3,4 42:19 58:16,20,21,22 61:17,17 124:23
**due**  100:4 119:22 122:16 128:8
**duly**  5:21 138:6
**duties**  135:9
**dwelling**  44:1 64:17
**dwellings**  89:17

**e**

**e**  6:6 19:8 35:15 81:10,17 87:24 88:19 90:2,5 93:9
**earlier**  36:25
**early**  19:12,13 20:14
**earn**  15:21,24 16:3 16:11
**east**  15:4,6 16:7,19 17:13,15
**ed**  119:20
**education**  15:9 16:24
**edward**  1:15 2:1 3:3,11 4:15 5:15 5:20 6:5,5 26:11 31:22 63:24 135:25 137:4,15
**edward's**  25:16
**effect**  33:2
**effort**  77:15

**efforts**  69:25 105:25
**eight**  40:20 54:5
**el**  123:15
**elder**  30:15
**elderly**  50:9
**electrical**  17:20,20
**element**  92:6
**eligible**  63:1
**emergency**  54:8
**emotional**  30:14
**employed**  6:17,18 6:22
**employees**  73:15
**employer**  47:16
**employment**  16:25
**ems**  119:16
**ended**  53:20,22,22
**endorsement** 75:15
**engineering**  17:18 17:20
**engineers**  17:23 18:4
**entire**  33:23 34:13 35:1 114:18 116:20 128:25 130:18 132:12
**entirety**  88:5
**entitled**  8:19 45:24 46:5 48:5,9 60:3 74:15
**entryway**  104:25 108:18
**equipment**  55:2 105:23 125:14,17 125:18,19 126:7 126:25 127:4
**especially**  123:7
**esq**  2:10,15

**estate**  16:18 17:4,5
**estimate**  3:14 16:22 17:25 18:5 18:16 19:11 20:25 40:2,14,20 41:1,22 45:17 46:24 48:18 48:23 49:16,17,18 51:1 52:5 55:1,21 55:22 56:4,8,14 61:7 62:18 73:17 73:20,22,25 74:1 76:17 78:4,6 80:5 80:15 82:3,5,17 83:2,15,19,23 84:18,19 85:10,16 85:18,22 86:9,11 87:19 88:2 89:12 89:13,18,21 90:2,8 90:12,20 91:4,9,10 91:11,16,17,19,22 91:23 92:2,11,13 92:18,23 93:3,7 95:25 97:7 98:2,4 103:14,17,19 104:1 106:14 116:17 117:8 118:7,12,13,22 119:2,4,9,13,16 120:22 121:2 125:11 126:5 132:7,18
**estimate's**  81:20 82:12
**estimated**  103:25
**estimates**  3:12 20:3 38:21 51:22 54:24 55:5 56:11 81:11,24,25 82:8 82:11,12,14 84:1 85:12,25 87:16 96:7,20 97:6

**estimating**  40:1,7 40:9,10 41:6,18 43:17 72:19 73:4 80:9,10,12,14,17
**estimator**  20:23 21:6 103:12
**et**  1:4,7 116:20
**evaluate**  51:22 99:4
**evaluated**  89:16
**evaluation**  48:25
**event**  8:9 69:12,13 91:11,17,21 106:4 138:19
**everybody**  70:2 95:6
**evidence**  50:12 69:20 95:13 97:10
**exact**  16:21 18:15 20:12 63:23 64:15 64:16 68:2 69:16 98:19
**exactly**  7:13 40:6 48:4 59:12 109:2
**examination**  3:2 6:1 14:8
**examined**  5:22 138:5
**excessive**  55:2 126:25 127:3
**excuse**  27:9 29:24 44:20 58:13,17 65:22 69:2
**executed**  137:8
**exercise**  93:16
**exhibit**  3:10,12,14 3:15 31:22 37:1 86:20,23 116:2,13 118:8,9,10 134:24 136:4,4

[exhibits - flipping]

| | | | |
|---|---|---|---|
| exhibits  3:8 | faith  10:9 | 57:16 60:4,7,14 | financially  5:1 |
| expectation | false  25:19 26:14 | 62:20 63:3 65:17 | find  8:20 35:25 |
| 132:19 | 26:21 27:20 29:10 | 66:13 67:1 68:4,7 | 37:20 63:12 68:1 |
| expenses  88:3 | 97:17 | 69:19 70:21 71:1 | 68:14,21 111:4 |
| experience  56:19 | familiar  63:8 | 71:4,9,15,17 75:5 | 129:1 130:20 |
| 57:11 61:3,10 | 71:13 93:19 126:3 | 76:19 77:8,16 | 133:10 |
| 79:18 84:5 99:9 | family  58:24 | 81:14 83:17 84:9 | fine  45:14 71:15 |
| expert  51:21,23,24 | 109:22,25 | 84:21 86:3 94:5 | 96:11 134:16,16 |
| 51:25 52:2,7,8,8 | fans  58:14 125:17 | 94:11,15,18 95:12 | 134:17,18 |
| 52:10,13,15 53:3 | far  13:8,9 34:25 | 95:20 96:2,5,14 | fingers  116:7 |
| 53:14,15,18 55:3,6 | 37:21 64:21 77:25 | 97:9,17 99:17 | finish  57:16 72:15 |
| 55:7,7 56:1,3 | 94:3 | 100:10 101:1 | 110:17 |
| explain  73:23 | father  101:24 | 102:12 103:13,21 | finishes  89:3 |
| 85:11 86:10,11 | 110:13,14,25 | 104:3 107:6,15,23 | fire  20:6,8 38:21 |
| explained  39:2 | 111:17 | 108:14 111:11 | 40:13,15 72:21 |
| 119:21 | feature  76:4 | 112:5 113:17 | 74:9 80:1 |
| explaining  73:17 | features  88:12 | 117:20 120:6 | fireplaces  89:5 |
| 73:20 | 89:3 92:9 | 122:2,19 124:3 | firm  4:22,24 22:3 |
| extended  33:1,9 | federal  138:15 | 127:24 128:3,9 | 22:4,8 29:20 |
| 33:11 124:16 | feel  114:18 | 129:3 130:12,16 | 129:1 |
| extra  120:1,2 | feeling  113:18 | 130:21,24 131:3,6 | first  5:21 15:4 |
| extreme  119:19,23 | fees  33:15 | 131:9,22 132:3,11 | 21:16 37:4 38:13 |
| 122:17 | feet  102:17,17 | 132:21 133:12,16 | 38:24 39:9 45:8 |
| | 106:22 125:1 | 134:14,19 135:18 | 63:12 64:9,24 |
| **f** | feldman  2:15 5:14 | felony  72:12 | 67:17 68:2 70:3 |
| f  88:21 | 5:14 9:23 10:18 | fences  44:5 | 70:23,24 72:17 |
| facility  39:14,16 | 12:1,11 13:1 | fifth  40:8 | 73:4,6 74:7 76:18 |
| 41:3 | 22:22 23:12,25 | figured  109:1 | 94:12,16 100:19 |
| fact  23:22,23 24:3 | 24:4,8,10,13,20 | file  11:7 13:25 | 100:21,24 101:20 |
| 24:7,17 26:16,24 | 25:9,19 26:14,21 | 30:17 33:23 34:14 | 102:10 104:23 |
| 26:25 76:16 90:18 | 27:5,7,18,23 28:1 | 34:22,24 35:1,7,10 | 105:13,14,15 |
| factor  93:2 | 28:6,16 29:21 | 35:12,22 47:6 | 106:17 108:1 |
| factors  98:1 120:2 | 30:3 31:4,24 | 64:1,13 71:13 | 112:7,17 114:3,11 |
| facts  50:11 95:12 | 32:10 33:6,9 | 101:3 110:5 | 115:12 119:15 |
| 97:10 | 34:16 35:4 36:19 | 118:25 128:19,25 | 120:17,21 121:4 |
| factual  61:19 | 36:23 43:10,12 | 130:18 | 123:18 |
| fading  109:23 | 44:8,23,25 45:7,12 | file's  119:1 | five  104:11 133:13 |
| fail  16:15 | 48:13 49:4,7 | filed  4:17 14:3 | 133:16 |
| failed  119:17 | 50:11,16 51:7 | 30:22 | flip  116:15 |
| 121:8 | 52:11,17,22 54:10 | filters  55:1 125:14 | flipping  37:8 |
| fair  62:21 104:14 | 54:12,16 55:19 | | |

Page 9

[floor - hancock]

**floor** 2:16 108:1,2
**flooring** 58:20,22 109:21
**floors** 61:14 89:5 106:8,10,12 107:1 109:19,24,25 110:17 124:23
**flows** 123:9
**fnol** 63:14 64:6,14 65:13
**folders** 35:25
**follow** 71:6
**followed** 85:9
**following** 5:23 88:5,14 118:2 135:6
**follows** 5:22
**foot** 43:4 107:21 125:2
**footage** 88:21 106:21,22
**foregoing** 137:6 138:6,14
**forget** 54:1 95:10
**forgot** 10:22 11:22 47:11 95:5
**formal** 23:5
**forth** 69:8 87:24
**forward** 100:5 134:7 135:21
**found** 19:1,21 31:1
**foundation** 31:4 43:12 48:13 50:11 52:11 62:20 63:3 66:13 69:19 76:19 77:8,16 84:9,21 88:15 95:12 97:9 97:17 103:21 104:3 107:15 112:5 113:17 120:6 122:2

131:22 132:21 133:12
**four** 59:13
**fourth** 40:8
**frame** 88:16
**framing** 80:9,10
**franco** 53:7
**fraud** 30:16,18
**frequently** 90:5
**fresh** 32:1
**friday** 1:16 2:3 4:2 70:15,15
**front** 26:11 27:13 28:11 29:4,5 76:15 77:3,5 119:2
**full** 6:4,20 73:3 116:23
**furnishings** 107:5 107:14
**furniture** 40:24,25 107:17
**further** 56:10 101:5 138:18

**g**

**g** 2:10,10 19:8 88:23 91:3 92:20
**gardens** 14:21,23
**gauge** 126:2
**gen** 129:19
**general** 15:9 61:16
**generate** 90:7
**generic** 89:2
**gentleman** 101:16 102:5 111:13
**gentleman's** 110:24
**geographic** 88:23 90:11
**getting** 77:25 80:3 94:21 98:13,14

106:1 130:13
**give** 12:3 13:5 29:9 31:18 38:5 41:10 59:23 60:17 81:15 97:3 100:24 103:15 104:1,8,9 106:15 125:25 127:10 133:13 134:6
**given** 38:11 135:24
**glad** 29:1
**go** 4:13 17:3 19:19 31:21,24 33:20 34:5,16 36:14 40:13 51:2 63:11 64:4,22 67:1 69:6 70:4,23,24 71:12 73:21,21,24 84:23 87:15,18 93:5 95:3 96:17 97:4 108:16 112:14 117:1 119:1 128:21 129:7,9,14 134:22
**goal** 132:5,9
**goes** 77:9 80:15 123:7
**going** 4:4 8:20,21 8:22 11:13 25:1 29:4,5 31:8,21 32:1,12,23,24 33:3 33:4 34:5 36:6 39:2,3 48:16 49:15 50:2 60:2 60:15,15 63:18,19 64:4 67:4 71:11 71:19 72:14 77:6 77:10,14,20 78:2 86:19 94:9 96:9 99:1,2 101:5

112:15 115:1 116:1,2,3,4,9,16 130:12,15 132:8 132:18 133:18 134:14,21,24 135:6
**good** 4:4 5:9 6:3 29:4 32:20 47:11 57:18,19 61:13,22 67:12 72:2 75:6 80:14 105:9 106:6 115:9 124:21
**gotta** 82:8,10 84:5
**govern** 42:2
**governing** 80:22
**government** 91:1
**grades** 15:10 42:13
**graduate** 14:18,24
**grasp** 77:22
**great** 133:17
**greenspan** 50:13 50:18,20
**greenwood** 6:12
**group** 17:23 18:4
**guess** 12:4,5 70:14 103:15 105:25
**guidelines** 42:5
**guys** 39:1 53:2

**h**

**h** 21:21 88:25 92:22 93:2
**hair** 103:3,4
**half** 17:10 99:14 108:5,6,7,8,9 110:10
**hallway** 108:19
**hampton** 2:15
**hancock** 62:3,5,7 99:14

[hand - hypothetical]

| | | | |
|---|---|---|---|
| **hand**  25:2 32:5 36:2,6,13 64:4 80:15,15 116:1 138:20 | 43:3 56:23,25 107:5,13 119:19 122:9,9,11,11 125:6,7 | 57:3,12 62:13 87:14 105:4,4,8,9 105:10,11 | 124:7 127:25 128:6,13 129:5 130:14,20,23 131:1,5,7,10,24 |
| **handed**  96:23 | **higher**  43:22 | **honest**  95:17 97:3 | 132:4,16,22 |
| **handle**  54:8 127:16,16,17 | **hindsight**  56:5 | **hook**  2:10,10 3:4 5:9,10 6:2 9:24 | 133:15,17,25 134:8,10,16,21 |
| **handled**  11:3 100:18 | **hire**  51:21 52:2,7 52:23 55:6,12,15 56:3 | 10:20 12:8,13 13:3 22:23 23:13 24:1,5,9,11,16,23 | 135:20 |
| **handling**  22:20 30:16 | **hired**  22:15 50:13 55:8,10 56:1 | 25:11,22 26:8,10 26:18 27:2,8,21,25 | **hoped**  134:2 |
| **handouts**  39:24 | **historic**  41:7,9,11 41:15,22 42:3 | 28:5,8,17 29:23 | **hopefully**  129:1 |
| **hands**  38:21 | 51:25 57:7,12,22 | 30:7 31:5 32:1,8 | **hour**  100:20 101:2 110:9,9 |
| **happen**  70:12 | 57:23 62:8 99:14 | 32:11,19,23 33:8 | **hours**  72:10 |
| **happened**  7:19 8:2 10:23,24 11:7 | 122:14 | 33:10 34:18 35:8 | **house**  42:14,21 57:23,24 58:4,5,7 |
| 15:12 38:24 50:5 | **historical**  42:8,11 43:3 62:11 | 36:22 37:3 39:15 43:13 44:10 45:1 | 58:24 61:4 77:14 82:18 98:13 99:9 |
| 67:23,24,25 79:23 101:2 | **hit**  108:15 119:17 | 45:11,13 48:15 49:5,8 50:14,21 | 99:14 105:16,16 105:17,21 106:12 |
| **happening**  53:21 | **ho**  57:23 | 51:8 52:14,25 | 106:15,16,19,23 |
| **hard**  108:17 | **hoa**  124:6 | 54:11,14,19 55:23 | 106:24 107:13,21 |
| **harder**  108:15 | **hold**  18:21 25:3 83:4 94:5 | 57:21 60:6,13,20 62:23 63:6 64:11 | 108:6,6,8,9,21,22 108:23,24 109:3,4 |
| **hardwood**  61:14 107:1 109:19,24 | **holding**  25:17 | 65:18 66:18 67:3 67:11 68:9 69:21 | 112:23,24 113:3 113:10,11,12 |
| **hazardous**  116:6 | **holds**  111:25 | 70:22 71:2,7,10,16 | 114:16,18 117:11 |
| **head**  61:1 131:25 | **holland**  53:4 | 71:18 72:1 75:9 | 117:19 118:3 |
| **hear**  96:16 | **home**  18:7 41:22 42:3,8,11 49:11 | 77:1,12,24 81:18 83:20 84:12 85:2 | 122:7 123:17 124:24 125:3,19 |
| **heating**  89:4 | 57:7,22 59:11,14 | 86:6,18,25 94:7,13 | **housing**  42:13,14 |
| **heavy**  102:24,25 126:6 | 59:15,16,17 61:8 62:16 105:13 | 94:17,22 95:8,16 95:22 96:4,13,15 | **hpoz**  62:11,16 99:24 |
| **heights**  89:1 | 119:17,20 122:9 122:11,12,14 | 97:13,21 99:20 100:14 101:7 | **huh**  10:25 49:6 50:22 54:11 66:8 |
| **held**  4:19 31:15 86:15 | 123:8 124:25 125:2,6,7 126:23 | 102:14 103:16,22 104:7 107:8,19 | **hundred**  59:8 61:5 99:13 104:11 |
| **hello**  26:8 | **homeowners**  48:9 54:9 76:7 87:22 | 108:4,20 111:12 112:8 113:21 | **hypothetical** 99:17 |
| **help**  42:2 53:18 100:5 113:1 119:13 120:14 126:1 | 91:6 92:4,16 93:12 124:5 | 114:24 115:8 116:9,14 117:3,24 | |
| **hey**  129:15 | **homes**  41:12,15 51:25 56:23 57:1 | 120:9 122:5,23 | |
| **high**  14:18,21,23 15:1 42:15,18 | | | |

[idea - kind]

**i**

idea  12:4
identification
  86:23 116:13
  136:5
identified  134:17
identify  92:8
  95:15
identity  12:22
ii  32:6
immediately  69:16
  69:18 118:2
imply  49:2
important  46:18
  48:4 57:9 63:20
  76:16 99:15
impression  112:10
  114:19
impressions  112:9
improper  60:5,15
  127:20
improperly  10:12
improprieties
  60:16
improvements
  124:11
inadvertent  111:9
incident  33:24
include  85:1,3,5
  88:3 89:22 90:3
  132:14
included  45:18
includes  45:5
including  35:14
  88:5,13 90:10
  120:16
inclusive  33:14
income  42:14
incomplete  99:17
incurred  88:4

index  3:1
indicated  101:6
indicating  26:23
  31:9 37:17 48:21
  64:5,7 68:6,16
  71:10 86:18 116:8
  118:18
individual  112:13
infla  92:25
inflation  93:2
inflationary  93:1
inflicted  30:14
inflush  92:25
informal  135:19
information  8:19
  9:5,7 64:1 79:4
  90:18,21 130:19
initial  12:10 48:8
  50:6 51:1 63:16
  134:11
initially  77:17
inside  107:14
inspect  101:8
inspected  101:4,6
inspection  63:16
  63:17 65:3,7,8,14
  65:16,19,23 66:22
  67:23 69:3,8,10
  70:1 75:24 77:4
  117:23
inspector  76:23
  77:10
instruct  47:13
insurance  1:7 5:15
  6:18,23 22:21,24
  33:11 62:17 79:20
  79:24 80:22 84:17
  87:11,13,22 90:25
  91:6,13 92:4,16
  93:12,15,17 94:2
  96:8

insured  26:4 43:8
  45:21,23 62:15
  67:22 69:4 70:9
  70:10,14 79:1
  86:1,9,11 87:20
  88:4,13 90:12
  91:5,10,19,20
  92:14,21 93:10
  102:2 124:1
insured's  47:20
insureds  47:8,14
  48:20 49:9,10,23
  50:8,9 51:4 54:9
  55:11,14 57:10
  65:4
intention  51:14,16
intentional  30:9
  74:10
intentionally  28:2
  28:9 30:14
interested  5:1 71:2
  138:18
interfere  4:10
interference  4:8
interior  89:3
intermediate  17:2
internet  129:21
interrupt  24:12
  50:17
interruption  32:15
  64:8 67:7 68:8
  86:24 111:10
  115:4 133:21
interview  73:8
inundated  107:22
investigate  100:2
investigation
  56:10
investment  87:10
invoice  125:22
  127:12

involved  11:18
  12:14,15 13:7
  20:6 53:3,4,7,14
  64:12 76:21 82:2
  98:13 99:16
  124:16
issue  45:22 52:16
issued  91:14
issues  7:20,22 10:3
  10:7
item  98:10
itemize  92:6
items  53:17 73:21
  121:2 125:22,25

**j**

j  2:15 89:7 93:5
jim  53:4
job  1:23 17:17
  18:1,3,25 19:20
  20:19 21:17 52:19
  57:19 59:5,6,9
  84:8,14 99:12
  126:17,18
jobs  22:17
judgment  31:2
july  6:10
jury  29:5,6

**k**

k  1:24 2:4 21:21
  89:9 90:15 138:3
katie  4:24
keep  24:11 39:17
  63:1 87:15,18
  88:1,6 89:11 95:6
keeps  129:17
kept  90:8
kinam  21:19 22:6
kind  11:12 36:2
  58:10 72:25 75:7
  78:19 80:15 109:4

Personal Court Reporters, A Veritext Company
818-988-1900

[kind - loss]

116:6 132:17
**kitchen**  89:6
**knew**  111:3
**know**  10:11,24
  11:23 13:6 28:15
  29:2 30:11 32:4
  34:25 36:11 37:21
  44:9 48:3,10
  50:25 51:24 52:18
  56:17 57:10,25
  58:7,12 59:16,25
  63:7,23 66:16
  69:15 74:9,12
  76:13 78:4,9
  79:15,17 81:5,9
  82:6 94:3 95:14
  97:2,22,25 98:11
  98:19 101:22
  102:5 103:6,8,24
  104:5,9 106:1
  107:18 108:2,3
  110:16 111:20
  112:6,11 114:17
  121:18 122:20,20
  122:22 123:4
  126:8 128:4,5,10
  128:12 129:6
  131:17 132:24
  133:5
**knowledge**  38:6
**known**  93:16

**l**

**l**  19:8
**l.a.**  15:4,5,6,13,16
  16:7,19 17:13,15
  123:4
**labor**  88:7 90:10
**lack**  104:3 113:17
**lacks**  31:4 43:12
  48:13 50:11 52:11
  62:20 63:3 66:13

69:19 76:19 77:8
  77:16 84:9,21
  95:12 97:9,17
  103:21 107:15
  112:5 120:6 122:2
  131:22 132:21
  133:12
**lady**  102:13
**land**  89:19
**landscape**  37:10
**laptop**  128:21
  129:7,9,13,24
  130:1,11,13,15,17
**large**  42:24 53:9
  106:3,6 119:16,19
  122:9,11 124:15
**largest**  123:10
**las**  33:25 61:8
  65:20
**late**  70:15
**lath**  119:25
**law**  2:10 23:4,5,25
  24:14,20 25:9
  29:13,20 81:1,7
  83:12 97:10
  128:25 129:9
**laws**  137:5
**lawsuit**  11:4,8,15
  30:9,25 31:15
**lean**  108:7
**learn**  39:1,4 44:4
**leave**  8:21 17:17
  18:6,25 19:19
  21:13 22:1 98:10
**left**  21:4,17 22:9
  22:11 31:25
**legal**  44:8 54:12
  81:14
**letters**  35:15
**level**  123:18,19,19

**levels**  123:18
**liable**  31:1,15
**library**  129:9
**license**  111:24,25
**licensee**  87:5,19
  90:5,19 91:3,8,12
  91:13,14 92:13,17
  93:3
**licenses**  90:17
**lie**  23:9,19,21,24
  24:3,7,18 25:8,18
  26:13,20 27:4,6,10
  27:11,17,19 28:1
  28:13,23 29:4
**lights**  110:20,21
  110:22
**limit**  33:12
**limited**  35:15
  42:17
**limits**  32:25 33:9
  33:11 92:24
**linda**  5:11 102:1,2
  102:10 103:20,23
  113:22,23
**line**  19:17 121:2
  121:8,11 123:7
  125:22,24
**listed**  92:9
**listen**  28:16
**litigation**  11:18
  12:15 37:24
**little**  18:7 34:3
  50:19 53:23 77:25
  82:2 102:18 126:6
  126:25
**living**  88:21
  109:14,20
**llp**  2:15
**loan**  89:20
**located**  4:20 88:19

**location**  88:23
  90:12 124:20
**long**  6:22 15:6,19
  17:9 18:3,21
  19:17 20:24 21:24
  54:3 74:9 104:8
  110:7 126:2
**longer**  50:19 82:2
**look**  11:14 28:10
  29:4 32:3 33:17
  33:20 36:8,15
  38:8 42:21 45:14
  52:7 54:23 64:5
  71:4 86:16 104:19
  106:3 110:22
  116:3,18,23 117:4
  128:18 129:3
  130:22 135:21
**looked**  37:10
  101:3 104:16,21
**looking**  68:15
  100:20 101:2
  116:19
**looks**  36:17 37:4,9
  126:25
**los**  2:4 4:1,20,21
  61:9 137:2 138:2
**loss**  7:18,19 8:9
  11:17 12:16,18,22
  33:2,24 41:11
  42:3 43:8 46:23
  47:20 48:1 49:25
  50:4,5 56:8 58:9
  61:11 63:13 64:9
  64:21 65:1 69:12
  69:13 70:10,17,23
  70:24 73:11 74:8
  74:10,11 75:22
  76:18 77:7,21,21
  81:2 100:25 101:4
  101:6,8 104:24

**[loss - mutually]**

106:3,6 112:22
114:4 115:13,24
117:11,14 118:2
119:21,21 120:13
120:17 121:21,25
122:16,16,24,25
123:10 124:14,18
124:21
**losses** 41:22 123:3
**lost** 34:3 74:13
135:16
**lot** 7:23 39:23
57:18 68:12,20
96:6 105:4 106:12
106:13 110:22
124:23,23 125:14
125:16,18,19,24
126:6 127:4 130:4
130:7,9
**low** 42:14,18
**lrn** 95:3,5,11
**lunch** 71:12,22
**luxury** 42:15

**m**

**m** 21:21
**mackey** 48:18,24
49:14,14,21,22
52:6 66:9 101:13
101:23 110:12
111:2,5,14,15,18
111:22 115:14
**mackey's** 49:18
55:22
**mailed** 91:19,24
**mails** 35:15 81:10
81:17
**maintain** 135:10
135:11,14
**makeshift** 80:3
**making** 33:6 62:24
70:17 93:13

**man** 21:22,23
**manager** 9:9
**mandated** 75:25
76:2 77:11
**manner** 81:10,11
82:14
**manual** 38:1,2,3,4
38:5,8
**marc** 2:15 5:14
71:11 111:9
**mark** 116:2,9
**marked** 86:22
116:12 136:3
**mary** 1:24 2:4
138:3
**massive** 69:12
77:7
**material** 42:2
88:17 90:11
**materials** 78:24
88:7,18 89:2
**matter** 4:16 7:16
9:11 10:10 30:2
31:19
**mean** 36:12 45:14
47:14 62:2,10,12
82:10 85:20 97:12
**meaning** 51:23
**means** 30:11 33:7
**measure** 40:16
**media** 4:14 32:13
32:17 67:5,9
71:20,24 115:2,6
133:19,23 135:25
**mediation** 53:2
**medium** 103:1,2
**medley** 1:24 2:5
4:24 138:3
**meet** 70:11,15
**meeting** 68:22
70:9,14 112:7

**memory** 114:10
**men** 66:15
**messages** 35:16
**met** 26:2 56:20
69:4 87:25 111:8
119:20
**methods** 90:7,14
90:19
**mfeldman** 2:17
**michelle** 56:20
62:2 101:12
**microphones** 4:6
4:10
**middle** 6:7,8 77:19
**midst** 77:18,22
**mike** 115:14
**mild** 108:12
**million** 57:4 99:15
108:23,24 109:1,5
109:6
**mills** 63:2,4,7,8
**mind** 12:24 32:5
37:14 39:17
108:25
**minutes** 133:14,16
**misleading** 93:15
93:17
**misread** 89:24
**missing** 80:4
**misspeaking** 44:23
45:2
**misstate** 24:2,17
**misstatements**
122:1
**misstates** 23:25
24:14,20 25:9
34:16 69:19 84:9
84:22 96:2 97:9
101:1 132:3,11
**misstating** 23:23
24:7 96:5,10

**mistake** 85:6
**mitigating** 77:18
**mitigation** 7:20,25
8:8 10:13 53:6,9
54:21 66:14,19
100:13 117:8,10
127:8,15 132:15
132:25
**mitigator** 125:16
**mocked** 40:22
**moderate** 42:14
108:12
**molding** 42:22,24
42:25 106:13
110:18
**moment** 32:9
**monday** 70:16
**monetary** 33:12
**money** 128:7,10
128:11 131:19
132:13
**montclair** 6:12
**month** 69:6
**months** 50:4,7
54:4,5,6
**morning** 4:4 5:9
6:3 32:20 67:12
67:13 70:16
101:10
**move** 16:17,19
100:5
**moved** 16:14
79:25 107:10
**movers** 125:17
**moving** 105:24
106:1 134:7
**mullin** 2:15 29:20
**multiple** 89:17
**mutually** 135:4

**[n - old]**

| n | | | |
|---|---|---|---|
| **n**  19:8 21:21 | **nonstandard** 88:25 | 115:10 | 28:8,19,20 29:1,1 |
| **name**  4:22 5:9 6:4 | **nook**  109:22 | **objection**  60:13 | 29:8,15,19 30:12 |
| 6:7,8 8:12,13,14 | **noon**  71:11 | 96:4 111:11 | 30:19 31:8,10,18 |
| 8:17 9:8 12:24 | **normally**  125:15 | **objections**  5:6 | 31:21 32:23 34:13 |
| 13:4,5 17:12 | **note**  4:6 68:16 | 24:9 54:16 | 35:3,13,23 36:1,6 |
| 18:12 19:5,24 | 70:4,8 101:5 | **obligate**  93:3 | 36:14,18,22 37:13 |
| 21:18 96:12 | **notes**  35:16 63:21 | **obligation**  23:4 | 38:1,7,11 39:1,4 |
| 101:22 102:6 | 64:2,3 65:11 68:2 | **observe**  104:23 | 39:16 41:5 42:1 |
| 110:24 111:20 | 68:10,21 76:24 | 105:12 | 42:12 43:14 44:21 |
| **named**  138:5,10 | 100:20 128:23 | **observed**  102:11 | 45:11 47:19 50:7 |
| **names**  66:16 | 129:16,18 | 117:18 | 53:20 55:4 56:1 |
| **nature**  62:14 82:3 | **notice**  3:10 31:22 | **obtain**  9:4,7 | 56:15,25 58:10,24 |
| 83:2 99:11 | 32:1 33:17 34:6 | **obtained**  90:20 | 61:19 62:15 63:9 |
| **necessarily**  27:25 | 36:24 64:9 70:16 | **obviously**  36:20 | 63:18,19 64:17 |
| **need**  31:6,9 62:17 | 135:19 | **occasions**  7:9 | 65:10,15 66:10,21 |
| 63:22 126:22 | **noticed**  120:13 | **occur**  41:22 | 66:25 67:20 68:18 |
| 133:10 | 125:13 | **occurred**  33:24 | 68:25 69:1,11 |
| **needed**  53:15 56:9 | **noticing**  5:8 | 67:20 106:4 | 70:7 71:9,18 73:1 |
| 85:9 120:13 | **notified**  63:24 | **october**  63:16 | 73:2,10 74:5,18 |
| **needs**  39:17 72:24 | 69:22 | 67:24 68:22 69:5 | 75:2 76:10 77:5 |
| **negative**  125:17 | **notify**  135:13 | 101:4 119:3 | 77:13,25 79:19,23 |
| **neighborhood** | **notwithstanding** | 126:18 | 80:11 82:20 83:1 |
| 62:4 105:3,5,6,11 | 90:17 | **offer**  41:21 43:16 | 83:10,21 84:3,7 |
| 107:13 | **november**  1:16 | 92:21 | 85:14 87:15,18 |
| **neutral**  51:24 | 2:3 4:2,5 138:20 | **offered**  43:24 | 93:6 94:18 98:5 |
| **never**  38:11 42:9 | **number**  4:14 | **offhand**  58:1 | 99:6 103:3,19 |
| 42:10 48:20,22,25 | 32:17 33:12,23 | 63:25 128:15 | 104:14,22 105:12 |
| 49:1,6,13 51:13 | 34:8,13,20 35:13 | **office**  36:20 130:9 | 107:20 110:2 |
| 78:22 79:6,8,8 | 36:12 54:2 67:5,9 | 135:13 | 112:12,16 114:2 |
| 94:2 | 71:20,24 88:25 | **offices**  2:10 | 114:24 115:12 |
| **new**  65:1 125:15 | 115:2,6 131:18 | **official**  87:8 | 116:1,23 117:9,14 |
| **nice**  94:8 102:13 | 133:2,3,10,13,19 | **oh**  11:13 44:24 | 117:17 118:7,21 |
| 105:4,11,11,16 | 133:23 134:25 | 68:1 71:9 87:7 | 119:14 120:15 |
| 109:4 122:12 | 135:25 | 106:20 109:4 | 121:24 122:12,13 |
| **nine**  22:7 | **numbers**  36:21 | **okay**  8:2 9:1,10,14 | 123:10,14,24 |
| **nineteenth**  2:16 | | 10:9,21 11:11,17 | 124:14 125:6,11 |
| **nodding**  131:25 | o | 12:21 13:7,16 | 125:22 126:21 |
| **nonprivileged** | | 14:12,16 17:9 | 133:9,17,25 134:8 |
| 35:7 | **o**  6:6 21:21 | 20:17,21 23:8 | 134:10,18 |
| | **o'clock**  101:9 | 24:11,13 25:7 | **old**  59:17 99:13 |
| | **oath**  23:2,3 32:21 | 26:2,4,10 27:12,17 | 103:5,6,11,19 |
| | 67:14 72:3 100:24 | | |

Page 15

[older - point]

older 59:17 62:14 104:19 105:4
oliver 5:11 102:1,2 102:10 103:23
omit 96:9
once 7:10 13:19,21 132:1
ones 35:24 59:22
open 33:4 44:6 98:10
opinion 97:3
opportunity 18:8 18:9 19:1,21 22:14
opposed 84:18
oral 31:6
order 37:15
organize 105:25
organized 68:10
orientation 37:11
original 135:11,14 138:14
outcome 5:2 10:23
outstanding 57:20 89:20
overall 39:2
overbroad 54:10 54:12 62:20 75:5 99:18 117:20
overhead 88:9 98:3,3
overland 2:11
overlay 62:8,11
oversized 110:19
owed 46:6,10

**p**

p.m. 65:25 67:21 71:21,25 115:3,7 133:20,24 135:24 136:6

pacific 17:22 18:3
packet 116:15 117:5
page 3:2,9 5:23 27:13,14,16 32:5 33:21 34:6 37:4 118:19 119:2,15 120:17,21 121:4 133:14
pages 1:25 129:2,4 131:2
paid 33:10 38:18 50:6 53:25 54:1 100:6
painting 58:20,22 61:15
palmas 33:25 61:8 65:20
paper 23:17,17,20 23:21 24:18 25:3 25:4,4,5,8,17 26:11,20 28:11,21 32:7
paper's 24:6 27:22
paperwork 68:12 98:15
paragraph 92:9 92:20 119:14 122:1
paragraphs 92:7
park 62:3,7 99:14
parking 130:2,4,7 130:9
part 8:7 42:15 51:9 63:19 90:25 107:7 123:10
partial 122:25
particular 85:24 96:22 121:1
parties 4:12 33:15

parts 35:9
party 4:25 90:21
pay 21:10 49:15 54:22,24 76:1,24 98:16,20,21,22,24 99:1,2,3 125:15 126:4 127:12,22 128:7 131:19,21 131:23 132:1
paying 53:22,23
pcm 22:3,5,9,11 22:17 23:1
penalties 29:11
penalty 137:5
people 102:4 105:24,24 110:11 119:12 123:8
percent 125:5
percentage 80:11
perform 61:14,14
performed 10:8
perjury 29:12 137:5
permits 75:23 88:11 98:7,11 132:25
permitted 48:24
person 13:4 111:5 111:15,19,21
personally 14:2 31:15
perspective 56:6
pertaining 81:13
pertains 138:14
phan 56:20 62:2 101:12
phones 4:9
photograph 37:9
phrased 24:14
physical 89:22 90:3 102:15,16

pick 4:7 123:13
picture 50:19 135:1
pictures 57:3 110:2,4 117:17,21 117:25
piece 25:3 28:11 32:6
pipe 114:9
place 4:9,12 37:15 38:16 138:10
plaintiff 2:2,9 4:16 8:15
plaintiff's 86:23 116:13 136:4
plaintiffs 1:5 5:10 5:13
plan 47:16
planned 112:22,24 113:1
plans 6:14 88:11 98:8,11 132:25
plaster 41:2,4,17 52:12 61:14,17 106:8,9,13 107:3 109:13,14,16 110:17 119:25
platform 43:18,21
play 73:9
played 29:5
playing 73:13,15 78:3
please 4:6,8 5:6,18 6:3 32:3,6,9 36:7 64:16 87:2 89:11 93:5 117:7 119:15
plenty 128:7
plus 46:9 109:2
point 24:11 60:15 64:19 81:22 109:23 115:15

Personal Court Reporters, A Veritext Company
818-988-1900

[point - range]

133:14 134:5
policies  38:8 43:25
  74:21,24 75:1,3,6
  75:7,11 76:5,6
  79:1
policy  26:5 32:25
  33:12 43:9 44:7
  44:11 46:2 47:20
  48:9 54:9 74:16
  76:4,8,12,15 87:22
  91:7,13 92:4,16,24
  93:1,12 96:8
  117:16 124:5,6
portfolio  56:22
portion  79:2 80:14
  120:20
portions  35:7
position  18:18,21
  19:14,17 20:22,24
  113:4
possible  10:17
  70:18 78:17
possibly  12:24
power  9:4,6
practice  42:2
  80:22
practices  40:1
  41:19 80:14 87:13
precautions  62:16
preceding  91:15
prefer  134:3
preferred  50:9
preloss  113:2,3,4,8
  113:8
preparation  96:19
prepare  83:15
prepared  117:9
preparing  84:18
  95:24
present  2:19 5:3
  66:2,4 94:9

101:25
preservation  62:8
  62:11
presume  9:3
pretty  17:6 68:10
  73:17 76:21 79:15
  84:4 106:3,5
  114:14 132:20
price  33:13
priced  62:22
prices  62:21
prior  13:16 138:5
private  4:7 115:13
  115:16,18,20
privileged  29:21
  30:5
probably  9:3
  103:9,10 108:16
  109:1,6 118:24
  119:7 127:9
  128:16
procedures  38:9
  79:1 85:8
proceed  48:18,24
  49:1,10 72:5
proceeding  5:6
  36:3
proceedings  32:15
  64:8 67:7 68:8
  86:24 111:10
  115:4 133:21
  136:6 138:13,16
process  42:2
produced  3:15
  34:24,25 35:6,10
  35:12 37:22
  116:17 128:25
  130:18
production  33:21
profit  88:9 98:6
  128:1

project  63:1 77:7
projected  92:6
projects  59:19,21
  60:23,25 62:3
promised  134:20
promotion  21:9
prop  40:12,18
  42:19
properly  83:15
property  13:7
  41:7,8,11 43:15,17
  43:24 67:18 68:3
  69:6 81:2 88:24
  89:15 100:22,25
  105:3,14,15
  114:11
propose  135:6
props  41:4 42:17
  80:18
provide  42:1
  43:14 48:17 61:7
  73:8 83:21 91:8
  91:16 92:18,19
  93:23 135:15,18
provided  35:5,22
  36:23 43:6 52:5,6
  79:19,20 90:15
  92:3
provides  44:12
  87:22 91:7 92:5
  92:16 93:12
provision  93:20
provisions  90:16
  93:1
public  82:1
pull  75:23
pulled  106:11
pulling  125:16
purchase  76:9
  91:25

purchased  74:17
purport  118:1
pursuant  90:22
  91:15 93:17
pursue  15:8 16:9
put  36:20 80:5
  84:1 101:5 110:6
  113:5 129:14,15
  129:19,20,24
  132:7,13
pyrotech  19:25
  20:4,21,25 21:15
  22:2
pyrotechnic  21:13
  22:21

q

qualified  52:1,19
  52:20 56:7,16,18
  57:13 60:1 61:7
  61:12,20 99:23
question  9:18,21
  9:25 25:23 28:16
  28:24 31:12 50:15
  50:16 52:22 60:5
  60:10,17,18 73:3
  85:14 94:5,12,13
  94:16 96:16
questions  60:8,15
  60:16 63:21 116:4
  129:11 134:11
quickly  69:13
quite  114:21,22
  134:23
quoted  78:6

r

r  6:6,6
rafters  80:10
ran  119:18
range  36:8 104:2,8
  104:10 106:15

[range - replacement]

110:9 131:16
**ranged** 110:17
**raw** 121:22
**rcv** 44:21,25 45:2
45:3 47:3
**reached** 119:12
**read** 36:8 39:24
87:1 89:24 93:25
95:24 96:21
119:14 120:4,8,11
120:12,15,15,21
120:23,24 121:1
**reading** 87:15,18
88:1,6 89:11
93:22 120:19
**ready** 31:18
**real** 16:18 17:3,5
**really** 72:24 85:13
95:17 112:11
**realms** 59:13
**reason** 12:4 70:11
72:5,7 120:10
**reasonable** 54:7
54:15 56:5 59:24
60:8 90:6,14
93:16 111:5
127:19
**reasonably** 62:22
88:3
**reasons** 69:17
**rebuild** 77:15
82:18 88:4 89:14
113:10
**rebuilding** 49:11
90:10
**recalculate** 93:3
**recall** 7:12 8:10,11
11:19,21 12:12
13:2 17:25 39:23
40:6 46:16,17
48:14,14 59:21

65:11 72:9 73:5
78:13,15,21 83:13
94:21,23 96:22,23
96:24 97:3 101:25
105:6 113:24
114:4,10,13
115:19,21,24
118:25 121:7
131:13
**receive** 78:24
80:21,24 81:8
83:14 94:25 95:18
118:22
**received** 35:14
72:16 81:3,6
90:22 119:5,8,9
120:4,18 125:11
**receives** 45:21
**receiving** 94:23
**recess** 71:22
**recognize** 116:21
**recollect** 17:1 61:1
**recollection** 11:24
59:23 72:23
106:16,17 131:14
**reconstruct** 89:15
**reconstruction**
90:9
**reconvene** 71:14
**record** 4:5,13 5:5
6:4 9:2 27:12,15
29:3 31:7,8 32:12
32:16,24 33:5
35:5 36:19 45:8
60:19 67:1,4,8
71:19,23 115:1,5
130:24 133:18,22
134:1,22 135:23
**recorded** 1:15 2:1
4:15

**recording** 4:11
**records** 134:18
**recover** 47:2 48:3
74:22,24
**recoverable** 44:18
44:21 45:3 73:22
**reduced** 45:20
138:11
**reevaluate** 11:12
**refer** 35:16 75:18
96:11
**referred** 86:21
116:11 136:2
**referring** 63:21
96:3
**reflect** 27:12 90:9
117:18
**reflective** 43:19
**refresh** 72:23
**regard** 83:22
**regarding** 43:15
78:25 80:21,25
81:7 85:24 95:19
96:1,19 98:12
**regulation** 94:15
94:20
**regulations** 80:22
81:12 84:8,14
87:8 93:20 94:3
94:14 95:7 97:1
97:25
**relate** 35:16
**related** 4:25 99:5
**relating** 11:14
41:11 86:8
**relied** 90:19
**relieved** 135:8
**relocate** 6:14
**remain** 33:3
**remediation** 20:7
54:8 56:2 58:10

77:15 127:7
**remember** 8:3,13
8:14,17 9:16,18,21
9:25 10:2,3,6,16
10:19 11:9 12:21
12:23 13:8,13
16:21 17:13,13
18:15 20:12 38:25
39:8 40:25 42:23
46:22 54:2,4 59:4
59:12 60:21,25
63:25 66:15 76:14
79:25 102:6,18
103:4 104:6 105:7
106:8 109:18,20
110:19,24 112:14
112:19,21,25
113:24 114:1,8
118:24 120:19
124:4,20 128:15
131:11
**remodeled** 56:23
57:1
**remotely** 5:4
**removal** 88:10
**removed** 107:9
**renewal** 87:21
91:6 92:4,15,21
93:11 96:8
**repair** 113:11,12
**repairs** 46:13
**repeat** 10:5 31:13
60:22 114:5
**replace** 80:6 89:14
125:9
**replacement** 3:12
33:1,11 43:9
44:12,17 45:15,16
52:5 56:4,11 61:7
62:18 75:1,3
76:17 83:15,23

[replacement - says]

84:18,20 85:10,15
85:22,25 86:9
87:17,20,23 88:2
89:12,18,21 90:2,8
90:13,20 91:4,7,9
91:11,16,18,22
92:2,5,11,13,17,19
92:24 93:4,7,13
95:24 96:6,20
124:8,15,16
**report** 116:20,24
118:10 120:5,16
121:5
**reported** 1:24
**reporter** 4:24 5:17
5:21 26:23 31:7
39:12,17 64:7
72:24 86:17,22
95:4 116:8,12
117:2 135:8 136:3
138:24
**reporter's** 116:9
**reports** 35:15
**represent** 116:16
**representation**
30:2
**representing** 5:15
**request** 33:21
35:21
**requests** 34:7,9
**required** 63:1 77:6
77:15 90:24 91:15
100:1 130:16
138:17
**requirement**
87:23
**requirements**
80:25 83:22 85:24
95:19,23 96:1
**resale** 89:19

**research** 109:3
**reserve** 128:22
131:18,23 132:1,5
132:10 134:11
**reserves** 128:14
129:6,11,14,15,18
129:20,25 130:19
131:11 132:7,13
133:4
**residence** 50:10
65:20 118:2
**residential** 69:13
119:22 122:16,24
**resolve** 50:24
51:17,18 52:4,15
54:21 55:12,21
56:3 119:13
120:14 132:5,9
**resolved** 10:21
119:11 132:20
**resolving** 79:12
**respect** 30:1 56:10
62:15 74:6 83:11
83:25 85:7 93:14
**respond** 69:14,15
69:18 82:21 83:7
**response** 31:6
39:18 69:12 71:3
**responses** 35:5
36:24
**responsible** 48:11
**responsive** 35:20
**restoration** 19:23
20:1,4,22 21:14
22:21
**result** 132:24
**results** 92:24
**retained** 136:1
**return** 113:13
**returning** 81:16

**review** 11:7 32:4
46:2 47:20 71:13
135:12 138:16
**reviewed** 125:13
**revised** 92:12,13
92:18
**revision** 92:23
**rewalk** 49:25
**rfps** 36:24
**richter** 2:15
**ride** 81:4
**rider** 75:16
**right** 11:1,2 14:10
14:11 20:15,19
23:22 25:4,5,8,15
25:17,25 26:5,19
27:3,14,17 28:5
29:16 31:7 32:20
33:16,20 37:3,5,22
39:8 45:9 49:16
50:10 56:15 59:19
60:6,14 61:2
64:14 69:25 72:19
72:24 82:6 84:8
84:14 93:5 100:15
101:16 103:12
104:1,11,16,25
106:24 108:10
111:4 113:10,13
114:22,24 115:9
117:4,12,16 118:5
118:11 119:1
120:17 122:7,10
124:13 126:16,18
126:19 127:23
128:8 130:1,10
131:9,21 132:2,6
132:10,23
**riverside** 58:3,25
59:1 61:4

**role** 73:9,13,16
78:3
**romero** 11:6
**roof** 80:10 88:17
**roofing** 88:17
**roofs** 80:3
**room** 5:3 40:13,15
40:18,18,19
109:15,15,20,22
109:22,25
**rooms** 40:21 41:2
80:9 106:10 123:9
124:22
**rosemead** 18:12
18:14,18
**rough** 132:17
**rule** 83:4
**rules** 11:14 42:5
81:13 86:8
**running** 122:6
**rush** 113:19
**ryan** 2:19 4:22

**s**

**s** 6:6 19:8 89:6
**san** 2:16 61:23
**sat** 38:25
**save** 56:2
**saw** 98:2 103:25
104:15 105:15
108:18 109:13
110:18 114:9
117:22 126:9
**saying** 24:17,22,24
27:21,22 28:14,18
30:20,24 39:19
52:9 79:10 99:25
111:16 114:9
126:20 128:11
**says** 26:25 28:12
32:6 66:1 96:6
119:2 126:16

Personal Court Reporters, A Veritext Company
818-988-1900

[says - sorry]

129:15
**scale**  53:6,8,8,9
**schaefer**  2:19 4:22
**schedule**  70:9,13
**scheduled**  68:16
**school**  14:18,21,23
  15:1 17:2,12,14
**science**  16:10
**scope**  77:7
**scratch**  32:2
**second**  33:20
  39:21 40:3 46:24
  51:2,19 67:2
  79:23 80:7 108:1
  117:23 123:19
**section**  87:1,6
  90:16,24 92:10,20
  93:10,18 96:12
**secured**  119:24
**see**  20:13 25:24,25
  26:8 34:2,7,14,19
  35:18 40:17 43:19
  65:7,11,12 68:15
  68:19,21 70:9,17
  70:17,19 74:7,8
  100:18 105:1
  107:7,11,13,17
  109:7,12 114:15
  114:15 118:17
  119:3 121:25
  124:19 126:5,23
**seeing**  61:10 76:18
  106:8 109:20
**seen**  119:22
  122:16,21
**segundo**  123:15
**select**  43:7
**selecting**  57:11
**senior**  101:23
**sense**  99:5 112:3

**sensitive**  4:7
**sent**  35:14 53:1
  135:10
**sentence**  91:15
**september**  33:2,25
  50:5 63:15 64:18
  67:20 69:22
  126:17
**series**  34:6
**servpro**  3:14 53:1
  100:7 101:19
  102:4,8 115:14,22
  115:23 116:17,23
  118:4,10 120:16
  121:4 122:15
  125:12
**set**  49:24 62:13
  65:14,24 67:23
  68:23 70:1 87:2
  87:24 102:24
  128:14,15,22
  131:19 133:2,8,9
**sets**  133:7
**setting**  37:14
  134:11
**settle**  78:11
**settled**  33:14 46:7
  82:13
**settlement**  32:25
**settling**  51:5 73:11
  79:2
**seven**  50:7 54:5,5
**severe**  108:13
**sewage**  121:19,22
**share**  113:19
**sheds**  44:5
**sheer**  119:23
  122:17
**sheesh**  111:3
**sheppard**  2:15
  29:20

**sheppardmullin....**
  2:17
**shingles**  80:4
**short**  53:23 70:16
**shorthand**  138:10
  138:24
**show**  59:24 60:7
  101:6
**showed**  105:13,18
  105:20
**shows**  118:3,4
**side**  17:6 37:16
  126:7
**siding**  88:18,18
**sight**  28:7
**signature**  138:23
**signed**  29:19,25
  30:1,4
**significant**  114:7
**similar**  43:1
**simple**  25:23
**simultaneously**
  92:21
**single**  9:21,25
  58:24 89:15
  123:21,22
**singley**  19:6,14
  20:11,14
**sir**  6:3,7,17 7:5
  8:19 14:18 23:2
  24:9 29:13 31:3,6
  31:13 32:3,21
  33:16 34:2,4,19
  35:18 36:7,12,16
  37:6,11,14 39:17
  44:6 45:11,15
  46:21 47:1 48:4,7
  49:6 50:15 51:3
  52:2 54:15 55:24
  60:21 63:18 68:14
  68:23 70:24 71:8

72:3 85:13 86:16
  87:1 93:21 95:17
  96:16 115:9 116:1
  116:15,21 117:4
  118:19,23 120:5
  121:6 131:12
  133:25 135:20
**site**  66:10 69:3
  70:1,24 110:8
  114:4,8 119:20
  126:12,13
**sitting**  101:16
**situation**  55:21
  79:13 121:21
**six**  6:24 136:1
**size**  89:9 105:9
  106:14,19,20
  119:23 120:14
  122:17 124:21
  125:25 126:23
  127:16
**sketch**  40:16,16
**skin**  102:22,23
**skinned**  102:20,20
  102:21
**skip**  93:5
**slope**  88:20
**slow**  44:25
**small**  42:23 77:21
  83:3 113:25
**smoke**  40:15
**sneak**  60:18
**sold**  22:7
**solely**  92:25
**solve**  79:15,16
**somebody**  11:25
  78:8 114:9 127:10
  127:14
**soon**  70:18 135:22
**sorry**  8:13 25:21
  28:25 34:3 36:12

[sorry - system]

44:18 58:18 68:20
85:5 86:4 87:7
90:1 96:17 100:12
111:8,12 114:5,5
**sort** 21:6 39:7 73:8
75:16
**source** 90:21
**sources** 90:7,14
**south** 61:8 65:20
**space** 8:22 88:22
**speak** 11:6
**speaking** 24:9
60:13 72:25
**special** 62:16 76:3
76:4 85:8 86:8
**specific** 9:8 10:6
38:7 80:25 81:8
83:21 85:13 95:18
95:19,23
**specifically** 41:20
47:2 48:2 74:14
81:23 82:5 84:16
95:25 96:3 123:6
**specifics** 10:11
81:7 83:10 96:19
100:17
**specified** 92:7
**speculate** 12:6,6,7
**speculation** 10:18
104:4 107:16
122:3 128:3
**speech** 60:12,17
60:19
**speeches** 60:10
**spell** 6:4 19:7
21:20
**spelled** 6:5,6 19:8
**spend** 101:2
130:24
**spent** 100:19

**spoke** 110:13
**square** 88:21
106:21,22,22
107:21 125:1,2
**ss** 137:1 138:1
**stack** 36:1,6,13,15
116:1
**stamp** 134:25
**stamped** 37:5,10
135:1
**standard** 43:5
87:24
**standards** 3:12
63:1 87:16 96:19
96:25 97:15
**stands** 95:6
**stapled** 116:5
**start** 17:24 18:14
20:9 106:1 112:12
134:25
**started** 6:25 20:21
38:13 80:2 109:10
109:23 123:23
126:16
**state** 5:4,7 6:3
27:3 29:3 32:23
33:5 35:4 96:4
105:20 137:1,5
138:1,4,25
**statement** 26:12
26:12 27:22,23
28:13,22 93:14
**statements** 31:8
121:6
**states** 1:1 4:17
**stating** 23:22,22
26:24,25
**statistical** 90:18
**statute** 97:8
**stay** 22:5

**stead** 135:17
**step** 63:10,10
**steps** 90:6
**steven** 111:2
**stiff** 100:7,11,12
**stipulation** 135:7
**stolen** 135:16
**stories** 88:25
**story** 106:23
107:21 123:15,16
123:17 124:25
**strategies** 78:10
**strike** 105:10
**structure** 88:4,13
88:19 89:7,10,14
90:12 127:16
**structures** 44:1,5
**stucco** 61:18
**stud** 80:10
**studied** 15:16
**study** 15:8 16:8
**stuff** 125:15,16
**stupid** 28:12
**subchapter** 87:12
**subcontractors**
57:14,18 61:13
**subdivision** 90:15
92:22 93:2
**subdivisions** 87:24
93:9
**subject** 34:14
35:17 67:18
100:21,25 114:11
**submit** 54:25
**submits** 82:17
99:3
**submitted** 98:15
98:21,23 99:2
100:4
**substantial** 77:15

**substantially**
104:19
**substantive** 114:3
**substantively** 73:6
**sudden** 74:12
**sue** 8:4
**suffered** 108:9
**suggest** 24:14
71:11
**suggestion** 12:23
**suing** 8:6,7
**suitable** 135:16
**suite** 4:21
**superiors** 79:5
81:4
**supervisor** 21:17
78:25 102:6,7,8
**supplies** 88:8
90:11
**supply** 119:17
121:8,11
**supposed** 47:20
69:14,15,16 70:10
82:15,21
**sure** 7:13 8:5 9:6
9:12 32:10 33:6,7
38:3 43:11 48:22
62:18,24 63:4
67:3,24 68:13
71:17 84:11 99:4
111:24 116:19
117:1 121:8,8
129:22,23 134:19
**suspect** 125:23
127:18
**suspecting** 127:20
**swear** 5:18
**sworn** 5:21 138:6
**system** 80:17 89:5

Page 21

[take - told]

| t | | | |
|---|---|---|---|
| **take** 4:12 25:1,3 32:3,8 36:7,13 38:16 62:17 63:10 64:5 68:24 80:23 82:7 84:1 86:16 90:6 95:11 97:4 110:2 114:24 116:3 117:4 126:23 127:1,11 127:14 128:18 130:10 133:15 | **telephone** 91:18 91:21,23 **tell** 9:7 23:3,4 28:9 38:23 46:14,14,21 47:1,4,8,9,12,13 48:2,7,12,16 49:9 49:10 66:21 68:1 69:25 73:13 77:20 81:5 82:4,8 84:16 85:8,23 86:7,14,14 97:19,20 98:12,14 105:2 107:24 109:2 110:20 120:7 123:6 126:14 131:1,3,7,8 131:17 | **thanks** 68:7 **thereto** 135:14 **thin** 102:24 **thing** 40:9 57:10 63:11 65:6 71:1 116:19 132:12 134:21 **things** 16:14 34:9 50:22 54:25 77:11 105:24 106:1 **think** 20:10,18,18 41:9 42:10 44:23 45:7 46:19 53:12 53:18 56:7,9 57:9 63:9,25 67:24 69:7 77:14 78:8 78:18,19 79:17 80:8 81:3,22 83:3 95:10 99:15 101:19,22 102:8 102:18,25 103:11 106:10 108:7,22 108:23 110:7,19 111:21 112:19 115:18 117:2 121:11 123:12 124:19,25 125:23 125:24 126:22 134:6 | 123:15,16,17,18 123:20,25 **throw** 94:10 **tile** 61:15 **tiles** 110:1 **time** 5:7 6:20 17:22 19:25 21:7 31:25 32:13,18 33:2,22 46:7 48:6 49:24 51:2 54:7 54:15,18 66:22 67:5,10 68:19,24 69:12,16 71:20,25 81:10,11 82:9 91:10,20 101:8 104:20 105:14,15 105:22 107:25 112:7,13 115:2,7 117:22 120:1,2 131:6 133:19,24 134:7 135:20 138:10 |
| **taken** 2:2 4:15 7:4 9:10 13:17,19,22 14:7,8,12,15,16 44:17 71:22 72:8 72:11 138:9 **takes** 82:2 132:25 **talk** 74:4 **talked** 11:9 72:17 73:4 78:2,3 114:1 115:24,25 | **telling** 23:23,23 24:3,18 25:18 28:21 48:11 78:4 112:21,25 **ten** 21:25 40:20 **term** 75:17 **terminology** 121:18 **terms** 21:10 75:7 84:22 104:16 111:6 **test** 80:23 82:8 84:1 | | **timeline** 100:17 **timeliness** 81:13 **timely** 82:14 **tired** 134:5,8 **title** 21:4,7,11,12 87:6,7,10 91:1 **today** 26:5 29:8 31:19 32:25 33:4 33:13,14 34:10,21 35:21 36:10,16,25 66:1 67:22 129:12 134:3,24 135:20 |
| **talking** 55:8 67:17 79:11 85:15 95:20 112:19 **tall** 102:19,23 **taught** 73:19 84:17 **teach** 78:5,10 **teacher's** 17:2,7,8 17:9 **teaching** 40:11 **team** 101:19 102:9 119:12 120:13 **tech** 15:5,13,17 16:4 **technical** 63:19 75:17 **teen** 103:8 **teenager** 103:7 | **testified** 5:22 **testify** 72:9 138:7 **testifying** 29:12 **testimony** 29:10 29:10 31:19 72:6 84:10 132:3,11 134:6 135:24 **tests** 82:7 133:1 **text** 35:15 **thank** 32:6,11 37:13 39:19 93:19 135:20,22 | **third** 40:5,6 90:21 123:19 **thought** 17:3 20:11 57:13 106:18 108:24 109:4 122:15 134:14 **thousand** 59:8 61:5 100:8 **three** 18:22,24 20:15 59:3 91:20 91:24 109:17 | **today's** 134:2 135:2,4,24 **toilet** 121:19 **told** 26:19 46:16 48:20 49:1,13 52:20 61:24 81:23 82:4 128:24 |

**[tomorrow - variations]**

**tomorrow** 68:17
**top** 80:3 87:4
    116:6 123:23
**topic** 72:15 79:9
    79:21
**tort** 30:11
**torts** 30:9,14
**total** 45:5,16 73:22
    118:14 135:25
**tour** 39:7,11,13,13
    39:16
**tract** 59:14,16
    89:17
**trade** 15:5,13,16
    16:3
**train** 39:3 43:23
    74:2,5 78:7 83:11
    95:25 96:18
**trained** 38:20 39:3
    40:2 51:3 79:8
    82:24 83:24
**training** 38:14,15
    38:18,21,23 39:22
    41:1,5,10,14,18,21
    41:24 42:12,16
    43:7,15 44:4
    51:10 72:15,18
    73:6 78:2,8,14,15
    78:19,22 79:9,21
    79:22,24 80:12,16
    80:20,24 81:3,5,6
    81:8 83:14,18,19
    83:22 84:4 94:25
    95:18 96:24
**transcript** 8:21
    135:11,12 138:13
    138:15,17
**transmitted** 85:25
**trapped** 68:5
**treatment** 90:24

**trial** 135:15
**tried** 50:23,25
    51:13 55:20 56:1
    69:7 70:2 81:9
    98:21,22 119:11
**true** 35:11 56:12
    84:11 100:18
    134:4 137:6
    138:12
**truth** 23:4,9,21,23
    25:13,18 27:19
    28:1 29:3 138:7,7
    138:8
**truthful** 26:12
    27:22,23 28:13,22
    29:9
**try** 49:19 51:4,21
    52:4,7 55:12 56:3
    60:18 70:20 79:15
    81:4,9 82:13 97:5
    100:5 119:13
    127:1
**trying** 7:12 23:14
    25:21 51:11,18,19
    68:21 69:8,9
    78:11 100:7,11
    105:23,24 109:17
    123:13 132:9
**turn** 4:9
**turned** 22:2
**two** 7:12 13:11
    15:20 38:15 41:6
    42:16 59:3 80:11
    106:23 107:21
    109:16 124:25
**type** 7:16,22 16:8
    20:2,22 43:15
    52:16 74:3,16
    78:22 88:15,16,17
    88:18 89:4,9
    107:13 124:1,6

**types** 43:24 47:21
    74:15,24 89:2
**typewriting**
    138:11
**typical** 69:11
**typically** 120:21
    125:25

| u |
| --- |

**uh** 66:8
**ultimately** 53:20
**unavoidable** 120:3
**understand** 23:2,6
    23:8 24:21,24
    25:20 28:24 29:6
    29:13 30:8,10,17
    30:19,21 31:2,3,12
    31:14,16 32:21
    34:10 39:18 43:11
    47:19 50:24 53:17
    61:23 62:7 67:14
    72:3 82:10 85:20
    115:10 121:23
    127:21 134:3
**understanding**
    14:9 35:9 81:15
    82:15 83:9 86:2,4
    86:10 99:10 113:9
**understood** 61:24
    62:2
**undertook** 70:1
**undisputed** 48:6
**unfair** 87:12
**unintelligible** 98:6
**unique** 62:14
**unit** 4:14 32:13,17
    43:19 67:5,9
    71:20,24 115:2,6
    123:15 133:19,23
**united** 1:1 4:17
**units** 123:20
    135:25

**unnecessary** 7:24
    8:1
**unreasonable**
    78:12
**unruly** 36:13
**update** 92:23
**updated** 92:12,18
**uploaded** 82:13
    110:4
**upset** 78:6,9 79:10
**upstairs** 106:9
    108:16 109:8,15
    109:24 119:18
**usc** 112:19
**use** 38:2,4 49:13
    49:14 55:14
    135:17
**usually** 128:21

| v |
| --- |

**v** 1:6
**vague** 12:11 22:22
    24:15 43:10 63:3
    65:17 77:16 83:17
    86:3 94:6,11,13,19
    102:12 107:6,23
    108:14 112:5
    117:20 122:19
    124:3
**vaguely** 8:3 40:24
**valuations** 87:14
**value** 3:13 43:9
    44:12,16,19,22
    45:3,9,15,16 46:7
    52:5 58:5,7 73:22
    83:16 84:25 85:3
    86:12,13 87:17
    89:19 93:8 96:20
    98:9,11 108:22
**valued** 44:7
**variations** 75:2

Personal Court Reporters, A Veritext Company
818-988-1900

[varies - written]

**varies** 99:10
**vendor** 10:13 12:9
  55:14
**vendors** 48:17
  55:17
**verbal** 31:7
**verify** 90:6
**veritext** 4:19,23
  4:24 136:1
**version** 71:5
**versus** 4:17 44:7
  44:12
**video** 1:15 2:1
  4:11,15 45:13
**videographer** 2:19
  4:4,23 5:17 32:12
  32:16 67:4,8 68:6
  71:19,23 115:1,5
  133:18,22 135:23
**videotaped** 29:2
**view** 39:2
**visit** 114:4,11
**visited** 100:21
  115:13
**volume** 1:17 2:1
  32:6 135:2 137:15

**w**

**w** 6:6
**wait** 48:17
**waited** 50:7 69:5
**waiting** 48:22
**waiver** 29:19 30:1
**walk** 46:24,25
  48:8 50:8 51:20
  67:18 109:8 111:8
  114:18
**walked** 46:23 68:2
  109:8
**walking** 48:1
**wall** 89:1 117:23

**wallpaper** 40:23
  42:20 106:10
**walls** 80:10 89:5
  107:3
**want** 11:23 12:7
  13:5 23:15 31:24
  45:8,14 48:3,10
  49:14 59:25 63:23
  81:5 82:6 85:11
  94:11 96:11 97:22
  100:12 116:18
  129:3,6,7,10
  130:10,21 131:3
**wanted** 15:15 17:3
  18:7 49:23 55:14
  71:4 72:15 113:10
  134:19
**warranted** 53:13
**watch** 116:7
**water** 7:18,19 8:9
  11:17 12:15,18,22
  33:24 38:22 54:8
  56:2 58:9 63:13
  69:12,13 72:22
  74:11 77:7 80:2
  105:17,19 106:3
  107:22 108:10,12
  108:17 110:23
  114:14,16 117:11
  122:6 123:7,12,22
  124:21 125:4
**way** 11:3 24:14
  76:22 109:10
  113:5 116:5
  123:16
**we've** 36:23
  130:18
**weaknesses**
  127:10
**week** 38:15 41:6
  42:16 72:17 73:5

73:6 79:24 80:7
**weeks** 80:11
**went** 8:3,6 10:22
  15:2,4,5,13 16:7
  17:18 46:23 48:1
  52:21 66:1 69:7
  77:13 100:25
  109:22 114:16
  124:21,21 131:1
**west** 2:16
**whatsoever** 10:4
  12:2 78:14
**whispering** 4:7
**white** 23:16,20
  25:4,5,13 26:17,17
  26:24 27:1,14,16
  102:17,20,22,23
**wilshire** 2:3 4:20
**wind** 38:22 40:13
  72:22 80:2
**wire** 68:4
**wish** 111:1,3
**witness** 5:18 10:19
  12:2,3,7,12 13:2
  24:21 25:10,20
  26:16,24 27:6
  29:22 30:6 39:13
  43:11 44:9,24
  45:10,11 48:14
  50:13,18 52:12,18
  52:24 54:17 55:20
  57:17 62:21 63:4
  64:9 66:14 71:2
  71:12 75:6 76:20
  77:9,17 81:16
  83:18 84:11,24
  86:4 94:21 95:5
  95:14 97:11,19
  99:19 100:11
  101:3 102:13
  103:14 104:5

107:7,17,24
  108:15 112:6
  113:18 117:21
  120:7 122:4,20
  124:4 128:4,10
  131:23 132:12
  134:5,9 135:12
  138:5,20
**woman** 21:22
**wonderful** 60:13
**wondering** 127:19
**wood** 106:8,10,12
  109:24 110:17
  119:25
**words** 36:11
**work** 17:18 18:10
  19:1 20:2 21:24
  22:14 49:19 59:2
  61:5,25,25 71:16
  73:14 74:20 118:4
  118:8 120:24
  127:8
**worked** 17:1,1
  20:11,14 57:4,6
  59:20 60:23
  109:10 122:24
  123:3,11,12
  124:14
**working** 66:15
  111:6
**works** 56:21 61:11
  61:24
**worse** 45:14
**worth** 58:4 99:14
**wow** 108:23
**write** 40:17
**written** 8:23 9:2
  34:8 35:5,13
  36:23 42:2 78:24
  85:24 121:4

Page 24

[wrong - zone]

| | |
|---|---|
| **wrong**  13:5 54:25<br>**wrote**  126:10 | **younger**  104:19 |
| **x** | **z** |
| **x**  129:15 138:17<br>**xactimate**  80:17 | **zip**  43:18,20,21,21<br>**zone**  62:8,11 |
| **y** | |
| **y**  19:8<br>**yeah**  14:5 17:8,16<br>  20:16 21:3,8<br>  22:12 30:6 35:19<br>  41:16 43:1,4 44:2<br>  44:3,15 49:19<br>  51:13 52:10 53:5<br>  53:15 58:6 60:14<br>  61:21 62:24 66:1<br>  66:20 68:12 70:8<br>  71:10 76:25 79:14<br>  95:22 96:14 97:19<br>  102:19 104:5<br>  106:5,6,21 109:5<br>  112:2 114:6<br>  115:17 117:1<br>  122:8 123:1<br>  129:13 131:5<br>  132:18 133:10<br>  134:5,17<br>**year**  6:15 14:24<br>  15:7,12 16:3,19,22<br>  17:10 19:9 20:9<br>  21:13 22:1 89:7<br>  95:10 99:13<br>  117:12,12,13<br>  128:2<br>**yearly**  80:23<br>**years**  6:24 7:12,14<br>  13:10,11 15:20<br>  18:5,22,24 19:18<br>  20:15,25 21:1,2,25<br>  22:7 59:3 123:25 | |

Personal Court Reporters, A Veritext Company
818-988-1900

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.